UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>RCG ADVANCES, LLC, a limited liability company, f/k/a Richmond Capital Group, LLC, also d/b/a Viceroy Capital Funding and Ram Capital Funding,<br><br>RAM CAPITAL FUNDING LLC, a limited liability company,<br><br>ROBERT L. GIARDINA, individually and as an owner and officer of RCG ADVANCES, LLC,<br><br>JONATHAN BRAUN, individually and as a *de facto* owner and an officer or manager of RCG ADVANCES, LLC, and<br><br>TZVI REICH, a/k/a Steven Reich, individually and as an owner and officer of RAM CAPITAL FUNDING LLC, and as a manager of RCG ADVANCES, LLC,<br><br>    Defendants. | **Case No.: 20-CV-4432** |

**DEFENDANTS RAM CAPITAL FUNDING LLC AND TZVI REICH'S
MEMORANDUM OF LAW IN OPPOSITION TO THE COMPLAINT AND IN
SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

I.      TABLE OF AUTHORITIES…............................................................  i

II.     PRELIMINARY STATEMENT........................................................  1

III.    STATEMENT OF FACTS.............................................................  4

IV.     ARGUMENTS............................................................................  9

        **POINT I**
        **THE COMPLAINT MUST BE DISMISSED BECAUSE IT**
        **FAILS TO STATE A CAUSE OF ACTION**…………..………………………  9

        **POINT II**
        **COUNT I OF THE COMPLAINT FOR MISREPRESENTATION**
        **MUST BE DISMISSED**………………………………………………………….. 15

                A. **PLAINTIFF'S CLAIMS FAILS TO SATISFY THE**
                   **PLEADING REQUIREMENTS OF RULE 9(b)**……………… 16

                B. **THE PLAINTIFF FAIL TO ALLEGE ANY SPECIFIC**
                   **MISREPRESENTATIONS BY DEFENDANTS**……………… 17

                C. **PLAINTIFF IS PRECLUDED FROM OFFERING**
                   **EXTRINSIC EVIDENCE**…………………………………….. 18

        **POINT III**
        **COUNT II OF THE COMPLAINT FOR UNFAIR USE OF**
        **CONFESSION OF JUDGMENTS MUST BE DISMISSED**………………….. 20

        **POINT IV**
        **COUNT III OF THE COMPLAINT FOR USE OF**
        **UNFAIR COLLECTION THREATS MUST BE DISMISSED**……………… 22

        **POINT V**
        **COUNT IV OF THE COMPLAINT FOR ALLEGED UNAUTHORIZED**
        **WITHDRAWALS MUST BE DISMISSED**………………………………… 23

V.      CONCLUSION…………………………………………………… 24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

Amalgamated Bank of New York v. Marsh,
    823 F. Supp. 209, 215 (S.D.N.Y. 1993)…………………………………  11

Ashcroft v. Iqbal,
    556 U.S. 662, 678 (2009)…………………………………………………  10

Bell Atl. Corp. v. Twombly,
    550 U.S. 544, 550 (2007)…………………………………………………  10

Brooke Group Ltd. v. JCH Syndicate,
    87 N.Y.2d 530, 534 (1996)………………………………………………  20

Frith v. Guardian Life Ins. Co. of Am.,
    9 F. Supp. 2d 734, 737-38 (S.D. Tex. 1998)………………………………  10

Global Entertainment Inc. v. New York Tel. Co.,
    2000 U.S. Dist. LEXIS 16038 (S.D.N.Y.  Oct.  31, 2000)………………  10

Harris v. Mills,
    572 F.3d 66, 72 (2d Cir. 2009)…………………………………………  10

In re M  Fabrikant & Sons, Inc.,
    480 B.R. 480, 484 (S.D.N.Y. 2012)………………………………………  11, 16

Kass v. Kass,
    91 N.Y.2d 554, 566 (1998)……………………………………………..  19

Mosella  v. Ali Inc. (In re Mosella),
    190 B.R. 165, 168 (Bankr. S.D.N.Y. 1995), *aff'd*, 193 B.R. 147
    (S.D.N.Y. 1996)…………………………………………………………  11

Richmond Capital Group, LLC v. Bank of America, N.A.,
    No. 57606/2016 (Sup. Ct. Westchester Cty. Aug. 3, 2017)………………  20

Richmond Capital Group, LLC v. Bank of America, N.A.,
    No. 85006/2018 (Sup. Ct. Richmond Cty. Mar. 19, 2018)………………..  20

Richmond Capital Group, LLC v. Bank of America, N.A.,
    No. 85063/2018 (Sup. Ct. Richmond Cty. May 4, 2018)…………………  20

i

Richmond Capital Group, LLC v. Bank of America, N.A.,
No. 85183/2017 (Sup. Ct. Richmond Cty. Feb. 1, 2018)…………………  20

Richmond Capital Group, LLC v. Best Floors,
No. 152722/2017 (Sup. Ct. Richmond Cty. Jan. 29, 2019)……………..  20

Richmond Capital Group, LLC v. Congregation, Inc.,
No. 2018-51838 (Sup. Ct. Dutchess Cty. Sept. 5, 2018)…………………..  20

Richmond Capital Group, LLC v. Paraguaybox Corp.,
No. 150333/2018 (Sup. Ct. Richmond Cty. May 9, 2018)………………… 20

Richmond Capital Group, LLC v. Villa Antonio of Ballantyne, LLC,
No. 69108/2015 (Sup. Ct. Westchester Cty. July 27, 2016)………………  20

Ritchie Capital Mgmt. v. General Elec. Capital,
121 F. Supp.3d 321 (S.D.N.Y. 2015) aff'd 821 F.3d 349 (2nd Cir. 2016)…. 16

Schron v. Troutman Sanders LLP,
20 N.Y.3d 430, 436 (2013)…………………………………………………… 19

Seville Industrial Machinery v. Southmost Machinery,
742 F.2d 786, 791 (3rd Cir. 1984)………………………………………… 16

Sykes v. James,
13 F.3d 515, 519 (2d Cir. 1993) cert. denied, 512 U.S. 1240,
114 S. Ct. 2749 (1994)…………………………………………………...  10

Telenor E. Invest AS v Altimo Holdings & Invs. Ltd.,
567 F. Supp. 2d 232, 441-42 (S.D.N.Y. 2008)…………………………….. 16

Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.
25 NY3d 675, 680 (2015)………………………………………………………..19

## Statutes and Other Sources

Rule 9(b) o f t h e  Federal Rule of Civil Procedure…………………………..4,16,21,23

R u l e  1 2 ( b ) ( 6 )  o f t h e  Federal Rule of Civil Procedure…………………1,9,10,11

Section 13(b) of the Federal Trade Commission Act……………………………   1

Defendants Ram Capital Funding LLC ("RAM LLC") and Tzvi Reich a/k/a Steve Reich[1] ("Reich" and collectively with "RAM LLC", the "Reich Defendants"), by and through their attorneys, Terenzi & Confusione, P.C. and the Law Offices Of Thomas A. Harvey PLLC, respectfully submit this memorandum of law in support of their motion pursuant to Federal Rules of Civil Procedure ("FRCP"), Rule 12(b)(6) (the "Motion"), to dismiss the Complaint filed by the Plaintiff, the Federal Trade Commission ("Plaintiff" or the "FTC") as against RAM LLC and Reich.

## PRELIMINARY STATEMENT

The FTC has commenced the instant action under Section 13(b) of the Federal Trade Commission Act ("FTC ACT"), 15 U.S.C. Section 53(b) alleging three causes of action sounding in fraud including Misrepresentation Regarding Financial Products, Unfair Use of Confessions of Judgment and Unauthorized Withdrawals, and one additional cause of action for Unfair Collection Threats.  As set forth below, the claims against the Reich Defendants should be dismissed pursuant to Rule 12(b)(6) of the FRCP as there are no plausible claims asserted against them.

RAM LLC engaged in the business of offering merchant cash advances ("MCA") to merchants that sought a capital infusion.  In doing so, RAM LLC purchased a merchant's future receivables for an agreed upon up-front purchase price (i.e., the cash advance), and then recovered its purchase from the merchant's receivables, which were debited through a set automated clearing house (ACH) which made withdrawals directly from the merchant's bank account.  Unlike a loan, where the lender has absolute recourse against the merchant business for non-payment, RAM LLC, importantly, had no recourse against the merchant under the terms of the MCA agreements (the "Agreements") if the merchant's business failed and the merchant no longer had any future

---

[1]  Reich is incorrectly named in the Complaint as an owner and officer of RAM LLC and as a manager of RCG Advances, LLC.

receivables.  A merchant only defaults under the Agreements when it makes misrepresentations or takes other affirmative actions to hide, divert or otherwise negatively impact the future receivables. Consequently, RAM LLC bore the risk of failure of the business.  In this sense, and as recognized under well-settled New York law, the MCA is akin to an investment or profit-sharing agreement since the merchant delivers to RAM LLC an agreed percentage of daily revenues only if revenues are received.  For efficiency and practicality, the parties agreed to a specified daily amount to be withdrawn as an estimate, based upon the merchant's historic receivables as of when the MCA was signed.  The Agreements also set forth an estimated time period for the payment of the agreed amount based on how long it would take to pay the agreed amount at the rate of the daily estimate. The Agreements provided for the adjustment of the actual daily debited amount if, upon the request of the merchant and upon the merchant providing certain required evidence of any fluctuation in the actual amount of receivables generated by the merchant.

RAM LLC's acted as a broker in originating MCAs with the merchants, much like a mortgage broker.  The MCA's were then funded by and assigned to other entities for collection and servicing.  RAM LLC used various third-party funding and servicing entities to take over their MCAs, one of which was defendants RCG Advances, LLC ("RCG") f/k/a Richmond Capital Group LLC ("Richmond"), also d/b/a Viceroy Capital Funding Inc. ("Viceroy"), which were operated by Defendants Robert Giardina ("Giardina") and Jonathan Braun ("Braun") (collectively RCG, Richmond, Viceroy, Giardina and Braun are referred to as the "RCG Defendants").  The funding entity, whether RCG or a third party, would actually fund the MCA and take assignment of the MCAs and, through itself and its subsidiaries, would service the MCA, including collecting the payments and enforcing the agreements.  This was all done independent of RAM LLC and Reich.

The Plaintiff, the FTC, incorrectly alleges that Reich held some position and/or authority with respect to RCG Defendants and that, collectively, with the other defendants, Reich and RAM LLC engaged in fraud by perpetrating a number of deceptive and unfair business practices in connection with providing financing under the MCA. (See Complaint at paragraph "11"). The Complaint also alleges, in classically impermissible group pleading, that all defendants deceived and fraudulently induced unsuspecting merchants into entering these Agreements, and then knowingly modified the terms without the merchants' consent.

The Complaint, however, fails to state a claim against the Reich Defendants in a number of respects.  First, Reich and RAM LLC acted entirely independent from the RCG defendants and did not act as a common enterprise as alleged in the Complaint.  In fact, the Complaint includes no factual allegations that indicate otherwise except a bald conclusory statement by the Plaintiff that all defendants worked in concert.

Second, Rich and RAM LLC merely originated MCAs.  They were then transferred to funding companies to be funded and serviced (explained in detail below).  Some of the MCAs originated by RAM LLC were transferred to the RCG Defendants, who were than solely responsible for the funding, servicing, and collection of the MCAs and RAM LLC had no role post origination.  Each and every allegation of fraud or deception cited in the Complaint, even if true, which is disputed, involved the funding, servicing, or collection of the MCAs.  Neither Reich nor RAM LLC were involved in any of the activities that form the basis of the Plaintiff's complaint.  Accordingly, to the extent that any of the allegations in the Complaint concerning the servicing and/or collection of the MCAs were in any way illegal, these claims must nonetheless be dismissed as to RAM LLC and Reich.

Moreover, the Complaint alleges fraud.  Under FRCP, Rule 9(b) fraud most be plead with particularity.  Plaintiff has failed to allege a single fraudulent act attributable to Reich or RAM LLC.  Consequently, the Complaint fails to satisfy the pleading requirements of Rule (9b).

Lastly, the FTC brings the Complaint under sections of the United States Code that are explicitly for the protection of consumers.  However, all MCAs involved business owners.  No MCAs were ever offered or entered into with a consumer.  Accordingly, the Complaint fails to adequately state a cause of action for which relief can be had.

## STATEMENT OF FACTS

The complete statement of the relevant facts are set forth in the Affidavit of Tzvi Reich sworn to on August 9, 2020 (the "Reich Affidavit") and are incorporated by reference herein. Below is a summary of these facts.

### The Merchant Cash Agreements

The Merchant Cash Agreement ("MCA") is a third tier financing instrument typically utilized by businesses who have a need for a cash infusion to keep their business afloat and have exhausted the typical financing methods such as a standard loan, a line of credit, or factoring of account receivables, any one of which are less expensive ways to finance.  As such, an MCA is typically a last resort for a business who has already extended itself and the Merchant is aware that the terms of the financing are going to be more expensive than traditional forms of financing, which goes hand-in-hand with the MCA provider's increased risk of non-payment.

Under an MCA Agreement, the funding entity will purchase a set amount of future receivables from the merchant at a discount.  For example, the funding entity may purchase $100,000 worth of future receivables for $85,000.  The MCA is far different from a loan in that

4

the funding entity does not have an absolute right payment of the $100,000 but, rather, must rely on the business generating that amount of receivables in order to recoup the $100,000 – and the concomitant risk that the merchant's business will not generate the estimated amount of future receivables.

The funding entity and the merchant agree on a set amount that the merchant will pay on a daily basis, typically based on a percentage of historical receivables collected by the merchant, which are debited directly formant the merchants bank account.  The MCA provides that upon request of the merchant the daily debit can be reconciled if there is a decrease in the merchant's receivable in order to lower the daily payment.  Such a request must be submitted along with certain documentation satisfactory to the funding entity in order to show the need and veracity of the merchants alleged change in financial circumstances.  Indeed, absent any MCA Agreement's terms requiring that the reconciliation request must be supported by such documentation, the previously agreed upon estimate of future receivables would be entirely illusory.

Under most MCAs, the merchant may also be required to give a guarantee, a collateral assignment and a confession of judgment in the amount of receivables purchased that will be triggered upon a default.  However, of notable importance, a default does not occur if the merchant failed to collect the required amount of receivables necessary to pay back the purchase price.  Rather, a default occurs only if the merchant takes certain actions to hinder the collection of the purchase amount, such as: diverting the collection of receivable to an account not being monitored and debited by the funding entity; the merchant blocks the funding entities access to the debited account; the merchant makes a material misrepresentation; or the merchant incurs additional debt that collects from the receivables, thereby putting the funding entity at additional risk.

MCAs are typically originated through brokers (the "Brokers") who have the initial contact with the business needing financing, analogous to a mortgage broker.  The Broker will have a relationship with one or more third-party companies that will fund the MCA (the "Funding Company").  The Funding Company will actually underwrite and fund the MCA and purchase the future receivables, as well as being the entity that will undertake the servicing and collection of the MCA.  The MCAs have a provision, which allows the free assignment of the MCA in order to facilitate this process.

Some companies are only Brookers and do no funding, while other companies are Funding Companies, who may originate their own deals, but also work with Brookers to take over the Broker's deals, fund them, and then would be the responsible entity for the servicing and collection of the MCA.  There are also salespeople who are known in the industry as representatives (the "Representative").  Representatives are, in essence, brokers who do not have a relationship with a Funding Company.  A Representative will bring an MCA opportunity to a Broker, who will sign the deal under the Broker's company and then turn the MCA over to a Funding Company to be funded and serviced.  In such a scenario, the Broker will split the origination fee with the Representative in an amount agreed upon among them.

The MCAs do not charge upfront fees, as are typically charged in commercial mortgages.  Those upfront fees in the commercial mortgages context are typically the cost of appraisals and other underwriting costs charged by banks in doing due diligence on prospective borrowers which must be paid at application.  They are payable "up front", with no assurance from the lender as to whether the borrower will be approved for the loan.  The result is that the prospective borrower may incur these costs with no concomitant benefit if they are denied the loan.  No such upfront fees are charged with an MCA.

6

There are, however, fees that are deducted from the purchase price of the future receivables under the MCA.  This will include an origination fee, from which the Broker/Representative is payed its originations commission, as well as the ACH Program fee, which is paid to the Funding Company as compensation for the overhead in servicing and collection of the MCA, which would be deducted from the funding amount but would not be paid by the merchant to the Funding Company.

### Reich and RAM LLC

With respect to the named Defendants, RAM Capital Funding, LLC was a Broker, while Richmond Capital Group LLC was a Funding Company.  Reich began working as an independent Representative/Broker in the MCA business in or about 2014.  Then, in or about May 2016 Reich formed RAM LLC, a New Jersey limited liability company to be a Broker company originating MCAs.  Reich, through RAM LCC, would originate MCAs, either directly or through referring Representatives, and then transfer the deals to one of a number of Funding Companies.  The Funding Company would then: take the deal; do the underwriting; have a funding call with the merchant; make any adjustments to the agreement as dictated by the underwriting and discussions with the merchant; fund the purchase amount; and take on the servicing and the collection under the MCAs.  Accordingly, neither Reich nor RAM LLC had any dominion, control or authority when it came to the actual funding of the MCA or the servicing, or collection thereunder.

In or about July 2016, RAM LLC began leasing office space from Richmond.  RAM LLC and began sending a portion of its MCA deals to Richmond to act as the Funding Company. Richmond created RAM DBA, as a separate and distinct entity form RAM LLC in order to facilitate the collection of the payments under the MCAs written through RAM LLC as Broker. Such an arrangement is common practice in the industry and Reich was informed by Richmond's attorneys that such an arrangement was perfectly legal and did not create any further liability for

RAM LLC.  However, there was no Common Enterprise between Reich and RAM LLC on the one hand and the RCG Defendants on the other.

RAM had a separate private office within Richmond's space and paid rent to Richmond monthly in the amount of $2,400 per month.  RAM LLC did not share staff with Richmond or any of its affiliates.  RAM LLC had its own telephone line and did not share phone lines with Richmond or any of its affiliates.  Although RAM LLC sub-let office space in from Richmond, RAM LLC did not (1) maintain officers and employees in common, (2) operate under common control, (3) commingle funds, and (4) share advertising and marketing.  Neither RAM LLC nor Reich had any ability to make any decision with respect to any funding made by Richmond, Viceroy Capital Funding LLC ("Viceroy") or any other affiliated company.  Neither Reich nor RAM LLC, or any entity in which Reich held an interest, owned any interest, either directly of beneficially, in the RCG Defendants.  As set forth in paragraph "36 of the Reich Affidavit, Reich was likewise never an employee of any RCG Defendant and had no management position, power, or authority of any kind with respect to any of the RCG Defendants and had no authority as to any decisions made by RCG Defendants.

RAM LLC did not have any exclusive sales agreement with Richmond or any other Funding Company.  Neither Reich nor RAM LLC had any non-compete, non-disclosure, or any other type of agreement, either orally or in writing other than MCAs as to which RAM LLC brokered and Richmond acted as the Funding Company.  Neither Reich nor RAMLLC did any joint advertising or marketing with any of the RCG Defendants.

Reich, through RAM LCC, originated MCAs and would then seek a Funding Company that would offer the best deal for RAM LLC and the merchant.  Ram employed a large network of Funding Companies and had no form of exclusive arrangement with RCG Defendants.  In fact, of

all the MCAs originated by RAM LCC, only about 20% of those were funded and transferred to Richmond, with the majority being funded by third party Funding Companies,

Specifically, with respect to the MCAs and the allegations of the Complaint, which relate exclusively to funding, servicing and collection issues, neither Reich nor RAM LLC had any authority, or decision-making role in the funding, servicing or collection of the MCAs funded by Richmond.  These decisions that were in the exclusive control of the RCG Defendants included: the amount funded; the fees charged; any requests for reconciliation; any collection efforts including the calling of defaults and the filing of confessions of judgment.  However, since Reich originated the MCA he would, on occasion, be contacted by a merchant with respect to some aspect of servicing the MCA.  On those occasions, he would refer the matter to the Funding Company on that particular MCA, whether Richmond or another, for them to handle, as the MCA had been transferred to the Funding Company.

RAM LLC did no advertising and there were no MCAs that originated from its web site. RAM LLC did not enter into any MCAs with Merchants unless the merchant had a prior MCA. Accordingly, every merchant with which RAM LLC originated an MCA was experienced with the process and had full knowledge as to what was involved.  In fact, with respect to each specific incident referenced in the Complaint, the Plaintiff references actions or documentation relating to the RCG Defendants and failed to identify any conduct related directly to Reich or RAM LLC, except insinuating guilt by association.

## ARGUMENT

### POINT I

### THE COMPLAINT MUST BE DISMISSED BECAUSE IT FAILS TO STATE A CAUSE OF ACTION

Under Federal Rule of Civil Procedure 12(b)(6), a purported cause of action may be

dismissed when the complaint fails to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), the complaint must meet two criteria:  it must assert a plausible claim; and it must set forth sufficient factual allegations to support the claim.  Ashcroft v. Iqbal, 129 S. Ct. at 1949-50 (*citing* Twombly, 550 U.S. 554); *see also* Frith v. Guardian Life Ins. Co. of Am., 9 F. Supp. 2d 734, 737-38 (S.D. Tex. 1998) (explaining that dismissal can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory).

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rule of Civil Procedure ("FRCP"), "a court merely assesses the legal feasibility of the complaint and does not weigh the evidence that may be offered at trial," Global Entertainment Inc. v. New York Tel. Co., 2000 U.S. Dist. LEXIS 16038 (S.D.N.Y. Oct. 31, 2000), and "must construe any well-pleaded factual allegations in the complaint in favor of the plaintiff . . . ." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied*, 512 U.S. 1240, 114 S. Ct. 2749 (1994).

Although the Complaint need not make an evidentiary showing, it must satisfy the pleading requirements of FRCP, Rule 8.  These requirements are now well established as the two "working principles" of the Iqbal/Twombly analysis.  Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).  Under the first principle, a court does not consider the allegations in a complaint that are "legal conclusions," or [t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); *see also* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 550 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do.") (alteration in original).

Second, the Court must determine whether the remaining allegations state a "plausible" claim for relief. Iqbal, 556 U.S. at 679. A "reviewing court . . . draw[s] on its judicial experience and common sense" to undertake this "context-specific task." Id. Where "obvious alternative explanations" for the allegations exist, in light of industry history and the "considered views of leading commentators," Twombly, 550 U.S. at 567, 556, it is less likely that a court can "draw [a]reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A complaint cannot merely plead facts that are "consistent with 'a defendant's liability but that 'stop[] short of the line between possibility and plausibility of 'entitle[ment] to relief.'" Twombly, 550 U.S. at 557. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]' 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In sum, a complaint must cross the line from the "conceivable" to the "plausible." In re M Fabrikant & Sons, Inc., 480 B.R. 480, 484 (S.D.N.Y. 2012).

In resolving a Rule 12(b)(6) motion, the court may consider "documents attached to the complaint as exhibits, or incorporated in it by reference, to matters of which judicial notice may be taken or to documents on which the plaintiff relied in bringing suit." Mosella v. Ali Inc. (In re Mosella), 190 B.R. 165, 168 (Bankr. S.D.N.Y. 1995), aff'd, 193 B.R. 147 (S.D.N.Y. 1996). "In short, the function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Amalgamated Bank of New York v. Marsh, 823 F. Supp. 209, 215 (S.D.N.Y. 1993). Indeed, of particular relevance here is Twombly's admonition that district courts should identify deficiencies in a complaint "at the point of minimum expenditure of time and money by the parties and the court." 550 U.S. at 558 (internal quotation marks omitted).

As set forth below, Counts I-IV of the Complaint must be dismissed as to Reich and RAM LLC for a variety of reasons.   Specifically, Counts I-IV must be dismissed because: (1) the Complaint is fundamentally flawed in that it fails to distinguish between the acts of Defendants Reich and RAM LLC and the other defendants, and (2) the Complaint fails to set forth a plausible claim against either Reich or RAM LLC or set forth sufficient factual allegations to support the claims asserted against these Defendants.

### Common Enterprise

At the outset, in the Complaint the FTC alleges that all defendants acted collectively and operated a common enterprise while engaging in the allegedly unlawful acts and practices set forth in the Complaint. See Complaint at paragraph "11".   In doing so, the Plaintiff utterly fails to distinguish between the acts of Defendants Reich or RAM LLC, and the other defendants named in the Complain, including RCG Defendants, thereby making Plaintiff's allegations impossible to decipher and thus entitled to no weight.  Moreover, the Complaint fails to set forth a single fact in support of their bald and conclusory statement of the existence of this concocted common enterprise.

The fact is that RAM LLC and each of the RCG Defendants are completely separate entities.  As set for the in the Affidavit of Tzvi Reich submitted in support of the Motion (the "Reich Aff."), Reich was never an employee or officer of any of the RCG Defendants and never had any actual or beneficial interest, directly or indirectly, in any of them and had no managerial, decision making, or any other authority whatsoever with respect to any of the RCG Defendants. Reich Aff. at ¶37.  The FTC's bald statement that Reich is a manager of RCG is unsupported by even a single piece of evidence or even a supporting factual assertion forming the basis of the FTC's claim.

While RAM LLC sublet an office within the Richmond leasehold, RAM LLC paid market rent, the office it rented was a separate private office with a locking door. Id at ¶30 and 31. RAMLLC had a separate phone number and did no joint advertising or marketing with the RCG Defendants and had no common employees.  *Id*. at ¶ 33 and 34.

The entity Ram DBA is wholly owned and operated by defendant RCG.  RAM DBA was created by RCG, for the convenience of processing checks received from merchants payable to Ram after the subject loans were transferred to RCG and/or defendant Viceroy by RAM LLC. This is common in the industry and Reich was assured by RCG's counsel that this was legal and proper. Id. at ¶ 47.

There was no exclusivity, non-disclosure, or non-compete agreements between Reich and RAM LLC on the one hand, and the RCG Defendants on the other, and none are alleged in the Complaint.  Moreover, of all the MCAs that Reich and RAM LLC originated and referred to Funding Companies, only approximately twenty (20%) percent were referred to the RCG Defendants for funding, servicing, and collection.

Based on all the foregoing, there is no basis for the FTC to baldly allege that Reich and RAM LLC can be imbued with any wrongdoing that the FTC alleges may have been perpetrated by the RCG Defendants.

### **Reich and RAM LLC were not involved in funding, servicing, or collection**

As explained in detail above, RAM LLC and Reich were solely involved in the origination of MCAs.  Once completed, RAM LLC immediately transferred and assigned their rights under the MCAs to various third party Funding Companies to fund, service and collect the MCAs.  Of the MCAs originated by Reich through RAM LLC, approximately 20% were transferred and assigned to RCG, who controlled the funding and servicing of the MCA going forward.  For those

MCAs assigned by RAM LLC to the RCG Defendants, the ACH, which debited the merchant's account, was under the exclusive control of RCG and Braun.  While Reich, at times, was contacted by merchants, as he originated the MCA and therefore had the initial contact, he would aid in any way he could, but ultimately referred the matter to the Funding Company that had taken assignment of the MCA.  Neither Reich nor RAM LCC had authority or control over any decisions or operations involving the ultimate funding, servicing, or collection of the MCAs.  Again, Reich and RAM LLC were strictly Brokers, whose sole involvement was to originate the MCAs.  The MCAs had clear and explicit language at Section IV 4.2 of the MCA which provided that RAM LLC "may assign, transfer or sell its rights to receive the Purchase amount or delegate its duties hereunder, wither in whole or in part without prior notices to Merchant."  After the assignment all decisions with respect to funding, servicing and collection were with the sole control of the Funding Company and RAM LLC played no role.

Accordingly, Plaintiff's allegations regarding deviations from the terms of the Agreements are wholly irrelevant and inapplicable to Reich and RAM LLC.  Although Plaintiff broadly alleges that all defendants engaged in fraud and deception by circumventing, ignoring, or abusing the written terms of the Agreements, RAM LLC and Reich's responsibilities and involvement were limited solely to negotiate and enter into the original MCA.  It is the Funding Company which then underwrites, makes and modifications, services (which includes debiting the account and handling any reconciliation), as well as any collection efforts.  As such, the performance of the Agreements in practice were not controlled by RAM LLC.  Rather, RAM LLC's position is similar to that of a broker, in that RAM LLC would enter into these contracts with merchants and then immediately assign these agreements to third parties, including RCG and its subsidiaries, who would then fund and service the contracts.

14

At no time did RAM LLC or Reich commit any fraud or engage in acts of deception by deviating from the terms of the Agreements, as is illustrated by the Complaint's failure to allege to the contrary.  All the instances cited in the Complaint by the FTC are attributable to the RCG Defendants and there are no facts or actions that attributable directly to Reich or RAM LLC.  Any failure to appropriately reconcile merchant debits pursuant to the agreements would have been committed by RCG Defendants.  The determination of whether to declare a merchant in default and enforce the guarantee, security interest, or confession of judgment was likewise entirely controlled solely by the RCG Defendants.  Moreover, any complained of collection tactics are solely the action of the RCG Defendants and there are no alleged facts implicating Reich or RAM LLC in any of these alleged wrongful acts.  As a result, the FTC's overzealous attempts to foist liability upon Reich and RAM LLC for actions undertaken by the RCG Defendants are without any factual basis and are, therefore, unavailing and must be dismissed.

### POINT II
### COUNT I OF THE COMPLAINT FOR MISREPRESENTATION MUST BE DISMISSED

In the instant case, the Plaintiff claims that the Defendants misrepresented their financing products by falsely claiming that they do not feature a personal guaranty or upfront costs and promise consumers a specific amount of financing but provide a much smaller amount. See Complaint at paragraph "15".  The Plaintiff's claims are unavailing.

To state a claim for misrepresentation, the "complaint must allege that the defendant made a material misrepresentation of fact; that the misrepresentation was made intentionally in order to defraud or mislead the plaintiff; that the plaintiff reasonably relied on the misrepresentation; and that the plaintiff suffered damage as a result of its reliance on the defendant's misrepresentation." *PT Bank Central Asia, New York Branch v. ABN Amero Bank NV*, 301 A.D.2d 373, 376 (1st Dep't 2003).  The Plaintiff's claims must be dismissed as to the Reich Defendants due to the fact that the

allegations relied upon in Counts I of the Complaint, as set forth in detail above, are not attributable to Reich or RAM LLC.

### A. Plaintiff's Claims Fails to Satisfy the Pleading Requirements of Rule 9(b)

Initially, the Plaintiff's allegations regarding the alleged misrepresentations fail to satisfy the pleading requirements of Rule 9(b).  "The purpose of Rule 9(b)'s particularity requirement is to place the defendants on notice of the precise misconduct with which they are charged and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  Seville Industrial Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3rd Cir. 1984); *see also* Ritchie Capital Mgmt. v. General Elec. Capital, 121 F. Supp.3d 321 (S.D.N.Y. 2015) *aff'd* 821 F.3d 349 (2nd Cir. 2016); In re M Fabrikant & Sons, Inc., *supra* at 57-58 (holding that claims of actual fraud must identify "the dates, amounts and other relevant circumstances of the particular transfers that it contends were made with the actual intent to defraud creditors"). "In short, a plaintiff must set forth the who, what, when, where and how of the alleged fraud." Telenor E. Invest AS v Altimo Holdings & Invs. Ltd., 567 F. Supp. 2d 232, 441-42 (S.D.N.Y. 2008).

In this case, there are simply no facts alleged, of any specificity whatever, in the Complaint regarding any specific representations made by the Reich Defendants to any specified or identified merchant.  Other than spouting conclusory allegations against all defendants named in the Complaint, which are entitled to no weight on a motion to dismiss, the Plaintiff has failed to plead any facts or point to any actions taken by the Reich Defendants that could form the basis for finding that the elements of the cause of action for misrepresentation are satisfied against them.  Thus, even if taken as true, the Complaint, on its face, fails to state a plausible claim for relief, which is sufficient to withstand a motion to dismiss.

**B. The Plaintiff Fail to Allege any Specific Misrepresentations by Defendants**

Upfront Fees

The Plaintiff alleges that Defendants falsely advertise to merchants that they charge "no upfront costs" but actually charged merchants the upfront cost of an origination fee and ACH program fee. See Complaint at paragraph "19".   However, these are not upfront costs, despite Plaintiff's mischaracterization.  Rather, these fees are applied at closing, *after* the parties execute and enter into the Agreements, and are fully disclosed within the Agreements.  Thus, Plaintiff appears to simply not have an understanding of what the term "upfront fee" entails.  As explained in the Reich Aff., in financing, upfront fees are fees paid by a borrower in advance of being approved for financing.  These will typically include such things as appraisals and other due diligence fees required by certain lenders, typically on commercial financing deals.  These fees are non-refundable despite the fact that the borrower may be denied the funding based on the appraisal or due diligence not meeting the criteria of the lender. Rein Aff ¶14.  No such "upfront fees" were charged in respect to any MCAs entered into by RAM LLC, as Ram LLC funded the MCAs without receiving any fees in advance. The only fees charged were those deducted from the funding amount and were fully disclosed in the MCA agreements.

Personal Guaranty

The Plaintiff similarly alleges that Defendants advertise that merchants can obtain a cash advance with no collateral or personal guarantee, but the agreements deceptively state otherwise. See Complaint at paragraphs "16" and "17". Again, the FTC critically points to no such representations by the Reich Defendants but only makes reference to the RGC Defendants' advertising, which plainly fails to support a claim against the Reich Defendants.  Notwithstanding

the foregoing, the advertisements are irrelevant as the agreements specify plainly and clearly, with no deception, that the MCA "embodies the entire agreement' between the parties and "supersedes all prior agreements, and understanding relating to the subject matter hereof." See paragraph "4.9" of the MCA attached as Exhibit "A" to the Reich Affidavit. Clearly, any merchant signing a guarantee, or a collateral agreement is deemed to know what they are signing.  These are not consumer transactions but involve businesses and businesspeople.  As stated on the Reich Aff, RAM LLC only originated MCAs with merchants that already have had at least one prior MCA. See Reich Aff. at ¶55.  Consequently, and owing to this fact, no merchant that did business with the Reich Defendants can truthfully claim that they did not know the parameters and requirements of an MCA.  MCAs are a high-risk, high-yield financing tool, which are often a last resort to address a merchant's cash flow issues, typically after traditional financing options have all been exhausted.

### C. Plaintiff is Precluded from Offering Extrinsic Evidence

Finally, the Plaintiff is precluded from using extraneous and contradictory materials to support its allegations.  The "Merchant Agreement" for the "Purchase and Sale of Future Receivables" specifically contains the following unequivocal provision:

> "4.8 Entire Agreement and Severability. This Agreement embodies the entire agreement between Merchant and RCG and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of any other provision contained herein shall not in any way be affected or impaired."

As a result, the Plaintiff's attempt to point to extraneous material (e.g., advertising not by the Reich Defendants, but by others) as somehow authoritative or controlling the transactions in question is

egregiously misplaced and unavailing.  This Court should exclude the extraneous materials Plaintiff relies upon in the hopes of establishing any misrepresentation of financial products claim inasmuch as the Defendants and each business they contracted with reduced the entirety of their respective understandings and agreements into an integrated writing in the form of the "Merchant Agreement" for the "Purchase and Sale of Future Receivables".

Courts in New York undisputedly look to the agreement itself to determine its meaning. Whether there is ambiguity "is determined by looking within the four corners of the document - not to outside sources." <u>Kass v. Kass</u>, 91 N.Y.2d 554, 566 (1998) (emphasis added).  It is axiomatic that "[contract] provisions are not ambiguous merely because the parties interpret them differently." <u>Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u> 25 NY3d 675, 680 (2015).  "[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Id*. at 163.  This rule is especially applicable where -- as here -- the parties are commercially sophisticated businesses and their contract specifically contains a merger clause. <u>Schron v. Troutman Sanders LLP</u>, 20 N.Y.3d 430, 436 (2013) ("[W]here a contract contains a merger clause, a court is obliged to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing").

In the instant matter, each "Merchant Agreement" for the "Purchase and Sale of Future Receivables" specifically disclosed the existence of a personal guarantee from the business in the event of certain specified defaults, all costs incident to the transaction as well as the specific amount of financing the merchant was to receive.  As a result, this Court should reject the Plaintiff's misplaced attempts to rely upon extrinsic and parol evidence in contradiction of the fully integrated contracts themselves.

**POINT III**
**COUNT II OF THE COMPLAINT FOR UNFAIR USE OF**
**CONFESSION OF JUDGMENTS MUST BE DISMISSED**

Contrary to the Plaintiff's allegations, the defendants' practice of obtaining a merchant's confession of judgment is perfectly within the bounds of the law.  The Confession of Judgment forum selection clauses in each "Merchant Agreement" for the "Purchase and Sale of Future Receivables" are enforceable and certainly not objectively per se invalid.  Such provisions "are prima facie valid and enforceable unless shown by the resisting party to be unreasonable." Brooke Group Ltd. v. JCH Syndicate, 87 N.Y.2d 530, 534 (1996).

In fact, the defendants have been previously successful in Court enforcement of their "Merchant Agreement[s]" for the "Purchase and Sale of Future Receivables" as well as Confessions of Judgment as corroborated by the holdings in numerous cases.  (*See e.g*. Richmond Capital Group, LLC v. Paraguaybox Corp., No. 150333/2018 (Sup. Ct. Richmond Cty. May 9, 2018); Richmond Capital Group, LLC v. Best Floors, No. 152722/2017 (Sup. Ct. Richmond Cty. Jan. 29, 2019); Richmond Capital Group, LLC v. Congregation, Inc., No. 2018-51838 (Sup. Ct. Dutchess Cty. Sept. 5, 2018); Richmond Capital Group, LLC v. Bank of America, N.A., No. 57606/2016 (Sup. Ct. Westchester Cty. Aug. 3, 2017); Richmond Capital Group, LLC v. Villa Antonio of Ballantyne, *LLC*, No. 69108/2015 (Sup. Ct. Westchester Cty. July 27, 2016); Richmond Capital Group, LLC v. Bank of America, N.A., No. 85006/2018 (Sup. Ct. Richmond Cty. Mar. 19, 2018); Richmond Capital Group, LLC v. Bank of America, N.A., No. 85063/2018 (Sup. Ct. Richmond Cty. May 4, 2018); Richmond Capital Group, LLC v. Bank of America, N.A., No. 85183/2017 (Sup. Ct. Richmond Cty. Feb. 1, 2018).

Notwithstanding the forgoing and more importantly, similar to the issues raised above, the Plaintiff's second cause of action, Unfair Use of Confessions of Judgments, is inapplicable to

Defendants' Reich and RAM LLC and, further, is at its essence a claim of fraud which also fails to meet the heightened pleading requirements of Rule 9(b) because it does not provide the requisite particularity to meet Rule 9(b) pleading requirements.  In this instance, the Plaintiff has opted to rely upon the following self-serving conclusions:

> "*36.      In numerous instances, Defendants use confessions of judgment unfairly, including by filing confessions of judgment against consumers who (a) are current in their payments or did not breach the Defendants' contract; (b) miss payments due to a slowdown in business revenues or business cessation, despite contractual representations that consumers will not be in breach or default under those circumstances, or (c) whose payments cannot be processed due to temporary technical difficulties outside the consumers' control.*"

Here too, the Complaint is devoid of the corresponding details.  The Plaintiff has not provided such information for one single solitary merchant or information regarding conduct attributed to a specific defendant, let alone any such conduct by the Reich Defendants.  For example, the Complaint does not specify which of the defendants filed what Confession of Judgment in connection with which merchant; how it was used unfairly; which merchant was current in their payments and did not breach their contract; fails to identify any slowdown in business revenues or business cessation which resulted in the merchant missing payments and why any given merchant payments could not be processed due to temporary technical difficulties outside their control.

Moreover, and decisive with respect to the Reich Defendants, the determination as to whether, together with any cation in furtherance of, a decision to declare a merchant in default and enforce the guarantee, security interest, or confession of judgment was within the entire and exclusive controlled of the Funding Company, which in the one case cited in the Complaint was the RCG Defendants. See Complaint at paragraphs "17" "18" and "21". Plaintiff presents no evidence or factual allegations relating to the conduct of the Reich Defendants to the contrary.  As

21

a result, the Plaintiff's overzealous attempt to foist liability upon Reich and RAM LLC for actions allegedly undertaken by the RCG Defendants is unavailing and must be rejected.

## POINT IV

### COUNT III OF THE COMPLAINT FOR USE OF
### UNFAIR COLLECTION THREATS MUST BE DISMISSED

With regard to the alleged unfair collection threats and harassment perpetuated against the merchants asserted by the Plaintiff in Count III, again, the Complaint offers no instances specifically involving the Defendants.  The Complaint states at paragraph "26" that, "Defendants also made threatening collection calls to consumers, frequently using obscene or profane language. . ." and "threatened violence or other criminal means to harm the physical person, reputation, or property of the consumer."  As stated above, these actions were in the sole control of the RCG Defendants and the instances cited in the Complaint make specific reference to the RCG Defendants but no references to the Reich Defendants.  The reason for this is clear, as neither Reich nor RAM LLC had any involvement in, or control over any decisions or actions regarding the collection or servicing of the MCAs.  Again, the Plaintiff, conveniently but ineffectively, fails to distinguish between Reich/RAM LLC and the other defendants, which, whether intentional or not, does not support Plaintiff's claims against Reich and RAM LLC.  Indeed, Braun, who is specifically referenced in the Complaint in this regard was an employee of RCG and not an employee or agent of RAM LLC or Reich.

The Plaintiff does not plead facts that the Reich Defendants authorized or approved or played any role whatever in any such conduct by Defendant Braun -- let alone that they had any culpable participation in it.  Instead, the FTC simply appears content attempting to foist strict liability upon the Reich Defendants for certain alleged wrongful conduct by the RCG Defendants

22

without any factual basis.  As such, the Plaintiff's claims fail as a matter of law because they purport to assert claims against the Reich Defendants for allegedly engaging in unfair collection threats without any factual basis linking the Reich Defendants to any such conduct.

## POINT V

## COUNT IV OF THE COMPLAINT FOR ALLEGED UNAUTHORIZED WITHDRAWALS MUST BE DISMISSED

The Plaintiff's final cause of action in the Complaint, for unauthorized withdrawals, is similarly inapplicable to Defendants Reich and RAM LLC and the Complaint, again, fails to provide any corresponding specifics required by Rule 9(b).

Paragraph "42" of the Complaint simply states that "In numerous instances, Defendants withdraw funds from consumers' bank accounts without the express informed consent of those consumers."  Although sounding in fraud, here too, the Complaint is devoid of specific details.  It provides nothing in the way of detail regarding these "*numerous instances*" or information identifying a single solitary merchant who was allegedly wronged.  For example, the Complaint does not state which merchants had unauthorized withdrawals, when the unauthorized withdrawals happened and for how much, which defendant was allegedly responsible for the withdrawals and how consent was lacking given the fact that each of the businesses in question executed a "Merchant Agreement" for the "Purchase and Sale of Future Receivables" that provided the Defendants with the specific affirmative right to withdraw funds from their respective bank accounts.

Moreover, as explained throughout this Motion, RAM LLC and Reich's responsibilities and involvement were limited solely to origination of the MCAs with the merchants.  As set forth in detail above, the servicing and performance of the MCAs, upon and subsequent to funding, was

never controlled or undertaken by Reich or RAM LLC and they had no involvement, authority, or role in withdrawing any funds from the consumer's bank accounts or any access to these accounts. Accordingly, Count IV of the Complaint must be dismissed as to the Reich and RAM LLC.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the Complaint as against Defendants RAM LLC and Reich with prejudice and grant such other and further relief as this Court deems just and proper.

Dated: Garden City, New York
       August 10, 2020

                      **TERENZI & CONFUSIONE, P.C.**
                      Co-Counsel for Defendants, Ram Capital Funding LLC
                      and Tzvi Reich a/k/a Steve Reich

                      By:     \s\ Ronald M. Terenzi
                              Ronald M. Terenzi, Esq.
                              401 Franklin Avenue, Suite 300
                              Garden City, NY 11530
                              (516)812-0800

                              -AND-

                      **LAW OFFICES OF THOMAS A. HARVEY PLLC**
                      Co-Counsel for Defendants, Ram Capital Funding LLC
                      and Tzvi Reich a/k/a Steve Reich

                            Thomas A Harvey (TAH 8855)
                            tomharveylaw@gmail.com
                            (212) 972-8935