**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FEDERAL TRADE COMMISSION,**

     **Plaintiff,**

     **v.**

**RCG ADVANCES, LLC,** *et al.,*

     **Defendants.**

**Case No. 20-CV-4432-LAK**

**PLAINTIFF FEDERAL TRADE COMMISSION'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

# TABLE OF CONTENTS

I.   INTRODUCTION AND PROCEDURAL HISTORY ........................................................1

II.   THE PARTIES ........................................................................................3

   A.  Federal Trade Commission ....................................................................3

   B.  Defendant Jonathan Braun ....................................................................3

III.   DEFENDANTS' UNLAWFUL BUSINESS PRACTICES ....................................10

   A.  Defendants Provided Funding to Small Business Consumers in the Form of Merchant Cash Advances, and Demanded That Consumers Provide Defendants with Access to Their Financial Accounts and Personal Assets ................................................10

   B.  Defendants Used False, Deceptive, Fictitious, Fraudulent, and/or Misleading Representations to Market Their Funding Services ........................................16

      1.  Defendants Misrepresented That They Would Withdraw from Consumers' Bank Accounts a Specified Amount to Repay Defendants' Funding to Consumers ...........16

      2.  Defendants Misrepresented That They Did Not Require Personal Guaranties from Business Owners ................................................................................22

      3.  Defendants Misrepresented That There Were No Upfront Costs and That Consumers Would Receive a Specific Amount of Funding ........................................25

   C.  Defendants Used Unfair Practices in Connection with Their Funding Services ..............32

      1.  Defendants Unfairly Used Confessions of Judgment ...................................32

      2.  Defendants Made Unfair Collection Threats, Including Death Threats .....................44

      3.  Defendants Made Unfair Unauthorized Withdrawals from Consumers' Bank Accounts ................................................................................51

IV.   DEFENDANTS' KNOWLEDGE OF THE GRAMM-LEACH-BLILEY ACT ....................54

V.   CONSUMER INJURY AND CIVIL PENALTY CALCULATIONS ....................55

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(a) of the Rules of the Southern and Eastern Districts of New York, Plaintiff Federal Trade Commission ("FTC") respectfully submits this statement of material facts ("Statement of Material Facts") as to which there is no genuine issue to be tried in support of its motion for summary judgment.

As discussed in the accompanying Memorandum in Support of the FTC's Motion for Summary Judgment, the uncontroverted evidence demonstrates that, in connection with providing financing to small businesses, (1) Defendant Jonathan Braun, together with the other Defendants, engaged in unfair and deceptive acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, and practices that violate Section 521 of the Gramm-Leach-Bliley ("GLB") Act, 15 U.S.C. § 6821, (2) individual Defendant Jonathan Braun participated in and/or had the authority to control, and did participate in and/or control, all aspects of Defendants' unlawful operation, and (3) Defendant Jonathan Braun had the requisite level of knowledge necessary to make him liable for injunctive and monetary relief and civil penalties.

## I.   INTRODUCTION AND PROCEDURAL HISTORY

1.     The FTC commenced this action on June 10, 2020.  (ECF No. 1.)  On June 8, 2021, the Court granted the FTC's motion to file an amended complaint (ECF No. 82), and the FTC filed its First Amended Complaint on June 10, 2021.  (ECF No. 84.)  The defendants named in the Complaint and First Amended Complaint are RCG Advances, LLC, RAM Capital Funding LLC, Robert Giardina, Steve "Tzvi" Reich, and Jonathan Braun.[1]  (ECF Nos. 1, 84.)

---

[1] The Court has entered a settlement agreement between FTC and Defendants RAM Capital Funding LLC and Tzvi Reich.  (*See* ECF No. 102.)  Meanwhile, the FTC and Defendants RCG Advances, LLC and Robert Giardina have reached a tentative settlement.  The Court has stayed the case as to those defendants to allow the several FTC Commissioners the opportunity to review and approve the settlement.  (See ECF No. 108.)

2.      The First Amended Complaint alleges that Defendants violated Section 5 of the

FTC Act, 15 U.S.C. § 45, and Section 521 of the GLB Act, 15 U.S.C. § 6821, in connection with

their business financing activities.  In particular, the First Amended Complaint alleges that

Defendants violated Section 5 of the FTC Act by:

- misrepresenting that Defendants required no personal guaranty from business owners, charged no upfront costs, would provide consumers with a specific amount of financing, and would withdraw from consumers' bank accounts a specified amount to repay Defendants' funding (Count I, ECF No. 84 at 11-12 ¶¶ 36-38);

- unfairly filing confessions of judgment ("COJ") against consumers who were current in their payments or were otherwise not in breach of their financing contracts, who missed payments due to a slowdown in business revenues or busines cessation, despite contractual representations that consumers would not be in breach or default under those circumstances, or who experienced temporary technical difficulties outside the consumers' control (Count II, ECF No. 84 at 12-13 ¶¶ 39-41);

- using unfair collection threats to induce consumers to make payments, including death threats or other unlawful or criminal means to harm the physical person, reputation, or property of consumers (Count III, ECF No. 84 at 13 ¶¶ 42-44); and

- unfairly withdrawing funds from consumers' bank accounts without the express informed consent of consumers.  (Count IV, ECF No. 84 at 13 ¶¶ 45-47.)

The First Amended Complaint also alleges that Defendants violated Section 521 of the GLB Act

by making false, fictitious, or fraudulent statements or representations to obtain consumers'

financial information, including by misrepresenting that Defendants would withdraw from

consumers' bank accounts a specified amount to repay Defendants' funding to consumers.

(Count IV, ECF No. 84 at 15-16 ¶¶ 53-54.)

3.      On June 10, 2020, the New York Attorney General commenced a similar

proceeding against several respondents including Defendants in a case styled *People of the State*

*of New York v. Richmond Capital Group LLC, et al*., Case No. 451368/2020 (N.Y. Sup. Ct. Jun.

10, 2020).  (PX35 at 6 ¶ 15, Att. O at 414-59.)  The New York Attorney General filed an

amended verified petition on January 9, 2021.  (PX35 at 6 ¶ 15, Att. P at 461-513.)

2

4.       One or more Defendants have also been sued in numerous private party actions. (PX35 at 6-7 ¶ 17, Att. Q at 515-28, Att. R at 530-37, Att. S at 539-68, Att. T at 581-613, Att. U at 615-22, Att. V at 630-37, Att. W at 651-98, Att. X at 703-13, Att. Y at 715-45.)

## II.    THE PARTIES

### A.  Federal Trade Commission

5.       Plaintiff FTC is an independent agency of the United States government created by the FTC Act, 15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts or practices in or affecting commerce.  In addition, the FTC also enforces Section 521(a) of the GLB Act, 15 U.S.C. § 6821(a), which prohibits "making a false, fictitious, or fraudulent statement or representation" "to obtain or attempt to obtain" from consumers "customer information of a financial institution."

6.       Sections 5(m)(1)(A), 13(b), 16(a), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a), and 57b, and Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), authorize the FTC, through its own attorneys, to initiate federal court proceedings to obtain monetary civil penalties, permanent injunctive relief, rescission or reformation of contracts, the refund of monies paid, and other relief as the Court deems appropriate for Defendants' violations of the FTC Act and the GLB Act.  *See also FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365-67 (2d Cir. 2011).

### B.  Defendant Jonathan Braun

7.       Defendant RCG Advances, LLC ("RCG") is a New York limited liability company that was formerly known as Richmond Capital Group LLC.  (PX01 at 3 ¶ 5; PX35 at 3 ¶ 7, Att. A at 12-19.)

8.      RCG also does business using the names Viceroy Capital Funding and Ram Capital Funding.  (PX01 at 3 ¶ 5; PX27 at 7-8 17:8-18:2, 10 20:5-6; PX28 at 7-8 33:18-34:14, 14 84:14-16;  PX33 at 3 ¶ 3 n.1; PX35 at 3 ¶ 8, Att. B at 20-25.)

9.      RCG lists its address as 111 John Street, Suite 1201, New York, New York. (PX01 at 3 ¶ 5; PX35 Att. HH at 1035-59.)

10.     Defendants also have used the address 125 Maiden Lane, Suite 501, New York, New York.  (PX35 Att. E at 95, Att. G at 211, 219, 222, 225, 228, Att. J at 296, Att. L at 329, Att. M at 354, 373.)

11.     RCG transacts or has transacted business in the Southern District of New York and throughout the United States.  (PX01 at 3 ¶ 5.)

12.     [Reserved]

13.     [Reserved]

14.     [Reserved]

15.     [Reserved]

16.     [Reserved]

17.     [Reserved]

18.     [Reserved]

19.     [Reserved]

20.     [Reserved]

21.     [Reserved]

22.     [Reserved]

23.     [Reserved]

24.     [Reserved]

25.     [Reserved]

26.     [Reserved]

27.     Defendant Jonathan Braun was an owner, manager, and officer of RCG, and

otherwise has the authority to control RCG.  (PX08 Att. C at 18 ¶¶ 48 (deemed admitted), 49, 50,

51;[2] PX10 at 5 ¶ 16 (Braun identified himself as "manager" for RCG); PX13 at 2-3 ¶ 6 (Braun

identified himself as "manager"); PX19 Att. B at 23 (email identifies Braun as "Senior Funding

Manager"); PX26 at 9 25:4-9, 20 45:17-19;[3] PX28 at 8 34:15-21, 9 35:6-23, 10 36:4-7; PX29 at

---

[2] Pursuant to Federal Rule of Civil Procedure 36(a)(3), the matters in the FTC's First Set of Requests for Admissions dated November 4, 2020 (PX08 Att. C at 9-19) and Second Set of Requests of Admissions dated June 25, 2021 (PX08 Att. E at 23-35) are deemed admitted, as Defendant Braun did not respond to, answer, object, or deny any of the requests within 30 days of being served (PX08 at 2 ¶ 2, 3 ¶ 3), even though they were served on his counsel.  (PX08 Att. A at 5, Att. B at 7, Att. D at 21.)  Nor did he obtain any stipulation or court order extending the time to respond.  (PX08 at 2 ¶ 2, 3 ¶ 3; PX36 at 3 ¶¶ 4-5, 7 ¶ 7, Att. B at 8.)  After stipulating on February 7, 2022, to a close of discovery on March 11, 2022 (ECF No. 104), Defendant Braun served responses to the FTC's Second Set of Requests for Admissions on March 11, 2022 (PX36 at 3 ¶ 5, Att. C at 11-31), and responses to the FTC's First Set of Requests for Admissions on April 1, 2022 (PX36 at 4 ¶ 7, Att. D at 34-54), more than seven and sixteen months after responses were due, respectively.  Because Defendant Braun has not moved for his admissions to be withdrawn or amended, here and throughout this statement of facts, the Court should treat all facts in PX08 Att. C and Att. E as admitted.  *Keawrsi v. Ramen-Ya*, 2021 WL 3540671, at *4 (S.D.N.Y. Aug. 10, 2021).  Summary judgment may be granted based upon Rule 36 admissions.  *See Donovan v. Carls Drug Co.*, 703 F.2d 650, 651 (2d Cir. 1983), *rejected on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-34, 108 S.Ct. 1677 (1988); *see also SEC v. Simeo*, 2021 WL 4041562, at *7 (S.D.N.Y. Sept. 3, 2021) ("Because they are deemed admitted, the Court can rely on the content of the RFAs to support the SEC's factual assertions"); *SEC v. Batterman*, 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002) (deeming facts admitted based upon failure to respond to requests for admissions and granting summary judgment based on those facts).

[3] In response to this and many other questions at their respective depositions, Defendants' employees Jose DaSilva, Miriam Deutsch, Christopher Kim, Ezra Mosseri, and Marcella Rabinovich repeatedly invoked the Fifth Amendment privilege against self-incrimination.  (*See* PX26, PX29, PX30, PX31, PX32.)  To the extent this Statement of Material Facts cites to portions of Exhibits PX26, PX29, PX30, PX31, and PX32 (here and below), an adverse inference should be drawn against Defendants based on these employees' invocations.  "[W]here a non-party declines to answer questions in a civil case on the basis of the Fifth Amendment privilege against self-incrimination, an adverse inference may be drawn against a party who is associated with the witness."  *SEC v. Durante*, 2013 WL 6800226, at *11 (S.D.N.Y. Dec. 19,

4 28:14-20; PX31 at 8 40:22-41:3; PX35 Att. II at 1084-87 (Braun states, "lol you still dont realize whos in charge?" to a business associate).)

28.     Braun had authority to, and did, make decisions on behalf of Defendants.  (PX08 Att. C at 18 ¶ 52; PX28 at 11 39:18-20; PX31 at 4 13:14-19; PX35 Att. II at 1448 (Braun forwarded contract to Giardina instructing him to "fill out and scan back for quarter [sic] spot please").)

29.     Braun had authority to, and did, establish policies for Defendants.  (PX08 Att. C at 18 ¶ 53.)

30.     Braun had knowledge of a Client Services Application and Agreement between RCG and Actum Processing (Defendants' merchant processor).  (PX08 Att. E at 32 ¶ 43 (deemed admitted).)

31.     Braun had the authority to, and did, fire representatives who worked with or for Defendants.  (PX26 at 25 52:19-22.)  Braun controlled Defendants' employment practices. (PX35 Att. II at 1224, 1225-26 (Giardina asked Braun what he thought about raising an employee's pay, and Braun denied the request), 1228-29 (Braun instructed Reich and a rep that they should not be asking an employee to "check for fraud accounts, she works in collections only, and not anyones [sic] secretary.").)

---

2013); *Kirschenbaum v. 650 Fifth Ave*., 257 F. Supp. 3d 463, 508 (S.D.N.Y. 2017) ("There is no doubt that a non-party witness's invocation of his or her Fifth Amendment right not to testify may constitute admissible, competent evidence in a civil case").  In determining whether to draw the inference, courts look to the nature of the relationship between the defendant and the witness, the degree of control over the witness by the defendant, the alignment of interests between the witness and the defendant, and the role of the witness in the litigation.  *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997).  As employees of Defendants who participated in the violative conduct, it is appropriate for this Court to draw adverse inferences against Defendants from their employees' invocation of the Fifth Amendment.

32.     Braun created content for the website www.richmondcapitalgroup.com.  (PX08 Att. C at 12 ¶ 1.)

33.     Braun received inbound facsimiles to Defendants.  (PX35 Att. F at 106, 110-95.)

34.     Braun negotiated the terms of agreements prior to funding.  (PX06 at 9-10 ¶¶ 22, 23; PX12 at 4-5 ¶ 15; PX13 at 2-3 ¶¶ 6-8; PX15 at 2-3 ¶¶ 3-5; PX16 at 2-3 ¶¶ 5-6; PX24 at 3 ¶ 9; PX26 at 8 23:3-6; PX28 at 13 78:8-12; PX31 at 5 22:11-15; PX35 Att. II at 1088-91, 1093 (Braun claimed he did all the negotiating for deals).)

35.     Braun had the authority to, and did, change the fees that consumers were required to pay in order to obtain financing.  (PX08 Att. C at 14 ¶¶ 12, 13; PX29 at 10 51:2-52:24, 11 59:3-60:2; PX30 at 7 31:22-32:5, 32:23-33:11; PX31 at 7 34:11-45:3.)

36.     Braun exercised final authority on approving the terms of Defendants' deals with consumers.  (PX26 at 11 29:5-13, 18 44:4-7, 20 47:23-25, 21 48:2-9, 23 50:3-5; PX27 at 14-15 58:20-59:11; PX35 Att. II at 1099-1101 (Giardina asked Braun if a deal's repayment term could be extended to 80 days, and Braun responded by telling him to do repayment in 75 days), 1102-04 (Giardina asked Braun if the terms of a deal could be changed to get the daily payment under $300, and Braun agreed he could offer $299), 1105-06 (Reich asked Braun "what you wanna do here," Braun replied "I say this guy isnt ram material," and then proposes "a non negotiable deal" to offer to the consumer), 1107 (a sales rep told Braun that a deal could be done at $35,000 and asked Braun to approve that amount; Braun approved "35K @ 1.499 – 999."), 1117 (talking about an RCG representative, Braun claimed in a chat to Reich that "no one is allowed to do as they please in this office.").)

37.     In some instances, Braun decided to fund a deal before his underwriter provided her opinion as to whether the deal should be funded.  (PX35 Att. II at 1120.)  In other instances,

Braun decided to fund a deal even though his underwriter recommended against it.  (*Compare* PX35 Att. II at 1123-24 *with id*. Att. II at 1125-26, *compare* PX35 Att. II at 1127-28 *with id*. Att. II at 1129-30, 1131, 1135-39, 1140-43, 1144-46, 1147-48, 1429.)

38.     Braun sent emails directing Defendants to "please fund" deals with specifications including the name of the company providing the funding, the terms of the deal, and the amount of money to wire to the consumers and withdraw daily from the consumer's account.  (PX35 Att. GG at 962-1003, Att. II. at 1149, 1150-51, 1152-53, 1154-55, 1156-57, 1158-59, 1160, 1164, 1166-69.)

39.     Braun directed Defendants to deposit funds into the bank accounts of one or more consumers.  (PX08 Att. C at 12 ¶¶ 2, 3.)

40.     Braun was notified when consumers missed payments.  (PX35 Att. II at 1083, 1170-71.)

41.     Braun made the ultimate decisions about how to service Defendants' advances, including how to deal with consumers who wanted information about their outstanding balance. (PX35 Att. II at 1172 (a consumer questioned his balance amount and Braun said to "ignore this guy – fuck him."), 1174 (Braun instructed an employee to send a payoff letter to which he added "some extra" money because the consumer was "annoying as hell."), 1192 (Braun emailed other employees, "Who is allowed to decide how much a merchant owes other then [sic] me.").)

42.     Braun regularly made collections decisions for consumers who had missed a payment.  (PX28 at 54 253:11-14; PX30 at 8 43:9-12), determined how to deal with consumers who had missed payments.  (PX35 Att. II at 1181, 1183, 1185-86), and communicated with consumers that the consumer was in default.  (PX35 Att. II at 1187, 1188-89.)  Braun appeared indifferent to the consequences of Defendants' activities on small businesses.  (*See, e.g.*, PX35

Att. II at 1230 (Braun's underwriter accused him of "ruining this guy's business and you think it's funny give the dude a break for a second.").)

43.     Braun had the authority to declare, and did declare, consumers in default of their merchant agreements.  (PX08 Att. C at 14 ¶¶ 15, 16; PX26 at 26 53:6-12; PX28 at 16 95:21-25, 17 96:25-18:7; PX35 Att. II at 1195 (Braun sent an email with the subject line including "New Default" and noted in the body that the company "MISSED 4 PAYMENTS AND SAYS THEY WONT HAVE FUNDS TILL AN INVOICE HITS.").)

44.     Braun had the authority to direct, and did direct, the filing of COJs against consumers.  (PX08 Att. C at 14 ¶¶ 17, 18; PX26 at 26 53:13-20, 36 78:14-21; PX35 Att. II at 1196, 1199, 1200, 1201, 1202, 1203-05, 1206-12, 1213.)

45.     In the infrequent case where Defendants provided a refund to consumer, Braun approved the refund.  (PX35 Att. II at 1215-19, 1220.)

46.     Braun was consulted on legal strategy, particular filings made, and legal developments in cases involving Defendants.  (PX35 Att. II at 1075, 1076, 1077 (determined when Defendants should try to settle), 1078-80, 1081-82, 1221-22 (engaged in settlement conversations), 1223 (set the settlement number).)

47.     Despite law enforcement proceedings by the FTC and the New York Attorney General, Braun appears to be continuing in the unlawful business practices set forth herein, including financing at least $17 million to new borrowers, lying to those borrowers about the terms of the funding, withholding substantial amounts of undisclosed upfront fees, and suing the borrowers.  (PX35 Att. KK at 1502-1518.)

## III.   DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

### A.   Defendants Provided Funding to Small Business Consumers in the Form of Merchant Cash Advances, and Demanded That Consumers Provide Defendants with Access to Their Financial Accounts and Personal Assets

48.     Defendants provided merchant cash advance funding to small business consumers in exchange for the purchase of rights to potential future receivables by way of debits from consumers' bank accounts.  (PX01 at 4 ¶ 13; *see also* PX10 at 3 ¶ 6; PX11 at 2 ¶ 4; PX13 at 4 ¶ 14; PX14 at 2 ¶ 5; PX15 at 3 ¶ 8; PX16 at 3 ¶ 7; PX17 at 2-3 ¶ 6; PX18 at 2-3 ¶ 6; PX20 at 3 ¶ 7; PX21 at 3 ¶¶ 7, 10; PX22 at 3 ¶¶ 5, 9; PX24 at 2 ¶ 5; PX25 at 3 ¶ 11; PX27 at 5 14:7-9; PX35 Att. C at 28, 36 ("Essentially, when we give a merchant cash advance we are purchasing a portion of your future sales.").)

49.     Defendants' website richmondcapitalgroup.com advertised Defendants' financing products.  (PX03 at 3 ¶ 1; PX04 at 3 ¶ 1; PX35 Att. C at 27-39.)

50.     Defendants also marketed their funding services via telemarketing.  (*See, e.g.*, PX10 at 2 ¶ 3; PX12 at 2 ¶ 5; PX13 at 2 ¶ 3; PX15 at 2 ¶ 3; PX19 at 2 ¶ 2; PX20 at 2 ¶ 2; PX21 at 2 ¶ 2; PX22 at 2 ¶ 2; PX23 at 2 ¶ 2; PX24 at 2 ¶ 2; PX25 at 2 ¶ 2.)

51.     In some instances, consumers worked with brokers who connected them to Defendants to receive funding.  (PX06 at 5 ¶ 11; PX10 at 2-3 ¶¶ 3-5; PX12 at 2-3 ¶¶ 5-9; PX18 at 2 ¶ 4; PX21 at 2 ¶ 2; PX22 at 2 ¶ 2; PX23 at 2 ¶ 2; PX24 at 2 ¶ 2; PX25 at 2 ¶ 2; PX35 Att. U at 624 ¶ 5.)

52.     In other instances, consumers worked directly with representatives of Defendants, including Defendant Braun, to receive funding.  (PX13 at 2 ¶ 3; PX14 at 2 ¶ 3; PX15 at 2 ¶¶ 3-4; PX16 at 2 ¶ 5; PX17 at 2 ¶ 5.)

53.     To initiate the merchant cash advances, consumers entered into agreements with Defendants called "Merchant Agreements."  (PX06 at 3 ¶¶ 5-6, Att. A at 10-11, Att.  B at 21-22, Att. C at 33-34, Att. D at 44-45, Att. E at 56-57; PX11 at 2 ¶ 4, Att. A at 8-9; PX12 Att. B at 14-15; PX13 at 4 ¶ 13, Att. A at 10-14; PX14 at 2 ¶ 4, Att. A at 10-14, Att. B at 26-30; PX15 at 3 ¶ 7, Att. A at 10-14, Att. B at 22-26, Att. C at 34-38; PX16 at 3 ¶ 7, Att. A at 12-13; PX17 at 2-3 ¶ 6, Att. B at 10-11; PX18 at 2-3 ¶¶ 5-7, Att. A at 8-12; PX19 at 2 ¶¶ 2, 5, Att. A at 8-10; PX20 at 2 ¶ 5, Att. A at 4-5; PX21 at 3 ¶ 7, Att. A at 12-13; PX22 at 2-3 ¶¶ 4-5, Att. A at 12-13, Att. B at 22-23, Att. C at 32-33, Att. D at 40-44; PX23 at 3 ¶ 7, Att. A at 9-13; PX24 at 2 ¶ 4, Att. A at 5-6, Att. B at 15; PX25 at 3 ¶ 6, Att. A at 7-8; *see also* PX35 Att. Q at 519 ¶ 9, Att. U at 624 ¶ 9, Att. AA at 750-813.)

54.     The Merchant Agreements provided that consumers would receive a specified amount of funding, called the "Purchase Price" or "Total Purchase Price."  (PX10 at 3 ¶ 6, Att. A at 10, Att. B at 21, Att. C at 33, Att. D at 44, Att. E at 56; PX11 at 2 ¶ 4, Att. A at 8; PX12 Att. B at 14; PX13 at 4 ¶ 14, Att. A at 10; PX14 at 2 ¶ 5, Att. A at 10, Att. B at 26; PX15 at 3 ¶ 8, Att. A at 10, Att. B at 22, Att. C at 34; PX16 at 3 ¶ 8, Att. A at 12; PX17 at 2-3 ¶ 6, Att. B at 10; PX18 at 2-3 ¶ 6, Att. A at 8; PX19 at 3 ¶ 6, Att. A at 8; PX20 at 2 ¶ 5, Att. A at 4; PX21 at 3 ¶ 7, Att. A at 12; PX22 at 3 ¶ 5, 5-6 ¶¶ 20-22, Att. A at 12, Att. B at 22, Att. C at 32, Att. D at 40; PX23 at 3 ¶ 7, Att. A at 9; PX24 at 2 ¶ 4, Att. A at 5, Att. B at 15; PX25 at 3 ¶ 6, Att. A at 7; *see also* PX35 Att. Q at 519 ¶ 10, Att. S at 572 ¶ 26.)

55.     In exchange for funding in the amount of the "Purchase Price," consumers assigned to Defendants their future receivables until Defendants collected from consumers a specified amount of funds, called the "Purchased Amount" or "Total Purchased Amount." (PX10 at 3 ¶ 6, Att. A at 10, Att. B at 21, Att. C at 33, Att. D at 44, Att. E at 56; PX11 at 2 ¶ 4

Att. A at 8; PX12 Att. B at 14; PX13 at 4 ¶ 14, Att. A at 10; PX14 at 2 ¶ 5, Att. A at 10, Att. B at 26; PX15 at 3 ¶ 8, Att. A at 10, Att. B at 22, Att. C at 34; PX16 at 3 ¶ 8, Att. A at 12; PX17 at 2-3 ¶ 6, Att. B at 10; PX18 at 2-3 ¶ 6, Att. A at 8; PX19 at 3 ¶ 6, Att. A at 8; PX20 at 2 ¶ 5, Att. A at 4; PX21 at 3 ¶ 7, Att. A at 12; PX22 at 3 ¶ 5, 5-6 ¶¶ 20-22, Att. A at 12, Att. B at 22, Att. C at 32, Att. D at 40; PX23 at 3 ¶ 7, Att. A at 9; PX24 at 2 ¶ 4, Att. A at 5, Att. B at 15; PX25 at 3 ¶¶ 6-8, Att. A at 7 *see also* PX35 Att. Q at 519 ¶ 10, Att. S at 572 ¶ 26.)

56.     To collect the "Total Purchased Amount," consumers agreed that Defendants would debit from consumers' bank accounts via ACH debit a specified amount on a daily basis, called the "Estimated Daily Amount," each business day until Defendants collected the "Total Purchased Amount."  (PX10 at 3 ¶ 6, Att. A at 10, Att. B at 21, Att. C at 33, Att. D at 44, Att. E at 56; PX11 at 2 ¶ 4, Att. A at 8; PX12 Att. B at 14; PX13 at 4 ¶ 14, Att. A at 10; PX14 at 2 ¶ 5, Att. A at 10, Att. B at 26; PX15 at 3 ¶ 8, Att. A at 10, Att. B at 22, Att. C at 34; PX16 at 3 ¶ 8, Att. A at 12; PX17 at 2-3 ¶ 6, Att. B at 10; PX18 at 2-3 ¶ 6, Att. A at 8; PX19 at 3 ¶ 6, Att. A at 8; PX20 at 2 ¶ 5, Att. A at 4; PX21 at 3 ¶ 7, Att. A at 12; PX22 at 3 ¶ 5, 5-6 ¶¶ 20-22, Att. A at 12, Att. B at 22, Att. C at 32, Att. D at 40; PX23 at 3 ¶7, Att. A at 9; PX24 at 2 ¶ 4, Att. A at 5, Att. B at 15; PX25 at 3 ¶¶ 6-8, Att. A at 7.)

57.     Thus, for example, Defendants entered into a Merchant Agreement with Anders Livery & Delivery.  (PX35 Att. AA at 757.)  Pursuant to the Merchant Agreement, Defendants were to fund the small business with $7,000 (the Total Purchase Price), in exchange for the small business's agreement to repay, automatically from its bank account on each business day, $299 (the Estimated Daily Amount) until the sum of those daily payments reached $10,493 (the Total Purchased Amount).  (*Id.*)

58.     The first page of the Merchant Agreement provided that the small business consumer would provide Defendants with "all required access codes" for the consumer's account.  (PX10 Att. A at 10, Att. B at 21, Att. C at 33, Att. D at 44, Att. E at 56; PX11 Att. A at 8; PX12 Att. B at 14; PX13 Att. A at 10; PX14 Att. A at 10, Att. B at 26; PX15 Att. A at 10, Att. B at 22, Att. C at 34; PX16 Att. A at 12; PX17 Att. B at 10; PX18 Att. A at 8; PX19 Att. A at 8; PX20 Att. A at 4; PX21 Att. A at 12; PX22 Att. A at 12, Att. B at 22, Att. C at 32, Att. D at 40; PX23 Att. A at 9; PX24 Att. A at 5, Att. B at 15; PX25 Att. A at 7.)

59.     Defendants also required consumers to sign an "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)."  (PX10 Att. A at 14, Att. B at 25, Att. C at 37, Att. D at 48, Att. E at 60; PX11 Att. A at 12; PX12 Att. B at 12; PX14 Att. A at 17, Att. B at 33; PX15 Att. A at 17, Att. B at 29, Att. C at 41; PX16 Att. A at 16; PX17 Att. B at 14; PX18 Att. A at 15; PX19 Att. A at 16; PX20 Att. A at 8; PX21 Att. A at 16, Att. B at 19; PX22 Att. A at 16, Att. B at 26, Att. C at 36, Att. D at 47; PX23 Att. A at 16; PX24 Att. A at 9; PX25 Att. A at 11; PX29 at 6 37:3-17; *see also* PX35 Att. BB at 815-35.)

60.     Among other things, this document required consumers to list their bank name, bank routing number, and bank account number.  (PX10 Att. A at 14, Att. B at 25, Att. C at 37, Att. D at 48, Att. E at 60; PX11 Att. A at 12; PX12 Att. B at 12, PX14 Att. A at 17, Att. B at 33; PX15 Att. A at 17, Att. B at 29, Att. C at 41; PX16 Att. A at 16; PX17 Att. B at 14; PX18 Att. A at 15; PX19 Att. A at 16; PX20 Att. A at 8; PX21 Att. A at 16, Att. B at 19; PX22 Att. A at 16, Att. B at 26, Att. C at 36, Att. D at 47; PX23 Att. A at 16; PX24 Att. A at 9; PX25 Att. A at 11; PX29 at 8 42:22-43:6.)

13

61.     Defendants required consumers to provide, and would not provide funding until consumers provided, their bank account routing information.  (PX07 at 8 ¶¶ 13, 15, 17, 9 ¶ 19; PX08 Att. E at 28 ¶ 18, 29 ¶¶ 20, 22; PX29 at 6 37:18-25.)

62.     Defendants also required consumers to provide information necessary for Defendants to access and control consumers' bank accounts, and would not provide funding until consumers provided this information.  (PX07 at 7 ¶¶ 12, 14, 16, 18; PX08 Att. E at 28 ¶¶ 15, 16, 17, 29 ¶¶ 19, 21.)  Specifically, Defendants required consumers to provide their bank portal website, username, password, three security questions and answers, and any other information necessary to access the account.  (PX10 Att. A at 16, Att. B at 27, Att. C at 39, Att. D at 50, Att. E at 62; PX11 Att. A at 14; PX12 Att. B at 17; PX13 Att. A at 19; PX14 Att. A at 20, Att. B at 36; PX15 Att. A at 20, Att. B at 32, Att. C at 44; PX17 Att. B at 19; PX19 Att. A at 20; PX20 Att. A at 10; PX21 Att. A at 18; PX22 Att. A at 18, Att. B at 28, Att. C at 38, Att. D at 50; PX23 Att. A at 20; PX24 Att. A at 11; PX25 Att. A at 13; *see also* PX35 Att. CC at 837-52.)  During the underwriting process, Braun would not agree to look at a consumer's bank account via screen-share because he demanded access on his own device.  (PX35 Att. II at 1234.)

63.     If during the funding period Defendants could not access a consumer's account, they claimed the right to "take an estimated payment plus a $39 fee for each day we don't have access."  (PX10 Att. A at 16, Att. B at 27, Att. C at 39, Att. D at 50, Att. E at 62; PX11 Att. A at 14; PX12 Att. B at 17; PX13 Att. A at 19; PX14 Att. A at 20, Att. B at 36; PX15 Att. A at 20, Att. B at 32, Att. C at 44; PX17 Att. B at 19; PX19 Att. A at 20; PX20 Att. A at 10; PX21 Att. A at 18; PX22 Att. A at 18, Att. B at 28, Att. C at 38, Att. D at 50; PX23 Att. A at 20; PX24 Att. A at 11; PX25 Att. A at 13.)

14

64.     Defendants also required consumers to sign a "Security Agreement and Guaranty," which purported to create a lien on all the consumers' "accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory," "all proceeds," and "all funds at any time in the [consumer's] Account, regardless of the source of such funds." (PX10 Att. A at 12-13, Att. B at 23-24, Att. C at 35-36, Att. D at 46-47, Att. E at 58-59; PX11 Att. A at 10-11; PX12 Att. B at 13, 16; PX13 Att. A at 15-16; PX14 Att. A at 15-16, Att. B at 31-32; PX15 Att. A at 15-16, Att. B at 27-28, Att. C at 39-40; PX16 Att. A at 14-15; PX17 at 2-3 ¶ 6, Att. B at 12-13; PX18 Att. A at 13-14; PX19 Att. A at 12-14; PX20 Att. A at 6-7; PX21 Att. A at 14-15; PX22 Att. A at 14-15, Att. B at 24-25, Att. C at 34-35, Att. D at 45-46; PX23 Att. A at 14-15; PX24 Att. A at 7-8; PX25 Att. A at 9-10; *see also* PX35 Att. DD at 854-97.)

65.     Defendants also required consumers to sign an "Affidavit of Confession of Judgment," pursuant to which consumers confessed judgment in favor of Defendants in the amount of the Total Purchased Amount (less any payments made by the consumer) plus legal fees calculated at 25% of the Total Purchased Amount and interest at 9%. (PX10 Att. A at 17-19, Att. B at 28-30, Att. C at 40-42, Att. D at 51-53, Att. E at 63; PX11 Att. A at 15; PX12 Att. C at 22-24; PX13 Att. A at 20-22; PX14 Att. B at 22-24; PX15 Att. D at 47-49, Att. E at 56-58; PX16 Att. C at 51-53; PX17 at 2-3 ¶ 6, Att. B at 16-18; PX17 Att. A at 17-19; PX20 Att. A at 11; PX21 Att. A at 9-11; PX22 Att. B at 19-21, Att. C at 29-31, Att. D at 52-54; PX23 Att. A at 21-23; PX24 Att. at 12-14; PX25 Att. A at 6; PX35 Att. U at 624 ¶ 9; *see also* PX35 Att. EE at 899-935.)

66.     After consumers completed and signed the Merchant Agreement and other documents, Defendants wired the funding to consumers' bank accounts and began debiting the daily payments from consumers' bank accounts. (PX10 at 3 ¶ 7; PX11 at 3 ¶ 9; PX12 at 5 ¶ 16;

PX13 at 5 ¶ 17; PX14 at 2-3 ¶¶ 6-7; PX15 at 3 ¶ 9; PX16 at 3 ¶¶ 9-10; PX17 at 3 ¶ 7; PX18 at 3 ¶¶ 8-9; PX19 at 2 ¶ 3, 3 ¶ 9; PX21 at 5 ¶¶ 18, 20; PX22 at 4 ¶ 15; PX23 at 6 ¶¶ 21, 22; PX24 at 3 ¶ 11; PX25 at 4 ¶ 16.)

67.     In some instances, consumers entered into subsequent financing arrangements with Defendants, often rolling over the unpaid balance from the previous Merchant Agreement (often together with additional funding) into the new financing agreements that required a new Merchant Agreement (with a new Total Purchase Price, Total Purchased Amount, and Estimated Daily Amount).  (PX10 at 4 ¶ 9; PX15 at 4-5 ¶¶ 11-14; PX19 at 2 ¶ 4; PX22 at 5-6 ¶¶ 17, 20-22.)

68.     In these instances, Defendants required consumers to execute the same documents for the new deal, including the Merchant Agreement, Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Security Agreement and Guaranty, and Affidavit of Confession of Judgment.  (PX10 Att. B at 21-31, Att. C at 33-42, Att. D at 44-54, Att. E at 56-64; PX15 Att. B at 22-32, Att. C at 34-45; PX19 at 2 ¶ 5; PX22 Att. B at 22-23, Att. C at 32-33, Att. D at 40-41.)

69.     Defendants have done business with consumers located throughout the United States.  (*See, e.g.*, PX10 at 2 ¶ 1 (Nevada); PX12 at 2 ¶ 1 (Virginia); PX15 at 2 ¶ 2 (North Carolina); PX18 at 2 ¶ 1 (Florida); PX19 at 2 ¶ 1 (Texas); PX20 at 2 ¶ 1 (Kansas); PX22 at 2 ¶ 1 (Arizona); PX23 at 2 ¶ 1 (California); PX24 at 2 ¶ 1 (New York); PX25 at 2 ¶ 1 (Connecticut).)

**B.  Defendants Used False, Deceptive, Fictitious, Fraudulent, and/or Misleading Representations to Market Their Funding Services**

**1.  Defendants Misrepresented That They Would Withdraw from Consumers' Bank Accounts a Specified Amount to Repay Defendants' Funding to Consumers**

70.     As noted above, in every Merchant Agreement, Defendants offered to provide the small business a cash advance in a specified amount (styled as the "Purchase Price" or "Total

Purchase Price") and represented that they would withdraw from consumers' bank account a specified amount (styled as the "Total Purchased Amount") to repay the funding.  (See SMF 53, 54, 55, and 56.)[4]

71.     As described on the first page of the contract, small business consumers agreed to pay the Total Purchased Amount by authorizing Defendants to take daily ACH debits from their accounts until Defendants received payment in full for the Total Purchased Amount.  (See SMF 53, 54, 55, and 56.)

72.     Despite the express language in the Merchant Agreements specifying the "Total Purchase Amount," in numerous instances Defendants withdrew from consumers' bank accounts more than the represented Total Purchased Amount.  (PX07 at 9 ¶ 21, 9-10 ¶ 22; PX08 Att. E at 29 ¶¶ 24, 25; PX12 at 7 ¶ 27 (Defendants withdrew approximately $160,000 when merchant agreement required payment of $89,940); PX23 at 8 ¶ 30 (Defendants withdrew $148,463 when merchant agreement required repayment of $139,900); PX24 at 4 ¶ 13 (Defendants withdrew $16,164 when merchant agreement required payment of $14,990); PX25 at 4-5 ¶¶ 19-20 (Defendants withdrew $40,959 when merchant agreement required payment of $37,475, and withdrew $300 more per day than what was set forth in merchant agreement); PX35 Att. Y at 724-25 ¶¶ 52-54 (Defendants collected $119,617 when agreement called for $74,950, or $44,667 in over collections).)

73.     In numerous instances, Defendants continued to make daily withdrawals from consumers' bank accounts, after the Total Purchased Amount had been fully repaid, until consumers contacted Defendants to stop those withdrawals.  (PX08 Att. E at 30 ¶¶ 30, 31; PX24

---

[4] SMF refers to the separately numbered Statements of Material Fact set forth herein.

at 4 ¶ 13 (consumer had to call multiple times to get Defendants to stop debiting her company's account even after she had repaid the financing).)

74.     Defendants collected more than the represented Total Purchased Amount in numerous instances.  In a random sample of 1,499 deals with consumers, Defendants collected more than the represented Total Purchased Amount from approximately 26.4% deals, corresponding to approximately 395 deals with small business consumers.  (PX34 at 7 ¶ 19.)[5]

75.     Further, Defendants continued to collect, on average, an additional 8.5 daily payments after having already collected the Total Purchased Amount.  (PX34 at 8 ¶ 24, 9-10 ¶ 26.)

76.     It was Defendants' policy from the outset to attempt to withdraw more from consumers' bank accounts than the represented Total Purchased Amount, and to do so until consumers contacted them to stop (or for as long as funds were available in the consumers' account).  (PX07 at 9 ¶ 20, 11 ¶ 26, 15 ¶¶ 38, 39; PX08 Att. E at 29 ¶ 23, 30 ¶ 29, 32 ¶¶ 41, 42.)

77.     For example, in one case Braun suggested Defendants leave automatic withdrawals on "forever and over collect lol."  (PX35 Att. II at 1244.)  When discussing whether to provide additional funding to another consumer, Braun noted that "we also over collected 3,200 on the previous 5k deal – LOL."  (PX35 Att. II at 1246.)  In another case, one of Defendants' employees emailed Braun about the status of collections on a few deals, noting that one consumer "is over collected 3500 (going till 5k)," meaning that Defendants would continue pulling debits from the account until the over collected amount reached $5,000.  (PX35 Att. II at 1250.)

---

[5] In the random sample, Defendants over collected on 26.4% of deals with consumers (with a 95% confidence interval of 17.6% to 37.0%), corresponding to a range between 263 and 554 consumers out of 1,499 total deals with consumers.  (PX34 at 7 ¶ 19.)

78.     In the random sample discussed above, Defendants collected exactly the represented Total Purchased Amount in 0.0% instances (PX34 at 7 ¶ 20),[6] further demonstrating that the Total Purchased Amount was a fiction.  Indeed, there were only two repayment outcomes—consumers were unable to pay the Total Purchased Amount (and were sent into default, regardless of whether they were actually in default) or Defendants continued to collect even after the Total Purchased Amount was paid.

79.     In numerous instances, Defendants' brokers informed Defendants that Defendants were collecting more than the Total Purchased Amount.  (PX35 Att. II at 1253.)  For example, a broker emailed Reich alerting him to the fact that "[a]ccording to our math the merchant's balance should have been paid off.  We are requesting to stop pulling from the merchant's account."  (PX35 Att. II at 1255-56.)  Reich emailed Braun, asking "What you guys wanna do here too . . . they are asking for it to be shut off."  (PX35 Att. II at 1254-55.)

80.     Defendants rarely refunded the amounts they over collected from consumers.  (PX07 at 14 ¶¶ 35, 36, 37; PX08 Att. E at 31 ¶¶ 38, 39, 40; PX23 at 8 ¶ 31.)  Often, Defendants ignored, mocked, and bullied consumers who noted that Defendants had taken payments in excess of the agreed amount.  Indeed, Defendant Braun admitted in an email that Defendants "don't refund unless merchants beg and chase us LOL."  (PX35 Att. II at 1267.)

81.     For example, a consumer emailed Reich advising him that they had overpaid on an account and was "hereby requesting the refund from both accounts."  (PX35 Att. II at 1269-70.)  Reich forwarded the email to Braun writing only "lol."  (PX35 Att. II at 1269.)  Braun

---

[6] In the random sample, Defendants collected exactly the Total Purchased Amount for 0.0% of deals (with a 95% confidence interval of 0.0% to 4.2%), corresponding to a range between 0 and 62 out of 1,499 total deals with consumers for whom Defendants collected the exact Total Purchased Amount.  (PX34 at 7 ¶ 20.)

replied that the consumer "blocked us" but said "thank god we made it," indicating he was pleased they had managed to over collect to the extent that they had.  (PX35 Att. II at 1269.)

82.     In another instance, Reich emailed Braun about a consumer who "knows we have his 4 payments and wants it," asking Braun "what should I tell him – I get you think Im a push over but merchant knows we are taking his money not sure what you want me to say."  (PX35 Att. II at 1271.)  Braun replied, "i don't fucking care bro."  (PX35 Att. II at 1271.)

83.     In another instance, in a chat with Reich, Braun mentioned that on one deal he "over collected 16k lol."  (PX35 Att. II at 1280.)  In that same conversation, Reich and Braun discussed how to deal with a consumer who requested a refund from Reich; Reich relayed that he told the consumer to "go away," and Braun replied "don't respond/or write that."   (PX35 Att. II at 1281.)  Later, Reich described his conundrum of what to say to a consumer who knows his balance: "we get 20% fees on most deals, over collect and never roll in the 4 payments – when a merchant knows exactly his balance not sure what I can tell him."  Braun advised to "let them beg you."  (PX35 Att. II at 1282.)

84.     In another instance, a consumer reached out to a broker noting the consumer had "made 59 daily payments" which amount to an overpayment of "close to $4000."  (PX35 Att. II at 1289.)  When the broker forwarded the email to Braun, Braun instructed the broker "dont answer me and don't answer."  (PX35 Att. II at 1288.)

85.     In another instance, Reich received an email requesting that he "turn off daily's on this deal and refund him what was over collected."  Reich forwarded the email to Braun adding "lol."  (PX35 Att. II at 1291.)

86.     In another instance, in a chat with Braun, Reich informed Braun that a merchant was calling in connection with its final payment to cease future withdrawals.  (PX35 Att. II at

1295.)  Braun replied "NO, he owes more money, tell him FUCK OFF AND SPEAK TO

JOHN."  (PX35 Att. II at 1295.)

87.     In another instance, one of Defendants' employees notified Braun, among others,

that a consumer had paid off their merchant agreement.  The employee noted that the consumer

"must have blocked after he sent the cashiers check …… (so, no over payments will clear)."

(PX35 Att. II at 1303.)

88.     In another instance, Reich informed Braun that Defendants took $10,490 in extra

payments, and that, according to the consumer, the withdrawals were supposed to stop in January

but continued until February 22.   (PX35 Att. II at 1304-05.)  Braun said "we can shut off" the

automatic withdrawals, but he told Reich "im keeping the money" that was drawn in excess of

the amount due.  (PX35 Att. II at 1305-06.)

89.     In another instance, a consumer asked Reich to "stop making pulls from our

account.  It hit again today and you are $4000 overdrawn.  Please refund the overage ASAP.  It is

hurting our cash flow."  (PX35 Att. Att. at 1309.)  Reich forwarded the email to Braun, saying "I

didn't reply anything."  (PX35 Att. Att. at 1309.)

90.     In another instance, a consumer contacted Defendants notifying them that they

had taken 8 extra daily payments for "close to 3500 in ACH over charges."  The email was

forwarded to Braun.  (PX35 Att. II at 1441-42.)

91.     In another instance, Braun explained his treatment of a consumer: "LOL WE

ARE OVER 10K ON RAM I SHUT IT OFF, AND INSTEAD OF REFUNDING HIM 10K, ILL

GO TO CONTRACT FOR 10K – NET HIM 8K BUT HE OWES A NEW 15K IN 30

PAYMENTS – IM RUNNING RCG, VICEROY, AND RAM DEALS WITH THIS MORON

LOL."  (PX35 Att. II at 1311.)

21

92.     In another instance, Braun explained his treatment of a consumer: "we actually are over paid by 6k – so I went to contract, for 10k – held back 2k in fees – and 2k "refi" which he doesn't even owe – and sent his 6k – and lowered daily to 599 instead of 699 - lol - . . . FREE RIDE LOL – try and make extra money with no risk lol."  (PX35 Att. II at 1313.)

93.     In another instance, Braun explained his treatment of a consumer: "lol don't worry we are 13k over paid on our last deal," and decides to fund the consumer again saying "I THINK ITS GONNA PAY AND GO OVER AGAIN."  (PX35 Att. II at 1120.)

94.     In another instance, a consumer emailed Reich about the consumer's deal "attaching the excel spreadsheet showing a detail of the payments made" and saying that "the amount due to me is $2,250 and not one payment of $375 as your accountant said."  (PX35 Att. II at 1317.)  Reich forwarded the email to Braun commenting "fml this guy does finance." (PX35 Att. II at 1317.)

95.     In another instance, Reich forwarded to Braun an email from a consumer who stated: "This guy [Defendants] took ANOTHER debit.  You need to get this resolved today.  I also want my money he has been overpaid returned.  The overpay is now $7250."  (PX35 Att. II at 1439.)

96.     Defendants over collected manually, too. In one instance, Giardina informed Braun that a consumer was seeking a payoff letter and asking what to send the consumer.  Braun responded, "Send him his balance plus one payment."  (PX35 Att. II at 1330.)

**2.     Defendants Misrepresented That They Did Not Require Personal Guaranties from Business Owners**

97.     Defendants represented on their website that they required "no personal guaranty of collateral" from small business consumers' owners.  (PX35 Att. C at 28, 36.)  Defendants also stated that they had "No Credit or Collateral Requirements."  (PX35 Att. C at 31, 37.)

22

98.     Despite those express representations, the "Security Agreement and Guaranty" that Defendants required consumers to sign contained a "Personal Guaranty of Performance" and was required to be signed both by the small business consumer and the business owner in his or her personal capacity.  (PX10 Att. A at 12-13, Att. B at 23-24, Att. C at 35-36, Att. D at 46-47, Att. E at 58-59; PX11 at 2-3 ¶ 6, Att. A at 10-11; PX12 at 3 ¶ 11, Att. B at 16-17; PX13 Att. A at 15-16; PX14 Att. A at 15-16, Att. B at 31-32; PX15 Att. A at 15-16, Att. B at 27-28, Att. C at 39-40; PX16 Att. A at 14-15; PX17 at 2-3 ¶ 6, Att. B at 12-13; PX18 Att. A at 13-14; PX19 Att. A at 12-14; PX21 Att. A at 14-15; PX22 Att. A at 14-15, Att. B at 24-25, Att. C at 34-35, Att. D at 45-46; PX23 Att. A at 14-15; PX24 Att. A at 7-8; PX25 Att. A at 9-10; PX35 Att. DD at 853-97.)

99.     The Personal Guaranty of Performance provision states:

The undersigned Guarantor(s) hereby guarantees to RCG, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

(PX10 Att. A at 12, Att. B at 23, Att. C at 35, Att. D at 46, Att. E at 58; PX11 Att. A at 10; PX12 Att. B at 16; PX13 Att. A at 15, PX14 Att. A at 15, Att. B at 31; PX15 Att. A at 15, Att. B at 27, Att. C at 39; PX16 Att. A at 14; PX17 Att. B at 12; PX18 Att. A at 13; PX19 Att. A at 12; PX21 Att. A at 14; PX22 Att. A at 14, Att. B at 24, Att. C at 34, Att. D at 45; PX23 Att. A at 14; PX24 Att. A at 7; PX25 Att. A at 9; PX35 Att. DD at 853-97.)

100.     In addition to the Security Agreement and Guaranty, some versions of Defendants' merchant agreements also included the following provision: "Personal Guaranty. In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof,

should RCG determine that the Purchase Amount cannot be obtained from the Merchant's

business, RCG will enforce its rights against the Guarantors of this transaction. Said Guarantors

will be jointly and severally liable to RCG for all of RCG's losses and damages, in additional

[sic] to all costs and expenses and legal fees associated with such enforcement." (PX10 Att. A at

11, Att. B at 22, Att. C at 34, Att. D at 45, Att. E at 57; PX11 Att. A at 9; PX12 Att. B at 15;

PX16 Att. A at 13; PX17 Att. B at 11; PX19 Att. A at 10; PX20 Att. A at 5; PX21 Att. A at 13;

PX22 Att. A at 13, Att. B at 23, Att. C at 33; PX24 Att. A at 6; PX25 Att. A at 8; PX35 Att. AA

at 751, 753, 763, 767, 771, 773, 780, 784, 790, 797, 813.)

101.    The Confession of Judgment that Defendants required every consumer to sign to

receive funding not only had the small business consumer confess judgment in the event of a

default of the Merchant Agreement (PX10 Att. A at 17, Att. B at 28, Att. C at 40, Att. D at 51;

PX12 Att. C at 22, PX13 Att. A at 20; PX14 Att. B at 22; PX15 Att. D at 47, Att. E at 56; PX16

Att. C at 51; PX17 Att. B at 16; PX18 Att. A at 17; PX21 Att. A at 9; PX22 Att. B at 19, Att. C

at 29, Att. D at 52; PX23 Att. A at 21; PX24 Att. A at 12), but also had the business owner

"confess judgment, *individually and personally*" (emphasis added) for the same breach.  (PX10

Att. A at 18, Att. B at 29, att. C at 41, Att. D at 52; PX12 Att. C at 23; PX13 Att. at 21; PX14

Att. B at 23; PX15 Att. D at 48, Att. E at 57; PX16 Att. C at 52; PX17 Att. B at 17; PX18 Att. A

at 18; PX21 Att. A at 10; PX22 Att. B at 20, Att. C at 30, Att. D at 53; PX23 Att. A at 22; PX24

Att. A at 13; PX35 Att. EE at 899-934.)[7]

102.    In numerous instances, despite having represented "no personal guaranty" was

required, Defendants in fact filed suit against the small business owners in their individual

---

[7] In some versions of the COJ required by Defendants, the small business consumers and its
owner "jointly and severally hereby Confess Judgment."  (PX10 Att. E at 63; PX11 Att. A at 15;
PX25 Att. A at 6; PX35 Att. DD at 935.)

capacity, submitting the "Personal Guaranty of Performance" and/or the COJ.   (PX10 at 6 ¶ 21, Att. F at 66-69; PX11 Att. D at 25-28; PX12 at 6 ¶ 22, Att. C at 22-29; PX13 Att. B at 24-29; PX14 Att. G at 65-70; PX15 Att. D at 47-52, Att. E at 56-61; PX16 at 6 ¶ 23, Att. C at 48-51; PX18 at 4 ¶ 13, Att. B at 23-28; PX21 at 7 ¶ 31, Att. E at 23-28; PX22 at 8 ¶ 35, Att. E at 55-60; PX35 Att. II at 1187 (Braun emailed consumers "We will be going after the company and you personally with our legal team.").)

103.    In numerous instances, Defendants obtained judgment against small business owners individually.  (PX10 at 6 ¶ 21, Att. F at 70-71; PX11 Att. D at 29-30; PX12 Att. C at 20-21; PX13 Att. C at 30-31; PX14 Att. G at 71-72; PX15 Att. D at 53-54, Att. E at 62-63; PX16 at 6 ¶ 23, Att. C at 46-47; PX18 Att. B at 29-30; PX21 Att. E at 29-30; PX22 Att. E at 61-62.)

### 3. Defendants Misrepresented That There Were No Upfront Costs and That Consumers Would Receive a Specific Amount of Funding

104.    Defendants represented on their website that they that they charged "No Upfront Costs."  (PX35 Att. C at 31, 37.)

105.    In every Merchant Agreement, Defendants represented, typically in a prominent line of the first page of the contract, that they would provide consumers with a specified amount of funds, called the "Total Purchase Price."  (PX10 at 3 ¶ 6, Att. A at 10, Att. B at 21, Att. C at 33, Att. D at 44, Att. E at 56; PX11 at 2 ¶ 4, Att. A at 8; PX12 at 3 ¶ 11, Att. B at 14; PX13 at 4 ¶ 14, Att. A at 10; PX14 at 2 ¶ 5, Att. A at 10, Att. B at 26; PX15 at 3 ¶ 8, Att. A at 10, Att. B at 22, Att. C at 34; PX16 at 3 ¶ 8, Att. A at 12; PX17 at 2-3 ¶ 6, Att. B at 10; PX18 at 2-3 ¶ 6, Att. A at 8; PX21 at 3 ¶ 7, Att. A at 12; PX22 at 3 ¶ 5, 5-6 ¶¶ 20-22, Att. A at 12, Att. B at 22, Att. C at 32, Att. D at 40; PX23 at 3 ¶ 6, Att. A at 9; PX24 Att. A at 5, Att. B at 15; PX25 at 3 ¶ 6, Att. A at 7; PX35 Att. Y at 723 ¶ 41.)

106.    Despite the express Total Purchase Price representation, Defendants charged

upfront costs by disbursing to consumers the Total Purchase Price less fees, resulting in

consumers receiving significantly less than the represented Total Purchase Price.  (PX10 at 3 ¶¶

7-8 (Defendants wired consumer only $42,002 instead of Total Purchase Price of $45,000);

PX11 at 3 ¶ 10 (Defendants wired only $36,002 instead of Total Purchase Price of $39,001);

PX12 at 4 ¶ 16 (Defendants wired only $57,502 instead of Total Purchase Price of $60,000);

PX13 at 5 ¶ 17; PX14 at 2 ¶ 6 (Defendants wired only $26,002 instead of Total Purchase Price of

$30,000) PX16 at 3 ¶ 9 (Defendants wired only $12,502 instead of Total Purchase Price of

$15,000); PX18 at 3 ¶ 8 (Defendants wired only $15,601 instead of Total Purchase Price of

$22,000); PX21 at 5 ¶ 18 (Defendants wired only $25,002 instead of Total Purchase Price of

$30,000); PX22 at 4 ¶ 15 (Defendants wired only $17,502 instead of Total Purchase Price of

$20,000), at 5 ¶¶ 19-20 (Defendants wired only $20,868 instead of Total Purchase Price of

$23,368), 6 ¶ 21 (Defendants wired only $18,301 instead of Total Purchase Price of $20,500), 6

¶ 22 (Defendants wired only $8,884 instead of Total Purchase Price of $9,884); PX23 at 7 ¶ 28

(Defendants wired only $91,500 instead of Total Purchase Price of $100,000); PX25 at 4 ¶ 18

(Defendants wired only $20,502 instead of Total Purchase Price of $22,002); PX35 Att. S at 572

¶ 28 (Defendants wired only $22,002 instead of Total Purchase Price of $30,000), Att. T at 597 ¶

190 (Defendants funded 20% less than agreed), Att. Y at 723 ¶¶ 43-44 (Defendants wired only

$50,000 instead of Total Purchase Price of $100,000).)

107.    Indeed, it was Defendants' policy to deduct fees from the Total Purchase Price

before depositing funds into consumers' accounts.  (PX05 at 5 ¶¶ 9, 10, 6 ¶¶ 11, 12;[8] PX07 at 5 ¶

---

[8] In response to each request in the FTC's requests for admissions, Giardina invoked the Fifth
Amendment.  (*See* PX05, PX07.)  To the extent this statement of fact cites to portions of Exhibits
PX05 and PX07 (here and below), an adverse inference should be drawn against Defendant

7, 5-6 ¶ 8; PX08 Att. C at 13 ¶¶ 4, 6, 9, 10, Att. E at 27 ¶¶ 6, 7; PX28 at 53 211:9-20; PX35 Att.

II at 1313 (Braun held back an additional, arbitrary two thousand dollars on top of fees, to "try

and make extra money with no risk lol.").)

108.    Consumers complained that fees had been deducted from the amount of funds

Defendants agreed to provide.  (PX10 at 3-4 ¶ 8 (consumer did not recall seeing information

about fees when she signed Merchant Agreement); PX12 at 4 ¶ 16; PX13 at 4 ¶ 15 (consumer

saw nothing in papers providing for any fees); PX18 at 3 ¶ 8.)

109.    In one instance, Defendants provided $57,502 in funding when the merchant

agreement promised $60,000 in funding.  (PX12 at 5 ¶ 16.)  Braun told the inquiring consumer

that Braun held back thousands of dollars in "brokerage fees" for his work.  (PX12 at 5 ¶ 16.)

110.    When another consumer called Defendants to ask why he had received less than

promised, Defendants said those were normal fees and explained "This is how we work. There

are no exceptions."  (PX13 at 5 ¶17.)  The consumer had not heard about this before taking out

the cash advance and had seen nothing in the papers he signed indicating Defendants would

reduce the advance for fees or any other amount.  (PX13 at 5 ¶ 17.)

111.    The funding documents consumers signed included an "Appendix A: The Fee

Structure" that lists various fees, including an "Origination Fee" "to cover Underwriting and

related expenses" and "ACH Program Fee."  (PX10 Att. A at 15; PX11 Att. A at 13; PX12 Att. B

at 18; PX14 Att. A at 18, Att. B at 34; PX15 Att. A at 18, Att. B at 30, Att. C at 42; PX17 Att. B

---

Braun and given significant weight.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551,
1558 (1976); *see also Brink's, Inc. v. New York*, 717 F.2d 700, 710 (2d Cir. 1983) (adverse
inference may be drawn against employer for employee's invocation of Fifth Amendment);
*United States v. District Council*, 832 F. Supp. 644, 652 (S.D.N.Y. 1993) (holding that refusal of
co-conspirator to testify may justify adverse inference against other conspirators).

at 15; PX18 Att. A at 17; PX21 Att. A at 17; PX22 Att. A at 17, Att. B at 27, Att. C at 37, Att. D at 48; PX23 at 3 ¶ 9, Att. A at 17; PX24 Att. A at 10; PX25 at 3 ¶ 9, Att. A at 12; *see also* PX35 Att. FF at 937-60.)

112.    Nothing in the Merchant Agreement, however, stated that those fees would be deducted from the "Total Purchase Price" or would otherwise be charged in all agreements.  In fact, the Merchant Agreement expressly stated that consumers "will be held responsible" for fees only "from a rejected ACH attempt or an event of default."  (PX10 Att. A at 10; PX11 Att. A at 8; PX12 Att. B at 14; PX14 Att. A at 10, Att. B at 26; PX15 Att. A at 10, Att. B at 22, Att. C at 34; PX17 Att. B at 10; PX18 Att. A at 8; PX21 Att. A at 12; PX22 Att. A at 12, Att. B at 22, Att. C at 32, Att. D at 40; PX23 Att. A at 9; PX24 Att. A at 5, Att. B at 15; PX25 Att. A at 7.)

113.    Indeed, Defendants provided their employees with no written policies or guidance regarding explaining fees to consumers.  (PX26 at 15 41:18-22, 17 43:12-15.)

114.    And if consumers did not specifically ask about fees, Defendants' representatives typically did not inform consumers about them.  (PX26 at 16-17 42:20-43:10.)

115.    Irrespective of the inconspicuous and vague listing of the fees, in numerous instances Defendants charged fees greater than the sum of those two fees.  (PX07 at 6 ¶¶ 9, 10; PX08 Att. E at 27 ¶¶ 8, 9; PX11 at 3 ¶¶ 8, 10 (Appendix A listed fees as $999 but Defendants deducted $3,998 in fees); PX18 at 3 ¶ 8 (Appendix A listed fees as $4,000 but Defendants deducted $6,399 in fees); PX22 at 4 ¶ 15 (Defendants deducted additional $1,000 in fees beyond those listed in Appendix A), 5 ¶ 20 (Defendants deducted additional $2,500 in fees beyond those listed in Appendix A), 6 ¶ 21 (Defendants deducted additional $2,199 in fees beyond those listed in Appendix A), 6 ¶ 22 (Defendants deducted additional $1,000 in fees beyond those listed in Appendix A); PX23 at 3 ¶ 9, 7 ¶ 28, Att. A at 17 (Origination and ACH Program Fees blank on

28

contract, yet Defendants deducted $8,500 in fees); PX25 at 4 ¶ 19 (Defendants deducted additional $1,500 in fees beyond those listed in Appendix A); PX26 at 26 53:21-24; PX28 at 47-49 190:11-192:17, 51 196:3-25, 52 206:3-8; PX29 at 9 48:6-14, 10 51:2-52:24; PX31 at 7 34:11-45:3.)

116.    In another instance, Defendants did not disclose the two fees *at all*, even in buried paperwork.  (PX23 at 3 ¶ 9, Att. A at 17.)  Nevertheless, they deducted $8,500 from the promised Total Purchase Price.  (PX23 at 7 ¶ 28.)  Nor did they provide the consumer any explanation for doing so.  (PX23 at 8 ¶ 31.)

117.    In another instance, a consumer agreed to fees of $2,998 (which would have resulted in net funding of $22,002) even though she thought them "excessive and did not seem justified."  (PX25 at 3 ¶ 9.)  Instead, Defendants only wired $20,502, adding an additional $1,500 in fees.  (PX25 at 4 ¶ 18.)

118.    Indeed, Braun boasted that he never provided consumers the amount of funds promised in the Merchant Agreement.  (PX35 Att. II at 1332 (in one email, Braun said his that his typical approach to business is to never provide "300k even on a 300k deal" because "someone gotta keep the lights on around here" and explained that "there are extensive fees affiliated with the underwriting process and manual labor put into processing and funding of a deal, and there are fees that come off the top.").)

119.    In one instance, Braun explained in an email to his underwriter that he had deposited $25,000 less than the total purchase price.  He kept a "reserve of 25k lol kept daily same, and i ripped ass whole apart with 11k fee."  The underwriter asked if Braun had ever sent the consumer the $25,000 in reserve, and Braun replied, "NOPE LOLLLL." (PX35 Att. II at 1336.)

120.    In another instance, the merchant agreement listed $14,999 in fees and Braun ordered that $19,998 be withheld.  (*Compare* PX35 Att. II at 1340, 1436 *with* PX35 Att. II at 1341.)

121.    In another instance, Braun instructed that $3,998 be withheld in fees, when the merchant agreement listed $2,998 in fees. (*Compare* PX35 Att. II at 1156 *with* PX35 Att. II at 1434-35.)

122.    In another instance, Braun instructed that $1,399 be withheld in fees when the merchant agreement listed $999 in fees.  (*Compare* PX35 Att. II at 1158 *with* PX35 Att. II at 1343, 1437.)

123.    In another instance, Braun said he charged higher fees than listed "when I can," admitting in that instance the contract fees were $4,999 and he "changed it to 19,999 and 19,999 lol cause I smelled the opportunity it's extra 30k I gotta do what I gotta do."  (PX35 Att. II at 1344.)

124.    In another instance, Braun sent a "Please Fund" email that listed $6,998 in fees, (PX35 Att. II at 1445), but the fees listed in the contract were only $1,899.  (PX35 Att. II at 1348, 1438.)

125.    In another instance, a broker complained to Reich about the excessive fees his small business consumer paid: "Your boy is a fucking asshole and I will not send anything anymore bro. He charged this guy $3,300 in fees and that's not the agreement we had man." (PX35 Att. II at 1349.)

126.    In another instance, Defendants wired a consumer $15,601 when the merchant agreement promised to provide $22,000.  (PX18 at 3 ¶ 8.)  The fees (buried in the merchant agreement) were listed at $4,000, but Defendants held back even more, $6,399.  (PX18 at 3 ¶ 8.)

When the consumer talked to Defendants' broker about it, he was told the only option was to send the money back; the consumer needed the money to make payroll so he accepted the lower amount.  (PX18 at 3 ¶ 8.)

127.   In another instance, Defendants wired a consumer $12,502 when the merchant agreement promised to provide $15,000.  (PX16 at 3 ¶¶ 8-9.)

128.   In another instance, a consumer's accountant and lawyer had an extended email conversation with Reich disputing his attempts to collect on the agreement because Defendants had not provided the full funding promised.  (PX35 Att. II at 1352-62.)  The consumer's attorney noted that the merchant agreement provided that the consumer would receive $50,000 and pay back $75,950.  (PX35 Att. II at 1361.)  Defendants sent the consumer $27,500, $22,500 less than promised.  (PX35 Att. II at 1360-61.)  Reich initially explained the gap by saying they held back $20,000 as "insurance."  (PX35 Att. II at 1359.)  Later, he offered to provide $17,500 to the consumer to fulfil Defendants' obligation.  (PX35 Att. II at 1355.)  The offer was $17,500, and not the full $22,500 that was promised, because there were "fees involved."  (PX35 Att. II at 1354.)

129.   In another instance, Braun wrote to Reich, "was just funded 43k and only deposited 15k – lol."  (PX35 Att. II at 1446.)

130.   In a random sample of 1,499 deals, Defendants deducted more in fees than what was listed in Appendix A to the merchant agreements from approximately 34.6% deals, corresponding to approximately 518 deals with overcharged fees.[9]  (PX34 at 11 ¶ 32; *compare*

---

[9] In the random sample, Defendants withdrew more fees than what was listed in Appendix A to the merchant agreement on 34.6% of deals (with a 95% confidence interval of 22.0% to 49.1%), corresponding to a range between 329 and 736 deals out of 1,499 total deals with consumers. (PX34 at 11 ¶ 20.)

*also* PX35 Att. AA at 772 and Att. FF at 946 *with* PX35 Att. JJ at 1488; *compare also* PX35 Att. AA at 805 and Att. FF at 956 *with* PX35 Att. JJ at 1474; *compare also* PX35 Att. AA at 781 and Att. FF at 949 *with* PX35 Att. JJ at 1494; *compare also* PX35 Att. AA at 754 and Att. FF at 939 *with* PX35 Att. JJ at 1476; *compare also* PX35 Att. AA at 774 and Att. FF at 947 *with* PX35 Att. JJ at 1499.)

131.    Consumers regularly complained to Defendants that they received fewer funds than they expected to receive.  (PX04 at 4 ¶ 19; PX05 at 7 ¶ 15; PX06 at 10 ¶ 24; PX08 Att. C at 14 ¶ 14; PX09 at 8 ¶ 21; PX10 at 3-4 ¶ 8; PX26 at 19 45:15-22; PX35 Att. II at 1349 (a broker complained to Reich about the excessive fees his small business consumer paid).)

### C. Defendants Used Unfair Practices in Connection with Their Funding Services

#### 1. Defendants Unfairly Used Confessions of Judgment

132.    To receive funding, Defendants required that every small business consumer and its owner, in an individual capacity, sign a Confession of Judgment confessing judgment in the event of a default of the Merchant Agreement.  (PX10 Att. A at 17-18, Att. B at 28-29, Att. C at 40-41, Att. D at 51-51, Att. E at 63; PX11 Att. A at 15; PX12 Att. C at 22-24; PX13 Att. A at 20-22; PX14 Att. B at 22-24; PX15 Att. D at 47-49, Att. E at 56-59; PX16 Att. C at 51-52; PX17 at 2-3 ¶ 6, Att. B at 16-18; PX18 Att. A at 17-19; PX21 Att. A at 9-11; PX22 Att. B at 19-21, Att. C at 29-31, Att. D at 52-54; PX23 Att. A at 21-23; PX24 Att. A at 12-14; PX25 Att. A at 6.)

133.    There were three versions of Defendants' Merchant Agreements that governed the specific and limited circumstances under which Defendants would execute upon the COJ.  None of those versions permitted Defendants to declare a default and execute upon the COJ if the consumer's business slowed down or shut down.

134.    One version of Defendants' Merchant Agreement (Section 1.8) explicitly provided that Defendants would not hold consumers in breach if payments were remitted more

slowly than anticipated because business revenues slowed down, and that consumers did not owe anything if the business shut down entirely:

> If Future Receipts are remitted more slowly than [Defendant] may have anticipated or projected because Merchant's business has slowed down, or if the full Purchased Amount is never remitted because Merchant's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Merchant has not breached this Agreement, Merchant would not owe anything to [Defendant] and would not be in breach of or default under this Agreement.

(PX13 Att. A at 11; PX14 Att. A at 11, Att. B at 27; PX15 Att. A at 11, Att. B at 23, Att. C at 35; PX18 Att. A at 9; PX22 Att. D at 41; PX23 Att. A at 10.)

135.    Another version of the Merchant Agreement authorized Defendants to file a COJ (as "Protection 3" against default) only "[u]pon breach of any provision in this paragraph 1.11." (PX10 Att. A at 11, Att. B at 22, Att. C at 34, Att. D at 45, Att. E at 57; PX11 Att. A at 9; PX12 Att. B at 15; PX16 Att. A at 13; PX17 Att. B at 11; PX21 Att. A at 13; PX22 Att. A at 13, Att. B at 23, Att. C at 33; PX24 Att. A at 6; PX25 Att. A at 8.)  In turn, Paragraph 1.11 of this Merchant Agreement spelled out five instances in which a COJ could be filed; failure to make payments because of a business slow down or shut down is *not* listed among those instances permitting filing of the COJ:

> (a)  Merchant takes any action to discourage the use of electronic check processing that are settled through [the assigned electronic check] Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the RCG electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse or unacceptable to RCG; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disaster or acts of God) [sic] transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of RCG, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation

satisfactory to RCG; or (e) Merchant takes any action, fails to take any action, or offers any incentive – economic or otherwise – the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processors.

(PX10 Att. A at 11, Att. B at 22, Att. C at 34, Att. D at 45, Att. E at 57; PX11 Att. A at 9; PX12 Att. B at 15; PX16 Att. A at 13; PX17 Att. B at 11; PX21 Att. A at 13; PX22 Att. A at 13, Att. B at 23, Att. C at 33; PX24 Att. A at 6; PX25 Att. A at 8.)

136.   A third version of the Merchant Agreement authorized Defendants to file a COJ (as "Protection 3" against default) only "[u]pon breach of any provision in this paragraph 1.10." (PX13 Att. A at 12; PX14 Att. A at 12, Att. B at 28; PX15 Att. A at 12, Att. B at 24, Att. C at 36; PX18 Att. A at 10; PX22 Att. D at 42; PX23 Att. A at 11.)  In turn, Paragraph 1.10 of this Merchant Agreement also spelled out five instances in which a COJ could be filed be filed; as above, none of these instances apply to consumers who were current in their payments or who had missed payments due to a business slow down:

(a)  Merchant takes any action to discourage the use of electronic check processing that are settled through [the assigned electronic check] Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the RCG electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to RCG; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor or to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disaster or acts of God) [sic] transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without (i) the express prior written consent of RCG, and (ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to RCG; or (e) Merchant takes any action, fails to take any action, or offers any incentive – economic or otherwise – the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than checks that are settled through Processor.

(PX13 Att. A at 11-12; PX14 Att. A at 11-12, Att. B at 27-28; PX15 Att. A at 11-12, Att. B at 23-24, Att. C at 35-36; PX18 Att. A at 9; PX22 Att. D at 41; PX23 Att. A at 10-11.)

137.    Despite the express language of the Merchant Agreements, in numerous instances, Defendants filed COJs against consumers in circumstances not permitted by their agreements. For example, Defendants filed COJs against consumers:

- who were current on their daily payments (PX05 at 8 ¶¶ 20, 21; PX08 Att. C at 14 ¶¶ 18, 19; PX26 at 38 80:9-12);

- whose bank accounts had insufficient funds from which to withdraw daily payments (PX05 at 8-9 ¶¶ 22, 23; PX08 Att. C at 15 ¶¶ 21, 22; PX10 at 4-6 ¶¶ 12, 21; PX26 at 37-38 79:23-80:2);

- who had notified Defendants they could not make payments due to a business slow down (PX05 at 9 ¶ 26, 10 ¶ 27; PX08 Att. C at 15 ¶¶ 25, 26; PX10 at 5-6 ¶¶ 13, 15, 21; PX26 at 37 79:13-17; PX35 Att. U at 625 ¶¶ 14-15);

- who had notified Defendants they could not make payments because their business went bankrupt or otherwise ceased operating in the ordinary course of business (PX05 at 10 ¶¶ 28, 29; PX08 Att. C at 16 ¶¶ 27, 28; PX26 at 37 79:18-23); and

- who had notified Defendants they were experiencing technical difficulties with their bank accounts that prevented the withdrawal of daily payments.  (PX05 at 10-11 ¶¶ 30, 31; PX08 Att. C at 16 ¶¶ 29, 30; PX12 at 6 ¶ 21; PX26 at 38 80:4-8), doing so even after receiving assurances that the consumers were working to resolve the technical difficulties.  (PX05 at 11 ¶¶ 32, 33; PX08 Att. C at 16 ¶¶ 31, 32.)

138.    In numerous instances, Braun directed that a COJ be filed after a consumer had insufficient funds in their account to pay the daily debits for four days.  (PX32 at 7-8 29:9-30:6; PX35 Att. II at 1164 (Braun directed the filing of a COJ after a consumer "bounced 4+ payments" and asked to restructure the payment schedule), 1363 (filed COJ after withdrawals bounced more than four times), 1188 (Braun explained to a consumer that when a consumer misses payments four times the consumer is in default), 1195 (Braun declared default when a consumer "MISSED 4 PAYMENTS AND SAYS THEY WONT HAVE FUNDS TILL AN INVOICE HITS."), 1364 (Braun decided to file a COJ against a consumer when the consumer

"bounced 4+ payments."), 1368 (Reich notified Braun of a default on a Ram deal, who then forwarded the information to Giardina and other employees, among others, informing them that there was a new default because the consumer "missed 4 plus payments.").)

139.    Braun would overrule other employees on the issue of whether to file a COJ against a consumer who was behind on payments. For example, Reich and Braun were chatting about a consumer Reich was responsible for. (PX35 Att. II at 1373-74.)  The consumer, according to Braun, had missed six payments.   (PX35 Att. II at 1374.)  Braun and Reich disagreed about whether to file a COJ when Reich was working with the consumer to get payments.  (PX35 Att. II at 1374-78.)  Braun explained his philosophy on filing COJs: "we dont have a deal go bad in a week and give them the benefit of the doubt" (PX35 Att. II at 1377) and "why would i sit here and be ok waiting 3.5 more months on a deal that's bad."  (PX35 Att. II at 1379.)

140.    In another instance, Reich explained that a consumer's payments had bounced because her bank shut down her account and she was looking for a new one.   (PX35 Att. II at 1392.)  Braun decided to move forward with filing a COJ despite Reich's objection, calling Reich a "dick" and saying "michelle and reich prepare the docs, we will file, and send to every bank and get her processing as well. fuck it, this is just a waste of time other wise."  (PX35 Att. II at 1392.)

141.    Numerous small business consumers had horrific experiences arising from Defendants' COJ practices.  For example, one consumer operated a business that had a significant decrease in revenue due to a seasonal slowdown in sales and had three payments to Defendants bounce due to insufficient funds.  (PX10 at 5-6 ¶¶ 15-17.)  Braun made numerous threats to the consumer but when the consumer did not have the revenue to make the daily

payments, Defendants filed a COJ against the consumer and his company.  (PX10 at 5-6 ¶¶ 17-21.)  After the COJ was filed, Defendants called the consumer and offered to settle for $50,000, even though the consumer had only received $46,000 of the promised $100,000 advance and had already repaid $52,937.96. The consumer determined the offer was not sensible.  (PX10 at 7 ¶ 25.)  By making threats, filing a COJ against this consumer who lacked the revenues to make daily payments, and making an unreasonable settlement offer, Defendants caused the consumer heartbreak, forcing him to comply with unbearable terms of repayment and seemingly attempting to strip him of every dollar his business had earned.  (PX10 at 7-8 ¶¶ 26-27.)

142.    In another instance, a consumer who ran a religious organization had financial difficulties resulting in insufficient funds to support daily withdrawals.  (PX16 at 3 ¶¶ 11-12.) After numerous attempts to work out a payment plan, and numerous threats by Braun, with no notice Defendants filed a COJ against the business and the consumer.  (PX16 at 6 ¶ 23.) Defendants claimed that the consumer owed at least $4,475 more than he did.  (PX16 at 7 ¶ 27.) The religious organization was unable to operate because its bank accounts were frozen.  (PX16 at 8-9 ¶ 32.)  The consumer ultimately paid the judgment by borrowing from friends and family so that he could be free from Defendants.  (PX16 at 9 ¶ 35.)  He lost control over the religious school he had been running, he became the subject of intense gossip, his reputation was disparaged, and he suffered from shunning.  (PX16 at 9 ¶ 36.)

143.    Indeed, in numerous instances, the affidavits of nonpayment filed by Defendants with consumers' COJs contained numerous misrepresentations including that consumers were in default under the Merchant Agreement when they were not and that consumers had paid less than they had paid.  (PX10 at 6-7 ¶¶ 21-23; PX11 at 4-5 ¶¶ 13-15; PX13 at 6-8 ¶¶ 26-30; PX15 at

5-7 ¶¶ 18-22; PX16 at 6-7 ¶¶ 23-27; PX18 at 4 ¶¶ 13-15; PX21 at 7-8 ¶¶ 31-34; PX22 at 8-9 ¶¶

36-40; PX32 at 8 30:19-32:4, 9-10 44:20-49:16, 11 50:8-53:6, 12 54:10-55:6, 12-13 56:3-58:18.)

144.     For example, a consumer blocked debits on his bank account because someone

had withdrawn an unauthorized $10,000 debit.  (PX13 at 5 ¶¶ 18-19.)  The consumer had

multiple calls with Braun to explain why he had blocked debits and to make other payment

arrangements, but Defendants still filed a COJ against the consumer.  (PX13 at 5-7 ¶¶ 20, 25-26.)

Defendants filed an affidavit in support of the COJ that made numerous misrepresentations,

including that the consumer had continually failed to remit collections, when in fact the company

had missed only one payment and had made multiple attempts to work out a solution with

Defendants.  (PX13 at 7-8 ¶¶ 27-30, Att. B at 27-29.)  After Defendants filed the COJ, every

time the consumer added funds to his account to pay other obligations, Defendants emptied the

bank account, ultimately taking tens of thousands of dollars from the consumer.  (PX13 at 6 ¶

25.)  Defendants also withdrew funds from the consumer's personal bank account.  (PX13 at ¶

25.)  Defendants' COJ led to numerous other companies obtaining judgments of confession

against the consumer.  (PX13 at 8 ¶ 31.)  As a result of the judgments, the company's creditors

refused to provide funding.  (PX13 at 8 ¶ 32.)  The company lost employees and defaulted on the

mortgages for various real estate projects.  (PX13 at 8 ¶ 32.)  The consumer's personal finances

were harmed, causing him to fear that he would lose his house.  (PX13 at 8 ¶ 32.)  The

consumer's personal relationships with his loved ones suffered.  (PX13 at 8 ¶ 32.)

145.     In another instance, Defendants filed two COJs against a consumer who had never

missed a payment to Defendants because Defendants learned that the consumer had obtained a

cash advance from another provider.  (PX15 at 5-7 ¶¶ 16, 18, 24.)  The consumer was surprised,

because he had disclosed to Defendants that he had other cash advances when he signed his first

agreement with Defendants, and he was not aware of any contract provision preventing him from taking other cash advances.  (PX15 at 5 ¶ 17.)  Nor is there such a provision.  (PX15 Att. A at 10-14.)  Defendants immediately withdrew $123,000 from the consumer's corporate bank account based on the judgments.  (PX15 at 7 ¶ 23.)  Shortly thereafter, Braun called the consumer and said he could pay off his obligations by taking out a new cash advance from another company; the consumer had no choice but to agree.  (PX15 at 7 ¶¶ 25-26.)  The consumer ultimately had to sell a share of his business to a third party to pay off his debt Defendants and avoid closing the business.  (PX15 at 7-8 ¶ 27.)  As a result of this experience, the consumer's company came within days of closing and having to lay off 150 employees.  (PX15 at 8 ¶ 28.)  The consumer was horrified that the business he worked for years to build into a productive enterprise was almost destroyed as a result of Defendants' practices.  (PX15 at 8 ¶ 28.)

146.    In another instance, a consumer called Braun to ask for a temporary adjustment of his daily debits because the consumer's clients had not paid their invoices and the consumer did not have enough revenue to cover the daily debits.  (PX12 at 5 ¶ 17.)  Braun told the consumer "I don't care about your problems" and "I'll default you before you can get out of the bathroom."  (PX12 at 5 ¶ 18.)  The consumer took these statements as a threat that Defendants would declare the company in default if they missed one payment.  (PX12 at 5 ¶ 18.)  That consumer was later informed by his bank that the bank suspected Defendants' debits of being fraudulent.  (PX12 at 6 ¶ 21.)  The bank blocked Defendants' debits from the consumer's account after trying unsuccessfully to reach Braun.  (PX12 at 6 ¶ 21.)  The consumer informed Braun that the bank had blocked Defendants' debits.  (PX12 at 6 ¶ 21.)  Nevertheless, Defendants filed a COJ against the business and the consumer in his personal capacity.  (PX12 at 6 ¶ 21, Att. C at 20-30.)  Braun

demanded that the consumer call the bank, with Braun also on the phone; the consumer did so and the bank lifted the block on Defendants' debits.  (PX12 at 7 ¶ 24.)  Shortly thereafter, Defendants debited the account for $39,107.52, draining the entire account.  (PX12 at 7 ¶ 25.)  After that, Defendants restarted the daily debits as if he had not paid the nearly $40,000 lump sum.  (PX12 at 7 ¶ 26.)  To make payments to Defendants (ultimately repaying double what he owed), the consumer was forced to take out other merchant cash advances, relying on a cycle of new cash advances for over two years to pay bills and keep up with payments on the advances.  (PX12 at 7 ¶¶27-28.)  The chain of events forced the consumer to close his business and led to an unsuccessful suicide attempt.  (PX12 at 7 ¶ 29.)

147.    In another instance, Defendants filed a COJ with a supporting affidavit claiming that the consumer's company owed $40,482, when in fact it owed $23,235.  (PX14 at 5 ¶ 19.)  The consumer only found out about the COJ filing from notices he received from Wells Fargo and PayPal that they would be turning over his funds to Defendants.  (PX14 at 4 ¶¶ 12-13.)  Because he was so frightened of Braun, the consumer borrowed money from his grandmother to pay Defendants, even though he did not owe the amount Defendants claimed.  (PX14 at 6-7 ¶ 26.)  The judgment from Defendants caused a ripple effect and he defaulted on other payments.  (PX14 at 7 ¶ 28.)  Defendants' judgment, while paid off, was never vacated, so it continued to show up on credit searches, making it impossible for the consumer to write checks, send an ACH, or send a wire.  (PX14 at 7 ¶ 28.)  The auction and insurances companies vital to the operation of his business were not willing to work with him anymore.  (PX14 at 7 ¶ 28.)  He ultimately filed for bankruptcy and had to close his business.  (PX14 at 7 ¶ 28.)  He cannot get a personal bank account since the company was held jointly in his name.  (PX14 at 7 ¶ 29.)

148.    In another instance, a consumer began to experience reduced cash flow.  (PX11 at 4 ¶ 12.)  The consumer had twice previously tried to call Defendants to address issues: first, to ask why less money than promised was initially deposited in his account, and second to complaint about double debits after holidays.  (PX11 at 3-4 ¶¶ 10-11.)  Since he was previously unable to contact Defendants to address issues, when he determined that the company had insufficient revenue to make daily payments the consumer instructed his bank to block future debits from Defendants.  (PX11 at 4 ¶ 12.)  The same day the consumer blocked debits, Defendants filed a COJ against the consumer.  (PX11 at 4 ¶ 13, Att. D at 25-30.)  Defendants seized the company bank accounts and other accounts for which the consumer was listed as an account holder, including his daughter's college savings account and his 90-year-old mother's account.  (PX11 at 5-6 ¶ 17.)  Being declared in default made it more difficult for the company to obtain credit and bank loans in the following years.  (PX11 at 6 ¶ 20.)

149.    In another instance, a small business consumer had cash flow issues and could not continue making its daily payments.  (PX18 at 3-4 ¶ 11.)  With its business slowing down, the consumer unsuccessfully attempted to work out a new payment plan with Defendants.  (PX18 at 3-4 ¶ 11.)  Because the consumer could not keep up with his payments, he instructed his bank to block withdrawals from Defendants, with the intention of restarting them when the company had sufficient cash flow.  (PX18 at 3-4 ¶¶ 11-12.)  Defendants filed a COJ almost immediately.  (PX18 at 4 ¶ 13.)  The company's bank accounts and PayPal accounts were frozen; the consumer had to scramble to open a new bank account so the company could continue operating.  (PX18 at 5 ¶ 16.)  Once the consumer had reestablished a steady cash flow, he hired an attorney and attempted to resolve his outstanding obligation to Defendants, but Defendants refused to accept anything other than a lump sum payment of the judgment and the consumer could not afford to

do that.  (PX18 at 5-6 ¶ 20.)  The experience with Defendants stunted the company's growth. Defendants put liens on the consumer's corporate and personal property that the consumer has not been able to clear, making it impossible to get a revolving line of credit from a bank to grow the business.  The experience with Defendants caused a potential buyer of the business to back out of the deal.  (PX18 at 6 ¶ 21.)

150.    In another instance, a consumer experienced a 50 percent reduction in revenues and asked Defendants for an adjustment in his daily payments.  (PX19 at 4 ¶¶12-15.)  Defendant Braun responded to these requests stating "Who do you think you are, motherfucker?  You don't know who you're fucking with.  We can get you wherever we want."  (PX19 at 5 ¶¶ 18-19.) Defendants refused to adjust the daily payment, and the consumer was forced to instruct his bank to block future debits.  (PX19 at 5 ¶ 22.)  In response, Defendants filed his COJ and obtained judgment against the consumer.  (PX19 at 6 ¶ 27.)

151.    In another instance, a consumer thought he had negotiated a 10-day hold on daily payments to allow for enough time for the consumer's customers to pay outstanding invoices. (PX22 at 7-8 ¶¶ 30-33.)  Despite Defendants' assurances, they continued to debit daily payments from the consumer's bank accounts.  (PX22 at 8 ¶ 33.)  Accordingly, the consumer put a temporary hold with his bank to prevent further debits.  (PX22 at 8 ¶ 34.)  In response, Defendants filed his COJ and obtained judgment.  (PX22 at 8 ¶ 35.)  Not only did Defendants freeze corporate accounts, they also froze two accounts of the business owner's minor children for which the consumer was a joint account holder.  (PX22 at 10 ¶ 42.)  Eventually, Defendants collected an additional $50,000 from both the consumer's corporate account and from other accounts for which the business owner was an account holder.  (PX22 at 10 ¶ 46.)

152.    In another instance, a consumer was having cash flow problems and sought to work out a deferred payment plan with Defendants.  (PX35 Att. U at 625 ¶ 14.)  Defendants refused and, instead, immediately declared default.  (PX35 Att. U at 625 ¶ 15.)  The consumer later learned that Defendants had levied on his bank account, tying up access to over $40,000 even though Defendants' judgment was only $20,823.  (PX35 Att. U at 626 ¶ 20.)  The levy had a devasting impact on the consumer's business since the levy included not just the consumer's funds but funds the consumer's clients had deposited with the consumer.  (PX35 Att. U at 626 ¶ 21.)  Without the levy being removed, the consumer risked default on his existing contracts that would put him out of business.  (PX35 Att. U at 626 ¶ 21.)

153.    By filing COJs against small business consumers who were current in their payments or could not keep up with their payments due to a slowdown in revenue, Defendants caused those consumers substantial financial harm, including:

- Numerous small business consumers closed their businesses (PX12 at 7 ¶ 29; PX14 at 7 ¶ 28), or were on the brink of closing (PX15 at 8 ¶ 28; PX22 at 10-11 ¶ 47; PX35 Att. U at 626 ¶ 21);

- Other small business consumers found it difficult to obtain credit and bank loans (PX11 at 6 ¶ 20; PX13 at 8 ¶ 32; PX14 at 7 ¶ 28; PX18 at 6 ¶ 21);

- Consumers lost employees and defaulted on other obligations (PX13 at 8 ¶ 32; PX14 at 7 ¶ 28; PX22 at 10-11 ¶ 47);

- Other small business consumers had to close and attempt to reestablish bank accounts and auto-payments, causing significant stress (PX14 at 7 ¶¶ 28-29; PX17 at 6 ¶ 20; PX18 at 5 ¶ 16); and

- Defendants' practices resulted in outstanding judgments, liens, and UCC filings against small business consumers that sometimes prevented them obtaining credit to grow their business or killed potential deals to sell the business.  (PX11 at 6 ¶ 19; PX14 at 7 ¶ 28; PX18 at 6 ¶ 21.)

154.    Defendants continued to cause financial harm even when disputes were fully resolved.  For example, one consumer settled with Defendants, yet Defendants failed to remove

43

the judgment from the consumer's credit report and the consumer had to contest the UCC lien to get it removed.  (PX11 at 6 ¶ 19; *see also* PX14 at 7 ¶ 28.)

155.    Defendants' practices have harmed small business consumers' personal finances. (PX13 at 8 ¶32.)

156.    At least one consumer declarant filed for personal bankruptcy.  (PX14 at 7 ¶ 29.)

## 2. Defendants Made Unfair Collection Threats, Including Death Threats

157.    In numerous instances, Defendants made threats or used other abusive language to consumers when trying collect amounts owed them.  As described below, Defendants

- threatened consumers with physical violence (including death) if they stopped making their daily payments (PX05 at 12-13 ¶ 38; PX07 at 12 ¶ 37; PX08 Att. C at 17 ¶¶ 36, 37; PX26 at 40 82:8-12; PX28 at 56-57 256:9-257:4, 57 257:15-19; PX30 at 8 43:22-44:8, 44:14-21);

- threatened to damage consumers' personal property if they stopped making their daily payments (PX05 at 14 ¶¶ 43, 44; PX08 Att. C at 17 ¶¶ 42, 43; PX26 at 40-41 82:23-83:3; PX30 at 8 44:9-13);

- threatened to cause financial harm to consumers who were behind on their payments (PX26 at 40 82:13-17);

- threatened to ruin consumers' reputation if they stopped making their daily payments (PX05 at 13 ¶¶ 40, 41; PX08 Att. C at 17 ¶¶ 39, 40; PX26 at 40 82:18-22); and

- used obscene or profane language in telephone calls to consumers who were struggling to make daily payments.  (PX05 at 12 ¶¶ 34, 35; PX08 Att. C at 16 ¶¶ 33, 34; PX26 at 40 82:3-7; PX28 at 54 253:18-21, 55 254:2-5, 57 257:5-14; PX30 at 8 43:13-21; PX35 Att. II at 1355.)

158.    Consumers routinely reported being threatened by Defendants over collections. For example, after obtaining judgment, a consumer business owner asked why Defendants had frozen his children's' accounts.  (PX22 at 10 ¶ 44.)  One of Defendants' representatives named "John" replied "Why don't you pay me, you redneck piece of shit?"  (PX22 at 10 ¶ 44.)  When the consumer tried to explain that he thought there was an agreement to suspend payments, John stated "I'm going to get my money one way or the other."  (PX22 at 10 ¶ 45.)  In another call,

John threatened the consumer "Be thankful you're not in New York, because your family would find you floating in the Hudson." (PX22 at 10 ¶ 45.) The consumer was quite disturbed by these comments and took them seriously. (PX22 at 10 ¶ 45.)

159.    In another instance, Braun threatened a consumer after Defendants filed a COJ against the consumer. When the consumer called Braun to discuss, Braun said, "Don't you know who I am," explaineded all the cash advance companies the consumer was working with were connected, and threatened, "I will kill you." (PX12 at 6 ¶ 23.) Defendants filed the COJ after the bank put a hold on Defendants' debits (PX12 at 6 ¶ 21), and Braun forced that consumer to call the bank to lift the hold so that Defendants could resume its regular debits. (PX12 at 7 ¶ 24.) After the hold was lifted, Defendants took the full $39,107.52 in the account at the time and also resumed making a daily debit. (PX12 at 7 ¶¶25-26.) The consumer ultimately paid Defendants double the original repayment amount. (PX12 at 7 ¶ 27.)

160.    In another instance, a consumer's revenues were too low to make daily payments due to seasonal fluctuations in business and several payments bounced for insufficient funds. (PX10 at 4-5 ¶¶ 12-15.) She then received several calls from Braun, who demanded that she immediately pay the full balance. (PX10 at 5-6 ¶¶ 16-17.) Braun threatened "we will take everything from you." (PX10 at 6 ¶ 18.) Braun then told her "we are from New York, do not mess with us." (PX10 at 6 ¶ 18.) Braun threatened "we'll take care of you and your family." (PX10 at 6 ¶ 18.) The consumer understood that Braun or his associates "would do physical harm to me and to my family" if her company did not pay immediately. (PX10 at 6 ¶ 19.) The consumer was distraught and fearful for her personal safety and that of her family, and a friend told the consumer she had never seen her in such a state of distress. (PX10 at 6 ¶ 20.)

161.    In another instance, one consumer blocked future debits on his bank account after someone attempted to make an unauthorized $10,000 debit, resulting in Defendants' regular debit no longer going through.  (PX13 at 5 ¶¶ 18-19.)  Braun called the consumer and demanded "Where's my money?" and "You owe me money.  Give me my money now."  (PX13 at 5-6 ¶¶ 20-21.)  Braun then stated that if the consumer did not pay "I'll deal with this my own way," then hung up.  (PX13 at 6 ¶ 21.)  Braun called back later the same day, saying "I want my money" and telling the consumer not to "fuck with" him.  (PX13 at 6 ¶ 22.)  Braun threatened "I can literally make your life a living hell," "I will destroy you," and "You don't know who you're dealing with right now."  (PX13 at 6 ¶ 22.)  When the consumer called Braun again to explain that the regular debits were suspended because of the large unauthorized debit, Braun said "You're fucking with the wrong guy."  (PX13 at 6 ¶ 23.)  Braun continued, threatening "I know where you live," "I know where your mother lives," "I will take your daughters from you," and "You have no idea what I'm going to do."  (PX13 at 6 ¶ 24.)  It was clear to the consumer that Braun was threatening violence to his daughters, his mother, and himself, even though the consumer did not know how Braun knew anything about his family members.  (PX13 at 6 ¶ 24.)

162.    In another instance, a religious institution consumer was unable to make daily payments because of a decrease in charitable giving.  (PX16 at 3 ¶¶ 11-12.)  When the consumer reached out to set up an alternative payment plan, Braun said, "Do you know who I am? I know everyone in your Chabad-Lubavitch community.  I am going to come down there and beat the shit out of you in 770 Eastern Parkway [the main Chabad-Lubavitch synagogue in Crown Heights] so that people know that you are a thief, liar and dishonest."  (PX16 at 4 ¶ 14.)  Out of fear for his safety, the consumer made two wire payments to Defendants.  (PX16 at 4 ¶ 15.)  But the consumer was still unable to keep up with regular payments, and a few weeks later, Braun

46

called again, saying, "I am coming to Crown Heights.  I am going to beat the shit out of you and publicly embarrass you.  I will hang papers all over the lampposts in Crown Heights stating that you are a liar and a thief.  I am going to tell people that you are running an illegal operation and a scam."  (PX16 at 5 ¶¶ 18-19.)  Again, out of fear, the consumer scraped together some money to wire Defendants.  (PX16 at 5 ¶ 19.)  Even after Braun filed a COJ against the consumer, Braun continued to threaten him by making the following threats:

- I am going to make you bleed.  You are going to regret the day you met me.

- You had the audacity to send that cunt [name of consumer's attorney], who do you think she is?  I know everybody in your community.

- Enjoy hanging out with all the molesters on Crown Heights Watch.  You are like the people in the mikva [communal bathhouse] that molest little kids.

- I am going to send this to COLlive.com [a Chabad-Lubavitch community news site].  Wait until I get in touch with your friends and family.

- Are you on your knees? Can you suck. Suck my dick.

- I am going to take your money.  You stole from me and I'm going to give it to my son's yeshiva [religious school].

- I will make you suffer for every penny.

(PX16 at 7-8 ¶ 29.)  The consumer filed a police report and obtained an order of protection against Braun, who proceeded to ratchet up his threats against the consumer.  (PX16 at 9 ¶ 33.)  The consumer ultimately borrowed money from a friend to pay Defendants to be free from them.  (PX16 at 9 ¶ 35.)

163.    In another instance, after Defendants filed a COJ against one consumer, the consumer called Braun to explain Defendants should not have done so.  (PX14 at 6 ¶ 21.)  In response, Braun threatened the consumer, stating "you don't want to fuck with me.  Stop being a little bitch.  I have enough power I will ruin your life.  Pay up now or you will suffer."  (PX14 at

6 ¶ 22.)  The consumer was frightened for his physical well-being, as well as that of his wife and dog, and carried a gun for protection for a while.  (PX14 at 6 ¶ 23.)  Braun also called companies that the consumer worked with which caused those companies to stop working with the consumer.  (PX14 at 6 ¶ 24.)  The consumer ultimately borrowed money from his grandmother to pay Defendants and get out from under Braun's threats.  (PX14 at 6-7 ¶ 26.)

164.    In another instance, after Defendants filed a COJ against one consumer, the consumer started receiving threatening phone calls to get him to pay the judgment.  Calling day and night, seven days a week, the callers threatened to go to the consumer's house and take his property; called the consumer's parents and told them the consumer was in trouble; and called the consumer's largest customer to try to get them to pay Defendants directly.  (PX18 at 5 ¶¶ 17-19.)

165.    In another instance, when a consumer was asking for a reduction in daily payments due to a business slowdown, Braun threatened the consumer: "You don't know who you're fucking dealing with.  We can get you wherever we want."  (PX19 at 5 ¶ 19.)  Braun continued to call the consumer several more times making similar threats.  (PX19 at 5 ¶ 20.)  The consumer thought that Defendants would find him to do physical violence.  (PX19 at 5 ¶ 19.)  The consumer was so scared, he began carrying a gun with him, something he had never done before.  (PX19 at 5 ¶ 21.)

166.    In another instance, the consumer contacted Defendants to ask them to adjust the payment schedule due to a business downturn caused by Hurricane Harvey, and to complain about being overcharged.  (PX21 at 6-7 ¶¶ 25-28.)  A representative who identified himself as John, responded that if the consumer did not pay what was owed "We'll put you [out] of business" and the consumer would never do business again.  (PX21 at 7 ¶ 28.)  Defendants'

representative then threatened the consumer, "we know where you live," and that if he did not pay "we'll go after your family." (PX21 at 7 ¶ 29.) The consumer understood these to be threats to come to his home and do violence to his family. (PX21 at 7 ¶ 29.)

167. As another example, one consumer was unable to make daily payments because a strong hurricane season caused revenues to decrease significantly. (PX17 at 3 ¶ 9.) Defendants' daily withdrawals put the consumer's bank account in the negative, and the bank threatened to shut his account. (PX17 at 3 ¶ 9.) The consumer tried to work something out with Defendants so he could keep his bank account open and his business operating; multiple times, he asked his broker to work out a new payment schedule but was told no. (PX17 at 3-4 ¶¶ 10, 11, 13, Att. C at 21-22, Att. D at 24-25.) Around that time, one of Defendants' representatives called the consumer and threatened him, using aggressive and vulgar language. (PX17 at 4-5 ¶ 14.) Among other things, the representative stated that:

- I will spend ten times the amount of money that you ever fucking dreamed of to bring you down financially (PX17 Att. E at 31:4-6);

- There is no law that says I can't curse at a degenerate, low-life like [the consumer] (PX17 Att. E at 32:4-7);

- [Defendants' owner] has a ton of fucking money, and he would love to fry a guy like you (PX17 Att. E at 32:18-19);

- I'm just going to freeze every fucking thing. I'm going to file a judgment against you and your god damn business (PX17 Att. E at 41:18-22); and

- Have a fucking nice life . . . you fucking dickbag. Suck my cock. (PX17 Att. E at 42:2,11-12).

168. In numerous instances Braun told his colleagues he would be harassing consumers to get them to make payments. (PX35 Att. II at 1396 (Braun informed colleagues that he was going to harass a consumer who had insufficient funds to pay the daily withdrawal to get him to start repaying.), 1402-03 (in a chat with Reich, Braun told Reich to "get guy on phone

with me – ill get wire for the week / hes petrified of me."), 1404 (in an email with his

underwriter, Braun describes what he will do to a consumer: "Its ok, im gonna beat this bitch at

his own game, they may be sneaky and shady, but they never thought theyd ever land on a slick

mother fucker like me, ill rock his world," and later commented "im gonna get paid and make

yet again another grown man cry.").)

169.    On another occasion, Braun provided Reich with a script to use when calling a

consumer to get the consumer to resume regular payments.  Braun said "tell him we didnt get a

call//and he blocked 4 days ago//and fraud//bank fraud wire fraud//gonna prosecute them//and

spend ton of money making sure they lose there [sic] business and freedom."  (PX35 Att. II at

1325.)

170.    Small business consumers complained to Defendants about receiving threatening

telephone calls when they struggled to make daily payments.  (PX05 at 14-15 ¶ 46; PX08 Att. C

at 17 ¶ 45; PX26 at 43 85:7-18.)

171.    Defendants were aware that their representatives made threatening telephone calls

to consumers who were struggling to make daily payments.  (PX17 at 5 ¶ 16; PX26 at 43-44

85:19-86:4; PX28 at 59 261:2-6, 261:11-16 (Braun continued to engage in this conduct even

after broker asked him to stop threatening his consumers); PX30 at 8 44:22-45:2.)

172.    Defendants' practices caused substantial harm, such as:

- several consumers continued making daily payments or paid improperly obtained
  judgments (PX12 at 7 ¶¶25-27; PX14 at 6-7 ¶ 26; PX16 at 4 ¶ 15, 5 ¶ 19, at 9 ¶ 35);

- one consumer unsuccessfully attempted to take his own life (PX12 at 7 ¶ 29);

- another consumer started his business filled with optimism and gratitude for the
  opportunity to pursue his passion, but now is heartbroken by being preyed upon (PX10 at
  8 ¶ 27)

- another consumer was horrified that the business he worked for years to build into a productive enterprise was threatened by Defendants' practices (PX15 at 8 ¶ 28);

- another consumer said the experience harmed his relationships with loved ones (PX13 at 8 ¶ 32);

- another consumer was worried about the impact Defendants' calls to his family had on his family (PX18 at 5 ¶ 18);

- another consumer was subject to intense gossip and shunning (PX16 at 9 ¶ 36); and

- another consumer lost his relationships with the other companies vital to running his business and had to close.  (PX14 at 7 ¶ 28.)

173.    Defendants' practices continue to cause substantial fear of injury.  For example, numerous small business consumers remain afraid that Defendants will harm them, their families, or their colleagues.  (PX10 at 7-8 ¶ 26; PX13 at 6 ¶ 24.)

### 3. Defendants Made Unfair Unauthorized Withdrawals from Consumers' Bank Accounts

174.    Defendants' Merchant Agreements provided that Defendant would "debit the specific daily amount each business day."  (PX10 Att. A at 10, Att. B at 21, Att. C at 33, Att. D at 44, Att. E at 56; PX11 Att. A at 8; PX12 Att. B at 14; PX13 Att. A at 10; PX14 Att. A at 10, Att. B at 26; PX15 Att. A at 10, Att. B at 22, Att. C at 34; PX16 Att. A at 12; PX17 Att. B at 10; PX18 Att. A at 8; PX21 Att. A at 12; PX22 Att. A at 12, Att. B at 22, Att. C at 32, Att. D at 40; PX23 Att. A at 9; PX24 Att. A at 5, Att. B at 15; PX25 Att. at 7.)

175.    In numerous instances, however, Defendants withdrew multiple payments on one business day, typically the business day before or after a bank holiday.  (PX04 at 3 ¶ 60; PX05 at 15 ¶¶ 47, 48; PX08 Att. C at 17 ¶¶ 46, 47; PX10 at 4 ¶ 10; PX11 at 3-4 ¶ 11; PX12 at 5 ¶ 19; PX14 at 3 ¶ 8; PX15 at 5 ¶ 15; PX18 at 3 ¶ 10; PX21 at 5-6 ¶¶ 20-22; PX22 at 5 ¶ 16, 6 ¶ 24; PX23 at 7-8 ¶ 29; PX25 at 5 ¶ 22l; PX35 Att. R at 533 ¶ 14.)

176.     In some instances, Defendants withdrew more than what was authorized by the Merchant Agreement or Authorization Agreement for Direct Deposit.  (PX25 at 4-5 ¶ 19 (Contracts authorized $699 daily debits, but Defendants withdrew daily payments of $999).)

177.     In fact, although not permitted by the agreement, it was Defendants' policy to take out two debits before or after bank holiday.  (PX26 at 33 73:6-14, 34 75:2-5; PX35 Att. H at 246-47, 250, 259, 262, 270, 272, 283, 289, 292, Att. II at 1412 (email to Defendants' payment processor explaining the double debit instructions: "we are on recurring drafts but we want to draft on the holiday and actum probably doesnt draft from the merchant on holidays. so I want to draft 2 payments on tuesday to make up for the draft im not pulling on monday[.]").)

178.     Defendants made clear their policy on double debits after holidays to the payment processor.  Shortly after Thanksgiving 2016, Actum Processing requested that Defendants "[p]lease verify that you will want duplicate transactions set for your customers to hit Tuesday after the holiday," since the Christmas and New Year holidays were on Mondays that year. Defendants responded, "Since it is a banking holiday on the 26th and 1/2 , we would like those holiday payments to show up on the merchants bank statement on TUESDAY 12/27 and TUESDAY 1/3. Thanksgiving payment was perfectly done!!!"  (PX35 Att. II at 1418.)  Despite those instructions, Actum Processing did not pull double debits after the New Year's holiday 2017 to Defendants' satisfaction.  They emailed Actum Processing that "[t]oday are [sic] holiday payments were supposed to be drafted, a double draft for today and they werent pulled."  (PX35 Att. II at 1419.)

179.     Braun knew that Defendants were withdrawing double payments after holidays. (PX35 Att. II at 1423.)  In at least one instance, Braun directed Giardina to not withdraw an extra payment after a holiday for a specific consumer.  (PX35 Att. II at 1424.)  Shortly after the New

Year's holiday, he asked "what day does last weeks holiday payments come into bank?"  (PX35 Att. II at 1423.)

180.    Consumers did not expect to have two payments withdrawn in one day shortly after bank holidays.  (PX10 at 4 ¶ 10; PX11 at 3-4 ¶ 11; PX12 at 5 ¶ 19; PX15 at 5 ¶ 15; PX18 at 3 ¶ 10; PX26 at 35 76:18-23 (consumers complained to Defendants that they did not understand why Defendants were taking out two debits instead of one as required by the merchant agreements).)

181.    Indeed, Defendants did not inform consumers that they would debit two separate daily payments from consumers' bank accounts before or after bank holidays.  (PX07 at 6-7 ¶ 11; PX08 Att. E at 28 ¶ 10; PX26 at 34 75:17-22, 35 76:9-13; PX28 at 41-42 182:25-183:8, 43-44 186:13-187:11.)

182.    For example, one consumer understood the agreement's express statement that the debits would occur on "business days" to mean just that, not that they would be debited once, much less twice, on holidays.  (PX12 at 5 ¶ 19.)  He called Braun to complain, and Braun said, "you don't ever question what we do" and "if you ever call me again and question what I do, I will default you in a heartbeat."  (PX12 at 6 ¶ 20.)

183.    Another consumer called Defendants to complain because he understood that debits would only be withdrawn on business days, but Defendants told him he had agreed to make five payments per week and Defendants could deduct an extra payment for holidays. (PX10 at 4 ¶ 10.)

184.    Another consumer was surprised to be debited twice after a federal holiday because the contract said "business days" only.  (PX11 at 3-4 ¶ 11.)

185.    Another consumer did not think it was fair that Defendants could get money from his company when the bank was closed but he could not get money from the bank when it was closed.  (PX14 at 3 ¶ 8.)

186.    When another consumer raised the unexpected holiday double debit, he was told the debit was to make up for the missed withdrawal on the holiday.  (PX18 at 3 ¶ 10.)  The consumer explained the contract only called for withdrawals on business days, but never got another response.  (PX18 at 3 ¶ 10.)

187.    When another consumer asked why Defendants were debiting his accounts for holidays despite agreeing to only debit on business days, Defendants' representatives responded that they needed to double-debit in order to keep repayments "on track."  (PX22 at 6 ¶ 25.)

188.    Another consumer lamented that Defendants' unauthorized withdrawals "were extremely damaging" to her company.  (PX25 at 5 ¶ 24.)  The consumer believed that Defendants "exploited my business while it was experiencing a period of significant financial distress."  (PX25 at 5 ¶ 24.)  The business was eventually forced to cease operations.  (PX25 at 5 ¶ 24.)

189.    Another consumer emailed Defendants contesting a double withdrawal. "If you wish to please advice me ASAP what provision of what agreement allows you or your companies to withdraw from my account double payments. That action violates any and all agreements, is an act of bad faith and breech of contract."  (PX35 Att. II at 1426.)

## IV.    DEFENDANTS' KNOWLEDGE OF THE GRAMM-LEACH-BLILEY ACT

190.    Defendants admit that, to process debits from consumers' bank accounts, they used the services of a merchant processor, Actum Processing.  (PX01 at 5 ¶ 15; PX35 at 5 ¶ 13, Att. G at 210-244.)

191.    Defendants entered into a Client Services Application and Agreement with Actum Processing (PX35 Att. G at 211-242) that required them to

- "follow all regulations" and "any other applicable regulatory body" (PX35 Att. G at 214 (Section 4.2 of the Client Services Terms and Conditions); PX07 at 15-16 ¶ 41; PX08 Att. E at 32 ¶¶ 43, 49), and

- "operate [their] business in strict compliance with: (i) all laws and regulations applicable to Client's business to the highest legal and ethical standards, including, among others, the Federal Trade Commission Act of 1914 (the "FTC Act") and the rules and regulations promulgated thereunder." (PX35 Att. G at 215 (Section 5.3 of the Client Services Terms and Conditions). PX07 at 16 ¶ 42; PX08 Att. E at 32 ¶ 43, 33 ¶ 50.)

192.    The Client Services Application and Agreement further defines "Regulations" to mean "All federal, state and local regulations that govern Internet business, consumer information, credit card transactions and Transactions (as defined below), including but not limited to the FCRA, federal Regulation E and Title 31 of the Code of Federal Regulations Part 210, Gramm-Leach-Bliley Act, Federal Trade Commission Act, and Driver's Privacy Protection Act." (PX35 Att. G at 218; PX07 at 16-17 ¶ 43; PX08 Att. E at 32 ¶ 43, 33 ¶ 51.)

193.    Defendants entered into a Partner Agreement with QuarterSpot, Inc. that required them to warrant that they were not subject to investigation or legal proceedings related to any violation of the Gramm-Leach-Bliley Act.  (PX35 Att. II at 1448-54.)

## V.    CONSUMER INJURY AND CIVIL PENALTY CALCULATIONS

194.    In a random sample of 1,499 consumers, Defendants collected more than the represented Total Purchased Amount from approximately 26.4% deals, corresponding to approximately 395 deals with small business consumers that were overcharged.  (PX34 at 7 ¶ 19 (95% confidence interval of 17.6% to 37.0%, corresponding to a range between 263 and 554 consumers).)

195.    The random sample further indicates that for the deals where Defendants collected more than the Total Purchased Amount, Defendants collected from consumers, on average, $8,579 more than the represented Total Purchased Amount.  (PX34 at 8 ¶¶ 24-25.) Multiplying this amount by the approximate number of deals for which Defendants over-collected yields a consumer injury of approximately $3,388,705.  (Applying this number to the 95% confidence interval range yields a range of consumer injury of between $2,256,277 and $4,752,766.)

196.    In a random sample of 1,499 deals, Defendants deducted more in fees than what was listed in Appendix A to the merchant agreements from approximately 34.6% deals, corresponding to approximately 518 deals with small business consumers.  (PX34 at 11 ¶ 32 (with a 95% confidence interval of 22.0% to 49.1%), corresponding to a range between 329 and 736 deals out of 1,499 total deals with consumers.)

197.    The random sample further indicates that for the deals where Defendants deducted more in fees than what was listed in Appendix A to the merchant agreements, Defendants deducted, on average, $2,817 more in fees than what was listed in Appendix A to the merchant agreements.  (PX34 at 12 ¶¶ 36-37.)  Multiplying this amount by the approximate number of deals for which Defendants deducted more than the fees listed in Appendix A to the merchant agreements yields a consumer injury of approximately $1,459,206.  (Applying this number to the 95% confidence interval range yields a range of consumer injury of between $926,793 and $2,073,312.)

198.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by the Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d) (2022), sets the maximum civil penalty for

each violation for each violation of the GLB Act at $46,517.  Multiplying this number by the

approximate number of deals for which Defendants over-collected yields a possible maximum

civil penalty award of $18,374,215.  (Multiplying the penalty number by the 95% confidence

interval range yields a range of the possible maximum civil penalty award of between

$12,233,971 and $25,770,418.)

199.    Multiplying the maximum civil penalty per violation number by the approximate

number of deals for which Defendants deducted more than the fees listed in Appendix A to the

merchant agreements yields a possible maximum civil penalty award of $24,095,806.

(Multiplying the penalty number by the 95% confidence interval range yields a range of the

possible maximum civil penalty award of between $15,304,093 and $34,236,512.)

Respectfully submitted,

JAMES REILLY DOLAN
Acting General Counsel

Dated:  April 8, 2022                         */s/ Gregory A. Ashe*
                                             GREGORY A. ASHE
                                             JULIA E. HEALD
                                             MARGUERITE L. MOELLER
                                             Federal Trade Commission
                                             600 Pennsylvania Avenue NW
                                             Washington, DC 20580
                                             Telephone: 202-326-3719 (Ashe)
                                             Telephone: 202-326-3589 (Heald)
                                             Telephone: 202-326-2905 (Moeller)
                                             Facsimile: 202-326-3768
                                             Email: gashe@ftc.gov, jheald@ftc.gov,
                                                     mmoeller@ftc.gov

                                             Attorneys for Plaintiff
                                             FEDERAL TRADE COMMISSION