# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

RCG ADVANCES, LLC, et al.,

      Defendants.

**Case No. 20-CV-4432-LAK**

**FTC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT JONATHAN BRAUN**

TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   SUMMARY OF FACTS .......................................................................................2

      A.   Defendants Provided Small Businesses with Merchant Cash Advances in Exchange
           for Access to Merchants' Financial Accounts and Personal Assets .............................4

           1.   Defendant Braun ............................................................................................4

           2.   Defendants Provided Merchant Cash Advances in Exchange for Access to
                Consumers' Bank Accounts and Personal Assets....................................................4

      B.   At Defendant Braun's Direction, Defendants Repeatedly Made Misrepresentations
           About MCAs When Marketing Their Financing Products ...........................................5

           1.   Defendant Braun Directed Defendants to Withdraw Funds in Excess of Agreed-
                Upon Amounts ...........................................................................................5

           2.   Defendants Falsely Claimed They Did Not Require Personal Guaranties from
                Business Owners Receiving MCAs ..................................................................6

           3.   At Defendant Braun's Direction, Defendants Misrepresented that There Were No
                Upfront Costs and the Amount of Funding............................................................7

      C.   Defendants' Unfair Collection Practices....................................................................8

           1.   At Defendant Braun's Direction, Defendants' Unfairly Used Confessions of
                Judgment to Collect from Consumers.....................................................................8

           2.   Defendant Braun Carried Out Defendants' Abusive Collections Tactics, Including
                Making Death Threats........................................................................................9

           3.   At Defendant Braun's Direction, Defendants' Made Unauthorized Withdrawals
                from Consumers' Bank Accounts .......................................................................10

      D.   Defendant Braun Was Aware of the Gramm-Leach-Bliley Act ..................................10

III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST DEFENDANT
      BRAUN ............................................................................................................11

      A.   Summary Judgment Standard ..................................................................................11

      B.   This Court Has Jurisdiction and Venue Is Proper.......................................................15

      C.   Defendant Braun Violated Section 5 of the FTC Act ..................................................15

           1.   Defendants Misrepresented Their Financing Products (Count I) ..........................16

                a.   Legal Standard for Deception .......................................................................16

                b.   Defendants Made Three Types of Deceptive Representations......................17

2. Defendants Unfairly Used Confessions of Judgment (Count II), Made Violent Collections Threats (Count III), And Charged Consumers Without Authorization (Count IV) ............................................................................................ 19

    a. Legal Standard for Unfairness ........................................................ 19

    b. Defendants' Unfair Use of Confessions of Judgment .................... 21

    c. Defendants Unfairly Made Violent Collection Threats .................. 22

    d. Defendants Unfairly Made Unauthorized Withdrawals from Consumers' Bank Accounts .............................................................................. 23

D. Defendants Violated Section 521 of the GLB Act (Count V) ..................... 24

E. Defendant Braun Is Liable for Injunctive and Monetary Relief .................. 26

IV. THE PROPOSED ORDER PROVIDES APPROPRIATE RELIEF IN LIGHT OF DEFENDANT BRAUN'S CONDUCT ................................................................... 28

A. The Proposed Injunctive Provisions Are Appropriate ................................. 28

    1. Conduct Relief ..................................................................................... 29

    2. Monitoring Provisions ......................................................................... 31

B. The Proposed Monetary Relief Is Appropriate ........................................... 32

    1. Monetary Relief for Defendant Braun's Violations of Section 521 of the GLB Act .................................................................................................. 32

    2. Civil Penalties for Defendant Braun's Violations of Section 521 of the GLB Act .................................................................................................. 34

V. THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO ANY OF DEFENDANT BRAUN'S REMAINING AFFIRMATIVE DEFENSES ........................... 37

A. Defendant Braun's Failure to State a Claim Defenses and Denials of Liability Are Negative Defenses and Can Be Rejected ....................................... 38

B. Laches Is Unavailable in a Government Law Enforcement Action ............... 39

VI. CONCLUSION ............................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505 (1986) .............................................................................11

*Atlantic Sea Pride Inc. v. McCarthy*,
    2013 WL 5652492 (N.D.N.Y. Oct. 15, 2013) ..................................................................13

*Baker v. David A. Dorfman, P.L.L.C.*,
    2000 WL 420551 (S.D.N.Y. 2000) ...................................................................................13

*Barnes v. AT&T Pension Benefit Plan*,
    718 F. Supp. 2d 1167 (N.D. Cal. 2010) ............................................................................38

*Baxter v. Palmigiano*,
    425 U.S. 308, 96 S. Ct. 1551 (1976) ................................................................................13

*Beberaggi v. New York City Trans. Auth.*,
    1994 WL 18556 (S.D.N.Y. Jan. 19, 1994) .......................................................................13

*Broad. Music, Inc. v. Prana Hosp., Inc.*,
    158 F. Supp. 3d 184 (S.D.N.Y. 2016) ..............................................................................12

*Buffalo Laborers Welfare Fund v. Di Pizio Constr. Co., Inc.*,
    318 F. Supp. 3d 591 (W.D.N.Y. 2018) .............................................................................12

*Carney v. IRS*,
    258 F.3d 415 (5th Cir. 2001) ...........................................................................................13

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548 (1986) ..............................................................................11

*Coach, Inc. v. Horizon Trading USA Inc.*,
    908 F. Supp. 2d 426 (S.D.N.Y. 2012) ..............................................................................13

*Collazols v. United States*,
    368 F.3d 190 (2d Cir. 2004) ........................................................................................13, 14

*Dickerson v. Napolitano*,
    604 F.3d 732 (2d Cir. 2010) .............................................................................................11

*Donovan v. Carls Drug Co.*,
    703 F.2d 650 (2d Cir. 1983), *rejected on other grounds by McLaughlin v. Richland Shoe
    Co.*, 486 U.S. 128, 108 S. Ct. 1677 (1988) .....................................................................12

*Ford Motor Co. v. FTC*,
    120 F.2d 175 (6th Cir.), *cert. denied*, 314 U.S. 668, 62 S. Ct. 130 (1941)........................15

*FTC v. 1263523 Ontario, Inc.*,
    205 F. Supp. 2d 218 (S.D.N.Y. 2002).......................................................15, 18

*FTC v. 4 Star Resolution, LLC*,
    2015 WL 7431404 (W.D.N.Y. Nov. 23, 2015) ..............................................39

*FTC v. Accusearch, Inc.*,
    2007 WL 4356786 (D. Wyo. Sept. 28, 2007), *aff'd*, 570 F.3d 1187
    (10th Cir. 2009)...............................................................................20, 22

*FTC v. Affordable Media, LLC*,
    179 F.3d 1228 (9th Cir. 1999) ....................................................................27

*FTC v. Amazon.com, Inc.*,
    2016 WL 10654030 (W.D. Wash. July 22, 2016) ..........................................24

*FTC v. Amy Travel Serv., Inc.*,
    875 F.2d 564 (7th Cir. 1989) ......................................................................26

*FTC v. BlueHippo Funding LLC*,
    762 F.3d 238 (2d Cir. 2014).......................................................................16

*FTC v. Bronson Partners, LLC*,
    654 F.3d 359 (2d Cir. 2011)..................................................................28, 34

*FTC v. Bronson Partners, LLC*,
    674 F. Supp. 2d 373 (D. Conn. 2009)...........................................................30

*FTC v. Consumer Health Benefits Assoc.*,
    2011 WL 13295634 (E.D.N.Y. Oct. 5, 2011)..................................................39

*FTC v. Credit Bureau Center, LLC*,
    2021 WL 4146884 (N.D. Ill. Sept. 13, 2021) .................................................33

*FTC v. Crescent Pub. Grp., Inc.*,
    129 F. Supp. 2d 311 (S.D.N.Y. 2001)..................................................16, 18, 26

*FTC v. Cuban Exchange*,
    2014 WL 3756358 (E.D.N.Y. July 30, 2014)..............................................16, 32

*FTC v. Direct Mktg. Concepts, Inc.*,
    648 F. Supp. 2d 202 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010)..........................32

*FTC v. Federal Check Processing*,
2016 WL 5940485 (W.D.N.Y. Oct. 13, 2016), *aff'd sub nom. FTC v. Moses*, 913 F.3d
297 (2d Cir. 2019) ................................................................................29, 30, 32

*FTC v. Five-Star Auto Club*,
97 F. Supp. 2d 502 (S.D.N.Y. 2000).........................................16, 17, 26, 32

*FTC v. Global Mktg. Grp., Inc.*,
594 F. Supp. 2d 1281 (M.D. Fla. 2008) .....................................................14

*FTC v. H.N. Singer, Inc.*,
668 F.2d 1107 (9th Cir. 1982) ....................................................................28

*FTC v. Inc21.com*,
745 F. Supp. 2d 975 (N.D. Cal. 2010), *aff'd*, 475 F. App'x 106 (9th Cir. 2012) .............24

*FTC v. Instant Response Sys., LLC*,
2015 WL 1650914 (E.D.N.Y. Apr. 14, 2015) .........................11, 26, 27, 29, 31

*FTC v. J.K. Publ'ns, Inc.*,
99 F. Supp. 2d 1176 (C.D. Cal. 2000) ........................................................24

*FTC v. Lakshmi Infosoul Svcs. Pvt. Ltd.*,
2014 WL 3744484 (S.D.N.Y. July 10, 2014) .............................................33

*FTC v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016)...........................................................16, 17, 26

*FTC v. Lead Express, Inc.*,
2021 WL 4173922 (D. Nev. Sept. 13, 2021) ..............................................31

*FTC v. Leanspa, LLC*,
920 F. Supp. 2d. 270 (D. Conn. 2013).......................................................27

*FTC v. Medical Billers Network, Inc.*,
543 F. Supp. 2d 283 (S.D.N.Y. 2008).........................................................18

*FTC v. Medicor, LLC*,
217 F. Supp. 2d 1048 (C.D. Cal. 2002) .....................................................27

*FTC v. Moses*,
913 F.3d 297 (2d Cir. 2019).............................................................17, 26, 27

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ..................................................20, 21, 23, 24

*FTC v. Neovi, Inc.*,
   598 F. Supp. 2d 1104 (S.D. Cal. 2008)..........................................................22

*FTC v. N. Am. Mktg. & Assocs.*,
   2012 WL 5034967 (D. Ariz. Oct. 18, 2012)....................................................38

*FTC v. OMICS Grp. Inc.*,
   374 F. Supp. 3d 994 (D. Nev. 2019)...................................................18, 28, 32

*FTC v. Pantron I. Corp.*,
   33 F.3d 1088 (9th Cir. 1994) ..........................................................................28

*FTC v. Pointbreak Media, LLC*,
   376 F. Supp. 3d 1257 (S.D. Fl. 2019)...................................................20, 21, 22

*FTC v. Primary Grp., Inc.*,
   713 F. App'x 805 (11th Cir. 2017) ..................................................................27

*FTC v. Pro Credit Grp., LLC*,
   2013 WL 12122429 (M.D. Fla. 2013) .............................................................22

*FTC v. Quincy Bioscience Hldg. Co.*,
   2020 WL 1031271 (S.D.N.Y. Mar. 2, 2020) ...................................................39

*FTC v. Ross*,
   897 F. Supp. 2d 369 (D. Md 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014) .........26

*FTC v. Think Achievement Corp.*,
   144 F. Supp. 2d 1013 (N.D. Ind. 2000), *aff'd*, 312 F.3d 259 (7th Cir. 2002)....32

*FTC v. Think All Publishing, LLC*,
   564 F. Supp. 2d 663 (E.D. Tex. 2008) .............................................................38

*FTC v. Verity Int'l, Ltd.*,
   443 F.3d 48 (2d Cir. 2006)...............................................................................16

*FTC v. Verity Int'l, Ltd.*,
   335 F. Supp. 2d 479 (S.D.N.Y. 2004).....................................19, 23, 26, 30, 32

*FTC v. Verity Int'l, Ltd.*,
   194 F. Supp. 2d 270 (S.D.N.Y. 2002)..............................................................39

*FTC v. Wells*,
   385 F. App'x 712 (9th Cir. 2010) ...........................................................20, 23

*FTC v. Windward Mktg., Inc.*,
  1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) ....................................................20, 21, 27

*Funnekotter v. Ag. Dev. Bank of Zim.*,
  2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015) ..................................................................12

*Gibson v. SCE Grp., Inc.*,
  391 F. Supp. 3d 228 (S.D.N.Y. 2019), *recons. denied*, 2019 WL 5188932 (S.D.N.Y.
  Oct. 15, 2019) ..................................................................................................................12

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010)..............................................................................................12

*Keawsri v. Ramen-Ya*,
  2021 WL 3540671 (S.D.N.Y. Aug. 10, 2021) ...................................................................12

*Kirschenbaum v. 650 Fifth Ave.*,
  257 F. Supp. 3d 463 (S.D.N.Y. 2017), *rev'd on other grounds sub nom. Havlish v. 650
  Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019) ....................................................................13

*Kraft, Inc. v. FTC*,
  970 F.2d 311 (7th Cir. 1992) .............................................................................................16

*LiButti v. United States*,
  107 F.3d 110 (2d Cir. 1997)..............................................................................................14

*Liu v. SEC*,
  140 S. Ct. 1936 (2020)......................................................................................................34

*Merchant Cash & Cap. LLC v. Haute Soc'y Fashion, Inc.*,
  2017 WL 2912452 (E.D.N.Y. July 6, 2017) .......................................................................6

*Murray Space Shoe Corp. v. FTC*,
  304 F.2d 270 (2d Cir. 1962)..............................................................................................17

*Nat'l Market Share, Inc. v. Sterling Nat. Bank*,
  392 F.3d 520 (2d Cir. 2004)..............................................................................................38

*Pellegrino v. Capital One*,
  2021 WL 4994320 (W.D.N.Y. July 28, 2021), *adopted* 2021 WL 4472583 (W.D.N.Y.
  Sept. 30, 2021) ..................................................................................................................13

*Pro. Merchant Advance Cap., LLC v. McEachern*,
  2015 WL 8665447 (E.D.N.Y. Dec. 11, 2015) .....................................................................6

*Ridinger v. Down Jones & Co. Inc.*,
 651 F.3d 309 (2d Cir. 2011)......................................................................11

*Sears, Roebuck and Co. v. FTC*,
 676 F.2d 385 (9th Cir. 1982) ....................................................................29

*SEC v. Batterman*,
 2002 WL 31190171 (S.D.N.Y. Sept. 30, 2002)........................................13

*SEC v. Durante*,
 2013 WL 6800226 (S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016)......13

*SEC v. Mgmt. Dynamics, Inc.*,
 515 F.2d 801 (2d Cir. 1975)......................................................................29

*SEC v. Pittsford Capital Income Partners, LLC*,
 2007 WL 2455124 (W.D.N.Y. Aug. 23, 2007) .........................................14

*SEC v. Suman*,
 684 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d Cir. 2011).................14

*United States v. Angell*,
 292 F.3d 333 (2d Cir. 2002)......................................................................39

*United States v. Com. Recovery Sys., Inc.*,
 179 F. Supp. 3d 728 (E.D. Tex. 2016).......................................................35

*United States v. Cornerstone Wealth Corp, Inc.*,
 549 F. Supp. 2d 811 ((N.D. Tex. 2008) ...............................................36, 37

*United States v. Dish Network LLC*,
 954 F.3d 970 (7th Cir. 2020) ....................................................................35

*United States v. Dish Network LLC*,
 256 F. Supp. 3d 810 (N.D. Ill. 2017), *aff'd and rev'd in part on other grounds*, 954 F.3d
 970, 978 (7th Cir. 2020)......................................................................34, 36

*United States v. Dist. Council of N.Y.C. & Vicinity of United Broth. Of Carpenters & Joiners of
America*,
 832 F. Supp. 644 (S.D.N.Y. 1993)............................................................13

*United States v. Kasuboski*,
 834 F.2d 1345 (7th Cir. 1987) ..................................................................13

*United States v. Nat'l Fin. Servs., Inc.*,
 98 F.3d 131 (4th Cir. 1996) ................................................................34, 37

*United States v. Reader's Digest Ass'n Inc.*,
    494 F. Supp. 770 (D. Del. 1980), *aff'd*, 662 F.2d 955 (3d Cir. 1981) .............................37

*United States v. Summerlin*,
    310 U.S. 414, 60 S. Ct. 1019 (1940) ..................................................................39

*United States v. Tech. Comms. Indus., Inc.*,
    1986 WL 15489 (E.D.N.C. Dec. 22, 1986) .......................................................35

*United States v. W.T. Grant Co.*,
    345 U.S. 629, 73 S. Ct. 894 (1953)..................................................................29

*Vogel v. Huntington Oaks Delaware Partners, LLC*,
    291 F.R.D. 438 (C.D. Cal. 2013) .....................................................................38

*Wong v. Slotkin*,
    154 Misc. 2d 655, 585 N.Y.S.2d 986 (Civ. Ct. 1992) ........................................6

*Wright v. Goord*,
    554 F.3d 255 (2d Cir. 2009)............................................................................11

*Zink v. First Niagara Bank*,
    2015 WL 423221 (W.D.N.Y. Feb. 2, 2015) .....................................................38

## STATUTES & REGULATIONS

1 U.S.C. § 1........................................................................................................24

15 U.S.C. § 45.................................................................................................2, 15

15 U.S.C. § 45(m)(1)(A)...............................................................................34, 35

15 U.S.C. § 45(m)(1)(C).......................................................................................36

15 U.S.C. § 53(b).............................................................................................15, 28

15 U.S.C. § 57b(b)................................................................................................33

15 U.S.C. § 1692*l*(a)............................................................................................26

15 U.S.C. § 6821 .................................................................................................2

15 U.S.C. § 6821(a)(2).........................................................................................24

15 U.S.C. § 6822(a) .......................................................................................26, 32

15 U.S.C. § 682 ...................................................................................................24

15 U.S.C. § 6827(1) ............................................................................................24

15 U.S.C. § 6827(2) .......................................................................................24, 25

28 U.S.C. § 1337(a) ............................................................................................15

28 U.S.C. 1345 ...................................................................................................15

28 U.S.C. § 1391(b)(2) .......................................................................................15

28 U.S.C. § 2461 .................................................................................................35

16 C.F.R. § 1.98(d) .............................................................................................35

Fed. R. Civ. P. 12(h)(1).......................................................................................15

Fed. R. Civ. P. 15(a) ...........................................................................................39

Fed. R. Civ. P. 36(b) ...........................................................................................12

Fed. R. Civ. P. 56(a) ...........................................................................................11

Fed. R. Civ. P. 56(c) .............................................................................................2

# I.      INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, plaintiff Federal Trade Commission ("FTC") hereby moves for summary judgment against defendant Jonathan Braun.[1]

The uncontroverted evidence establishes that since at least 2015, the defendants named in this action ("Defendants"), led by Defendant Braun, made misrepresentations regarding the features of their small business financing products, including the amount of financing they will provide, the amount they will withdraw from consumers' bank accounts to repay that financing, the amount and existence of upfront costs, and that business owners must provide personal guaranties.[2]  Further, under Defendant Braun's leadership, they engaged in unfair collection practices, including by filing fraudulent court affidavits when consumers have not breached their contracts, and by making egregious threats involving physical violence.  Finally, at Defendant Braun's direction, Defendants have made unauthorized debits from consumers' accounts.  Based on the foregoing unlawful practices, the FTC's amended complaint (ECF No. 84, the "Amended Complaint") charges Defendants with violating Section 5 of the Federal Trade Commission Act

---

[1] The FTC and defendants RAM Capital Funding and Tzvi Reich reached a settlement agreement, and the Court has entered a Stipulated Order for Permanent Injunction and Monetary Judgment as to them.  (*See* ECF No. 102.)  The FTC and defendants RCG Advances, LLC ("RCG") and Robert Giardina have reached a tentative settlement.  The Court has stayed the case as to those defendants to allow the several FTC Commissioners the opportunity to review and approve the settlement.  (*See* ECF No. 108.)

[2] Consumers interacted with RCG and the related persons and entities collectively referred to as Defendants in this motion.  As noted throughout the accompanying Statement of Material Facts, Defendant Braun was personally involved in nearly all of the wrongdoing alleged in the Amended Complaint.  And, as shown in the legal argument below, Defendant Braun bears individual liability for all of Defendants' unlawful activities based upon that individual participation, and his knowledge and control.

("FTC Act"), 15 U.S.C. § 45, and Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6821.

Summary judgment is appropriate in this case because the FTC has presented overwhelming and uncontroverted evidence that Defendants violated Section 5 of the FTC Act and Section 521 of the GLB Act, that Defendant Braun is individually liable for those violations because of his knowledge of and participation in the unlawful acts, and that there are no genuine issues for trial. Fed. R. Civ. P. 56(c). The FTC seeks a permanent injunction that would prohibit Defendant Braun from the merchant cash advance and debt collection industries, prohibit him from making certain misrepresentations, enable the FTC to monitor his compliance with a final order, and require Braun to pay monetary civil penalties and redress for his violations of Section 521 of the GLB Act.

## II.    SUMMARY OF FACTS[3]

RCG provided financing to small business consumers in the form of merchant cash advances ("MCAs"). MCAs are financing transactions in which an MCA provider gives a business a lump-sum payment in exchange for an agreed-upon percentage of the business's future receivables. MCA contracts generally require small businesses to repay the advances via daily or weekly automated clearing house ("ACH") debits that reflect a specified percentage of their business revenues. As such, small businesses' payments to MCA providers subject to such agreements should increase and decrease as business revenues fluctuate. Additionally, the agreements provide that if the small business goes bankrupt or otherwise ceases operations, it has

---

[3] Pursuant to Local Rule 56.1(a), the FTC has submitted its statement of material facts not in dispute, with appropriate citations to the evidentiary record, as a separate document. References to specific paragraphs in the Statement of Facts are referred to as "SMF ¶ XX."

no obligation to repay the advance.  In practice, however, Defendants imposed on small businesses a fixed repayment amount and fixed daily payments that do not correspond to their actual revenues.  Additionally, if business revenues dried up or the business went under, Defendants engaged in collection actions.

In marketing MCAs and in their contracts with small business consumers, Defendants, who were led by Defendant Braun, made three types of misrepresentations.  First, they falsely stated in their contracts with consumers the amount of funds they would withdraw as repayment for the MCAs they provided, repeatedly withdrawing more than consumers had bargained for.  Second, their marketing and advertising materials falsely stated that individual business owners were not required to personally guarantee their loans.  Third, they falsely told consumers that there were no upfront costs associated with their MCAs and misrepresented the amount of funds small businesses would receive.

Defendant Braun and the other defendants, at Braun's direction, also engaged in unfair practices in violation of the FTC Act when collecting repayments from consumers.  First, Defendants unfairly used Confessions of Judgment ("COJs") by filing COJs against consumers in circumstances not permitted by their contracts with consumers.  Second, Defendants—particularly Defendant Braun—engaged in illegal and unfair collections methods by threatening consumers, including with violence.  Third, Defendants made unauthorized withdrawals from consumers' bank accounts, frequently withdrawing more than had been advanced to consumers and making multiple withdrawals on single days contrary to their contracts.

## A. Defendants Provided Small Businesses with Merchant Cash Advances in Exchange for Access to Merchants' Financial Accounts and Personal Assets

### 1. Defendant Braun

Defendant Jonathan Braun operated and controlled RCG, a New York company formerly known as Richmond Capital Group LLC.  (SMF ¶¶ 7, 27–46.)

As RCG's Senior Funding Manager, Defendant Braun negotiated the terms of MCAs directly with small business owners and had final decision-making authority at RCG about those terms, including whether to enter into the deals at all.  (*Id.* ¶¶ 34–36.)  He received notifications when consumers missed payments to RCG and made decisions about how RCG would proceed. (*Id.* ¶¶ 40–45.)  Defendant Braun communicated with consumers he determined to be in default and informed them of the steps RCG would take (or threaten to take) in order to collect.  (*Id.* ¶¶ 42–43, 159–68.) His involvement in RCG's day-to-day operations extended to making employment decisions and policies, creating content for RCG's website, and making decisions about RCG's litigation strategies.  (*Id.* ¶¶ 31–32, 46.)

### 2. Defendants Provided Merchant Cash Advances in Exchange for Access to Consumers' Bank Accounts and Personal Assets

Pursuant to contracts with their small business customers, Defendants provided consumers advance cash funding in exchange for the rights to potential future receivables.  (*Id.* ¶ 48, 53.)  These contracts, called "Merchant Agreements," specified a "Purchase Price" or "Total Purchase Price" representing the amount of money Defendants would advance upfront to consumers.  (*Id.* ¶¶ 53–54.)  For repayment, the Merchant Agreements assigned the merchant consumers' future receivables to Defendants until Defendants collected a specified amount of funds, referred to as the "Purchased Amount" or "Total Purchased Amount."  (*Id.* ¶ 55.) Defendants collected funds towards the Purchased Amount by making ACH debits from the consumers' accounts every business day, called the "Estimated Daily Amount," until Defendants

had collected the full Purchased Amount. (*Id.* ¶ 56.)  Thus, for example an agreement might offer a consumer $7,000 in upfront funding as the Purchase Price and call for $299 to be withdrawn from the consumer's bank account each business day until the Total Purchased Amount of $10,493 had been paid. (*Id.* ¶ 57.)

To effectuate this automated daily repayment process, Defendants' Merchant Agreements required that small business consumers provide Defendants with "all required access codes" for their bank account (including usernames, passwords, and security questions and answers) and that consumers sign agreements authorizing ACH withdrawals that included their bank account number, routing number, and bank name. (*Id.* ¶¶ 58–60, 62.)  To complete a Merchant Agreement and receive funding, Defendants also required that consumers sign a "Security Agreement and Guaranty" purporting to create a lien on all of the consumer's accounts and funds, and an "Affidavit of Confession of Judgment" in which the consumer confessed judgment of the Total Purchased Amount, less payments made by the consumer, plus significant legal fees and interest. (*Id.* ¶¶ 64–65.)

**B. At Defendant Braun's Direction, Defendants Repeatedly Made Misrepresentations About MCAs When Marketing Their Financing Products**

**1. Defendant Braun Directed Defendants to Withdraw Funds in Excess of Agreed-Upon Amounts**

Despite RCG's Merchant Agreements each listing a specific "Purchase Amount" or "Total Purchase Amount," Defendants routinely abused their access to consumers' bank accounts by debiting more than the contracted amounts, often simply continuing to make daily withdrawals until consumers asked them to stop. (*Id.* ¶¶ 72–73.)  Using a random sample drawn from Defendants' 1,499 deals with small businesses, the FTC's expert, Dr. Patrick McAlvanah, determined that Defendants took more than the agreed amount of funds in 26.4% of their contracts (or approximately 395 deals) and, on average, continued to collect from those

5

consumers for 8.5 days after having withdrawn the Total Purchase Amount. (*Id.* ¶¶ 74–75.)

These repeated overcollections were not accidental; rather they reflected Defendant Braun's

deliberate policy to continue daily debits for as long as possible before consumers either ran out

of money or pleaded with them to stop. (*Id.* ¶¶ 76–77.) Once they were alerted by consumers to

these overcollections, Defendants, in particular Defendant Braun, would mock, ignore, and bully

merchants and rarely paid requested refunds. (*Id.* ¶¶ 80–95.)

### 2. Defendants Falsely Claimed They Did Not Require Personal Guaranties from Business Owners Receiving MCAs

Defendants advertised their financing products on their website where they stated that

"no personal guaranty of collateral" would be required of merchants' owners. (*Id.* ¶ 97.)

Despite this express representation, RCG's Merchant Agreements required business owners to

agree to a "personal guaranty of performance" signed on behalf of both the small business and its

owner in his or her personal capacity. (*Id.* ¶ 98–99.) Many of Defendants' financing contracts

also stated that, in case of default, RCG would move to enforce the provisions of the personal

guaranty of performance against the guarantor.[4] (SMF ¶ 100.) In addition, the COJs that

---

[4] The minor wording difference between the phrases "personal guaranty of collateral" on Defendants' website and "personal guaranty of performance" in the Merchant Agreements is immaterial. Courts applying New York law, which governed Defendants' Merchant Agreements, have required guarantors to pay the amount owed by the debtor in both cases: "[T]here is 'no meaningful distinction between guaranteeing performance . . . and guaranteeing the payment of money, since as a practical matter, in most cases a judgment cannot be made to require specific performance.'" *Pro. Merchant Advance Cap., LLC v. McEachern*, 2015 WL 8665447, at *3 (E.D.N.Y. Dec. 11, 2015), (quoting *Wong v. Slotkin*, 154 Misc. 2d 655, 658–59, 585 N.Y.S.2d 986, 988 (N.Y. Civ. Ct. 1992)). When considering personal guaranty provisions similar to the ones used by the Defendants, courts in this Circuit generally hold individual business owners personally liable for the debts of their businesses. *See, e.g., Pro. Merchant Advance Cap.*, 2015 WL 8665447, at *3; *see also Merchant Cash & Cap. LLC v. Haute Soc'y Fashion, Inc.*, 2017 WL 2912452, at *2–3 (E.D.N.Y. July 6, 2017).

Defendants required every consumer to sign included confessions by the small business owners of judgment "individually and personally" for the merchant's breach.  (*Id.* ¶ 101.)

Defendants' requirement that consumers make personal guaranties and sign COJs did not end with the signed Merchant Agreements.  Defendants filed suit against numerous small business owners in their personal capacities relying on the personal guaranties of performance and COJs, frequently obtaining judgments against the owners individually despite Defendants' representation that "no personal guaranty" was required.  (*Id.* ¶ 103.)

### 3. At Defendant Braun's Direction, Defendants Misrepresented that There Were No Upfront Costs and the Amount of Funding

Defendants also misrepresented to consumers the amount of funding they would provide. First, Defendants stated on their website that they charged "No Upfront Costs" when providing small business financing.  (*Id.* ¶ 104.)  Second, they prominently featured on their contracts that consumers would receive a specific dollar amount called the "Total Purchase Price."  (*Id.* ¶ 105.) Neither claim was true.  In fact, Defendants withheld significant fees when providing MCAs, resulting in consumers receiving significantly less than the contracted Total Purchase Price.  (*Id.* ¶ 106–110.)

While Defendants' Merchant Agreements sometimes (but not always (*id.* ¶ 116)) attached an appendix listing various fees, the contracts did not state anywhere that those fees would be assessed upfront to reduce the amount of funding provided.  (*Id.* ¶ 111–12.)  To the contrary, the Merchant Agreements stated that the only fees consumers would be responsible for were those resulting from a rejected ACH withdrawal attempt or in the event of a default.  (*Id.* ¶ 112.)

Nor did Defendants limit themselves to the fees listed in Merchant Agreements' appendices.  At Defendant Braun's direction, they frequently made upfront deductions from the Total Purchase Price that were larger even than the fees buried in the appendices to consumers'

contracts.  (*Id.* ¶¶ 115, 117, 119–29.)  Based on Dr. McAlvanah's random sample of RCG's

deals, he estimated that Defendants withheld fees greater than those mentioned in appendices to

the Merchant Agreements in 34.6% of deals (or approximately 518).  (*Id.* ¶ 130.)

### C.  Defendants' Unfair Collection Practices

#### 1.  At Defendant Braun's Direction, Defendants' Unfairly Used Confessions of Judgment to Collect from Consumers

Contrary to the provisions in the Merchant Agreements, which allowed for execution of

COJs only in limited circumstances, Defendants frequently declared small business consumers in

default and filed their signed COJs when the merchants' business slowed or shut down.

Defendants used several versions of Merchant Agreements, one of which stated explicitly that

consumers would not be held in breach if a business slow down caused their payments to be

remitted more slowly than anticipated or if the business shut down entirely.  (*Id.* ¶¶ 133–34.)

Other versions of Defendants' standard contracts listed specific situations in which COJs could

be filed, none of which included businesses who missed payments due to slow downs.  (*Id.* ¶¶

135–36.)

At Defendant Braun's insistence, Defendants were nonetheless quick to file COJs against

consumers in numerous situations not provided for in Merchant Agreements, including where

consumers were current on their daily payments, had insufficient funds in their bank accounts for

Defendants to withdraw daily payments, had notified Defendants that a slow-down in business

made them unable to make payments, had told Defendants their business was bankrupt or no

longer operating, and had told Defendants that technological issues with their bank accounts

prevented daily withdrawals.  (*Id.* ¶¶ 137–40.)

Small business consumers and their owners faced substantial financial harm as a result of

Defendants' wrongful filing of COJs, including being forced to close their businesses, having

difficulty obtaining new credit and loans, losing out on potential deals to sell their businesses, losing employees, defaulting on other financial obligations, and being forced to open new bank accounts and set up auto-payments.  (*Id.* ¶¶ 141–56.)

### 2. Defendant Braun Carried Out Defendants' Abusive Collections Tactics, Including Making Death Threats

Defendant Braun frequently used profane threats of violence and financial ruin when seeking to collect from small business consumers.  (*Id.* ¶ 157.)  For example, Defendant Braun once told a consumer "I will kill you" (*id.* ¶ 159) and told another consumer that "we'll take care of you and your family," causing her to fear for her and her family's personal safety.  (*Id.* ¶ 160.) A consumer who closed his business's bank account because of an unauthorized withdrawal, thereby missing some automated debits to Defendants, was told by Defendant Braun: "I know where you live," "I know where your mother lives," "I will take your daughters from you," and "You have no idea what I'm going to do."  (*Id.* ¶ 161.)  One of Defendants' representatives named "John" (Braun's first name) told a consumer to "[b]e thankful you're not in New York because your family would find you floating in the Hudson."  (*Id.* ¶ 158.)  Defendant Braun threatened to publicly humiliate and beat up another consumer who had received an MCA for his religious institution, telling him among other things that he would "hang papers all over the lampposts in Crown Heights stating that you are a liar and a thief," and "beat the s*** out of you" at a synagogue "so that people know that you are a thief, liar and dishonest."  (*Id.* ¶ 162.) Multiple other consumers received similarly profane and violent tirades from Defendants' representatives, including Defendant Braun, when they had trouble making daily payments to RCG.  (*Id.* ¶¶ 163–68.)

Defendants' internal communications show that Defendants discussed these harassing calls internally.  Defendant Braun routinely told his colleagues that he would harass a consumer

whose account lacked sufficient funds for Defendants' daily withdrawals, that he would harass the consumer in order to get him to resume payments, and in another instance relayed that a consumer was "petrified of" him. (*Id*. ¶ 168–69.)

Consumers on the receiving end of Defendant Braun's abusive language and threats complained to Defendants about the harassment and suffered considerably, causing them to worry about their businesses and safety. Consumers' relationships with family members and reputations in their communities suffered under the stress of Defendants' threats. (*Id.* ¶ 170–73.) One consumer unsuccessfully attempted suicide following abusive communications with Defendants. (*Id.* ¶ 172.)

### 3. At Defendant Braun's Direction, Defendants' Made Unauthorized Withdrawals from Consumers' Bank Accounts

In direct contradiction to the language of their Merchant Agreements stating that a certain dollar amount would be debited "each business day," Defendants frequently made multiple withdrawals from consumers' bank accounts in a single day. (*Id.* ¶¶ 174–76.) Indeed, Defendants specifically instructed their payment processor to withdraw twice the specified daily amount on days before or after bank holidays. (*Id.* ¶¶ 177–78.)

Given the express language in the agreements that debits would be taken once a day on business days, many consumers complained to Defendants when they saw double payments. (*Id.* ¶¶ 180–89.) Multiple unexpected double debits from consumers' bank accounts caused significant financial strains, with one consumer whose business was forced to cease operations describing the practice as "extremely damaging." (*Id.* ¶ 188.)

### D. Defendant Braun Was Aware of the Gramm-Leach-Bliley Act

Defendant Braun, like others in the small business financing industry, was aware of the GLB Act and its requirements. In Defendants' contract with Actum Processing, the merchant

processor they used to make withdrawals from consumers' bank accounts, Defendants agreed to operate their business in compliance with the GLB Act. (*Id.* ¶¶ 190–92.) Defendants' partner agreement with QuarterSpot similarly stated that they were not under investigation or facing lawsuits for violating the GLB Act in an amended provision that Defendant Braun received and sent to Mr. Giardina with instructions to sign. (*Id.* ¶ 193.)

## III. THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST DEFENDANT BRAUN

### A. Summary Judgment Standard

Summary judgment is appropriate where, as here, the movant shows "that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue of material fact exists, and the Court must construe evidence in the light most favorable to the nonmoving party and draw all inferences in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552–53 (1986); *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). A genuine dispute about a material fact exists where there is sufficient evidence for the trier of fact to return a verdict for the non-moving party. *FTC v. Instant Response Sys., LLC*, 2015 WL 1650914, at *3 (E.D.N.Y. Apr. 14, 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). Once the moving party has met its burden, the burden shifts to the party opposing summary judgment to "set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (citation and quotation marks omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," *Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere

speculation or conjecture as to the true nature of the facts." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Under Federal Rule of Civil Procedure 36(a)(3), matters in a written request to admit are deemed admitted in the absence of a timely response or objection from the party served with the request. A matter admitted in this manner is "conclusively established" unless the court grants a motion—which Defendant Braun has not made—to withdraw or amend the admission. Fed. R. Civ. P. 36(b). As the Second Circuit has explained, a party who does not respond to requests for admissions "has plainly made Rule 36(a) admissions," and "[t]hese may be used for Rule 56 summary judgment." *Donovan v. Carls Drug Co.*, 703 F.2d 650, 651 (2d Cir. 1983), *rejected on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133–34, 108 S. Ct. 1677, 1681–82 (1988); *see also Keawsri v. Ramen-Ya Inc.*, 2021 WL 3540671, at *4 (S.D.N.Y. Aug. 10, 2021) (deeming facts conclusively established where party provided no responses to requests for admissions, made no motion for withdrawal or amendment, and offered no explanation for their failure to seek more time to respond to requests); *Gibson v. SCE Grp., Inc.*, 391 F. Supp. 3d 228, 250 (S.D.N.Y. 2019) (deeming request admitted because plaintiffs "did not respond to the[] requests within 30 days" and did "not submit[] a motion to amend or withdraw their admission"), *recons. denied*, 2019 WL 5188932 (S.D.N.Y. Oct. 15, 2019); *Buffalo Laborers Welfare Fund v. Di Pizio Constr. Co.*, 318 F. Supp. 3d 591, 597–98 (W.D.N.Y. 2018) (rejecting responses to requests for admission served three months late as untimely and granting summary judgment based on deemed admissions because defendant did not move under Rule 36(b)); *Broad. Music, Inc. v. Prana Hosp., Inc.*, 158 F. Supp. 3d 184, 190 n.5 (S.D.N.Y. 2016) (deeming facts admitted and undisputed based on failure to respond to requests for admission, and granting summary judgment); *Funnekotter v. Ag. Dev. Bank of Zim.*, 2015 WL 9302560, at *4 (S.D.N.Y. Dec. 17,

2015) (granting summary judgment based on deemed admissions because party had not moved to withdraw admissions); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432–33 (S.D.N.Y. 2012) (same); *SEC v. Batterman*, 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002) (same).[5] Here, Defendant Braun offered no timely response or objection to dozens of requests to admit, and those facts can be used to support entry of judgment.[6] (*See, e.g.*, SMF ¶ 27 n.2.)

On a motion for summary judgment, the Court may draw an adverse inference against a party based on the invocation of the Fifth Amendment by his coconspirators, *United States v. Dist. Council of N.Y.C. & Vicinity of United Broth. Of Carpenters & Joiners of America*, 832 F. Supp. 644, 652 (S.D.N.Y. 1993), or non-parties who are associated with the party. *SEC v. Durante*, 2013 WL 6800226, at *11 (S.D.N.Y. Dec. 19, 2013), *aff'd*, 641 F. App'x 73 (2d Cir. 2016); *Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 512 (S.D.N.Y. 2017), *rev'd on other grounds sub nom. Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976); *Collazols v. United*

---

[5] Courts recognize that Rule 36 may lead to harsh results because "[t]he failure to respond to admissions can effectively deprive a party of the opportunity to contest the merits of a case," but conclude that such a result "is necessary to insure the orderly disposition of cases." *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987); *see also Atlantic Sea Pride Inc. v. McCarthy*, 2013 WL 5652492, at *3 (N.D.N.Y. Oct. 15, 2013) (affirming bankruptcy court's summary judgment based upon litigant's default admissions); *Carney v. IRS*, 258 F.3d 415, 421 (5th Cir. 2001) (affirming summary judgment based on deemed admissions); *Pellegrino v. Capital One*, 2021 WL 4994320, at *5 (W.D.N.Y. July 28, 2021) (granting summary judgment based on *pro se* litigant's default admissions), *adopted* 2021 WL 4472583 (W.D.N.Y. Sept. 30, 2021).

[6] Nor is the FTC required to move the Court for requests for admissions to be deemed admitted. *See, e.g.*, *Beberaggi v. N.Y.C. Trans. Auth.*, 1994 WL 18556, at *2 (S.D.N.Y. Jan. 19, 1994) ("[T]he requesting party need not even move for a declaration that its requests are deemed admitted."); *Baker v. David A. Dorfman, P.L.L.C.*, 2000 WL 420551, at *6 (S.D.N.Y. Apr. 17, 2000) (rejecting "defendants' contention that the plaintiff must make a motion for the responses to be deemed admitted").

*States*, 368 F.3d 190, 203–204 (2d Cir. 2004) (holding adverse inference is appropriate where defendant deprived government of "opportunity to conduct a deposition"); *FTC v. Global Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008) (granting summary judgment in favor of FTC based on adverse inferences from defendant's assertion of Fifth Amendment rights and record evidence in support of those inferences). While a motion for summary judgment cannot be granted on an adverse inference alone, and while the Court must weigh the inference against other evidence in determining whether genuine issues of fact exist, the inference may be given significant weight. *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997); *see also SEC v. Suman*, 684 F. Supp. 2d 378, 386–87 (S.D.N.Y. 2010) (drawing adverse inference and granting SEC's motion for summary judgment where invocation prevented the SEC from obtaining "material which they were entitled to"), *aff'd*, 421 F. App'x 86 (2d Cir. 2011); *SEC v. Pittsford Cap. Income Partners, LLC*, 2007 WL 2455124, at *15 (W.D.N.Y. Aug. 23, 2007) (granting motion for summary judgment based in part on adverse inference). Here, Defendant Braun's employees Jose DaSilva, Miriam Deutsch, Christopher Kim, Ezra Mosseri, and Marcella Rabinovich repeatedly invoked the Fifth Amendment privilege against self-incrimination during deposition (*see, e.g.*, SMF ¶ 27 n.3), as did co-conspirator Robert Giardina. (*See, e.g.*, *id.* ¶ 107 n.8.) Because the FTC has shown that those individuals worked for Defendant Braun, and has introduced corroborating evidence for the factual matters covered by those witnesses' invocations, the Court may draw the appropriate adverse inference against Defendant Braun.

Here, there are no material facts in dispute that (1) Defendant Braun, together with the other Defendants, violated Section 5 of the FTC Act, (2) Defendant Braun, together with the other Defendants, violated Section 521 of the GLB Act, and (3) Defendant Braun had the necessary levels of involvement and knowledge to be individually liable for these violations.

### B. This Court Has Jurisdiction and Venue Is Proper

This Court has jurisdiction over cases brought under the FTC Act. 15 U.S.C. §§ 45, 53(b). *FTC v. 1263523 Ontario, Inc.*, 205 F. Supp. 2d 218, 220 (S.D.N.Y. 2002). In addition, the Court has subject matter jurisdiction because this is a civil action arising under an act of Congress regulating commerce, 28 U.S.C. § 1337(a), and an agency of the United States is plaintiff, 28 U.S.C. § 1345. Further, venue is also proper under 28 U.S.C. § 1391(b)(2).[7] Defendants entered into merchant cash advance agreements with small business consumers nationwide. (SMF ¶¶ 11, 69.) Such transactions are "in or affecting commerce," as required by the FTC Act. *See Ford Motor Co. v. FTC*, 120 F.2d 175, 183 (6th Cir.), *cert. denied*, 314 U.S. 668, 62 S. Ct. 130 (1941).

### C. Defendant Braun Violated Section 5 of the FTC Act

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce." 15 U.S.C. § 45. Defendant Braun, individual and together with others under his direct or indirect control, violated the FTC Act's prohibition on deceptive practices by misrepresenting to consumers the amount of funds they would withdraw to repay MCAs, luring customers to their business by falsely claiming that small business owners did not need to make any personal guaranties in order to receive cash advances, and misrepresenting both the existence and amount of upfront fees they withheld from payments to consumers. Defendant Braun, individual and together with others under his direct or indirect control, violated the FTC Act's unfairness provision by improperly using COJs against consumers, making abusive collections

---

[7] Defendant Braun has also waived his right to object to personal jurisdiction and venue by neither moving to dismiss nor raising an affirmative defense on those grounds in his Answer. *See* Fed. R. Civ. P. 12(h)(1).

threats, and by making unauthorized withdrawals from small business consumers' bank accounts.

## 1. Defendants Misrepresented Their Financing Products (Count I)

### a. Legal Standard for Deception

An act or practice is deceptive under Section 5(a) if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 168 (2d Cir. 2016); *FTC v. Verity Int'l., Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006); *FTC v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) (Kaplan, J.). A misrepresentation is material if it involves facts that a reasonable person would consider important in choosing a course of action. *See FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 529 (S.D.N.Y. 2000); *Kraft, Inc. v FTC*, 970 F.2d 311, 322 (7th Cir. 1992). Express claims that are false are presumed material. *FTC v. Cuban Exchange*, 2014 WL 3756358, at *3 (E.D.N.Y. July 30, 2014). Further, "[i]nformation concerning prices or charges for goods or services is material" because it is "likely to affect a consumer's choice of or conduct regarding a product." *Crescent Pub. Grp.*, 129 F. Supp. 2d at 321 (internal quotation and citation omitted). In addition, consumer action based on express statements is presumptively reasonable. *Five-Star Auto Club*, 97 F. Supp. 2d at 528; *Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d at 321.

The FTC need not prove reliance by each consumer misled by Defendants. *FTC v. BlueHippo Funding LLC*, 762 F.3d 238, 244 (2d Cir. 2014). Because the "injury to a consumer occurs at the instant of a seller's misrepresentations, which taint the consumer's subsequent purchasing decisions," the FTC is entitled to a presumption of actual reliance upon showing that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's products. *Id*.

In considering whether a claim is deceptive, the Court must consider the "overall impression" created by the representation. *Murray Space Shoe Corp. v. FTC*, 304 F.2d 270, 272 (2d Cir. 1962); *Five-Star Auto Club*, 97 F. Supp. 2d at 528 ("[T]he Court must consider the misrepresentations at issue[] by viewing them as a whole without emphasizing isolated words or phrases apart from their context.") (internal quotation and citation omitted).

The FTC need not prove that Defendants' misrepresentations were made with an intent to defraud or deceive or were made in bad faith. *FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019); *LeadClick Media*, 838 F.3d at 168 ("[I]t is enough that the representations or practices were likely to mislead consumers acting reasonably.") (internal quotation and citation omitted); *Five-Star Auto Club*, 97 F. Supp. 2d at 526 ("It is not necessary to prove Defendants' misrepresentations were made with an intent to defraud or deceive, or were made in bad faith to establish a Section 5 violation.").[8]

Defendant Braun's individual liability for the deceptive conduct is discussed in Part III.E, *infra*.

### b. Defendants Made Three Types of Deceptive Representations

There is no genuine dispute that Defendants represented to their MCA customers that (1) they would withdraw a specific dollar amount of funds in exchange for MCAs (SMF ¶¶ 54–55, 70), (2) no personal guaranties were necessary to obtain MCAs (*id.* ¶ 97), and (3) they would charge no upfront fees and advance a specific dollar amount of funds (*id.* ¶¶ 104–105).

The evidence also shows there is no genuine dispute that in numerous instances these representations were false or misleading. *First*, Defendants used their access to consumers' bank

---

[8] The Court should therefore reject Defendant Braun's twelfth affirmative defense (good faith). (PX02 at 11.) Where appropriate, the FTC will address Defendant Braun's other affirmative defenses in context. The remaining defenses are discussed in Section V below.

accounts to take more money than they had contracted for in more than one quarter of their deals with consumers, and for an average of 8.5 days after collecting the Total Purchased Amount in full. (*Id.* ¶ 74–75.) As further detailed above, Defendants admitted in internal communications that this was their routine practice, suggesting for example that automatic withdrawals from a consumer's account continue "forever and over collect lol." (*Id.* ¶ 77.) Further, because Defendants' claims to consumers about the amount of money they would withdraw were express, they are presumed material. *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008); *FTC v. OMICS Grp., Inc.*, 374 F. Supp. 3d 994, 1010 (D. Nev. 2019). Even without that presumption, information about prices—like Defendants' statements in Merchant Agreements about the costs of an MCA—is material because it is "likely to affect a consumer's choice of or conduct regarding" a service or product. *Crescent Pub. Grp.*, 129 F. Supp. 2d at 321 (internal quotation and citation omitted). For similar reasons, consumers' reliance on Defendants' express claims about the cost of their MCAs was reasonable. *1263523 Ontario*, 205 F. Supp. 2d at 223.

*Second*, despite advertising on their website that no personal guaranties were required of small business owners, before providing any MCAs Defendants required a "Security Agreement and Guaranty" containing a "Personal Guaranty of Performance" signed by small business owners in their personal capacities and a COJ which Defendants could and did use to go after business owners' personal assets. (SMF ¶¶ 98–103.) The presence of the COJ and guaranty provisions in the Defendants' agreements does not absolve Defendants for the false statement on their website. As above, Defendants' false claim that they did not require personal guaranties is presumed material because it was express, and consumers' reliance on the statement is presumed reasonable.

*Third*, Defendants withheld funds when making cash advances to consumers despite their claims that no upfront fees would be charged and that consumers would receive the full Total Purchase Price amount indicated on their contracts. (*Id.* ¶ 106.) Defendants' Merchant Agreements highlighted on the first page a Total Purchase Price that small business consumers would receive. (*Id.* ¶ 105.) Defendants sometimes identified fees, and even then, they only did so several pages later on an appendix attached to the contracts, and even then, they did not state that these fees would reduce the upfront amount funded. (*Id.* ¶ 111.) Thus, the disclosure in an appendix of certain fees is neither clear nor conspicuous, and does not cure Defendants' prominent misrepresentations. Further, Defendants routinely withheld *more* than the listed fees—indeed, they did just that in roughly one-third of their deals with consumers. (*Id.* ¶¶ 115, 130.) Defendants' misrepresentations about upfront fees are material for the same reasons discussed above: they may be presumed material because they were express claims and because they relate to the cost of Defendants' financing products. Consumers' reasonable reliance may be presumed for the same reasons.

Accordingly, there is no genuine dispute that Defendants' claims are deceptive and violate Section 5 of the FTC Act as alleged in Count I of the Amended Complaint.

### 2. Defendants Unfairly Used Confessions of Judgment (Count II), Made Violent Collections Threats (Count III), And Charged Consumers Without Authorization (Count IV)

#### a. Legal Standard for Unfairness

A practice is unfair under Section 5 of the FTC Act if it "causes or is likely to cause substantial injury to consumers" that "is not reasonably avoidable by consumers themselves" or "outweighed by countervailing benefits to consumers or to competition." *FTC v. Verity Int'l, Ltd.*, 335 F. Supp. 2d 479, 498 (S.D.N.Y. 2004) (quoting 15 U.S.C. § 45(n)).

Businesses may cause direct consumer harm in violation of the FTC Act "in a variety of ways," even in the absence of deceit and even where a defendant lacks knowledge of the harm. *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010) ("*Neovi I*") ("Courts have long held that consumers are injured for purposes of the [FTC] Act . . . through the actions of those whose practices facilitate, or contribute to, ill-intentioned schemes if the injury was a predictable consequence of those actions."); *FTC v. Wells*, 385 F. App'x 712, 713 (9th Cir. 2010) ("An unfair practice does not require knowledge of consumer harm . . . ."). An injury is substantial even where it causes small harms to individuals if it affects a large class of people. *Neovi I*, 604 F.3d at 1157–58. Moreover, the injury is not limited to economic injury; courts have recognized that emotional impact harm that is substantial and real can satisfy the "substantial injury" prong. *See FTC v. Accusearch, Inc.*, 2007 WL 4356786, at *7–8 (D. Wyo. Sept. 28, 2007), *aff'd*, 570 F.3d 1187 (10th Cir. 2009).

A practice is "reasonably avoidable" only where consumers were presented with "a free and informed choice that would have enabled them to avoid the unfair practice." *FTC v. Windward Mktg., Inc.*, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997). And where a practice "produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition," it fails the final prong of the unfairness test. *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1286 (S.D. Fl. 2019) (quoting *Windward Mktg.*, 1997 WL 33642380, at *11).

Defendant Braun's individual liability for the unfair conduct is discussed in Part III.E, *infra*.

### b. Defendants' Unfair Use of Confessions of Judgment

Defendants' use of consumers' COJs violates the unfairness standard set forth above.

First, Defendants' customers were substantially injured by Defendants' practice of filing COJs against customers who had not breached their contracts with Defendants or were current on their payments. (SMF ¶¶ 137, 144–55.) Consumers suffer a substantial injury when they are "injured by a practice for which they did not bargain." *Neovi I*, 604 F.3d at 1157 (quoting *Windward Mktg.*, 1997 WL 33642380, at *11). Consumers were likewise substantially injured by Defendants' practice of misrepresenting the sums they purportedly owed when filing COJs. (*Id.* ¶¶ 143, 147.) The financial strain caused by Defendants' improper filing of COJs caused consumers a wide range of harms, from shuttering their small businesses, facing challenges when applying for new lines of credit, losing their businesses' employees, and having deals to sell the business fall through. (*Id.* ¶ 153.)

Next, consumers were not able to reasonably avoid Defendants' unfair use of COJs because they did not expect to face any collection action when they were current on their payments to Defendants or had otherwise not breached their Merchant Agreements. (SMF ¶¶ 134–37.) *See Windward Mktg.*, 1997 WL 33642380, at *11. And there are no benefits to consumers or to businesses stemming from Defendants' use of COJs against consumers who are in compliance with their Merchant Agreements with Defendants or against consumers who are making timely payments. *See Pointbreak Media, LLC*, 376 F. Supp. 3d at 1286. Accordingly, there is no genuine dispute that Defendants' practices are unfair and violate Section 5 of the FTC Act as alleged in Count II of the Amended Complaint.

### c. Defendants Unfairly Made Violent Collection Threats

Defendants' egregious collection behavior also violates the FTC Act's prohibition against unfairness. *See FTC v. Pro Credit Grp., LLC*, 2013 WL 12122429, at *4 (M.D. Fla. 2013) (issuing permanent injunction where defendant participated in unfair debt collection scheme).

Defendants' threatening behavior towards customers facing difficulties repaying MCAs caused the small businesses significant harm. (*Id.* ¶¶172–73.) The egregious debt collection threats caused consumers to make payments and forfeit assets for sums they did not owe, and to lose business partners. (*Id.*; *see also id.* ¶¶ 141, 147.) This conduct also caused severe emotional strain, *Accusearch, Inc.*, 2007 WL 4356786, at *7–8; consumers feared for their personal safety and that of their families after receiving threats of violence from Defendant Braun and RCG's representatives. (*Id.* ¶¶ 158, 160–63, 165–66, 172–73.) Others faced reputational harm because of Defendants' publicizing their inability to pay. (*Id.* ¶¶ 162, 172.) As with the use of COJs discussed above, Defendants' threatening conduct was not reasonably avoidable by consumers, as nothing in the Merchant Agreements or Defendants' advertising indicated that a small business consumer's inability to repay would result in violence and other egregious collection practices. (*See id.* ¶ 53.) And Defendants' violent threats and aggressive actions created "clear adverse consequences for consumers that [were] not accompanied by an increase in services or benefits to consumers or by benefits to competition." *Pointbreak Media*, 376 F. Supp. 3d at 1286. Hence the final element of the unfairness test is "easily satisfied." *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008) ("*Neovi II*"). Accordingly, there is no genuine dispute that Defendants' practices are unfair and violate Section 5 of the FTC Act as alleged in Count III of the Amended Complaint.

#### d. Defendants Unfairly Made Unauthorized Withdrawals from Consumers' Bank Accounts

Defendants' practice of making unauthorized and unexpected withdrawals from consumers' bank accounts similarly violates the FTC Act's prohibition of unfair trade practices. Courts in numerous instances have found that making unauthorized charges to consumers is an unfair practice under the FTC Act. *See, e.g.*, *Verity Intern.*, 335 F. Supp. 2d at 498–99 (finding defendants' practice of billing subscribers for services they did not use or authorize to be an unfair trade practice in violation of the FTC Act); *Wells*, 385 F. App'x at 713 ("Carrying out unauthorized transactions was an unfair practice.").

As for substantial injury, Defendants' customers suffered financial harms from Defendants' practices of continuing to make withdrawals after consumers had paid off their MCAs and debiting consumers' accounts more than once per day contrary to their Merchant Agreements. (SMF ¶¶ 74–75, 180–89.) This practice harmed a significant portion of Defendants' customers—more than one fourth—with a mean overcollection of $8,579. (*Id.* ¶¶ 194–95.)

Defendants' practice of charging consumers without authorization was not reasonably avoidable by consumers who had no reason to expect Defendants would collect higher amounts and with more frequency than what they expressly promised in their contracts. It is axiomatic that consumers whose bank accounts are withdrawn from without authorization "suffer[] unavoidable injuries." *Neovi I*, 604 F.3d at 1158.

Finally, there is no benefit to consumers or competition deriving from Defendants' charging consumers more than what they authorized and charging them more often than they had authorized. Courts have repeatedly found either that unauthorized billing has no countervailing benefits at all, or that any such benefits are outweighed by the harm of taking money from

consumers without their consent. *See, e.g.*, *id.* at 1158–59; *FTC v. Amazon.com, Inc.*, 2016 WL 10654030, at *10–11 (W.D. Wash. July 22, 2016); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010), *aff'd*, 475 F. App'x 106 (9th Cir. 2012); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1203 (C.D. Cal. 2000). Accordingly, there is no genuine dispute that Defendants' practices are unfair and violate Section 5 of the FTC Act as alleged in Count IV of the Amended Complaint.

### D. Defendants Violated Section 521 of the GLB Act (Count V)

Section 521(a)(2) of the GLB Act bars the use of false or fraudulent statements to acquire a consumer's banking information. Specifically, the act prohibits "any person" from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."[9] 15 U.S.C. § 6821(a)(2). "[C]ustomer information of a financial institution" refers to "information maintained by or for a financial institution which is derived from the relationship between the financial institution" and its customer that is "identified with the customer." 15 U.S.C. § 6827(2). A "customer" of a financial institution is "any person" or their authorized representative "to whom the financial institution provides a product or service." 15 U.S.C. § 6827(1).

Defendants violated Section 521 of the GLB Act by obtaining and attempting to obtain "customer information of a financial institution"—namely, information about merchants' bank accounts that allowed repeated withdrawals at Defendants' discretion—by making false

---

[9] The GLB Act does not restrict "person" to mean only natural persons; accordingly, small business consumers are protected by Section 521 of the Act. *See* 15 U.S.C. § 6827; *see also* 1 U.S.C. §1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnership, societies, and joint stock companies, as well as individuals.").

statements and representations to consumers about Defendants' financing products. The same misrepresentations Defendants made in violation of Section 5 of the FTC Act that (1) they would collect a specific amount from consumers' bank accounts (the Total Purchased Amount specified in consumers' Merchant Agreements) to repay their funding to consumers and (2) that they would provide consumers with a specific amount of funding (the Total Purchase Price), constitute "false, fictious, or fraudulent" statements in violation of the GLB Act. As discussed *supra*, the FTC's expert Dr. McAlvanah's random sample analysis indicates that Defendants (1) overcollected on 395 accounts by debiting more funds than were agreed to in Merchant Agreements and (2) underfunded 518 accounts by withholding more upfront fees than were listed in the merchants' contracts.

To receive an MCA from Defendants, Defendants *required* that merchants provide Defendants with their bank account information, including routing and account numbers, along with "all required access codes" to their bank accounts, including login information and questions and answers to security questions. (SMF ¶¶ 60–62.) This bank account information, including routing and account numbers, is "customer information of a financial institution" under the GLB Act. 15 U.S.C. § 6827(2).

Defendants' false statements to consumers about their MCAs were intended to, and did, induce customers to do business with Defendants and not their competitors, and thereby provide Defendants with their banking information. The cost of Defendants' financing products—consisting of both the amount of funds debited from consumers and the amount of funds advanced to consumers—was central to consumers' decisions to do business with Defendants, including by providing all the banking information Defendants demanded before providing advances. Accordingly, there is no genuine dispute that Defendants made false,

fictitious, or fraudulent statements or representations to customers of financial institutions in order to obtain customer information of a financial institution relating to another in violation of Section 521(a)(2) of the GLB Act as alleged in Count V of the Amended Complaint. Defendant Braun's individual liability for this violation is discussed immediately below.

### E. Defendant Braun Is Liable for Injunctive and Monetary Relief

The undisputed evidence establishes that Defendant Braun, as the controlling force behind Defendants' scheme, is individually liable for injunctive and monetary relief. Under the FTC Act, individuals may be subject to injunctive relief for corporate violations where they participated in the acts or practices or had authority to control them. *Moses*, 913 F.3d at 306; *Verity Int'l*, 335 F. Supp. 2d at 499; *Instant Response Sys.*, 2015 WL 1650914, at *9; *see also LeadClick Media*, 838 F.3d at 168 (rejecting argument that a defendant must have personally created deceptive content to be liable); *Crescent Pub. Grp.*, 129 F. Supp. 2d at 324.[10]

An individual's "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer," establishes their "authority to control." *Verity Int'l*, 335 F. Supp. 2d at 499 (quoting *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)); *see also Instant Response Sys.*, 2015 WL 1650914, at *9; *Five-Star Auto Club*, 97 F. Supp. 2d at 538; *FTC v. Ross*, 897 F. Supp. 2d 369, 381–82 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014). Even where an individual is not formally designated as a

---

[10] Violations of the GLB Act are treated as violations of the FTC Act, and therefore the same standards for evaluating Defendant Braun's individual liability for violations of the FTC Act apply to evaluations of his liability for violations of the GLB Act. This is because Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act ['FDCPA'] . . . to enforce compliance with such Act," and Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), deems a violation of the FDCPA as an unfair or deceptive practice in violation of the FTC Act.

corporate officer, courts consider "the control that a person actually exercises over given activities." *Windward Mktg.*, 1997 WL 33642380, at *5 (imposing permanent injunction despite defendant's assertion that he was not an employee of corporate defendant because evidence established his authority); *FTC v. Medicor, LLC*, 217 F. Supp. 2d 1048, 1055–56 (C.D. Cal. 2002) (enjoining defendant who did not have hiring or firing authority and was not an officer or owner because he had authority to formulate and implement policies). The FTC is not required to establish an individual's intent to deceive in order to obtain injunctive relief against an individual. *Instant Response*, 2015 WL 1650914, at *9.

An individual may be held liable for monetary relief for corporate practices if he or she had, or should have had, knowledge of the corporate defendant's misrepresentations. *Moses*, 913 F.3d at 307. The FTC need not establish that "the defendant had actual and explicit knowledge of the particular deception at issue." *Id*. Instead, the FTC need only demonstrate that the defendant had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such representations, or had an awareness of a high probability of fraud with an intentional avoidance of the truth. *Id*. (quoting *FTC v. Primary Grp., Inc.*,713 F. App'x 805, 807 (11th Cir. 2017)). Participation in corporate affairs is probative of knowledge. *Moses*, 913 F.3d at 309; *FTC v. Leanspa, LLC*, 920 F. Supp. 2d. 270, 279 (D. Conn. 2013). "[T]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *FTC v. Affordable Media*, 179 F.3d, 1228, 1235 (9th Cir. 1999).

Here, as discussed above, Defendant Braun not only had the authority to control and did control Defendants' unlawful acts, but he also actively participated in and had knowledge of those acts. He identified himself as a "manager" and "Senior Funding Manager" of RCG, and

told a business associate that he was "in charge" of the company. (SMF ¶ 27.) He negotiated the

terms of Merchant Agreements prior to funding and exercised final authority over the terms of

Defendants' deals with consumers, and when customers missed payments, Braun determined

how to respond. (*Id.* ¶¶ 34–36, 42–45.) He was well aware of and participated in Defendants'

overcollection practices. (*Id.* ¶¶ 77, 83, 92.) He also cavalierly elected to withhold an arbitrary

$2,000 from a customer's advance in order to "try and make extra money with no risk lol," and

in another instance increased the fee amount withheld upfront because "I smelled the opportunity

its extra 30k I gotta do what I gotta do." (*Id.* ¶¶ 107, 123.) He personally made the vast majority

of the violent and profane threats against Defendants' customers. (*Id.* ¶¶ 159–63, 165–66, 168–

69.) Accordingly, Defendant Braun is liable for both injunctive and monetary relief.

## IV.    THE PROPOSED ORDER PROVIDES APPROPRIATE RELIEF IN LIGHT OF DEFENDANT BRAUN'S CONDUCT

### A.  The Proposed Injunctive Provisions Are Appropriate

Section 13(b) of the FTC Act expressly authorizes courts to grant a permanent injunction

against violations of any provisions of law enforced by the FTC. 15 U.S.C. § 53(b); *FTC v.*

*Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011). "This provision gives the federal

courts broad authority to fashion appropriate remedies for violations of the Act," *FTC v. Pantron*

*I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), including "any ancillary relief necessary to

accomplish complete justice." *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982);

*OMICS Grp.*, 374 F. Supp. 3d at 1013. The scope of the proposed injunctive provisions

provided in the proposed final order is appropriate in light of Defendants' past conduct and the

likelihood of recurrence absent such relief.

### 1. Conduct Relief

A permanent injunction is justified when there is a "cognizable danger of recurrent violation, or some reasonable likelihood of future violations." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S. Ct. 894, 898 (1953). To determine whether violations are likely to recur, courts look to two factors: (1) the deliberateness and seriousness of the present violation, and (2) the violator's past record with respect to unfair advertising practices. *Sears, Roebuck and Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982). Prior illegal conduct is highly suggestive of the likelihood of future violations. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975). Given the overwhelming evidence that Defendant Braun violated Section 5 of the FTC Act and Section 521 of the GLB Act, and did so in a particularly egregious manner, there is a cognizable danger that he will continue to violate the law in the absence of a nationwide injunction. The permanent injunctive provisions of the proposed order, therefore, are necessary to protect the public from Defendant Braun's further violations of the law.

Section I of the proposed final order would ban Defendant Braun from marketing, selling, or collecting on, or assisting others in the marketing, selling, or collecting on, any product represented to provide funds in exchange for future receivables, revenues, or proceeds—e.g., merchant cash advance products. Section I would also ban him from participating in debt collection activities.

Numerous courts in the Second Circuit have imposed bans enjoining future participation in a particular line of business. *See, e.g.*, *FTC v. Federal Check Processing*, 2016 WL 5940485, at *4, *7 (W.D.N.Y. Oct. 13, 2016), *aff'd sub nom. FTC v. Moses*, 913 F.3d 297 (2d Cir. 2019) (banning defendants from engaging in debt collection); *Instant Response Sys.*, 2015 WL 1650914, at *10 (banning defendant from engaging in the marketing, promotion, or sale of

medical alert goods or services); *FTC v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 393–94 (D. Conn. 2009) (banning defendants from engaging in sales and advertisements of weight loss products); *Verity Int'l*, 335 F. Supp. 2d at 500 (imposing "broad permanent injunction" barring defendants from offering audiotext or videotext services following trial).

The facts here clearly demonstrate that Defendant Braun overcharged consumers both with respect to upfront fees and with excess collections after consumers had completed their contractual repayments. Indeed, he stole from consumers on both ends *by design and with glee*. (*See, e.g.*, SMF ¶ 77 (Defendant Braun suggesting Defendants take automatic withdrawals "forever and over collect lol"); *id.* ¶¶ 78–96 (discussing Defendant Braun's direct involvement with overpayments); *id.* ¶¶ 107, 109, 118–24 (discussing Defendant Braun's direct involvement with excess upfront fees); *id.* ¶ 129 (Braun stating a consumer "was just funded 43k" but that Braun "only deposited 15k – lol.").)

On the collections side, Defendant Braun's actions, which included death threats ("I will kill you"), and threats to harm business owners ("I am going to beat the s*** out of you"), their families ("I will take your daughters from you"), and their reputation ("I will hang papers all over the lampposts in Crown Heights stating that you are a liar and a thief"), among other outrageous statements, were likewise beyond the pale. (*Id.* ¶¶ 159–69.)

Accordingly, banning Defendant Braun from advancing funds and participating in debt collection is appropriate and necessary, as in the above-cited cases.

The proposed order also has several provisions to prevent Defendant Braun from repeating the unlawful conduct alleged in the Amended Complaint and proven above. Such provisions require Braun do no more than follow the law and are commonplace in FTC matters. *E.g.*, *Federal Check Processing*, 2016 WL 5940485, at *7 (prohibiting misrepresentations

relating to financial products or services); *Instant Response Sys.*, 2015 WL 1650914, at *10.

Specifically, here, Section II of the proposed order would prohibit Defendant Braun from making various misrepresentations regarding the requirements, costs, and benefits associated with obtaining a product or service or the circumstances that would constitute a breach of contract, to remedy Defendant Braun's deceptive practices. Section V would likewise prohibit Defendant Braun from obtaining customer information of a financial institution by making false statements or otherwise violating the GLB Act. And Section III would prohibit Defendant Braun from making unauthorized withdrawals from any consumer's bank account to remedy those unfair practices.

Section IV of the proposed order would require Defendant Braun to dismiss any pending cases against consumers, terminate any UCC liens imposed against consumers, and request removal of negative credit reports. Forward-looking prohibitions on Defendant Braun's cash advance and collections activity alone will offer no relief to consumers wronged by Defendants' widespread and abusive overcharging and collections conduct and against whom Defendants have already sought or obtained judgments and liens, and reported derogatory credit information; corrective measures on those fronts as set forth in Section IV are therefore appropriate. *Cf. FTC v. Lead Express, Inc.*, 2021 WL 4173922, at *8–9 (D. Nev. Sept. 13, 2021) (order provision deeming the defendant's outstanding payday loans paid in full and prohibiting the defendant from reporting any obligation to any consumer reporting agency).

### 2. Monitoring Provisions

The proposed order also contains various provisions courts have imposed in other FTC actions to ensure defendants' compliance and the orders' enforceability: a section requiring the provision of customer information sufficient to enable consumer redress (Section VII); a

requirement that Defendant Braun acknowledge receipt of the Order (Section VIII); a compliance reporting provision (Section IX); a provision requiring maintenance of records (Section X); and a provision permitting the FTC to monitor his compliance with the order (Section XI).

It is well-settled that these types of monitoring provisions are proper to ensure compliance with the permanent injunctive provisions discussed above. *See, e.g.*, *Five-Star Auto Club*, 97 F. Supp. 2d at 533 (noting that "equitable relief can include . . . monitoring provisions and reporting requirements"); *Federal Check Processing*, 2016 WL 5940485, at * 4; *Verity Int'l*, 355 F. Supp. 2d at 502; *Cuban Exchange*, 2014 WL 3756358, at *5 (adopting report and recommendation to issue permanent injunction with compliance and monitoring provisions); *OMICS Grp.*, 374 F. Supp. 3d at 1014 (imposing monitoring provisions because they "are necessary to ensure compliance"), at 1022–24 (order containing similar monitoring provisions); *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 213 (D. Mass. 2009) ("Courts have also included monitoring provisions in final orders in FTC cases to ensure compliance with permanent injunctions."), *aff'd*, 624 F.3d 1 (1st Cir. 2010); *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1026–27 (N.D. Ind. 2000), *aff'd*, 312 F.3d 259 (7th Cir. 2002) ("Courts may order record-keeping and monitoring to ensure compliance with a permanent injunction.").

## B. The Proposed Monetary Relief Is Appropriate

### 1. Monetary Relief for Defendant Braun's Violations of Section 521 of the GLB Act

Section 522(a) of the GLB Act empowers the FTC to enforce Section 521 of the Act "in the same manner and with the same power and authority" it has under the FDCPA.  15 U.S.C. § 6822(a).

Looking to the FDCPA redress framework, a violation of the FDCPA is deemed an unfair or deceptive practice in violation of the FTC Act, and can be remedied in the same manner as an

FTC trade regulation rule.  That language invokes Section 19(b) of the FTC Act, which authorizes the Court to grant monetary relief to redress consumer injury resulting from rules violations.  15 U.S.C. § 57b(b); *FTC v. Credit Bureau Center, LLC*, 2021 WL 4146884, at *12 (N.D. Ill. Sept. 13, 2021) (amending judgment to award consumer monetary redress pursuant to Section 19 for violations of statute whose violations are considered rule violations); *FTC v. Lakshmi Infosoul Svcs. Pvt. Ltd.*, 2014 WL 3744484, at *2 (S.D.N.Y. July 10, 2014) (granting relief pursuant to Section 19 to redress injury to consumers resulting from defendants' rule violations).  Thus, the FTC may seek monetary relief to redress consumer harms resulting from Defendants' violations of the GLB Act.

Here, the undisputed evidence shows that Defendants' violations of Section 521 of the GLB Act caused $4,847,911 in consumer injury.  As set forth below, this represents the amount of consumer harm caused by (1) Defendants' pulling excess payments from consumers' accounts even after they collected the agreed-upon repayment amount, and (2) Defendants' withholding fees from MCA funding that were larger than the upfront fees stated in Merchant Agreements.

The FTC's expert determined based on analysis of a random sample that Defendants imposed unauthorized charges on approximately 395 small business consumers' accounts with a mean unauthorized charge amount of $8,579.  (SMF ¶¶ 194, 195.)  Multiplying these figures results in consumer harm of $3,388,705 caused by Defendants' misstatements about the amount of funds that consumers would repay.  (*Id.* ¶ 195.)

Further, the FTC's expert determined based on analysis of a random sample that Defendants hit approximately 518 consumers' accounts with unexpected fees, resulting in a mean underfunding amount of $2,817.  (*Id.* ¶¶ 196, 197.)  Multiplying these figures results in

$1,459,206 in consumer harm attributable to Defendants' underfunding advances.  (*Id.* ¶ 197.)

Adding these two consumer injury figures yields a total consumer injury of $4,847,911.[11]

### 2. Civil Penalties for Defendant Braun's Violations of Section 521 of the GLB Act

Section 5(m)(1)(A) of the FTC Act calls for the imposition of civil penalties where a

defendant violated a trade regulation rule "with actual knowledge or knowledge fairly implied on

the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such

rule."[12]  15 U.S.C. § 45(m)(1)(A).  Actual knowledge is not required; the knowledge element is

satisfied where "a reasonable person under the circumstances would have known of the existence

of the provision and that the action charged violated that provision."  *United States v. Nat'l Fin.*

*Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996); *United States v. Dish Network LLC*, 256 F. Supp.

3d 810, 930 (N.D. Ill. 2017) ("A person also commits a knowing violation if, under the

---

[11] Defendant Braun asserts in his ninth and fifteenth affirmative defenses that consumers would be unjustly enriched by any monetary award if such award is not offset by any supposed benefits consumers received, refunds paid, and costs associated therewith.  (PX02 at 10, 11.)  But the FTC is not seeking the return of all monies paid to Defendants by consumers, only the amounts taken by, or withheld by, Defendants outside of the agreed Merchant Agreements.  With respect to refunds, the FTC would have reduced its redress demand if Defendants had produced credible evidence that they refunded amounts they failed to advance or overcollected, but Defendants did not do so.  And with respect to Defendants' operating costs, Section 19(b) of the FTC Act expressly states "refund of money" without any statutory provision to deduct value or costs.  Additionally, courts have held that, in FTC matters, redress is based on consumers' losses, rather than defendants' gains and, thus, do not take costs into account.  *See, e.g., Liu v. SEC*, 140 S. Ct. 1936, 1945 (2020) ("[W]hen the entire profit of a business or undertaking results from the wrongful activity . . . the defendant will not be allowed to diminish the show of profits by putting in unconscionable claims for personal services or other inequitable deductions.") (internal quotation and citation omitted); *Bronson Partners*, 654 F.3d at 375 & n.11 ("Bronson seeks to deduct from its revenue not the (negligible) costs of the products that it fraudulently sold, but the (substantial) costs of placing its fraudulent advertisements.  This argument, equivalent to an armed robber's seeking to deduct the cost of his gun from an award of restitution, could stand with the classic patricide who claims mercy as an orphan as an illustration of the concept of chutzpah.").  Accordingly, the Court should reject his ninth and fifteenth affirmative defenses.

[12] As discussed above, the GLB Act is enforceable in the same manner as a trade regulation rule.

circumstances, a reasonable, prudent person would have known of the existence of the rule and that his or her acts or omissions violated the rule."), *aff'd and rev'd in part on other grounds*, 954 F.3d 970, 978 (7th Cir. 2020) (holding that under Section 5(m)(1)(A), a defendant is liable if it either "knew that the act was unlawful or if it should have known the act was unlawful"); *United States v. Com. Recovery Sys., Inc.*, 179 F. Supp. 3d 728, 737 (E.D. Tex. 2016); *United States v. Tech. Comms. Indus., Inc.*, 1986 WL 15489, at *3 (E.D.N.C. Dec. 22, 1986) ("The law only requires that the defendant or his agent have some knowledge, actual or constructive, of the requirements of the rule such that the defendant knew or should have known that his conduct was unlawful.") (internal quotations and citation omitted).

The undisputed evidence shows that Defendant Braun was aware of his obligation to comply with the GLB Act when Defendants made the misstatements discussed above, and he is therefore individually liable for civil penalties. Specifically, Defendants, in their contract with their merchant processor, expressly agreed to comply with all laws, including the GLB Act. (SMF ¶¶ 190–92.) And Braun directed Giardina to sign an amendment to another contract warranting that RCG was not subject to investigation or legal proceedings related to the GLB Act. (*Id.* ¶ 193.)

Here, the FTC requests that the Court impose on Defendant Braun a civil penalty of $42,470,021, based on the number of violations and the per-violation amount. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by the Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of up to $46,517 for each violation of the GLB Act. *See* 16 C.F.R. § 1.98(d) (2022). The undisputed evidence shows at least 918 violations of Section 521 of the GLB Act (395

attributable to false, fictitious, or fraudulent statements about how much consumers would be charged, and 518 attributable to Defendants' withholding fees in excess of what was specified in consumers' contracts). When multiplied by the civil penalty amount, this yields $42,470,021.

The factors courts consider when determining the amount of civil penalty are set forth by statute: 1) the degree of culpability; 2) any history of prior such conduct; 3) ability to pay; 4) effect on ability to continue to do business; and 5) such other factors as justice may require. 15 U.S.C. § 45(m)(1)(C); *United States v. Dish Network L.L.C.*, 954 F.3d at 980. An analysis of these factors demonstrates that Defendant Braun should be subject to the maximum civil penalty.

*First*, Defendant Braun is highly culpable. As discussed *supra*, he was directly involved in making the misstatements causing the GLB Act violations, and these misstatements represented Defendants' consistent practices and policies. Defendant Braun ensured that it was RCG's policy to charge consumers without authorization, often making light of RCG's overcollections and his victims' financial distress in discussions with his colleagues. (SMF ¶¶ 76–77.) Defendant Braun similarly directed RCG's practice of withholding upfront fees from merchants' advances, admitting he did so to "try and make extra money with no risk lol." (*Id.* ¶ 107.)

*Second*, Defendant Braun's unlawful conduct with RCG permeated the company and extended over years of its operations.

*Third*, although a defendant's ability to pay "is not a determinative factor in assessing a § 45(m)(1)(A) civil penalty," *United States v. Cornerstone Wealth Corp, Inc.*, 549 F. Supp. 2d 811, 823–24 (N.D. Tex. 2008), Defendants' large profits from their MCA operation suggest an ability to pay civil penalties, weighing in favor of the full civil penalty amount.

*Fourth*, Defendant Braun's illegal conduct pervaded all of RCG's operations, so there is little value in ensuring its continued operation. *Cf. id.* at 824 (declining to consider effect on ability to continue to do business where defendants' conduct warranted a ban).

*Finally*, regarding the fourth factor—justice—courts prioritize imposing penalties sufficiently large to deter future violations. *See Nat'l Fin. Servs.*, 98 F.3d at 141 ("Without a real sting, the defendants would be unlikely to be deterred from violating the Act, in light of the substantial profit to be made . . . ."); *United States v. Reader's Digest Ass'n Inc.*, 494 F. Supp. 770 (D. Del. 1980), *aff'd*, 662 F.2d 955 (3d Cir. 1981) ("A civil penalty should be more than a mere 'license fee' or 'an acceptable cost of violation' of an order and should provide 'meaningful deterrence.'") (citation omitted). Because Defendant Braun appears to be engaging in the same misconduct (*see* SMF ¶ 47) (according to a news report, Braun is engaged in offering merchant cash advances and, through affiliated businesses, continues to lie to borrowers about cash advance terms and withhold substantial and undisclosed upfront fees), it is important that any civil penalty be sufficient to provide "meaningful deterrence" and not just "an acceptable cost of violation."[13]

## V. THERE IS NO GENUINE DISPUTE OF MATERIAL FACT AS TO ANY OF DEFENDANT BRAUN'S REMAINING AFFIRMATIVE DEFENSES

In his Answer, Defendant Braun advanced sixteen affirmative defenses. (PX02 at 9–11.) The FTC has already addressed above his ninth, twelfth, and fifteenth affirmative defenses. (*See*

---

[13] Defendant Braun's egregious threats when collecting from consumers also counsels in favor of a significant penalty in the interest of justice. Braun deliberately scared consumers, stating, for example, "I am going to make you bleed," "We'll go after your family," and "I will spend ten times the amount of money that you ever f***ing dreamed of to bring you down financially," (SMF ¶¶ 162, 166–67.) Defendant Braun's abusive collections practices stemmed directly from the GLB Act violations given that Defendants typically drained consumers' financial institution accounts before moving on to collections activity.

notes 8 and 11, *supra*.)  There is no genuine dispute of material fact on the other affirmative

defenses, which can also be rejected on purely legal determinations.[14]

### A. Defendant Braun's Failure to State a Claim Defenses and Denials of Liability Are Negative Defenses and Can Be Rejected

A properly pleaded affirmative defense absolves a defendant of liability "even where the

plaintiff has stated a prima facie case for recovery."  *Vogel v. Huntington Oaks Delaware*

*Partners, LLC*, 291 F.R.D. 438, 442 (C.D. Cal. 2013).  A defense that attacks the case-in-chief

by disproving one or all elements of a complaint, on the other hand, is a negative defense and not

properly pleaded as an affirmative defense.  *Zink v. First Niagara Bank*, 2015 WL 423221, at

*3–4 (W.D.N.Y. Feb. 2, 2015); *see also Nat'l Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d

520, 527 (2d Cir. 2004) (challenges to elements of the case-in-chief are not affirmative

defenses); *FTC v. Think All Pub. LLC*, 564 F. Supp. 2d 663, 665 (E.D. Tex. 2008) (noting that

negative defenses tend to disprove elements of a complaint).

Similarly, the defense of failure to state a claim is a negative defense that may be

disregarded.  *See, e.g.*, *FTC v. N. Am. Mktg. & Assocs., LLC*, 2012 WL 5034967, at *2 (D. Ariz.

Oct. 18, 2012) (striking failure to state a claim defense); *Barnes v. AT&T Pen. Ben. Plan*, 718 F.

Supp. 2d 1167, 1174 (N.D. Cal. 2010) (same).

Here, Defendant Braun's third through eighth, tenth, eleventh, thirteenth, fourteenth, and

sixteenth defenses are nothing more than restatements of denials of liability or elements of the

---

[14] The FTC previously moved to strike these affirmative defenses.  (ECF No. 91.)  Observing that Defendants' affirmative defenses were asserted "almost all in substantially conclusory terms" and "probably unlikely to prevail," and that many are "probably redundant" general denials, the Court denied the FTC's motion without prejudice because allowing the affirmative defenses "to stand would result in little or no discovery that would not otherwise take place." (ECF No. 97.)  As the Court explained, the sufficiency of the purported affirmative defenses is "readily determinable on a motion for summary judgment."  (*Id.*)

FTC's claims and should be rejected on that basis alone. Further, as to Defendant Braun's first defense, the FTC has set forth above undisputed facts that Defendant Braun, in fact, deceived consumers, and, accordingly, violated Section 5 of the FTC Act and Section 521 of the GLB Act. Therefore, the Court may reject these affirmative defenses.

## B. Laches Is Unavailable in a Government Law Enforcement Action

Finally, Defendant Braun raises the equitable defense of laches as his second defense. Where, as here, the United States (including the FTC as one of its agencies) undertakes to enforce a public right or to protect the public interest, it is categorically not subject to the defense of laches. *United States v. Summerlin*, 310 U.S. 414, 416, 60 S. Ct. 1019, 1020 (1940) ("It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights."); *United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002) (holding that the defense of "laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest"). Accordingly, courts routinely strike the defense of laches when asserted by defendants in FTC enforcement actions. *See, e.g.*, *FTC v. Verity Int'l, Ltd.*, 194 F. Supp. 2d 270, 286 (S.D.N.Y. 2002) (dismissing laches defense and noting "the government generally is not subject to the defense of laches[]"); *FTC v. Quincy Bioscience Hldg. Co.*, 2020 WL 1031271, at *2 (S.D.N.Y. Mar. 2, 2020) (striking laches defense); *FTC v. 4 Star Resolution, LLC*, 2015 WL 7431404, at *2 (W.D.N.Y. Nov. 23, 2015) (same); *FTC v. Consumer Health Benefits Assoc.*, 2011 WL 13295634, at *5–6 (E.D.N.Y. Oct. 5, 2011) (same). Defendant Braun's second affirmative defense may therefore be disregarded.[15]

---

[15] Defendant Braun's filings have alluded to other affirmative defenses, but only the enumerated defenses addressed above are pleaded in his Answer. Because Defendant Braun has not sought leave to amend his Answer, the Court need not entertain any additional affirmative defenses at this stage. *See* Fed. R. Civ. P. 15(a) (allowing amendment of pleadings only with the opposing party's consent or the Court's leave).

## VI.    CONCLUSION

For all the foregoing reasons, the FTC respectfully requests that this Court grant its

motion for summary judgment and enter the proposed final order.


Respectfully submitted,


JAMES REILLY DOLAN
Acting General Counsel


Dated:  April 8, 2022            */s/ Gregory A. Ashe*
                                GREGORY A. ASHE
                                MARGUERITE L. MOELLER
                                JULIA E. HEALD
                                Federal Trade Commission
                                600 Pennsylvania Ave. NW
                                Mail Stop CC-10232
                                Washington, DC 20580
                                Tel: (202) 326-3719 (Ashe)
                                Tel: (202) 326-2905 (Moeller)
                                Tel: (202) 326-3589 (Heald)
                                Facsimile: (202) 326-2752
                                Email: gashe@ftc.gov, mmoeller@ftc.gov,
                                jheald@ftc.gov

                                Attorneys for Plaintiff
                                FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 8, 2022, 2021, a true and correct copy of **FTC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT JONATHAN BRAUN** was filed electronically with the United States District Court for the Southern District of New York using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ Gregory A. Ashe
GREGORY A. ASHE
Attorney for Federal Trade Commission