UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FEDERAL TRADE COMMISSION,

                     Plaintiff,

      - against -                              20-cv-4432 (LAK)

RCG ADVANCES, LLC et al.,

                     Defendants.
-------------------------------------------------------------------X

## DECLARATION OF JONATHAN BRAUN

      JONATHAN Braun, being duly deposed, declares under the penalties of perjury pursuant to 28 U.S.C. §1746 as follows:

      1.     I am a Defendant ("Braun" or "Defendant Braun") in the above captioned action. I have personal knowledge of the facts, and make the within declaration in opposition to the Plaintiff-Federal Trade Commission's ("FTC" or "Plaintiff") Motion for Summary Judgment and in support of my Cross-Motion to serve late responses to the admissions to the FTC's first and second sets of requests for admissions which are attached to the within Declaration, in addition to amend my answer. The FTC has submitted 36 exhibits and voluminous documentation consisting of hundreds of pages of documents and is not prejudiced by the responses or the proposed Amended Answer to add one specific affirmative defense which will clarify the defenses in this case. As from the outset of this case, I instructed my counsel to cooperate and settle this matter (See Exhibit DX5, separate declarations in support of the Cross-Motion in addition to the Memorandum of Law pg. 2). For the sake of judicial economy, the within Declaration encompasses both the opposition to the Plaintiffs motion for permission to serve the late responses and amended answer, as well as the opposition to the Plaintiffs Motion for Summary Judgment.

      2.     Plaintiffs Motion for Summary Judgment is for the injunctive and substantial

monetary relief as the FTC was required to amend its complaint in order to obtain the relief it sought in its initial complaint, as it was compelled to do so as a result of a decision by the U.S. Supreme Court. Annexed as Exhibit DX2 is my Answer with Affirmative Defenses to Federal Trade Commission's AC. My request to add a specific statute of limitations defense is to clarify the existing affirmative defense based upon the expert report and the New York Attorney General ("NYAG") exhibits that are being used by the FTC.1

3.       Previously, I was working as an underwriter, senior fund manager, and independent consultant for Defendant RCG, which includes a d/b/a Ram Capital Funding ("Ram") and Viceroy Capital Funding ("Viceroy"), which Plaintiff has also sued in this case, in the Merchant Cash Advance business ("MCA"). The MCA business is a totally different than a commercial lending business. An MCA is a purchase of a future account receivable from a merchant.. Yet, the FTC incorrectly refers to "consumers" and not merchants, as all of the transactions complained of are with commercial companies.

4.       Plaintiffs AC alleges that I made three (3) types of misrepresentations in dealings that I had relating to RCG which also does business using d/b/a's of Ram and Viceroy. I was not an owner, officer or director of RCG. I acted as an underwriter, Consultant and senior fund manager to RCG, Ram and Viceroy. See excerpts of my investigative hearing testimony of September 19, 2019 ("Investigative Hearing"), which are annexed as DX3. The Plaintiff incorrectly alleges that I was an owner of RCG Advances2, LLC ("RCG"), yet has provided no

---

1 As a part of the exhibits to the within motion, the FTC is using discovery that is being used in the pending NYAG motion for summary determination that was not available until the NYAG made its motion for a summary determination in *People v. Richmond Capital Group,* Index No. 451368/2020 N.Y. Sup. Ct.

2 The FTC has informed the Court that it has entered into a proposed settlement with RCG and its owner, Robert Giardiana and with RAM Capital and its owner, Steven Reich. I was not a signatory or party to either settlement. Yet, the FTC claims that I am an owner, officer, director, or control person of both of those companies, but was somehow willing and able to enter into settlements with the corporate defendants without my agreement. This constitutes the FTC's apparent acknowledgement that, contrary to what they claim in these motion papers, I am not an owner, officer, director, or control person of any of the entity defendants.

evidentiary proof of such ownership, other than referring to documents which do not show or attach any legal indicia of ownership. I testified at the Investigative Hearing conducted by the NYAG in a separate action (Petition by the NYAG in an action pending in the New York State Supreme Court entitled *People v. Richmond Capital Group,* Index No. 451368/2020 N.Y. Sup. Ct. A motion for summary determination (summary judgment) is pending in that case. Plaintiff has annexed to its exhibit list in the within case numerous documents from the exhibits filed by the NYAG in that case, so that they are required to be addressed here. In my investigative testimony before this case or the NYAG case started, I specifically denied that I was an owner, officer, director of a control person of Respondents in the NYAG case; that I never signed or had the authority to sign a check, authorize a wire transfer of funds with a bank on behalf of Richmond Capital Group LLC ("Richmond") or any other defendant; that I never signed an MCA agreement, as I was not authorized to do so; and that I never signed or was part of an operating agreement or any other document that showed that I had any ownership rights in Richmond. None of the FTC documents that have been produced specifically prove that I had any such authority to do so. Instead, the FTC is relying on emails and affidavits of individuals and companies that have no personal knowledge of the ownership of Richmond or any legal document that verifies the ownership of Richmond.

5.      Plaintiff fails to recognize that the MCA business has consistently been determined to be a legitimate and legal business in the State of New York. The FTC points to the request for admissions, which are addressed in the Cross-Motion. The FTC cannot deny that settlement and cooperation discussions were ongoing from the outset of the case, and that I was incarcerated for a matter that was not related to the instant case, and was subject to COVID-19 restrictions when the request for admissions were served. Further, I was in the process of

providing the FTC substantial financial information required by the FTC for the purpose of settling with the FTC. The FTC had previously settled with Tzvi Reich ("Reich) and RAM Capital and is in the process of finalizing a settlement with Robert Giardina ("Giardina") and RCG Advances, *Supra.* 3 It is apparent that the FTC had prepared the within motion prior to settling with Defendant Giardina, as it consistently refers to "Defendants" in its papers, and that it obtained a 120 stay as to Giardina and RCG Advances *(Supra).* I am soon to be the only remaining Defendant in this case as a result of the Reich and RAM Capital and the pending Giardina/ RCG Advances settlements. I am the only Defendant that appeared pursuant to a pre-Petition investigative hearing subpoena issued by the NYAG in the case pending in the New York State Supreme Court entitled *People v. Richmond Capital Group,* Index No. 451368/2020, N.Y. Sup., and gave pre-Petition investigative hearing testimony without asserting my Fifth Amendment rights. I cooperated with Petitioners in their investigation into violations of Executive Law §63(12), usury, banking, fraud and harassment laws. Petitioners in that case filed the complete transcript of my September 18, 2019 testimony (DX3). I answered all questions in spite of Petitioners' warning which stated:

> *Your testimony is being taken today pursuant to a subpoena issued by our office dated August 5th, 2019. This is an investigatory hearing. It is not a deposition.*
>
> *Unlike a deposition, you do not have the right to have an attorney present. As a courtesy, we have allowed you to have an attorney present on the condition he not raise objections, assist with your answers, or otherwise interrupt or interfere with the questioning.*
>
> *There will be no transcript provided, and you are not permitted to create a transcript. The only matters as to which you may consult with your attorney on are the attorney/client privilege and any Fifth Amendment*

---

3 Former Defendant Reich settled with the FTC and is no longer a party in the within case. Defendant Giardina has settled with the FTC, and his settlement agreement is in the FTC settlement process, and has obtained a 120 day stay of any action in this case.

> *rights. You have the right to refuse to answer any question if a truthful*
> *answer to the question would tend to incriminate you.*
>
> *Any willful misstatement by you may constitute perjury. Anything you say may be*
> *used against you in a legal proceeding.*

*See* Braun Testimonial Hr'g Tr., ECF No. 583 ("Braun Tr."), at 3:12-25, 4:2-8.

6. I deny having any knowledge or having any information sufficient to form a belief as to allegations that former Defendant Reich/Ram Capital and pending settling Defendant Giardina/RCG Advance or I violated §521 of the GLB Act, and I did not make any false statement or representation to obtain consumer's financial information. (DX2).

7. I am not the defacto owner of Richmond or an officer, and did not act alone or with others in formulating, directing or controlling, nor did I have the authority nor did I participate in the misconduct alleged in the AC. (Def Xl at 8 Third Aff. Def., Sixth Aff. Def., Seventh Aff. Def., Tenth Aff. Def., Eleventh Aff. Def., Sixteenth Aff. Def. Notably, DX3 filed as document 45 in People v. Richmond Capital, Index No. 451368/2020 NY Sup Ct PX33 contain an Affidavit of Giardina where he stated *"I am the owner of Richmond Capital Group LLC, Viceroy Capital Funding and Ram Capital Funding. " "Richmond Capital Funding does have a DIE/A Ram Capital Funding. Viceroy Capital Funding is also a DIE/A of Richmond Capital.9"* (DX4). *"Robert Giardina was your supervisor at Richmond?",* DX3 Investigative Hearing September 18, 2019 ("Braun Tr.") at 17:5-6.

See also the Braun Tr. at 21:7-25:

> *Q.    Giardina had -- among his roles was --he supervised the*
> *bank account from which Richmond wired cash advances;*
> *correct?*
>
> *A.    I know that I didn't, and I would assume that the owner of the*
> *company does, yeah. I never saw anybody else at the*
> *company have the rights to do anything with the bank.*
>
> *Q.    Did Giardina generally -*

> *A.*     *The only person that I know that was able to operate any bank account is him.*
>
> *Q.*     *And when you say "operate any bank account" do you mean --*
>
> *A.*     *Any type of transaction from it would be from him.*
>
> *Q.*     *For example, that would include wiring cash advances from the Richmond bank account?*
>
> *A.*     *Anything, yeah. That would definitely include it, because if nobody else could do it, nobody else could send the wire.*

See Braun Tr. At 22:5-11:

> *Q.*     *Giardina also supervised the relationship with Actum Processing; isn't that right?*
>
> *A.*      *Everything that had to go through the company would go through the owner of the company, yeah. So I'm -- yeah, I would say so. I never spoke with them.*

8.     Further evidencing that I did not have any authority to directly or indirectly control Richmond, Ram or Viceroy, Giardina or Reich, I never signed a wire, or any agreement with Richmond, Ram or Viceroy (See DX3 Braun Tr. at 21:7-25). Giardina was the only individual that I knew that was able to administer any bank account of RCG, Richmond, bib/a Ram d/b/a Viceroy. There was also a separate entity known as Ram Capital Funding LLC, which was owned and operated by Steve Reich (and with whom the FTC has settled). Steve Reich was the only individual that I knew that was able to admonsteter any bank account Ram Capital Funding, LLC. As noted at my deposition:

> *Q.*     *Who owns or owned RAM Capital Funding, LLC?·*
>
> *A.*     *Steve Reich. I'm not sure if that's his legal name, but that's what he went by.* (See Braun Tr. at 18:17-20)

See also Steve Reich Investigative hearing on January 13, 2021, *"I own Ram Capital Funding LLC"* (DX13). I was terminated by Giardina on December 6, 2018. See Affidavit as Exhibit A (ECF No. 677) in the NYAG case as well as DX3 Braun. Tr. at 15:9.

> *Q.    Is Richmond Capital still in the business of issuing merchant cash advances today, to your knowledge?*
>
> *A.    To my knowledge I'd say no. They told me when I was fired that they are winding down and just complying with your -- I guess your department's subpoena.* (See DX3 Braun. Tr. At 14: 21-15; 15:2-3)

9.    As stated herein, I did not exercise my right to assert my Fifth Amendment privilege at the September 18, 2019 investigative hearing, even though my counsel advised me to do so. I answered all questions of Mr. Figura, the Assistant Attorney General who conducted the investigative hearing. I further explained the differences between a purchase and sale of future receivables, which are the business of merchant cash advance companies, and a commercial loan transaction, and that all of the MCA agreements were contracts to purchase receivables with businesses and not individual consumers. The FTC is alleging that even though it has direct evidence to show that I was not an owner, officer or director that I somehow was, and even though I was fired by Giardina (NYAG ECF No. 677) that I was an owner who directly controlled Richmond. Simply put, these were not loans, but rather, the purchase and sale of future receivables.

10.    I would like to address the investigative testimony at the hearings conducted by the NYAG of party and non-party witnesses that are listed as exhibits or excerpts in the FTC exhibits in this case of witnesses that took the Fifth Amendment as follows:

> Excerpts from Deposition of Jose DaSilva - PX26
>
> Excerpts from NYAG Investigational Hearing of Miriam Deutsch filed as Document #46 in *People v. Richmond Capital Group,* Index No. 451368/2020 (N.Y. Sup. Ct.) - PX29

Excerpts from NYAG Investigational Hearing of Christopher Kim filed as Document #47 in *People v. Richmond Capital Group,* Index No. 451368/2020 (N.Y. Sup. Ct.) - PX30

NY AG Investigational Hearing of Robert Giardina filed as Document #585 in *People v. Richmond Capital Group,* Index No. 451368/2020 (N.Y. Sup. Ct.)

Excerpts from NYAG Investigational Hearing of Ezra Mosseri filed as Document #48 in *People v. Richmond Capital Group,* Index No. 451368/2020 (N.Y. Sup. Ct.) - PX31

Excerpts from NY AG Investigational Hearing of Marcella Rabinovich filed as Document #49 in *People v. Richmond Capital Group,* Index No. 451368/2020 (N.Y.Sup. Ct.)- PX32

11. Plaintiff is claiming that there should be an automatic adverse inference against each of the non-parties for taking the Fifth Amendment against me as a Defendant in this case. I am advised that an adverse interest should not be drawn against me as courts do not automatically impose an adverse inference when co-parties or non-parties invoke their own Fifth Amendment privilege in a case, and that the Court of Appeals for the Second Circuit has identified a number of non-exclusive factors to guide their determination of whether any testimony of parties or non-parties that invoke the Fifth Amendment can result in an adverse inference against a party (Braun) in this case, including (a) the nature of the relevant relationships, (b) the degree of control over the non-testifying witness, (c) the compatibility of interests between the non-testifying witness, (d) the party and the role of the non-testifying witness in the litigation, and (d) whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth. The burden is on the proponent of admissibility, the Plaintiff FTC, to show that the circumstances of the case, that a failure to speak is so unnatural that it supports the inference proffered by the proponent FTC. Each specific

question for which an adverse inference is such it must be individually answered.4

12.     The FTC has failed to show that such an adverse inference should be imposed against me in this case. The Plaintiff has not shown that I controlled any of these witnesses. Additionally, the non-parties who testified at the investigative hearing, all had an interest in pinning any blame on others (including me) and not themselves, and thus their interests are not aligned.5

13.     As I have stated herein, I have not exercised my right to take the Fifth Amendment either in the NYAG investigative hearing on September 18, 2019 (DX3) or in this case as to any questions as to the alleged wrongdoing as alleged in DXl.

14.     Plaintiff submits the following below listed exhibits in further support of the motion consisting of declarations alleging specific claims in Count I of its Amended Complaint, claiming that I made misrepresentations regarding financing products and made directly or indirectly or by implication that I violated Section 5(A) of the FTC Act, 15 U.S.C. §45(A) in **,i,r36,** 37 and3 28 in Count I. My Amended Answer to Count I denies **,¶¶** 36**,** 37 and 38 (DX2). I deny that I made any such misrepresentations or threats of physical harm to the people from whom the FTC obtained affidavits from and submitted as exhibits PX12, PX13 PC14, PX15, PX16, PXl7, PX18, PX19, PX20, PX21, PX22, PX23, PX24, PX25, PX26, PX27, PX28, PX30, PX31, PX32, PX33 and PX34 as follows:

### PXlO: Declaration of Jean Marie Auboine (JMA Chocolates LLC)

15.     Mr. Auboine's declaration clearly states that the forms (MCA agreements) sent to him by Richmond, not by me, and the forms which constitute the FTC exhibits (B and C) in his

---

4 Point I of the Memorandum of Law in opposition to the within motion for summary judgment.
5 The Memorandum of Law in Opposition to the FTC Motion for Summary Judgment, Point IL See cases cited with respect to required procedure that must be followed in order to attribute an adverse inference to a party based upon the taking of the Fifth Amendment by a co-party or non-party witnesses.

declaration were provided by a representative of the Plaintiff and are notably labeled Purchase and Sale of Future Receivables (copies of MCA agreement [Exhibit DX 14]). Mr. Auboine admits that he did not deal with me, but a Ms. Washington and Michelle Gregg with respect to the MCA transaction. At a later date, around June 1, 2017, he claims that I called him about his company's contract, admittedly after the MCA agreement was in effect and that I told him that *"my boss had signed a contract that we could not get out of it"* and further that I threatened him and his family. Mr. Auboine does not claim that I made any misrepresentations to him, as he signed the MCA agreement prior to my ever talking to him or that I was ever involved in dealing with him with respect to signing a confession of judgment. I never met Mr. Auboine nor did I ever threaten any physical or other harm to him, his colleagues or his family. Mr. Auboine resides in Las Vegas, Nevada. His business is also located in Las Vegas, about 3,000 miles from where I live and work. If I had many any such threats, certainly Mr. Auboine would have contacted law enforcement authorities or even the FTC representative who would or should have informed him to make the appropriate action by reporting the threats to the police authorities. To my knowledge, no such action was ever taken because the threats never occurred. It is my further understanding that JMA Chocolates and Mr. Auboine did not fully satisfy its legal obligations in full.

## PXll: Declaration of John Brewer

16. Mr. Brewer states that he was president of Wyldewood Cellars Inc. ("Wyldewood"), and in May of 2017, five years ago, he was contacted by a broker by the name of Derrick Jarvis of Ram, in addition to Steve Reich and that there was a legal action in the NYS Supreme Court, New York County which was settled, and that Wyldewood had difficulties and credit issues, and that even after the case was settled, Wyldewood still had credit issues. It is

apparent that there was both a business and legal dispute, and it is more apparent that Mr. Brewer does not claim that I was involved in the MCA transaction. I was not involved with the MCA agreement (Exhibit A to his declaration), and it shows that it was not signed by me, nor was the confession of judgment, or even the settlement agreement or any other document connected with the Wyldewood MCA transaction, otherwise any such documentation would have been annexed to his declaration. It should also be noted that Exhibit B annexed to Mr. Brewer's declaration is redacted, as is Exhibit C. Exhibit D is a copy of a summons and complaint against Ram Capital LLC as defendant, and not against me individually.

### PX 12: Declaration of Jerry Bush

17.     Mr. Bush's declaration states that he was the former owner of JB Plumbing. Mr. Bush swears that he initially dealt with a person named Sabrina of Madison Funding Partners and that she referred him to Richmond as a lender, and that she referred him to a person named Josh who informed him that the transaction was a purchase and sale of future receivables. He alleges that Sabrina and Josh requested bank information as a part of the transaction to prevent fraud and to check my account status if debtors were ever blocked. He further alleges that following that conversation, after the MCA agreements were signed, I declined to cooperate with him to adjust the MCA, and that I would call other merchant cash companies stating *"We are all connected"* and *"All I've got to do is to make a telephone call. Finally, he threatened me and stated I will kill you?"* I did not and would not threaten to kill anyone, let alone Mr. Bush. I did not threaten Mr. Bush. I never met him. It should be noted that the Plaintiff has not submitted any documentation that was ever signed by me with respect to the MCA agreement, and that the news article referred to by Plaintiff as stated in Mr. Bush's declaration as part of its evidence has not been verified in any way that would constitute evidentiary proof, and is not evidence. It is

also my understanding the Mr. Bush ultimately entered into a settlement agreement with Richmond Capital.

## PX13: Declaration of Michael Gianni

18.    Mr. Gianni, the owner of Touch Plate Properties, LLC, a real estate development company, and Touch Plate Ink, LLC, a printing company, states he was contacted by a representative from Richmond and further that he was also contacted by other cash advance compames named Yellowstone Capital LLC ("Yellowstone"), Knight Capital Funding ("Knight"), and Empire Funding ("Empire"), which he identified as merchant cash advance compames. He claims that I offered him a "loan" of $200,000 even though Richmond was an MCA company that does not make commercial loans (nor does Yellowstone, Knight and Empire.) He further states that the initial amount was a $200,000 "loan" that was reduced to $30,000 because Touch Plate had other MCA agreements with Yellowstone, Knight and Empire (thus evidencing that Mr. Gianni understood that there was no loan rather, an agreement to purchase receivables.)

19.    He claims that on or about December 15, 2017, Richmond, not I, emailed him a draft merchant agreement and other forms, not loan documents, and that it wasthe FTC that provided him with the documents in Exhibit B. He claims thatand on the same day (December 15, 2017), he completed and signed Richmond's papers and returned them by email to me. Firstly, Mr. Gianni, states that he was familiar with companies in the MCA business, and thus apparently knew the difference between a loan and an MCA transaction. The Richmond MCA agreements sent to him that he signed were clearly not commercial loan documents, and that the Plaintiff FTC provided *"True and correct redacted and signed copies of these documents ... "* (Gianni Deel. **,r13),** some dated December 16, 2017 and others dated December 16, 2017, and

that he had a dispute with Richmond about the amount of funding he received. Mr. Gianni was apparently in communication with the Plaintiff FTC but apparently did provide a complete version of what happened with respect to the MCA transaction. Mr. Gianni fails to explain the timeline or the complete role of the FTC with respect to providing the correct version of the MCA agreements, or that the FTC may have assisted him in the preparation of his declaration. The FTC actions alone create issues of fact that should be explained by the individual at the FTC with respect to the assistance provided to Mr. Gianni.

20.   I never threatened Mr. Gianni and his family. I never met him, much less ever threatened him. Mr. Gianni further claims in if3 l that Yellowstone, Knight and Empire also obtained judgments against Touch Plate using confessions of judgment and caused financial harm, and that in if32 of his declaration:

> *"These judgments, which started with the unexplained $10,000 debit from Touch Plate's bank account and with Richmond's filing of its confession of judgment, have caused great damage to Touch Plate and to me personally. As a result of these judgments, Touch Plate's creditors have refused to provide funding to cover our capital needs, and the financial condition of my businesses - both Touch Plate Properties and Touch Plate Ink, the printing business - have deteriorated. The financial harm caused by these judgments has caused Touch Plate to lose personnel, caused a number of our real estate projects to fall into default on their mortgages, damaged my personal finances, caused me to fear that I will lose my house, and harmed my relationships with loved ones. "*

21.   Mr. Gianni refers to unnamed creditors that refused to provide funding, and it is unclear who would provide funding if Touch Plate Properties LLC or Touch Plate Ink, LLC have judgments against each of them. He points to three other MCA companies Yellowstone, Knight and Empire that had judgments that were the cause of Mr. Gianni's financial problems. Mr. Gianni also fails to state if either of the Touch Plate companies or he ever repaid all or any of the judgments against them or that he paid any of the judgments. He blames Richmond and myself for his financial problems even though he dealt with a number of creditors as well as other MCA

13

companies when he was in charge of running his business. His company accepted the MCA funding from Richmond, and did not honor the terms of the MCA agreement with Richmond, which is a legal matter which should be decided in the courts.

## PX14: Declaration of Richard Hagen

22.     This is a three-part declaration. Mr. Hagen, the owner of a used car dealership in California (Euro Motorwerks, LLC ["Euro Motorwerks"]), admits that he was familiar with the MCA business, that he signed an agreement with Richmond, and that I purportedly "admitted" that Richmond made two debits to Euro Motorwerks' account ($2998), and that I promised that I would make it up to him on the next cash advance. He also claims that I offered him other MCA agreements but that neither he nor Euro Motorwerks accepted them, and that a judgment was rendered against him and Euro Motorwerks by Richmond. He further states that Plaintiff FTC provided him with true and correct copies of these filings and judgment attached as Exhibit 6 to his declaration, so that the Plaintiff FTC provided and processed the alleged evidentiary proof that is being used by Plaintiff in this case. Mr. Hagen also refers to Michelle Gregg signing fake documents. Ms. Gregg is not a defendant in this case even though Ms. Gregg took the Fifth Amendment and signed both MCA agreements and confessions of judgment.

23.     Mr. Hagen further states and concedes that Euro Motorwerks had entered into other MCA agreements with other MCA companies. Mr. Hagen also states that he had a number of conversations with me (I never met him in person). Mr. Hagen goes on to claim in his declaration that *"I did not think Richmond should have filed a judgment against him and frozen my accounts".* He ignores that Euro Motorwerks was in violation of the MCA agreements and falsely states that I threatened him, *"that he carried a gun and was afraid of me physically harming him, his wife and his dogs".* He falsely claims that I called businesses that he worked

14

with, including auction companies and insurance companies, but does not identify the names of the companies that he is referring to. He further claims that he filed bankruptcy in 2019. I never met or threatened Mr. Hagen and, as he admits that he carried a gun, it is I that should have been in fear of Mr. Hagen. I do not have a gun nor have I owned a gun, and surely Mr. Hagen would have reported all of these threats to either the Federal Bankruptcy Trustee or the appropriate police authority had they occurred (they did not). Nor does Mr. Hagen appear to have asserted a claim against me in his bankruptcy or informed the bankruptcy court of any potential claims against me

24.    Exhibit 14, part 2, Attachment D are copies of MCA agreements from GTR Source LLC ("GTR") and Hardin Enterprises Inc. ("Hardin"), and Mr. Hagen's statements that he did not enter into any MCA agreements with Hardin are not relevant in this case. Mr. Hagen is still apparently involved in the bankruptcy process, and has not been discharged under the bankruptcy law. Action could have been taken under the bankruptcy law if his allegations had any merit, and to my knowledge, no action was taken.

## PX15: Declaration of Nabih Kadri

25.    Mr. Kadri states that he is the owner of Smart Courier Inc. ("Smart Courier"), and that I contacted him along with another individual named Jack. Mr. Kadri admits that he was familiar with the MCA business and worked with other MCA businesses. Mr. Kadri further states that Ms. Gregg made fake statements in obtaining a judgment against Smart Courier, and that Richmond had the ability to obtain a money judgment.. He claims that I called Mr. Kadri and told him that his company must pay off the advances paid to it by Richmond, as Richmond had transferred the MCA to a company known as GTR. He claims that Smart Courier was compelled to sell one half of its business to a third party in order to pay off the purported

Richmond/GTR debt. He blames both Richmond and me for his company's financial difficulties. He does not allege that I ever made any threats, nor did I, nor did I ever make any misrepresentations to him.

### PX16: Declaration of Avraham Lesches

26.     Here again, the Plaintiff FTC provided copies of these documents annexed as Exhibit A to Mr. Lesches' declaration, and that the documents included in Exhibit B through G were provided to Mr. Lesches by a representative of the FTC. Mr. Lesches states under oath that the FTC provided and handled the so-called evidentiary documentation puts in issue whether the handling of the documents by the FTC to Mr. Lesches that it is submitting in support of their motion, and assisted Mr. Lesches in the preparation of his declaration.

27.     I deny that I ever threatened Mr. Lesches in any manner. The agreements and documents submitted in this exhibit by the Plaintiff are not signed by me. All documents were signed by Michelle Gregg. Ms. Gregg, as stated herein, took the Fifth Amendment in her investigative testimony in the NYAG action filed in the New York Supreme Court. It should be noted that Ms. Gregg is not a defendant in this case. Not one single email or agreement or any other document has been signed by me.

### PX17: Declaration of Rick Rahim on behalf of Alternative Pet Care, LLC

28.     The agreements refer to an MCA agreement negotiated with Joe DaSilva on behalf of Richmond. I did not negotiate the MCA agreement. Mr. DaSilva is not a defendant in this case. Mr. Rahim in his declaration did not state that he dealt with me, as he dealt with Mr. DaSilva, and no documents were attached to Mr. Rahim's declaration that show any communications with me or are a part of any evidentiary proof.

### PX18: Declaration of Joseph Sykes (HD Turf Properties)

29.     The declaration of Mr. Sykes makes no mention of any communication with me either by email or telephonically. To the best of my recollection, I never met, talked or communicated with him in any manner, and he has not offered any evidentiary proof that there was any wrongdoing on my part.

### PX19: Affidavit of Said Aboumerhi

30.     Mr. Aboumerhi claims that he requested a reconciliation and adjustment of his company's account, and that I threatened to do physical harm to him. Here again is another example of a merchant (Texas Tactical Gear & Firearms, Inc. ["Texas Tactical"]) that primarily dealt with Michelle Gregg and was apparently in default in its MCA agreement. I never met Mr. Aboumerhi and never threatened him in any manner. To the best of my knowledge, neither Texas Tactical nor Mr. Aboumerhi ever resolved its defaults under the MCA agreement.

### PX20: Declaration of Kelly Hickel on Behalf of Wyldewood Cellars, Inc.

31.     Ms. Hickel's declaration does not make any reference to any written or telephonic communications with me in her August 22, 2019 affidavit. She states that she was contacted by a person by the name of Derrik Jarvis who sent to her by email, merchant agreements on behalf of JM Funding Group, and that those agreements were sent on behalf of Ram, and were signed by John A. Brewer as owner and president. She claims that the documents were sent to her by a representative of the NYAG. The documents are described as a "loan", even though the documents clearly state that they are MCA agreements. She states that Mr. Brewer participated in a telephone call with Steve Reich, and refers to the affidavit of Mr. Brewer. It is clear that Ms. Hickel never dealt with me, and that as a financial advisor, she has no authority to act for Wyldewood or Mr. Brewer, as no such written authority was attached to her affidavit, and further

that she was provided with papers from the NYAG, as she had no papers from Wyldewood or Mr. Brewer that she refers to. Ms. Hickel's affidavit is not of any evidentiary value against me in this case. She does not allege that I ever spoke or dealt with her, nor did I to the best of my recollection.

## PX21: Affidavit of Michael Kramer

32. The affidavit of Mr. Kramer was obtained from the NYAG, and the affidavit contains Bates stamped numbers 000042143, 000042149 and 000042148. Mr. Kramer states that he is the owner of Triad Well Services, LLC and Triad Specialty Solutions, LLC (collectively "Triad"), and that he dealt with Dan Jones on behalf of Richmond. Mr. Kramer further states that Richmond was a "lender", even though Richmond is an MCA business that does not make loans. Later on in his affidavit he admits that Richmond is an MCA company. Again, as in other exhibits, Mr. Kramer states that Exhibit A is a Richmond MCA agreement, and that Exhibit A in addition to Exhibits B and E were provided to him by the NYAG. There is no question that the Richmond merchant agreement and other documents clearly state it is a purchase and sale of future accounts receivable, and not a commercial loan transaction. Mr. Kramer refers to specific transactions with Richmond. He claims that he spoke to me on numerous occasions and that I threatened him *"I'll put you out of business"* and *"we would never do business again. We know where you live. "* I never met or threatened Mr. Kramer. My understanding is that Triad did not pay the full amount due to Richmond as per the MCA agreement with Richmond. Here is yet another example of an alleged threat that was. not reported to any police authority or agency. There was no such threat.

<u>**PX22: Affidavit of Michael Pennington**</u>
Document #92, 93, 94, 95, 96 and 97 in *People v. Richmond Capital Group,*
Index No. 451368/2020, N.Y. Sup., Part 1 Affidavit- attachment B, pages 1-28

33.     The affidavit of Michael T. Pennington, owner of Bionicle Plumbing LLC ("Bionicle") in Mesa, Arizona states that he was contacted by a person named Erica, and describes his dealing with Erica as a broker that could arrange a merchant "loan" from Ram, and that documents attached to his affidavit as Exhibit A, and the other exhibits were provided to her by a representative of the Office of the NYAG. The papers provided are not evidence of a commercial loan but an MCA agreement-the opposite is true. The papers do not refer to a loan but to a purchase of receivables. He asserts that there were alleged misrepresentations that were made by Erica --not by me. Not a single document in this MCA transaction was signed by me. He asserts that Mr. Reich participated with Ms. Gregg in the MCA and Exhibits A, B, C and D had nothing to do with me, but yet claims that I joined a call between Mr. Reich and Mr. Pennington, whom I never met.

34.     He claims that I was asked to join the call, and on that call when I talked to Mr. Pennington, that I threatened and insulted him and that I said to Mr. Pennington *"Be thankful you're not in New York, because your family would find you floating in the Hudson".* I did not talk to Mr. Pennington about the MCA transaction until after the transaction was entered into. I never threatened Mr. Pennington or his family, and did not even know that he had a family. To my knowledge, no report to any police authority of this alleged incident was ever made and Bionicle has not paid Ram what it owes under its MCA agreement.

<u>**PX22: Affidavit of Michael Pennington-Part 2**</u>
Attachment C- pages 26-62

35.     This exhibit is a copy of a Confession of Judgment that upon examination does not show that I am mentioned or referred to in any part of the affidavit The Ram merchant

agreement is clear in that it is an MCA agreement, and no such agreement was ever signed by me. I deny ever threatening him.

**PX;23: Affidavit of Paul Price**
Document #98, 99, 100, and 101 in *People v. Richmond Capital Group,*
Index no. 451368/2020 (N.Y. Sup. Ct.) Part 1: Pages 1-14

36.     This affidavit is sworn to by Paul Price as general counsel of a medical services company known as Optimis Corporation. Mr. Price appears to be a lawyer, and he refers to a broker named Mary Clark, and that she sent to Mr. Price applications for MCAs from Richmond, Yellowstone and GTR, and that this document was provided to him by a representative of the office of the NYAG. I don't recall ever speaking to Mr. Price and he does not seem to mention me at all.

**PX24: Affidavit of Jennifer Savastino**
Document #102, 103, and 104 in *People v. Richmond Capital Group,*
Index No. 451368/2020 (N.Y. Sup. Ct.)

37.     Ms. Savastino, as the owner of Gannon Pest Control Inc. ("Gannon") states that she signed an MCA agreement sent to her by a Howard Gelfand from a company called Two Trees Funding, and that he sent her the MCA from Richmond (Exhibits A and B attached to her affidavit), and that *"The copies of the documents were provided to me by a representative of the office of the New York Attorney General."* Ms. Savastino also points to specific parts of the MCA agreements that she claims refer to violations of the agreements, and that she signed the forms and returned them to Mr. Gelfand of Richmond. Ms. Savastino states that on the same day (on or about December 19, 2016), she talked to me and that I told her that Gannon was not eligible for $15,000. She further states that she agreed to a $10,000 reduced amount and signed a revised MCA for the reduced amount, so that Gannon voluntarily agreed to the reduced amount of the purchase price. Ms. Savastino does not claim that there were any threats of any kind or

20

that Gannon was forced in any way to take the reduced funding. Gannon pparently did not qualify for the amount of the original purchase price of the future accounts receivable and Gannon had the right not to pursue the MCA, but elected to go forward with the MCA transaction.

**PX25: Affidavit of Theriault**
**Document #105 and 106 in *People v. Richmond Capital Group,***
**Index No. 451368/2020 (N.Y. Sup. Ct.)**

38.     Ms. Theriault states that she is the owner ofMRM Consulting Inc. and dealt with Ram, dealt with a person that she could not recall him name, that she received a draft of an MCA (annexed as Exhibit A to her affidavit), and that *"The copies of the documents at Exhibit A were provided to me by a representative of the Office of the New York State Attorney General. "* Ms. Theriault does not explain what happened to the original MCA and other documents, or why the NYAG representative provided her with copies of the Richmond MCA and other documents. She further states that the MCA and other documents contained terms that struck her as excessive. Further, that the broker urged her to return the signed papers and she signed the papers and returned them to the broker. Shortly after the papers were signed, she says she talked to Steve Reich, and that there were violations of the MCA agreement. Ms. Theriault does not state that she ever talked to me or that she had any interaction with me, and yet the FTC submits the exhibit as evidence against me in support of the within motion.

**PX26: Excerpts from Deposition of Jose DaSilva**

39.        Plaintiff submits as Exhibit 26 certain parts of the investigative hearing of Jose DaSilva held on January 21, 2021 wherein Mr. DaSilva exercised his right to take the Fifth Amendment, and did not answer any questions posed by the NYAG's office, and now attempts to impute an adverse inference to me without following the proper procedure as set forth in the

established case law procedures (see MOL Pg 9). I have been advised that the adverse inference should not be permitted.PX27: The FTC submits a listing of lawsuits as part of its submission in support of its motion. Lawsuits are not evidence and most were brought by the same attorneys. Notably, the FTC does not include lawsuits where I was exonerated, including for example, P & HR Solutions, LLC et al v. Ram Capital Funding, LLC et al

650238/2019: To my knowledge, none of the cases resulted in any judgments of record, and were either settled or disposed of, and are not evidence.

40.    Plaintiff cites Exhibit PX27 from my Investigative Hearing, in which Plaintiff again fails to point out in its motion that I did not assert my Fifth Amendment right when I had the right to do so, and the only document I had with me was a piece of paper with the wording of the right to assert my Fifth Amendment protection. I answered all of the NYAG questions to the best of my ability both truthfully and accurately. Regarding Co-Defendant Giardina, pg. 16, lines 15-21 of that testimony:

> Q.    Robert Giardina was involved in launching Richmond Capital; correct?
>
> A.    Uh-huh.
>
> Q.    What was his involvement?
>
> A.    Owner, manager, I don't know. I don't know what you refer to it as, but principal, I guess.

I am not an attorney, and my answer was intended to explain Mr. Giardina's role that he was the boss. See pg. 17, lines 5-7:

> Q.    Robert Giardina was your supervisor at Richmond?
>
> A.    Boss.

41.     Plaintiff refers to lines 8 to 25 on pg. 17 of the Investigative Hearing regarding

Ram Capital Funding LLC. I explained it was a company that worked with Richmond Capital

that was operated like a joint business venture. They would have a way of doing business. *"The*

*participation or joint venture ... "* Later on page 18, line 17-20:

> Q.     *Who owns or owned RAM Capital Funding, LLC?*
>
> A.     *Steve Reich. I'm not sure if that's his legal name, but that's what he*
>        *went by.*

Further, on page 19, lines 15-20:

> **Q.**     *And Giardina oversaw the operations of Richmond; correct?*
>
> A.     *Correct.*
>
> Q.     *Was he closely involved in management decisions at Richmond?*
>
> A.     *Yes.*

On page 20, lines 5-11:

> Q.     *What is Viceroy Capital Funding?*
>
> A.      *D/b/a of Richmond Capital.*
>
> Q.     *What is Viceroy Capital Funding, Inc.?*
>
> A.      *No clue. It's, I'm assuming, the same -type of setup that was originally*
>        *done for RAM, similar thing was done for that, in that it was made to*
>        *co-.fund with whatever.*

Again, I do not have any legal training, and I answered the questions honestly with respect to

Viceroy, and that I assumed it was the same type of set up.

42.     On page 21, lines 7-25 of the Investigative Hearing:

> Q.     *Giardina had -- among his roles was -- he supervised the bank*
>        *account from which Richmond wired cash advances; correct?*
>
> A.     *I know that I didn't, and I would assume that the owner of the company*
>        *does, yeah. I never saw anybody else at the company have the rights to do*

*anything with the bank.*

*Q.     Did Giardina generally -*

*A.     The only person that I know that was able to operate any bank account is him.*

*Q.     And when you say "operate any bank account" do you mean -*

*A.     Any type of transaction from it would be from him.*

*Q.     For example, that would include wiring cash advances from the Richmond bank account?*

*A.     Anything, yeah. That would definitely include it, because if nobody else could do it, nobody else could send the wire.*

It is clear that I did not have any authority to handle any bank transaction, and that the only person I know was able to operate any bank account was Robert Giardina.

43.     On page 22, lines 5-11:

*Q.     Giardina also supervised the relationship with Actum Processing; isn't that right?*

*A.      Everything that had to go through the company would go through the owner of the company, yeah. So I'm -- yeah, I would say so. I never spoke with them.*

It is also clear that I did not work with Actum Processing, the company that handled the record processing for Richmond, Ram and Viceroy. *"I never spoke with them".*

44.     Further in the testimony on page 22, lines 21-25, and page 23, lines 2-8:

*Q.     When managers and decision makers at the Richmond companies decided the terms of merchant cash advances, Giardina participated in these conversations, did he not?*

*A.  He participated in conversations about it, but he's the only manager of the company. As far as being an underwriter, he's not an underwriter. So I would say that the people that do underwriting are the ones that dictate or give their opinion on what should and shouldn't be.*

> *But nothing could have got done without him saying it's okay.*

I answered specifically as to what I did as an underwriter and informed the NYAG at the
hearing on what an underwriter does. An underwriter follows a deal and monitors it so that in
many instances, there is communication with not only the owners and managers but the staff as
well.

45.     On page 58, lines 20-25, and page 59, lines 2-11:

> Q,     *This is an e-mail where you were instructing Giardina and Gregg on*
> *the terms for a cash advance; correct?*

> A.     *I'm instructing them. Basically I was a part of the underwriting on this*
> *deal. And I said it's approved to proceed and -- yeah. I'm not*
> *instructing them the terms that this is what it was -- came back at.*

> Q.     *Were you advising Giardina and Gregg what the terms -- what*
> *the amounts should be?*

> A.     *Again, Giardina does the bank, I do underwriting and deal with the*
> *broker, which is who I dealt with on this file, and Gregg does the input of*
> *the payments. So as far as talking about terms, it's not about the terms;*
> *it's about the actual deal, you know, specifics.*

I specifically stated that I do the underwriting and deal with the broker, and Gregg does the
input of the payments.

46.     On page 79, lines 6-13, I testified truthfully with respect to the question of the
reserve, and that it could probably be worded more clearly or what not. I did not prepare legal
agreements (See DX12, copies of the MCA forms and related documents). The agreements were
prepared by the lawyers for Richmond.

47.     Regarding PX34, the expert report of Dr. Patrick McAlvanah, Dr. McAlvanah
states that he is a full-time salaried employee of the FTC and he used information from Actum
Processing LLC ("Actum"). I did not have any interaction with Actum

48.     Notably, the purported random sampling does not necessarily state what the FTC asserts. For example, the examples of supposedly unauthorized deductions listed in Rule 51.1 Statement No.130 gives certain samples of supposed overcharges that were not overcharges at all. Documents 1474 /805 indicates that 12% in fees of the funding amount was allowed to be deducted, and the funding amount is $50,000 thus, the fees taken were *less* than permitted, not more. Document 781/94 states that 12% of the total funding amount can be deducted, and the funding amount was $10,000.00, 12% is $1200, thus the funded amount of $7802 ($10,000 less the fee of $1200) is actually less than the fees that could have been lawfully deducted.

49.     Notably, the report of Paul M. Ribaudo (DXll) in response to Dr. McAlvanah's report states that Dr. McAlvanah's report was based upon numerous flawed, unreliable and speculative assumptions that invalidate Dr. McAlvanah's report and his calculations range renders his opinion completely unreliable (pg. 1, if3; pg. 2, ,r,r5 and 6). According to Mr. Ribaudo, he questions the mean overpayments of $9,472 as well as the mean number of overpayments of 8.8, which are the basis for his estimation of damages. Mr. Ribaudo clearly states that the report of Dr. McAlvanah is not reliable. See DX11.

50. With respect to Plaintiff's Rule 56.1 Statement of Material Facts and my response thereto as to facts that there are genuine issues to be tried, I refer to specific numbered paragraphs 146, 147, 150, 158, 159, 160, 161, 162, 163, 164, 165, 166 and 167, all of which are denied as a result that the information contained in the numbered items never happened or I specifically deny ever discussing the matter with any party listed in the document purported to be admissible evidence by Plaintiff.  Additionally, any statements alleged to have been made by me are also denied as the numbered paragraphs are alleged to be undisputed material facts

which are denied and are genuine issues of fact.  Further, paragraphs numbered 170, 172, 173, 188 and 192 do not contain any reference to me, so that those numbered paragraphs are denied as stated in my email wherein I specifically advised all coworkers to make sure that they followed all of the required rules and regulations involved in the MCA business (DX15).

51.     There is a substantial difference of the opinions of the experts, and in order for the Court to make a determination, each expert should testify in person and permit the Court to make its own determination as to the validity of the opinion in each report so that there can be a determination as to alleged damages claimed by the FTC, if any.

52.     I wish to address the situation with regard to the numerous emails submitted by the Plaintiff FTC in this case in PX35 that contain both inappropriate and off-color language with respect to some of the merchant customers. Those emails were not addressed to any customers, but to owners, managers and employees and other independent contractors or Richmond, while intended to be in jest should not have been sent, as while they are inappropriate, they are not illegal. The emails were not intended to degrade any merchant or individual, and if I could take them back, I would do so.

53.     In a number of affidavits and declarations submitted as exhibits by the FTC wherein allegations of physical threats of harm to a merchant regarding the collection of payments due under the MCA agreement.  I never made any of those alleged threats.

54.     I respectfully submit that the Plaintiff FTC has submitted a huge volume of documents, declarations, affidavits and exhibits in support of its motion, in addition to numerous exhibits from a similar lawsuit pending in the New York State Supreme Court, New York County, Commercial Division in *People v. Richmond Capital Group,* Index No. 451368/2020 (N.Y. Sup. Ct.). That case is being vigorously contested by all Defendants, so

that a number of the exhibits listed in the FTC exhibit list, as well as referred to in its Rule 56.1 Statement, will most likely have been disputed in this case as well by co-Defendants Reich and Giardina had they not entered into settlement agreements.

### The FTC's Requested Financial Penalties and Injunctive Relief

55.     I was never aware that anything I am accused of doing would constitute a violation the Gramm-Leech-Biley Act. In fact, I had no knowledge or awareness of 15 USCS § 682l(a)(2) or of any instance in which the FTC sued anyone under that provision.

56.     The FTC seeks to impose the maximum financial penalties against me, but the Court should respectfully decline to do so.

57.     First, I do not have the ability to pay these fines. The FTC's requested penalties will render me entirely insolvent.

58.     Second, as I have testified, I neither owned nor controlled the corporate defendants.

59.     Third, I have no history of any alleged consumer misconduct prior to the conduct complained of in this FTC action, and the FTC has not accused me of such misconduct since this action. While the FTC cites to a non-admissible news article about me that says I still work in the merchant cash-advance industry, the FTC does not claim that I am doing any of the actions complained of in this action. A penalty over 40 million dollars is entirely unnecessary to deter me from any future violations and is wholly disproportionate to the damages alleged by the FTC in this action.

60.     The FTC's proposed permanent injunction seeks to ban me from lending money to anyone for the rest of my life, while requiring numerous forms of monitoring and compliance. A lifetime ban as proposed by the FTC is overly broad and unnecessary when I have never violated

any lesser injunction. The FTC's injunction will render me unable to make a living.

WHEREFORE, the within Motion for Summary Judgment should be denied in all respects, and the responses to the admissions should be permitted to be served, as well as the request to amend the answer to include the affirmative defense of statute of limitations be granted, and for such other and further relief as to this Court may be just and proper.

Dated: New York, New York May 13, 2022

_____

JONATHAN BRAUN