1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FEDERAL TRADE COMMISSION,,

4               Plaintiff,

5          v.                           20-CV-4432 (LAK)

6   RCG ADVANCES, *et al.*,

7               Defendants.
                                        Order to Show Cause
8   ------------------------------x

9                                       New York, N.Y.
                                        July 20, 2022
10                                      4:00 p.m.

11  Before:

12                     HON. LEWIS A. KAPLAN,

13                                      District Judge

14              APPEARANCES (Via Microsoft Teams)

15  FEDERAL TRADE COMMISSION
    BY:  GREGORY A. ASHE
16       JULIA EMMET HEALD

17  JOSEPH MURE, JR. AND ASSOCIATES
         Attorneys for Defendant RCG
18  BY:  ANTHONY VARBERO

19  J. IANDOLO LAW PC
         Attorneys for Defendant Giardina
20  BY:  JEREMY IANDOLO
    KLUGER KAPLAN
21       Attorneys for Defendant RCG
    BY:  ALAN J. KLUGER
22       MARISSA A. REICHEL
         TERRI MEYERS

23

24

25

APPEARANCES (Continued)


MICHAEL DiBENEDETTO
     Attorney for Defendant Braun

THOMAS HARVEY
     Attorney for Defendant Ram Capital

WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP
     Attorneys for Intervenor
BY:  IRWIN WELTZ

```
 1              (Case called)
 2              THE LAW CLERK:  Federal Trade Commission, are you
 3    ready?
 4              MR. ASHE:  Yes.
 5              THE LAW CLERK:  Defendants are you ready?
 6              MR. KLUGER:  We are, your Honor.
 7              THE COURT:  All right.
 8              THE LAW CLERK:  Proposed intervenors, are you ready?
 9              MR. WELTZ:  Yes.  Thank you.
10              THE COURT:  Mr. Weltz, you're up.
11              MR. WELTZ:  Thank you, your Honor.
12              THE COURT:  Don't spend too much time on intervention.
13    Talk to me about what is really going on here, please.
14              MR. WELTZ:  Sure.  Thank you, your Honor.
15              So, in plain terms, the third-party intervenor, which
16    is Broad Street, is in simplest terms a hedge fund in various
17    different affiliated entities.
18              As I understand it, RCG Advances is a limited partner
19    in the Broad Street hedge fund, and there are basically two
20    subfunds within that fund that RCG Advances is invested in.
21    One is a securities account or a securities fund, which is
22    noted as F1, and the other is a real estate fund with respect
23    to ongoing real estate projects, and that's known as R2.
24              THE COURT:  Now, let me interrupt with a question
25    here.
```

1          With respect to R1, the subfund holds, as I understand

2     it, all publicly traded liquid securities, right?

3          MR. WELTZ:  As I understand it, that is correct.  But

4     my understanding is also that there is a fair amount that is

5     not actively trading, and I also got further gloss today that

6     it also involved synthetics and derivatives.

7          As you would imagine, it is a hedge fund, and there

8     are credit facilities and they try to take advantage of things

9     like leverage as much as they can.

10          THE COURT:  Well, that is not exactly what your papers

11     said.

12          MR. WELTZ:  I understand that that was not included,

13     your Honor.

14          THE COURT:  Well, it is more than that.  Your papers

15     said they were all publicly traded securities.

16          MR. WELTZ:  I think that's accurate.  The gloss I am

17     putting on is that there is a layer of derivatives and

18     synthetics that are involved in the trading strategy.

19          THE COURT:  Those presumably can be unwound also.

20     Yes?

21          MR. WELTZ:  Presumably at some cost and at some impact

22     as well on the partnership and the limited partners.

23          THE COURT:  What percentage of the net asset value of

24     R1 is stuff that is publicly traded in the sense that General

25     Motors is publicly traded.

```
 1                MR. WEITZ:  And the --

 2                THE COURT:  Pardon?

 3                MR. WELTZ:  I'm sorry, your Honor.  I didn't mean to

 4     interrupt you.

 5                THE COURT:  That is all right.  Go ahead.

 6                MR. WELTZ:  My understanding is they are all publicly

 7     traded.  So I don't have a breakdown specifically whether or

 8     not it's 10 percent GE or 20 percent technology.  I understand

 9     that it is a lot in technology, but they are publicly traded.

10     You are correct.

11                THE COURT:  Yes.  But, look, part of your position

12     here is that there would be some damage to the hedge fund --

13     and I'm focused specifically now on R1 -- if an additional

14     liquidation of the interests of RCG were to take place.

15                I came onto the line having read your papers and

16     thinking it was all publicly traded liquid securities, and

17     therefore that there would be no disruption at all in

18     liquidating as much as was needed to take RCG out of R1 at

19     least.  And now you are telling me a whole different story, but

20     you --

21                MR. WELTZ:  No, your Honor.

22                THE COURT:  Excuse me.  You are not telling me to what

23     extent the different story is really reality.

24                MR. WELTZ:  I understand, your Honor, and I apologize.

25     But you are correct, they are all publicly traded securities.
```

1          THE COURT:  Okay.  So where we are is they're publicly

2     traded securities.  There is an unsupported assertion that

3     unwinding enough of them to liquidate the RCG interest in R1

4     would create a problem, but we have no idea whether that's

5     really true and how big a problem it would create.

6          That's where we are, right?

7          MR. WELTZ:  Yes, your Honor.

8          As stated in Mr. Baldassarra's affidavit, there would

9     be an impact globally.  But I think you're right, a hundred

10    percent, that the bigger impact is in R2, which is the real

11    estate fund.

12         THE COURT:  All right.  Let's go on to that.

13         MR. WELTZ:  So the real estate, which is R2 -- the

14    securities is F1 -- the R2 consists, as I understand it, of

15    ongoing private and illiquid real estate projects that have not

16    yet been completed.  I believe that the account statement has

17    those valued at about $4 million.

18         THE COURT:  Counsel, what does it mean to say that

19    they're ongoing projects?  Does this mean that there's

20    construction going on as we speak?

21         MR. WELTZ:  I think it is more than one investment.

22    It's multiple real estate investments, and I believe they're in

23    various different stages of their projects.  But my

24    understanding is they have not yet, the projects have not yet

25    completed, and they're not ready to be sold and/or liquidated.

1          THE COURT:  What is a "project" for this purpose?

2          MR. WELTZ:  A project would be, for example --

3          THE COURT:  Is it construction of a new structure?

4          MR. WELTZ:  I believe the investment in real estate

5  would include that, would include building new structures,

6  among other things.

7          THE COURT:  And what else might it include?

8          MR. WELTZ:  I don't know specifically beyond that

9  their investments, they buy property, they build on the

10  property, and that is what the focus of R2 is, real estate

11  projects, buying, developing, things of that nature.

12          THE COURT:  Might it include vacant real estate that

13  they bought as an investment or for future use?

14          MR. WELTZ:  It could possibly include that, your

15  Honor.  I don't know the full range of their activity.

16          THE COURT:  Okay.  All right.

17          Go on.

18          MR. WELTZ:  So really the crux here of the issue is

19  that with respect to F1, which is the securities account, or

20  the publicly traded securities I should say, there are

21  redemption restrictions in each calendar year where the

22  investors are only permitted to redeem 50 percent of the

23  account value.

24          As we pointed out in our papers, that 50 percent has

25  already been wired out to RCB, which is about 1.3 or so million

1   dollars I believe on or about April 22, 2022.

2          With respect to the real estate subfund, which is R2,

3   there is a lockup period that still is in effect, which I think

4   there was a date of January 2023, but it is ultimately in the

5   manager's discretion when that lockup ends, and there can be no

6   redemptions at this point under the governing special limited

7   partnership agreement and the notices we have provided to your

8   Honor.

9          So, when faced with, you know, the order, our

10  difficulty here is that my clients are seeking to stand on

11  their contractual rights here that no further redemptions for

12  F1 can be had in calendar year 2022, because we have already

13  wired out one --

14         THE COURT:  The trouble is your client has no

15  contractual rights either with the Court or with the Federal

16  Trade Commission.

17         MR. WELTZ:  Understood, your Honor.

18         It would be vis-a-vis obviously the limited partner,

19  which is RCG in this case.  So really that's the nub of the

20  dispute, whether or not we are going to be able to protect our

21  contractual interests or something else.

22         THE COURT:  I believe I read this afternoon that the

23  guy who made this investment on behalf of RCG is or was at the

24  time connected with your fund.

25         Is that true?

1          MR. WELTZ:  I saw that, your Honor, and I did see the

2     website so I presume that what is on the website is accurate,

3     if you're referring to Mr. Feingold.

4          THE COURT:  Yes.

5          So this agreement into which he entered, if in fact

6     the case is that he did it in circumstances where there was an

7     undisclosed manifest conflict of interest between his

8     obligation to RCG and his interest in the fund, may very well

9     be voidable.

10         MR. WELTZ:  That is fair, your Honor.  And my

11    understanding just from looking at the agreement now was that

12    Mr. Feingold had the authority to make various investments, and

13    I think there's a disclosure about potentially there could be

14    conflicts.  And my understanding is also that this relationship

15    has been going on for quite some time.

16         THE COURT:  All right.

17         Anything else from you?

18         MR. WELTZ:  Not on the just general factual

19    background, your Honor, which I think is what you wanted to

20    hear from me.

21         THE COURT:  Well, I want to hear whatever else you

22    have to say as to why I ought to grant the relief you are

23    asking for.

24         MR. WELTZ:  Sure.

25         So, your Honor, I think, look, the Broad Street Fund

```
1    is somewhat in a difficult position because we are obviously

2    unrelated to the main underlying proceeding here, the

3    underlying case, the settlement.  And the Court does, according

4    to the settlement with the FTC, retain jurisdiction over

5    elements of that agreement.

6         So really our only recourse when we are staring down

7    the barrel of an order signed by your Honor is to take some

8    action.  The action that we have taken is to come in and say,

9    look, essentially we are defending this, because, as set forth

10   in the FTC and the RCG motion, which is ECF 137 they note there

11   is a dispute here.  They don't really say what the dispute is,

12   but obviously if it was as one sided as being made out in the

13   papers that I received an hour or so ago, you know, it wouldn't

14   be a dispute.  It would be just one sided.

15        So from my perspective I think we would be intervening

16   here as a defendant and basically responding to the claim that

17   RCG can liquidate these funds and, our response would be to

18   file either some type of jurisdictional motion, because the

19   relevant limited partnership agreement includes a forum

20   selection clause and/or ask your Honor to rule on whether or

21   not my clients are correct or incorrect.

22        THE COURT:  I am just curious about how anybody

23   selected Luxembourg.

24        MR. WELTZ:  I understand a little bit, and I could

25   give you my understanding of it.  Apparently, and I didn't know
```

1     this either, your Honor, apparently Luxembourg is an extremely

2     popular place to set up hedge fund structures such as this.  I

3     had heard that it is something like the third most popular

4     place because of their various different regulations and so

5     forth.

6             So apparently, unbeknownst to me, Luxembourg is a

7     popular place to set these types of things up.  So that is I

8     think how Luxembourg gets into the picture here.

9             THE COURT:  And a very popular place, I am sure, for

10    major financial litigation.

11            MR. WELTZ:  I don't know about that, your Honor, for

12    sure.  I have never litigated there.  But perhaps there is

13    always a first for everything.

14            THE COURT:  Did you ever meet anybody who did?

15            MR. WELTZ:  I can't say I have, your Honor.

16            THE COURT:  All right.

17            Mr. Verbaro.

18            MR. VERBARO:  Yes, your Honor.

19            MR. KLUGER:  Would you like me to address the Court

20    for RGC and Robert Giardina?

21            THE COURT:  Yes.  That is why you are here.

22            MR. KLUGER:  Yes.

23            If I may, your Honor, if it please the Court, Alan

24    Kluger.  We filed an appearance.  We have been in the case less

25    than a day.  If I get too granular, stop me, but let me just

tell you -- you started to go down the road -- these assets

were wrongfully secreted.  The contract interests that counsel

asserted are a sham.

What we have uncovered so far is the following.  You

touched on these.  I'm sorry we filed late, but we have

literally have been in the case less than 24 hours.  We have

been working around the clock, until 3 in the morning.

Between late 2018 and early 2019, my client RCG wired

$9,070,000 to their attorney, David Feingold.  They signed an

escrow agreement with his law firm dated December 10, 2018.

There's no mention in here of Broad Street Global.  There's no

mention of any hedge fund.

What it said was that he was going to be the lawyer in

paragraph 8.

In paragraph 5 he said he would be providing escrow

services in a transaction related to the escrow arrangement and

would have a limited power of attorney to execute documents to

facilitate the transaction contemplated, which in paragraph 7

says it's settlement of claims such as this claim that's before

the Court.

Then what happened, and we have attached these and we

filed them as composite Exhibit B, a series of wire transfers

totaling the $7 million was sent by RCG to Feingold Morgan, a

law firm's trust account, and the reference on every one of

these is the same, Richmond Capital escrow for litigation

1   settlement and attorneys' fees.

2          David Feingold, it's clearly obvious he is the CEO of

3   the fund, and we have attached a private equity firm filings

4   and what we have seen on the internet that he is the CEO.

5          So he was the lawyer, the CEO, and what he did was he

6   used his limited power of attorney to sign a page and append it

7   to the Broad Street general partnership agreement that gives

8   them the right to, you know, tell investors that they can't

9   liquidate.  He signed his own name on behalf of our client on

10  this limited power of attorney.  What's fascinating is the date

11  of that document is April 2018.  The date of the escrow

12  agreement with our client is December 2018.

13         So what he did was he appended a page to this

14  document, used the limited power of attorney.  And it's clear

15  from the engagement that there's nothing about hedge funds.

16  There's nothing about putting the money behind escrow.  It was

17  our client wiring his money to settle these claims so that he

18  could pay and make deals with the FTC, the State of New York,

19  the attorney general, etc.

20         It gets worse, your Honor, not better.

21         They said in the papers that they filed -- and I quite

22  frankly think that counsel seeking to intervene was not shown

23  all of these documents because he didn't reference them, and I

24  am sure in good faith he made those allegations.  They are just

25  not true.

1          What happened was Mr. Baldassarra -- who in his

2     affidavit positions himself as the head, is really the puppet.

3     The head is Feingold the lawyer, who operated as the escrow

4     agent.  It is not me saying it.  It is what we see online when

5     we look at the fund.

6          There's series of e-mails that we have appended as

7     Exhibit E, and what they say is, to the FTC, the FTC,

8     Mr. Baldassarra gets a copy of a letter from Ms. Heald, from

9     the FTC that says in March, "The FTC is contemplating a

10    settlement agreement with certain defendants in which funds

11    payable to the FTC would be held in CJS technology select

12    management account, named" -- listen to the name of the fund --

13    "Feingold Morgan Sanchez" -- that's Feingold's firm --

14    "trust/escrow for the benefit of Richmond Capital."

15          She then goes on to say, "The contemplated settlement

16    agreement provides that the defendants' payment obligations

17    would be secured by a security interest in the above-referenced

18    account.  To the extent such account is a deposit account, the

19    security interest would be perfected by an execution of a

20    deposit account control agreement between the FTC Feingold

21    Morgan Sanchez.  If the account ending in 299 is a deposit

22    account, please provide CJS technology form deposit control

23    agreement.  Please feel free to contact me."

24          Mr. Baldassarra, on behalf of this hedge fund as

25    they call it, writes an e-mail back to the FTC on March 22 --

and this is important because they told you in their filings
that this is the first they heard about it when they got the
order.

He writes back:  "Thank you for your e-mail.
Technically I believe the account is characterized as ownership
in a pooled investment fund.  Let me know if I can be of any
further assistance."

Mr. Ashe -- who is on the screen -- writes back on
July 11, "Mr. Baldassarra, enclosed please find an order
entered by the Court" -- that's your order -- "that ordered
them to liquidate the account."

And then it says, "One of these people will send you
appropriate wire transfer instructions.  Do not hesitate to
contact me."

And that's what they knew.  Those were the documents
that were sent to them.  They now take the position that these
funds are tied up.

Your Honor, something is really wrong here.  I have
been in the case a day.  I don't know if you want me to brief
it, but we never received an accounting.

Here's what happened.

Feingold says:  "I am your lawyer.  I owe you a
fiduciary responsibility.  My law firm your lawyer."

By the way, he doesn't say, "I am the CEO of this
hedge fund that is now seeking relief here."  There is nothing

1     in the letter.

2          I don't know if we can share a screen with you but it

3     is attached to what I filed, and if you could pull it up, it's

4     very telling.  It is Exhibit A.  It's Feingold's law firm's

5     agreement.

6          There is no mention of any hedge fund or anything.

7     They clearly were in the role that many of we lawyers have been

8     in:  "Client, you are in trouble.  Give me the money.  We are

9     going to pay all your claims, get you leases.  We are going to

10    do these things.  We owe you a fiduciary duty because we are

11    your lawyer.  Sign it."

12          Wires him the money.  The money has a re on every

13    single penny we sent that says this is to pay claims.

14          He then goes ahead and puts it in his own hedge fund,

15    and now comes before you and basically claims that because he

16    murdered his parents he is an orphan and you should have

17    rachmanus on him.

18          Essentially that is what is going on here.  I think

19    your order was right.  I think you are ordering them to

20    liquidate the funds.  I think they should liquidate the funds.

21    They caused the problem.  I think there's something totally

22    smelly.

23          The final point, Judge, is after this whole thing

24    comes to light, and after it's clear what's going on here and

25    the FTC is moving ahead, Feingold resigns as escrow agent.

He's still CEO of the fund, but he resigns as escrow agent and
we don't know where the money is.

          We do know, and there is a document that is both I
think attached to their affidavit, and we have filed a
document, it's dated -- it is a statement of December 2021.  It
is a statement, and it is from the tech fund to Feingold Morgan
Sanchez trust escrow for the benefit of Richmond Capital, and
it says the ending balance is $6,673,077.25.

          My client gave the money to his lawyer to help get him
out of trouble with all the regulatory agencies he was trying
to settle with.  That's why he put the money beyond his
control.  He didn't intend to put the money beyond the control
of the creditors that are entitled to this money.

          THE COURT:  Okay.  Thank you, Mr. Kluger.

          Mr. Ashe, anything you want to add?

          MR. ASHE:  The only thing I would add, I just -- sort
of, you know, when we went forward with the settlement, there
was additional language in the e-mail response from
Mr. Baldassarra of the fund.  He mentions, he goes, "Broad
Street brought is a fund, not a bank.  Pointing out the
distinction however" -- I'm quoting from the e-mail.  And this
is in the defendants' recent filing, the document 150 at page
28.

          He goes, "We are aware of your proposed settlement, do
have the assets associated to your referenced account, and

believe they will be able to satisfy the proposed amounts of
the settlement and are happy to execute any such documents
needed to achieve your goal and the settling parties' goals."

So really I think the FTC's position is, I guess most
analogous, although it is not the perfect analogy, to almost
like interpleader.

You know, we know this money is available.  You know,
we believe, you know, we and, you know, the defendants entered
into good faith with the settlement.

I do note, in terms of timing issues, you know, it's
$1.5 million which is sort of due now under the way the order
is structured.  And the remainder of that, of the settlement
order is not due until, by my calculation, June '23, which is
six months after this, what they call the lockup or lockout
date.  So we do note that.

In terms of the intervention, we really take no
position on that.  Obviously, you know, we do think that CJS
should, you know, should be, you know, entitled to at least
address its claims.

But in terms of the merits, we would agree with the
defendants that, you know, the Court's order should remain in
place, and it looks at least with respect to the securities
fund, you know, I guess, based on my limited understanding of
the finances, that that could be, you know, liquidated in
accordance with the Court's order, turned over to the

1   defendants' counsel to begin satisfying the remainder of their

2   obligations under the settlement and would defer to smarter

3   people as to what to do with the real estate fund, at least in

4   the short term, since, you know, the balance of the settlement

5   judgment really would not be due until the earlier of June 2023

6   or, going into details of the order, when RCG and the New York

7   Attorney General's office resolve their state court litigation.

8           THE COURT:  Mr. Ashe, did the commission know about

9   this bundle of money that we are now dealing with?

10          Did you have what you regard as full disclosure of the

11  settling defendants' assets?

12          MR. ASHE:  Yes.

13          In the financial statements they indicated that they

14  had approximately $8 million in client trust account.  I think

15  there was a little uncertainty as to where that trust account

16  was located.  Initially it was the understanding that, you

17  know, it was at the securities fund.  That's why we first

18  reached out to the securities fund.

19          Later, when we were putting together the actual, you

20  know, final language of the order, it was disclosed that the

21  RGC counsel was in the process of transferring it from the CJS

22  to Mr. Iandolo, who was one of RCG's counsel in this matter,

23  into his client trust account to make it easier to get the

24  payments done.

25          So that's why the settlement that we submitted to the

1    Court has payment coming from Mr. Iandolo's trust fund account.

2    It was our understanding that money was going to be

3    transferred.  I believe -- and I don't want to speak for the

4    defendants -- they thought that they would have no issue

5    liquidating the position and bringing it over to Mr. Iandolo's

6    account.

7              THE COURT:  So this is not a situation, so far as the

8    commission knows, where this money went into the escrow account

9    to obscure its existence from the government?

10             MR. ASHE:  I mean, we filed our action in 2020.  We

11   know this action -- I mean, the money was transferred in 2018.

12   I do know -- certainly that's pointed out in our summary

13   judgment papers against the remaining defendant Braun, that

14   there was at least investigational matters with the New York

15   Attorney General's office, and I really can't speak to, you

16   know, what that money was used for.

17             I take, you know, the defendants' statement on their

18   word that they, you know, this pot of money was to satisfy, you

19   know, judgments.  I know they have been negotiating in good

20   faith with us, and we don't have any, any issue with that.

21             You know, I can't speak as to, you know, I know they

22   have a number of other litigations.  You know, we don't think

23   they are trying to hide it from us.  They disclosed that they

24   had this trust fund, a client trust account of $8 million, and

25   that was the basis on which we negotiated our settlement.

1          THE COURT:  Okay.  That's helpful.

2          All right.  What remaining briefing does anyone wish

3    to conduct here?

4          MR. KLUGER:  So, your Honor, I think we would want to

5    just -- I think there is enough for the Court to rule on.  If

6    the Court wishes, what we would do is we do limited discovery,

7    and then file a brief with the Court to show the Court the bona

8    fides of RCG's sending of this money, put in the record all of

9    the transfers we made, show the terms of the transfer to the

10   lawyers.

11         Feingold is on the hot seat.  I just think he took the

12   money.  He's got a whole bunch of stuff going on.  I think the

13   Court should be aware of it.  I proffer to the Court what we

14   have been able to -- he's been sued with an $18 million IRS

15   judgment, he's been sued by various people over the years.

16   He's had issues.

17         He is an attorney that plays in this space, and I

18   think that he just took our client's money, used it for an

19   investment that we know that that fund supposedly, according to

20   his own records, has $38,200,000 of invested assets of which

21   our piece is just a portion.  And I am sure he makes money on

22   the hedge.  He had no right to take our money and put it beyond

23   us.

24         What I would ask the Court to do, because it is very

25   telling, is look at the December 10, 2018, our Exhibit A that

1    we filed this afternoon.  It is the retention by my client RCG

2    and Robert Giardina where he says exactly what he intends to

3    do, why he's sending the money, and the lawyer undertaking his

4    fiduciary responsibility.

5         Why he did what he did, I have no idea.  But the fund

6    is complicit.  They can't hide behind Baldassarra because the

7    CEO of the fund is the same guy who signed the escrow agreement

8    on behalf of the law firm.  He's the first named partner.  It's

9    his law firm.

10        MR. WELTZ:  Your Honor, may I briefly reply?

11        THE COURT:  Who is speaking?

12        MR. WELTZ:  It's Mr. Weltz, your Honor.  Irwin Weltz.

13        May I briefly respond to some of this argument,

14   because what I am hearing now is very damaging to Mr. Feingold

15   who apparently was doing fine and dandy with these folks for I

16   guess the past four years.

17        I think there is another side to this story, but to

18   accuse Mr. Feingold of essentially theft without an affidavit,

19   without anything and just conjecture, is just inappropriate.

20        I too have been involved in this case for a very short

21   period of time, as my clients only received that, the order,

22   the liquidation order on July 11.  But I am certain

23   Mr. Feingold would have something to say about these

24   allegations that are being made against him in his absence.

25        The other thing I would like to point out is the

1  motion that was made jointly by the FTC and the RCG defendants

2  actually notes that there is a dispute here.  They don't say

3  that, oh, my clients agreed, as they're saying now based on

4  these e-mails I am now seeing.

5       They don't address the fact that there are e-mails

6  reflecting that dispute in writing.  I think if we had an

7  opportunity to, number one, respond to whatever affidavits that

8  the RCG defendants want to put in, I think we would be able to

9  explain a little bit of the disconnect here that's being

10  portrayed.

11       But at the end of the day I think my clients

12  understood that the amount of money that would be taken by the

13  FTC would not exceed the money that was wired to the RCG

14  defendants in April of 2022, which was about one point, I think

15  three three million.  So I do think perhaps both sides could

16  use supplemental submissions.

17       The other point I would like to make, your Honor, is

18  that in the agreement that they point to, with respect to this

19  escrow agreement, they only point to a couple of provisions.

20  Two of the things they omit -- I am sure not intentionally --

21  but that was in the sixth -- under the quote-unquote sixth

22  paragraph it discloses that the attorneys here who are handling

23  this trust can act in the present or future one or more

24  parties' managers or affiliates or owners, direct, indirect, in

25  the transaction, etc.

1          And to suggest that over the course of four years, as

2    I think the suggestion is being made, that my client somehow

3    hid from these folks what was going on with this money that was

4    apparently so vital to them strains credulity.  I think we will

5    be able to dispute that resolutely.

6          The other point I would like to make is that in the

7    seventh paragraph, it refers specifically -- it says, "We are

8    further authorized to place the money in an interest bearing

9    account, fund, or investments during the term of this escrow

10   relationship," you know, and so forth.

11         So the escrow agreement itself provides for the

12   ability of Mr. Feingold, his firm, etc., to make investments,

13   which would make sense, right?  Because nobody wants money to

14   be just languishing around in a trust account, especially this

15   sum of money.

16         THE COURT:  To make investments in a fund of which he

17   is the CEO?

18         MR. WELTZ:  I understand, your Honor.  Obviously it

19   would be up to the parties to get to the bottom of that.  It

20   was a little bit beyond the scope as, at least from my

21   perspective, as what I saw was involved here.  And it appears

22   to me -- and I think there is a larger dispute brewing between

23   obviously RCG and Mr. Feingold and perhaps their affiliates and

24   so forth, but I am not sure that in the midst of this FTC

25   action is the place to bring that dispute, because this

```
 1   dispute --

 2              THE COURT:  We are in a "Go Luxembourg" moment.

 3              MR. WELTZ:  It is very serious, though, when somebody

 4   makes an accusation about a lawyer.  I understand that counsel

 5   is new to the case, and I understand that he wants to represent

 6   his client zealously, but at the same time to make those types

 7   of allegations without the opportunity to be heard on the other

 8   side and quite frankly without an affidavit --

 9              THE COURT:  You are going to have an opportunity.  It

10   just not going to be now.

11              MR. WELTZ:  Thank you, your Honor.

12         So I would say, you know, net net, putting aside the

13   various different strands of what appears to be a larger

14   dispute, the issue here, as I would ask the Court to review it,

15   is whether or not our contractual redemption rights permit us

16   to say to Mr. Giardina and RCG, "Hey, we gave you the amount

17   that you were entitled to receive for this year, the $1.3

18   million.  Come back to us in six months, and you will be able

19   to get the other half."

20              It would be, quite frankly, unfair for my client to be

21   required to essentially allow this limited investor -- and,

22   quite frankly, not others -- simply because they have taken

23   this circuitous route.  We did not get notice about this motion

24   or this order.

25              Quite frankly, I don't blame the FTC.  I am not sure
```

```
 1   whether they have been parties or involved in all of the phone
 2   calls and so forth that have gone on between I guess my side
 3   and the other side.
 4              THE COURT:  Mr. Weltz, I have your point.
 5              MR. WELTZ:  I apologize, your Honor.
 6              THE COURT:  Mr. Kluger, how much time do you want to
 7   make a further submission?
 8              MR. KLUGER:  Are you going to allow us to take
 9   discovery, or do you want us to do it just on the documents we
10   have?
11              THE COURT:  I will allow you a limited amount of
12   discovery.
13              How about 30 days?
14              MR. KLUGER:  30 days is fine.  If we say 41, to be
15   exact, by the end of August, with people's vacation
16   calendars -- not mine, but others -- we will take the
17   discovery, we will do it by Zoom, we will get the documents we
18   need, and we will get it all before you by the end of August.
19              THE COURT:  Okay.  August 31 it is.
20              How much time, Mr. Weltz, do you want to reply to
21   whatever is coming up?
22              MR. WELTZ:  When would that be coming in?  I guess
23   August 31?
24              MR. KLUGER:  Yes.
25              THE COURT:  Yes.
```

1            MR. WELTZ:  What would your Honor, would two weeks or

2     21 days be appropriate?

3            We would also like to take discovery as well during

4     that period of time.

5            THE COURT:  Go ahead.

6            Okay.  September 21 for your papers.

7            Anything else?

8            MR. KLUGER:  No, your Honor.

9            Thank you for seeing us on short notice.

10            MR. WELTZ:  Your Honor, we will agree to meet and

11     confer with Mr. Kluger in good faith about the various parties

12     who will be deposed, etc., and the documents and so forth.

13            THE COURT:  I hope so.  Okay.

14            Bye-bye.

15            (Adjourned)

16

17

18

19

20

21

22

23

24

25