MBM1FTCC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   FEDERAL TRADE COMMISSION,

 4                   Plaintiff,

 5           v.                              20 Civ. 4432 (JSR)

 6   RCG ADVANCES, LLC, et al.,

 7                   Defendants.             Conference
     ------------------------------x
 8                                           New York, N.Y.
                                             November 22, 2022
 9                                           10:17 a.m.

10   Before:

11                       HON. JED S. RAKOFF,

12                                           District Judge

13                           APPEARANCES

14   FEDERAL TRADE COMMISSION
          For Plaintiff
15   BY:  GREGORY A. ASHE, ESQ. (Present via speakerphone)

16   KLUGER PERETZ KAPLAN, LLP
          Attorneys for Defendant RCG
17   BY:  ALAN J. KLUGER, ESQ. (Present via speakerphone)
          MARISSA KLUGER, ESQ. (Present via speakerphone)
18
19   J. IANDOLO LAW, PC
          Escrow Agent for Defendant RCG
     BY:  JEREMY M. IANDOLO, ESQ.
20
21   LAW OFFICES OF AIDALA, BERTUNA & KAMINS, P.C.
          Attorneys for Defendant Braun
     BY:  MICHAEL DiBENEDETTO, ESQ.
22
23   WELTZ KAKOS GERBI WOLINETZ VOLYNSKY
          Attorneys for Intervenor Broad Street Global Fund
     BY:  IRWIN WELTZ, ESQ.
24        THOMAS S. WOLINETZ, ESQ.

25
```

MBM1FTCC

1          (Case called)

2          THE DEPUTY CLERK:  Will the parties please identify

3    themselves for the record, beginning with those at the front,

4    plaintiff's counsel table.

5          MR. WELTZ:  Irwin Weltz for the intervenor, Broad

6    Street Global Fund.

7          MR. WOLINETZ:  Thomas Wolinetz, also for Broad Street.

8          MR. IANDOLO:  Good morning, your Honor.  Jeremy

9    Iandolo as the escrow agent for RCG.

10          THE DEPUTY CLERK:  And now on the phone?

11          (Inaudible)

12          MR. ASHE:  On the phone, Gregory Ashe for the Federal

13    Trade Commission.

14          MR. KLUGER:  Good morning, your Honor.  Alan Kluger on

15    behalf of RCG.

16          THE COURT:  Please be seated.

17          THE DEPUTY CLERK:  And in the back, from the Aidala

18    law firm for the Braun party is?

19          MR. DiBENEDETTO:  Michael DiBenedetto.

20          THE COURT:  So this case was reassigned to this Court

21    from Judge Kaplan a few weeks ago.  And I convened this

22    conference because it was not at all clear to me where things

23    stood, and I thought rather than bother Judge Kaplan, it would

24    be best to hear from the parties.

25          I permitted two counsel to appear telephonically, but

MBM1FTCC

1    at least one of them has a really rotten telephone connection,

2    which made it difficult to understand him, so in the future,

3    all conferences will be in court and no one will be permitted

4    to appear telephonically.

5         Also, unlike Judge Kaplan, I have a strict rule

6    against anyone submitting anything to the Court, whether by

7    email, motion, or any other form of writing, without first

8    calling my chambers jointly, with all affected parties, at

9    which time either I will deal with the matter right then and

10   there or, if we need further submissions, we'll set a schedule

11   for them at that time.  That rule, which has been my rule for

12   26 years, is subject to no exceptions.  So I just want to make

13   clear to everyone at the outset, don't send me anything in

14   writing without having received prior telephonic permission of

15   the Court, because I will send it back to you.  And if you file

16   it, I will unfile it, or defile it.  Is that understood by the

17   people on the phone?

18        MR. KLUGER:  Yes, your Honor, it is.

19        MR. ASHE:  Yes, your Honor.

20        THE COURT:  Okay.  Very good.

21        Now here's the little I understand about what's going

22   on so far, but I look to you folks to enlighten me.  As I

23   understand it, the underlying dispute concerns a claim brought

24   by the FTC against the RCG defendants that was settled on

25   June 2, 2022, for $2,713,705.

MBM1FTCC

1          To finance this settlement payment, Judge Kaplan, on

2     July 9, 2022, ordered the liquidation of assets in the account

3     managed by CJS Technology Select Management and the transfer of

4     the proceeds to escrow agent Jeremy Iandolo.  But turns out the

5     RCG defendants were not the sole owners of the assets.

6          On July 14, 2022, the Broad Street intervenors, the

7     other owners of those assets, moved to vacate Judge Kaplan's

8     liquidation order and to intervene.

9          On July 20, 2022, Judge Kaplan set a briefing schedule

10    concerning Broad Street intervenor's motion.  Pursuant to the

11    schedule, the RCG defendants were to respond by August 31st and

12    the Broad Street intervenors were to reply on September 21st.

13    However, on August 29th, the RCG defendants submitted a letter

14    to the Court saying that the Broad Street intervenor's motion

15    was moot and asking that the Court's briefing schedule be held

16    in abeyance.

17         The intervenors, in a letter dated August 30, 2022,

18    stated that they did not consider the motion to be moot.

19    Nonetheless, on September 6, 2022, the RCG defendants filed a

20    motion requesting that the Court enforce the liquidation order

21    and also that the Court order the CEO of one of the Broad

22    Street intervenors to remit $4 million that were supposedly

23    owed to the RCG defendants.

24         The Broad Street intervenors responded to this motion

25    in a letter dated September 7, 2022, to which the RCG

MBM1FTCC

1    defendants replied on September 15.

2           In addition, there was handed to my law clerk this

3    morning something that was apparently filed, I'm not totally

4    sure when, but it's dated -- well, on the copy given to my law

5    clerk, it's undated.  And that's interesting in itself because

6    it's a memorandum, from the RCG defendants, defendants RCG

7    Advances, LLC and Robert Giardina, entitled Memorandum in

8    Opposition to Proposed Intervenor's Application for Immediate

9    Emergency Relief.  Neither the memorandum on the signature page

10   nor the accompanying notice of filing of exhibits is dated,

11   presumably on the assumption that the way this case is going,

12   it will last till time immemorial.

13          I also was furnished this morning with another letter.

14   This one is dated, from Mr. Kluger, dated August 2nd, relating

15   to demand for an accounting, and there is an attachment to that

16   letter as well.

17          So as near as I can tell, my colleague Judge Kaplan,

18   one of the great judges of this court, decided that this matter

19   was such a mess that he ought to reassign it to me.  And I

20   express my deep thanks to him for that.

21          Now maybe someone would like to be heard as to where

22   things stand.

23          MR. KLUGER:  I would be willing to, your Honor.

24          THE COURT:  Identify yourself for the record.

25          MR. KLUGER:  Alan Kluger on behalf of RCG.

MBM1FTCC

1          THE COURT:  Okay.  And Mr. Kluger, in the future, you

2   ought to date your papers.

3          MR. KLUGER:  So, your Honor, that document is dated.

4   I don't know what copy you have, but it's Document 149.  It was

5   filed on 7/20/2022, and --

6          THE COURT:  It's not dated in the copy that bears your

7   signature that was handed to my clerk this morning, but let's

8   not spend any more time.  It's neither here nor there.  Tell me

9   where things stand.

10          MR. KLUGER:  I'll tell you where they stand.

11          So on July 9th, as your Honor noted, Judge Kaplan

12   entered an order.  The order provided that CJS Technology, and

13   any other necessary person -- so it extended beyond them

14   probably to Feingold -- shall liquidate or cause to be

15   liquidated an account.  That account was Account No. 299.  It

16   was in the name of a law firm, Feingold Morgan Sanchez Trust

17   Account, for the benefit of Richmond Capital, which changed its

18   name to RCG.

19          Appended to the motion, your Honor, that you have as

20   composite Exhibit B is a series of wire transfers that totaled

21   $9,070,000.  These monies were wired by RCG to Feingold Morgan

22   Sanchez Trust Account.  The firm is in Palm Beach Gardens,

23   Florida.  And this was pursuant to what we appended to the

24   motion you have as Exhibit A, which was a December 10, 2018,

25   escrow agreement between the law firm of Feingold Morgan

MBM1FTCC

Sanchez and Richmond Capital Group, which stated that Feingold

Morgan were their attorneys, that they were acting as escrow

agent, and it's clear from that letter, as well as the bottom

of the invoices I referenced as Exhibit B, that this money was

being sent in escrow for "litigation settlement and attorney's

fees."

       The underlying case that you received was a case by

the FTC v. RCG Advances, and that piece of the litigation was

resolved by a stipulated order for permanent injunction,

Documents 125 and 127, in June of 2022.  That was a 21-page

judgment signed by Judge Kaplan that essentially said —- and

I'm paraphrasing to get to the bottom of this.  It said that

money would be put in escrow by my client in order to pay

claims pursuant to a schedule.  And of course there are claims

out there —- and Mr. Meringolo, who unfortunately and very

sadly passed away last week, had negotiated a series of cases

with the Attorney General and consumers.  This stipulation

contemplated —- the FTC is on the phone and can confirm this —-

that that money would be for the purpose to liquidate these

claims.

       So Judge Kaplan (inaudible/unintelligible) payments

due, but the payment wasn't paid timely.  Judge Kaplan ordered

Feingold Morgan Trust to pay it.  That's when Mr. Weltz's firm

filed an application seeking to intervene to vacate the

liquidation order and essentially took the position in their

MBM1FTCC

1    Document 144 that the court had no jurisdiction, that the money

2    was beyond the court, and a series of other arguments.  That is

3    the hearing that we had in front of Judge Kaplan.

4              After that hearing, Judge Kaplan entered another

5    order, which essentially crossed out the language that

6    Feingold, or -- whatever you want to call them -- Technology,

7    CJS, Global, whatever name they use, and they sought to have a

8    stay.  Stay was not granted, and based on that, they then

9    voluntarily paid $1,336,000 following that hearing, which money

10   was then sent to the FTC in order to meet the obligation that

11   resulted in all those orders.

12             The order that Judge Kaplan entered on July 20th is a

13   document with two numbers on it, 141 and 151.  I think one is

14   the original and the other is the filed, stamped copy.  But

15   essentially what he did in that was he essentially issued an

16   order to show cause and crossed out the language they wanted

17   which would have stayed the prior liquidation order, which is

18   why we took the position that it was moot because if they want

19   to intervene, we're fine with it, let them intervene, let them

20   come in the case.  They have our money.  They now have

21   $4 million of our money.  We signed a document with David

22   Feingold, an attorney in Florida.  We requested that he give us

23   the rest of the money.  They -- when this started to happen in

24   March and April of 2022, he resigned his escrow and has now

25   taken the position that this money cannot be liquidated, that

MBM1FTCC

```
 1    it's in a fund, the fund is called Global.  The CEO of Global,

 2    according to the website of Broad Street Private Equity, which

 3    is what they're known as, is David Feingold.  And Judge Kaplan,

 4    you know, he -- we were on Zoom -- he raised his eyebrows and

 5    he said:  So this agreement, if in fact the case is that he did

 6    it in circumstances where there was an undisclosed manifest

 7    conflict of interest between his obligations to RCG and his

 8    interest in the fund, may very well be voidable.  And that's

 9    what Judge Kaplan said.  And later, in response to Mr. Weltz's

10    argument that the funds couldn't be liquidated, Judge Kaplan

11    said, so this was to make investments in the fund which he's

12    also the CEO of.

13              And that's sort of the status of where we are.

14              What we would like, and the relief that we are asking

15    the Court to review, is to enforce Judge Kaplan's order of

16    July 9, 2022, which ordered that CJS Technology Fund, Account

17    No. 299, in the name of the law firm of Feingold Morgan

18    Sanchez, liquidate the account and transfer the proceeds of the

19    liquidation to the Citibank Account 0997, which is

20    Mr. Iandolo's -- who's in the courtroom -- trust account, which

21    the FTC could tell you that they would like also because that

22    was the agreement, that that would be the place from which

23    payment would be made.

24              Two more points and I'll be done.

25              As your Honor stated, August 29th, we filed a letter,
```

MBM1FTCC

1    which Judge Kaplan has that procedure where you can do letter

2    motions requesting a status conference, because we thought it

3    was moot, since they had said in other -- in other responses to

4    the court that they were in the process of liquidating the rest

5    of the fund.

6              On August 30th, they said, "Since R2 involves ongoing

7    real estate projects that are not yet completed, and other

8    investors, this is the only realistic option for

9    liquidation. . ." and note while the value of the investment is

10   noted at 4 million, it doesn't translate into an obligation

11   (inaudible/unintelligible) if you're liquidating, we'd like the

12   money.  We'd like them to tell us what they're doing with the

13   liquidation, which is why, under Florida law, I sent the letter

14   that you referenced of August 2nd.  Because under the rules of

15   professional responsibility in Florida, Article 5, they have an

16   obligation, upon request of the client, RCG, to account.  So we

17   demanded an accounting pursuant to 5-1.2 because Mr. Feingold,

18   as a member of the Florida bar, is required to provide that

19   accounting, and that is why we asked that, so we could find out

20   where the rest of the money is so we can settle the rest of

21   these claims.

22             THE COURT:  All right.  Well, that is very helpful,

23   and we'll hear from other counsel in a minute.  But I'm glad

24   you brought to my attention that Judge Kaplan raised his

25   eyebrows because that has been known to strike fear and terror

MBM1FTCC

1    in the hearts of even the strongest attorney.

2              But now let me hear from other counsel.

3              MR. WELTZ:  May it please the Court.  Irwin Weltz for

4    the Broad Street intervenors.

5              I have a little bit of a different time line and

6    substance as well as to what happened here.  As your Honor

7    noted, this is -- the underlying case here is an FTC case

8    against RCG Advances, Robert Giardina.  Mr. Iandolo has been

9    counsel for those parties since day one.  Mr. Kluger has only

10   recently come in.  And our involvement here was when we got a

11   five-day order.

12             What basically happened is, the FTC and the RCG

13   defendants stipulated, on a stipulated motion -- provided a

14   stipulated, essentially, order for Judge Kaplan.  I don't think

15   Judge Kaplan was aware at that time that the property involved

16   not a brokerage account but essentially a hedge fund

17   investment.

18             So the RCG defendants -- Mr. Giardina the owners of

19   RCG -- you know, had an investment in two portfolios.  One was

20   the F1 portfolio, which was started as a fixed income

21   portfolio, had securities in it, publicly traded; and the other

22   was a real estate portfolio of seven ongoing real estate

23   infrastructure products, and we've actually submitted

24   declarations in this case describing what the projects are and

25   the difficulties involved in selling this type of thing.

MBM1FTCC

1        So we went before Judge Kaplan, and during the course

2   of the hearing, Judge Kaplan obviously heard argument,

3   Mr. Kluger asked for limited discovery, and then Judge Kaplan

4   set a briefing schedule, and said, August 31st, opposition; I

5   think it was September 21st reply.

6        We went through a period of limited discovery, and

7   during that period of time both sides sent out document

8   requests.  We responded to theirs, they did not respond to

9   ours.  We produced documents, they did not produce any

10  documents.  We were available to have our parties' depositions,

11  they did not -- they were not available for that.  It was a

12  one-way situation.  And so ultimately, the date passed for

13  opposition.

14        And so really at the core of this case is not Feingold

15  and the escrow account -- which, by the way, their clients,

16  RCG, if you think merchant cash advance folks don't know where

17  their money is, I got a bridge to sell somebody somewhere.

18  These folks knew exactly what was being done, and in fact the

19  escrow agreement itself provides that investments could be

20  made.  We even have a picture of Mr. Cardinale and Mr. Giardina

21  meeting with the manager of Broad Street in South Carolina, and

22  we put in a declaration of Mr. Baldassarra explaining, you

23  know, what went on during those trips to South Carolina, how

24  they decided —- "they" being the RCG defendants —- how they

25  decided to move from fixed income to real estate because of

MBM1FTCC

1    what happened in March 2020.

2           So from our perspective, these folks knew what was

3    going on this entire time; they knew what these investments

4    were.  In fact, Mr. Giardina himself was in the securities

5    business for I think 15 years, he's a real estate investor;

6    Mr. Cardinale, one of the other owners of RCG Advance, he's a

7    hedge fund manager, he's been in the securities business for

8    years as well.

9           So for the other side, meaning RCG defendants, to say,

10   oh, it's Feingold, it's Feingold, it's Feingold, first they

11   came in and said, oh, he stole the money.  Well, they knew that

12   wasn't true because Mr. Iandolo was paid part of that money.

13   He knew that wasn't true.  Mr. Varbero, another attorney in the

14   case, was paid with part of that money.  I think it was over a

15   million dollars.  Which -- so it was not true.  They knew that

16   RCG itself, or I should say Mr. Giardina himself, received

17   money back from that, from that trust account as well.  Okay?

18   And so they fully were aware of both the investments and where

19   the money was going.

20          And so this case is really about us trying to come in

21   and say, look, we have restrictions on redemptions.  We're a

22   hedge fund, right?  It's not like you could just -- everybody

23   could pull out their money all at one time and that's that.  Of

24   course, if that happened, it would be -- you couldn't do it.

25   You couldn't have ongoing infrastructure real estate projects.

MBM1FTCC

1    I mean, Mr. Baldassarra, you know, set forth all the, you know,

2    the various iterations of these type of yields in his

3    declaration.  He provided, you know, these are ongoing, very

4    large-scale, significant projects.  So if hedge fund people,

5    who are limited partners, could just pull out their money, you

6    couldn't do this.

7          And so we came in and we said, look, we can't just

8    liquidate the F1 portfolio, which is a series of limited

9    partnerships in the hedge fund, and R2, because R2 is also

10   ongoing -- seven ongoing infrastructure projects.  And Judge

11   Kaplan was not persuaded about F1.  He said, well, Mr. Weltz,

12   F1 does have public securities, and I said, yes, your Honor, my

13   understanding is that these are not the most liquid, and he

14   said, okay.  I tried to describe for him R2 at the time.  I had

15   less information at that point because I had just -- we had

16   just seen the order and we had to kind of run to court, because

17   we had a federal court order; you can't just ignore it, and we

18   ran to court very quickly.  I think we got it and then within

19   five days -- we got it I think on a Thursday; by Monday, we had

20   a filed order to show cause.  And I think Judge Kaplan was more

21   persuaded about R2, and I think for that reason, he allowed

22   this, you know, little bit of an extended briefing schedule.

23         The other side wanted discovery.  We said, okay, if

24   they get it, we want it too.  And that's not what he expected,

25   opposition to be filed.  What should we do?  What's your

MBM1FTCC

1   problem with this?  Why are you objecting to this?

2           But at the end of the day, what we're left with is,

3   what we decided to do after the order was, said, okay, let's

4   comply.  Judge Kaplan was not persuaded about F1.  Let's

5   liquidate that, send the money.  We did.  $1.3 million was sent

6   I think on July 28, 2022.  So months before that, in

7   March 2022, 1.3 million was sent as well.  So between March and

8   July 2022, I think it was 2.6 million was sent back to at that

9   point Mr. Iandolo's escrow account, who's also a guarantor

10  under the agreement with the FTC.

11          And so we said, look, rather than fight about that, or

12  fight about this, we'll put up the limited partnership interest

13  in the R2 portfolio as well, which we did immediately.  We put

14  out I think it was over a hundred ads.  It's all part of the

15  Baldassarra declaration, which is Document 162-1.  We put it up

16  for sale with ads immediately.  I think there were over a

17  hundred.  They were international, national, local.  I think

18  they got something like -- they only got a few inquiries.  I

19  think there were two.  But there was no follow-up because the

20  person who was inquiring did not provide sufficient information

21  to ascertain who they were, what their background was, that

22  type of thing.

23          So after I think two or three months of that -- I

24  think it was October 1st -- Broad Street said, you know what,

25  we're not getting a lot of traction on selling this, this

MBM1FTCC

1    interest.  So what they did was they hired a broker, a real

2    estate broker, to list this, and that's what we did.  It's

3    currently listed.  It has been listed I think since about

4    October 1, 2022.  There's an agreement with the real estate

5    broker.

6           At base, if you look at the size of these projects, I

7    think you'll see that -- the nature of them and how you really

8    need somebody who's got the particular knowledge to buy, take

9    over, to do something with those, with that type of situation.

10   It's not like a stock.  It's not like, you know, something that

11   could be bought and sold very easily.  So we are doing -- we

12   are trying to comply, but I can't say to RCG or your Honor that

13   this is going to get sold tomorrow.  It just, you know -- I

14   could put up my house for sale.  It doesn't sell.  And this is

15   not a regular house.  This is, you know, massive infrastructure

16   deals.

17          So at the end of the day, our position is that it's

18   moot, if folks accept that it sells when we can sell it.

19   Otherwise we're in a position where we kind of have to hang in

20   for the fight and try to vacate the order because we do think

21   there was good grounds to vacate it since, number one, we

22   weren't served with papers beforehand, this was given to us

23   afterwards; number two, I do not believe Judge Kaplan knows

24   what we know here today.  And, you know, so -- and also, the

25   redemption provisions limit redemptions.  And that was the

MBM1FTCC

1    problem with the F1 portfolio, initially.  They had --

2              THE COURT:  All right.  So sorry to interrupt, but

3    this is also very helpful.

4              Just on one small thing before we get to more of the

5    merits.  You mentioned that there has been no response to your

6    discovery demands.  Let me ask Mr. Kluger:  What about that?

7              MR. KLUGER:  Your Honor, we actually sent a letter to

8    Mr. Weltz saying, in light of the fact that you paid the money

9    to the FTC and we're no longer in default under the stipulated

10   order for injunction, why don't we go to the Court and ask for

11   a 60- to 90-day stay while you liquidate the remaining

12   accounts.  He wrote me back an email that says, we don't object

13   to a 60- to 90-day extension.  They then -- for some reason,

14   they attempted -- I don't know what was going on on their end,

15   but a couple weeks later, I got an attempt to unring the bell,

16   after they had already paid the money, and that they wanted to

17   fight, but I don't know what they wanted to fight about.  If

18   they're liquidating the account, we just need to know where the

19   money is, which is why I sent them a request for, as escrow

20   agent, where's the money?  So I didn't give them discovery

21   because I don't know what we're litigating about.  So if they

22   want to put forth --

23             THE COURT:  Let me interrupt you.  Forgive me.  That

24   is a good example of why I have my policy against written

25   matters before there is a joint call to the Court, because that

MBM1FTCC

```
 1    typically would be something I would resolve right then and
 2    there over the phone rather than let it just pause, in effect.
 3            So let me ask counsel here in court:  Are you still
 4    seeking discovery?
 5            MR. WELTZ:  We are.  But let me -- but I want to
 6    address --
 7            THE COURT:  No, no, no.  Just answer my question.  And
 8    you've answered my question.
 9            MR. WELTZ:  Yes, your Honor.
10            THE COURT:  So how quickly, Mr. Kluger, can you
11    provide that discovery?
12            MR. KLUGER:  I could do it fairly quickly.  Here's the
13    problem, your Honor.  Since I don't know what it is that
14    they're prosecuting -- because remember, they haven't been --
15            THE COURT:  No.
16            MR. KLUGER:  -- allowed to intervene --
17            THE COURT:  I didn't ask you that.  I asked you -- and
18    I want counsel to understand, going forward, when I ask a
19    question, I expect you to answer my question and only my
20    question.  If you have other things to say, believe me, I will
21    give you full opportunity.
22            The question was:  How quickly can you provide
23    discovery?  Give me a date.
24            MR. KLUGER:  I believe, your Honor, we could get them
25    all the documents, subject to objections, within 21 days from
```

MBM1FTCC

1    today.

2            THE COURT:  That's not acceptable.  14 days.

3            MR. KLUGER:  We could do that too, your Honor.

4            THE COURT:  Very good.  If there are any depositions

5    at that point, counsel will jointly call the Court and we'll

6    set the date for the depositions.

7            MR. KLUGER:  Now, your Honor, if I may just address

8    the Court.  I've answered your question, but I would like to

9    address the Court on sort of my "scratch the head" issue.

10           THE COURT:  Well, I'm going to hear you for that in a

11   minute, but there's something else I want to make sure I

12   understand.  Do I understand that no party objects to the

13   intervention, as opposed to other requests that are made by the

14   intervenors, but for the fact of intervention, Mr. Kluger, I

15   think you already said you have no objection to the fact of

16   intervention, correct?

17           MR. KLUGER:  That's correct, your Honor.

18           THE COURT:  Anyone else want to be heard on that?

19           All right.  So the intervention is granted.

20           Now, Mr. Kluger, I'm happy to hear from you.

21           MR. KLUGER:  So, your Honor, the -- now that the

22   intervention is granted, there is no essentially motion or

23   request for relief for the Court to -- discovery is necessary

24   because that's done at the hearing because we all thought that

25   we were getting money because we were resisting the court order

MBM1FTCC

that ordered the payment.  They paid the money.  So I don't

know to -- I mean, I'm going to have discovery and I'm -- I'm

going to object, and I don't want to raise the ire of the

Court, but I'm scratching my head because I don't know to what

proponent -- what they are the proponent of so that I know

whether I have objections.  It really --

THE COURT:  I understand your point.  It's impossible

to raise the ire of the Court because I am just a pussycat with

nothing but feelings of goodwill towards all my fellow lawyers.

However, the way I look at it is, you were ordered to give

discovery.  That order was never rescinded by Judge Kaplan.

You can provide the discovery, at least the documentary

discovery, in 14 days.  And therefore, if it turns out that it

is irrelevant, so you're put to a little bit of cost.  It

doesn't sound to me very excessive.  So notwithstanding the

point you're now making, I affirm, reconfirm my order for the

document discovery to be completed in 14 days.

Now if I understand -- and I appreciate what both

counsel have brought to my attention, and it's very helpful.

It's clarified this case considerably in my mind.  The current

dispute is largely, forgetting about technical-legal questions

of vacating or whatever, is largely about the timing of the

liquidation of what's called R2 or something to that effect.

So let me ask Mr. Kluger, what's your view on that?

MR. KLUGER:  I think that that ship has sailed.  I

MBM1FTCC

1  think that they announce on the website —- and we filed this as

2  Exhibit C to our filing 149 —- they have $3 billion sitting in

3  their assets.  They were an escrow agent.  Feingold, as the

4  lawyer, decided to move this money into his hedge fund or

5  whatever, and they —-

6           THE COURT:  Yes.

7           MR. KLUGER:  This is not our problem.  The FTC,

8  consumers, and the Attorney General are waiting for this money.

9           THE COURT:  Yes.  Hold on.  I'm sorry to interrupt

10  again.  This is one of the reasons why, in the future, all

11  conferences will be in court, because there always is this

12  problem in telephonic conferences of when two people are

13  talking, they don't realize they're both talking.

14           If you were agreeable to extending their time to

15  liquidate, are you agreeable to extending it, say, 30 days?

16           MR. KLUGER:  I have to defer to Mr. Iandolo, who's in

17  the courtroom, to see whether the settlements that he has

18  negotiated with the Attorney General and the other cases,

19  whether they can get 30 days.

20           THE COURT:  All right.  Let's ask him right now.  He's

21  here.  We'll ask him.

22           MR. IANDOLO:  Your Honor, may it please the Court.

23           So as of now -- Mr. Meringolo, the late Mr. Meringolo,

24  I was working hand in hand with him.  Moving forward,

25  negotiating with the Attorney General and four other merchants

MBM1FTCC

1    that are -- that there's lingering litigations out there that

2    I've been working with for probably the last two years.  I'm at

3    a point where, if we had the money, we could settle.  We have,

4    in sum and substance, settlements at this point, with those

5    merchants.  As far as -- if we had the money, we could satisfy

6    those victims.  As far as the Attorney General, I was not privy

7    to the conversations.  It was all heard secondhand from

8    Mr. Meringolo, and from what was told me was that if we had a

9    dollar amount to negotiate, they would be more susceptible to

10   accepting a settlement at this point.  As of right now, we have

11   no money to move forward with them.  So they're really in limbo

12   about the next step and the next phase.  So in my position, as

13   far as the four merchants go, the 30 days wouldn't be a

14   problem, but as far as the Attorney General goes, there's a

15   summary judgment motion scheduled for -- I want to say the

16   Tuesday after Thanksgiving.  It's either Tuesday or Wednesday

17   after Thanksgiving.  And it's our position that we could have

18   settled prior to that had we had the money.  Due to the

19   untimely death of Mr. Meringolo, they may be willing to put

20   that out, and I do not know yet.  There's counsel trying to

21   work on that as we speak.  There's new counsel retained for

22   the -- specifically for the Attorney General arguments of next

23   week.

24            THE COURT:  Well, it sounds to me that their choice,

25   as a practical matter, is either to go along with a 30-day

1    extension on the assumption, which I want to get to in a

2    minute, that there will be no further extensions, so the

3    liquidation will have to occur within 30 days, or they just

4    want to continue to spin their wheels and litigate or talk or

5    negotiate or whatever.  That doesn't sound like a very sensible

6    approach.  Now I know you don't have a dispute in front of the

7    Attorney General and so forth, but it's hard for me to believe

8    that no one would be opposed to a 30-day extension.

9            MR. IANDOLO:  Your Honor, if I may just answer that, I

10   think that's a good point.  As far as my negotiations, my

11   personal negotiations with the --

12           (Audio interruption)

13           THE COURT:  Go ahead.

14           MR. IANDOLO:  As far as my negotiations with the four

15   merchants, their position was to settle.  They needed a time

16   line.  They wanted to know if, when and if, when they were

17   getting their money, and that was really contingent on

18   settling.  I don't see the reason why the Attorney General

19   would be any different.  But once again, as your Honor --

20           THE COURT:  Right, okay.

21           MR. IANDOLO:  Secondly, more importantly, is, due to

22   the untimely death, I think 30 days would not be an issue,

23   because we -- not that we're going to use Mr. Meringolo's

24   untimely death as an excuse, but it is practical, based on the

25   holiday season and things like that for next week, if we could

MBM1FTCC

1    go to them and ask them for the new year, for an argument in

2    the new year, and during that time, if we knew money was coming

3    and we had some kind of guarantee the money was coming, I think

4    that everybody would put aside the possibility of an adverse

5    decision in their favor to move forward in light of that.

6          THE COURT:  Okay.  So let me come back to counsel for

7    the people who would be liquidating this R2 group of assets.

8    Are you agreeable to doing it within 30 days come hell or high

9    water?

10         MR. WELTZ:  I can't -- I can't guarantee that, your

11   Honor.  We've had this property -- we've had this up for sale

12   for quite some time, since Judge Kaplan issued his order, and

13   we've gotten limited response, because of the unique nature of

14   the listing.  My most recent information from the broker, who

15   has -- who we've contracted to sell this, is, as she says, it's

16   a unique listing and doesn't get as much traffic as regular

17   homes and land.  However, I did have a few investors and

18   builders ask for information.  So if you see the scope of this

19   project, it's over -- it's hundreds of acres of land in I

20   believe South Carolina that's in the process of being prepared

21   for infrastructure.  It's not just us.  If you take a look at

22   Mr. Baldassarra's affidavit --

23         THE COURT:  But here's the problem.  I'm not going to

24   allow what you started out with, which is an indefinite

25   extension that will relieve the necessary pressure to get this

MBM1FTCC

 1   liquidated.  So we need to have a date certain, and if it means

 2   it's a fire sale, too bad.

 3          So 30 days seems to me to be appropriate, but given

 4   the holidays, if you would rather have 45 days, I could live

 5   with that.

 6          MR. WELTZ:  Your Honor, I would -- I don't know if I

 7   could commit to you to do that, because it's just -- these

 8   projects are not like a regular situation.

 9          THE COURT:  You've made that clear, and that's part of

10   what's motivating my approach, but the other side of the coin

11   is, as I said, we can't let this go on indefinitely,

12   notwithstanding the market difficulties that you have brought

13   to the Court's attention.  And if you can't commit, then I

14   guess I will have to order.  But I'd much prefer to arrive at a

15   consensus than forcing something upon you.  Now that you are

16   intervenors, you are, of course, subject to the Court's orders.

17          MR. WELTZ:  I understand, your Honor.  I just couldn't

18   give you a specific date.

19          THE COURT:  All right.  Here's what I think we should

20   do.  I think you should go back and talk to your folks and come

21   up with a firm, fixed, unalterable date that you can live with;

22   then discuss it with Mr. Kluger and any other interested

23   counsel, the trustee, and if you're all in agreement, you will

24   jointly call the Court and I'll issue an order.  If you're not

25   in agreement, I will also issue an order, and I'll figure out

MBM1FTCC

1    what I think makes sense.  And I think, given the Thanksgiving

2    holiday, I will give you, jointly, and severally, till next

3    Tuesday to get back to the Court.  In fact, why don't we set a

4    time right now for that call.  Let's say 1:00 on Tuesday.  What

5    is that?

6              THE DEPUTY CLERK:  Tuesday, the 29th?

7              THE COURT:  The 29th.

8              MR. IANDOLO:  Your Honor, I have another matter on

9    that morning.  Could we do it at 2:30?

10             THE COURT:  Okay.  So 2:30?

11             MR. IANDOLO:  That would work better for me.

12             MR. WELTZ:  Yes, your Honor.  Thank you very much.

13             (Discussion off the record)

14             THE COURT:  So 3:00 on November 29th.  Is there

15    anything else we need to take up today?

16             MR. WELTZ:  No, your Honor.

17             MR. WOLINETZ:  No, your Honor.

18             MR. IANDOLO:  No, your Honor.

19             THE COURT:  And the folks on the phone?

20             MR. KLUGER:  No, your Honor.  Not on behalf of RCG.

21             THE COURT:  And was there one other person on the

22    phone?

23             MR. IANDOLO:  The FTC was on the line.

24             THE COURT:  Ah.

25             MR. ASHE:  Nothing for the FTC, your Honor.

MBM1FTCC

1              THE COURT:  Very good.  Okay.  Good.  It's been a

2     pleasure, and I look forward to talking to you next Tuesday.

3              ALL COUNSEL:  Thank you, your Honor.  Have a good

4     holiday, your Honor.

5              THE COURT:  You too.

6                                  o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25