EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:22-cv-20375-RKA

DAVID FEINGOLD and MICHAEL DAZZO,

                Plaintiffs,

vs.

RICHARD CARDINALE, VANIA CARDINALE,
RVCNY, LLC. and RVCSI, LLC.,

          Defendants.

_____/

**Michael Dazzo**, declares under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am one of the Plaintiffs in the above action.   I respectfully submit this declaration in support of Plaintiffs' motion regarding sequencing and other discovery related matters.  I make this declaration based upon my own personal knowledge unless otherwise stated.

2.      I concur with the statements made by Mr. David Feingold in his declaration submitted in connection with this motion.

3.      I am providing this separate declaration focused on my concerns about being in a deposition room with Defendant Richard Cardinale ("Cardinale").

4.      Both Cardinale and his life-long business partner Mr. Robert L. Giardina ("Giardina") have a history of organized crime and violence, including four separate recent matters.

5.      The four separate incidences all arose or were issued this year, 2022, and are:

(A)  A finding by Honorable Judge Lewis J. Liman of the Federal Court in the Southern District of New York that the business owned, operated and managed by Mr. Cardinale and his business partner (they are partners in virtually every deal they have done over the last 25

years) engaged in the tactic of threatening violence including sexual violence (i.e. rape) against person's that owed their business money and for which a protective order was issued. *See* Judge Liman's findings attached to the declaration of David Feingold [ECF No. 30].

(B)   In May 2022, they sent two persons to the home of a business competitor named Darren Silverman to assault Mr. Silverman even though Mr. Silverman had no noncompete or legal obligation to have Mr. Cardinale and Mr. Giardina as owners in his business.  Cardinale specifically let Mr. Silverman know that he was going to let Giardina "do whatever he is going to do" if Mr. Silverman did not, for free, give a percentage of his competing business to Cardinale and Giardina. *See* Exhibit "A" attaching ring doorbell footage of the attackers standing outside of Mr. Silverman's house who then later admitted their intent was to smash in Silverman's head.  A police report was also filed with the Boca Raton Police, a copy of the police report filing number is also part of Exhibit "A" as well as photos proving gangsters outside of Mr. Silverman's house, Exhibit "B" is Mr. Silverman's email to  Cardinale and Giardina and another person named Dan Meeler also disassociating from Cardinale and Giardina due to violence as put in his email attached as Exhibit "C."

(C)  I was personally advised approximately two weeks ago that threats were made of plans of someone going to my house to smash in my head related to the business dispute with Cardinale and Giardina.

(D)  I learned of another meeting in New York where discussions took place about utilizing force against me as a result of my involvement in this lawsuit.

6.    Filing this lawsuit has now raised great concerns for my safety.  I am certainly willing to have my deposition taken on short notice (and as directed by Your Honor) but would

ask that the depositions be required to be taken at the courthouse or at another secure facility with metal detectors or by Zoom. Again, security is a major concern.

7.    In addition, Cardinale's lawyers apparently represented to this Court that they had no understanding why Plaintiffs ceased wanting to have any relationship with Cardinale. However, the below text to Mr. Cardinale's and Mr. Giardina's personal lawyer in Staten Island (Anthony) from Mr. Feingold is quite clear as to the exact reason why and therefore Cardinale's feigned shock of the withdrawal by Mr. Feingold and me of any relationship with Cardinale or Giardina is quite clear. The below was sent upon Mr. Feingold learning of the attack which Cardinale and Giardina set towards Mr. Silverman:

> Feingold texts:   I have nothing to do with Rob (Giardina) after this stunt he pulled.
> No room in my life for him and Rich (Cardinale) and the gangster
> move. . . Anthony (Cardinale and Giardina lawyer) I like
> you a lot. However, please don't reach out to me for anything
> I take violence super serious. It's not part of me in any way.
> I will not be involved with these guys no matter what. Nothing
> personal involving you. The gangster stuff they did makes me
> sick.

> Anthony response: I appreciate all that, and thank you for the kind words. To be
> clear I didn't know about how someone handled stuff until
> after events transpired . . .

8.    Thus, Cardinale's shock that Mr. Feingold and I want nothing to do with him is a feigned excuse to the Court. Similar to his feigned claim that he has no records, his feigned claim to his investors that he cannot pay them, his feigned claim that he has no understanding of the business projects, and the list goes on and on.

9. Both Cardinale and Giardina have a countless history of obscene conduct, this is only a very small portion, however, it is hopefully enough to give this Court a sense of the need for security.

10. In addition, there is no question in my mind that if Cardinale is afforded discovery before he and Defendants are deposed, he will improperly tailor and fabricate his testimony.

11. For the reasons stated in all of my moving papers, I respectfully request that the Court grant the motion in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27 day of September 2022 in MIAMI FLORIDA

_Michael Dazzo_
Michael Dazzo







**Gmail**

1 me age

**From:** admin@debtleader.com
**Date:** May 24, 2022 at 7:25:18 PM EDT
**To:** Robert Giardina &lt;                    &gt;          Richard Cardinale &lt;
**Cc:**                              danm@debtleader.com, matth@debtleader.com
**Subject: Continuing Threats**

The fact that you threatened me on the phone recently was bad enough, but coming to my house with
another guy and waiting out ide for 20 min  to try and intimidate me and my family i  the la t  traw  I have
video of it from my house and from several of my neighbors, I am also getting more information and videos
from my community. I have saved your threatening text and photo you sent me showing you were at my
house. My wife has now filed a police report. I will be ceasing any contact with you from here on. If you
contact or threaten me or my family any more I will pur ue further mea ure   Thi  will be my final word  to
you.

**From:** admin@debtleader.com
**Date:** May 25, 2022 at 6:03:57 PM EDT
**To:** Richard Cardinale <l3capitalmanagement@gmail.com>, Robert Giardina <robert@crgny1027.com>, daz1201@aol com
**Cc:** Admin Admin <>
**Subject: Update**

Dear Partners,

As the manager of our LLC I've sat back and saw that even after countless emails, calls and explanations of everything we all have been through I now see the direction things have turned and it's quite disgusting.

After working for 6 years and countless hours through marketing issues, global pandemics and economic downturns we did a great job holding things steady for investors and all the partners had a good benefit as well. It's unfortunate the California law caused it to wind down.

However, after witnessing the behavior of you guys first making threats over the phone and then actually coming down to a partners house with other people to cause him harm all because we want to move on with another company that you have nothing to do with is downright crazy. We never signed a non-compete and were always free to do our own business and now like mobsters, you are demanding ownership in our new business, with zero investment or else.

In light of this, we need to focus on the wind down of the business and make sure there's enough funds to sustain the business. We have taken many steps to cut expenses and will continue to do so. Until we can determine how much it will cost to service the existing client base and wind down the business, all possible future distributions will be held in an escrow account until further notice.

Any positive non threatening suggestions are welcome but servicing the existing clients to avoid any potential complaints, cancellations and refunds are the highest priority.


Sincerely


Dan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:22-cv-20375-RKA

DAVID FEINGOLD and MICHAEL DAZZO,

                Plaintiffs,

vs.

RICHARD CARDINALE, VANIA CARDINALE,
RVCNY, LLC. and RVCSI, LLC.,

                Defendants.

_____/

      **David Feingold**, declares under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

      1.     I am one of the Plaintiffs in the above action. I respectfully submit this declaration in support of Plaintiffs' motion regarding sequencing and other discovery related matters. I make this declaration based upon my own personal knowledge unless otherwise stated.

      2.     I am an attorney duly licensed and in good standing in the State of Florida and have been since the year 1991 and so for almost 32 years. I am also the Chief Executive Officer of Broadstreet, Inc. ("Broadstreet") and have been since July 2022. In that role, I oversee the development and management of the portfolio of properties and businesses in which Broadstreet participates.

      3.     Broadstreet is a very large private equity firm based in Greenville, South Carolina. Broadstreet and its affiliates have been involved in billions in transactions involving properties, businesses and investments involving all of its related enterprises. The firm has been prominently featured in the press and copies of such press clippings were previously filed with this Court

showing the extensive media coverage and the sizeable deals which Broadstreet procures.[1]  There

are more than 600 people employed in its various businesses in which it is involved in operations

and investments and there are approximately 35 personnel  that work in Broadstreet's front office.

### Summary of Relevant Facts

4.       Defendants' recent assertions before this Court that I am somehow hard to find or

looking to hide is preposterous and one of the many lies being baselessly hurled by them.  I oversee

a massive operation, enjoy doing it and am not going anywhere.  Also, I am the one that filed this

action along with Mr. Dazzo in February 2022, not the other way around.  Further, I am prepared

to be deposed after Defendants (or as the Court otherwise directs) on 72-hours advance notice.[3]  In

contrast, Mr. Cardinale is the one who is seeking to avoid being promptly deposed under oath both

here and in the other action described below where his counsel refused to give any dates of his

availability.

5.       It is imperative that Mr. Cardinale and the Defendants be deposed prior to document

discovery or other depositions regarding the topics focusing on the books and records of the

Alternative Named Entities as a core allegation in the First Amended Complaint is that Mr.

Cardinale's "L3" entities were paid about $1.3 million to keep and maintain those very same

records he apparently now claims to need and not possess while he simultaneously secretes the

bank accounts to the tune of $40 million.  Mr. Cardinale acted as a Registered Investment Advisor

that has absolute legal obligations to maintain records, yet he claims he has no records and cannot

---

[1] I have previously submitted a declaration in opposition to the subpoena served on Davick Capital LLC [ECF No. 30].

[3] I am scheduled to attend various corporate executive and shareholder meetings on October 12 through 14 which I would prefer not having to cancel due to the inconvenience it would pose to many others that already have prior paid and arranged travel, however, I can and will happily cancel any other prior engagements including multiple trips and medical appointments to have depositions proceed.

pay any of his investors and continues to tell his investors he cannot pay them because of his lack of records. His assertions are shocking and troubling given the fact that when myself and Mr. Dazzo resigned in January of this year, there was approximately $40 million in liquid cash and commercial paper and yet now, since Mr. Cardinale locked us out of bank accounts, we have no idea what he has done with this money nor how he can claim he has no records, especially since he prepares K-1 tax forms for his investors and since he apparently continues to at least pay his staff and possibly himself. This Court will be further advised as set forth below, that Mr. Cardinale has been involved in business disputes with multiple instances of physical gangster-style violence against business competitors and people that he claims owe him money. This has been memorialized with both the Boca Raton Police Department and also identified by the Honorable Judge Lewis Liman from the Federal Court in the Southern District of New York who made findings just this year of threats of physical and sexual violence against persons that owed money to Mr. Cardinale's business, a business of which Mr. Cardinale often boasted of his ownership and management style as he ran operations from his Staten Island, New York office. Upon my learning of Mr. Cardinale's violent tactics, I immediately forwarded written objection to Mr. Cardinale and withdrew from any further communication or association with Mr. Cardinale and have certain *in camera* information that can be shared with this Court to further show my concerns for safety in the location of the deposition and what may in fact happen due to my pursuing Mr. Cardinale in this action.

6.      Mr. Cardinale's efforts through his counsel to use his L3 Capital Income Fund investors to suggest some urgency here is a smokescreen and fraud to deflect Mr. Cardinale's own wrongdoing with respect to his own investors and has nothing to do with Plaintiffs' claims here. In that regard, Mr. Cardinale's L3 Capital Income Fund is a *lender* (not an equity investor) to

Alternative Named Entities and the L3 Capital Income Fund collects interest payments (between 12%-15%) on those loans. Mr. Dazzo and I were insistent on this loan structure because we had no desire to be involved with Mr. Cardinale's retail investors. Mr. Cardinale is the sole manager of the L3 Captial Income Fund. Neither Mr. Dazzo nor I have never had any roles with Mr. Cardinale's L3 Capital Income Fund, he is the sole manager and we specifically told Mr. Cardinale that we had no desire to be fund managers. Mr. Dazzo and I were managers of entities that borrowed money from the L3 Capital Income Fund. Mr. Cardinal's multiple, conflicting roles was a major concern that I shared with Mr. Cardinale repeatedly as he wore the multiple hats of **manager and advisor** to the **lender** L3 Capital Income Fund, one-third **owner of the borrower** Alternative Named Entities **and was a payee** receiving payments for services he never provided as set forth in Plaintiffs' First Amended Complaint.

7.  Furthermore, any purported "urgency" is severely undermined by the fact that this case has been pending since February 2022. In truth, Mr. Cardinale is seemingly panicking due to his own misrepresentations to his own fund investors regarding his own activities that are becoming more acute at this time. If there is any urgency, it relates to the fact that Mr. Cardinale has locked Plaintiffs out of the bank accounts and short-term commercial paper which was worth nearly $40 million when Plaintiffs resigned. Since our resignation, Mr. Cardinale has denied us access and visibility into those accounts through the present time nor has he distributed any money to us. **What has Mr. Cardinale done with $40 million?**

8.  The multiple subpoenas issued or noticed by Defendants further highlight Mr. Cardinale's desperation, and attempts to point to someone else as the problem (when he alone is to blame). In a more sinister vein, as described below, this is Mr. Cardinale making good on his gangster-like threats to disrupt and damage my business and business relationships.

9. In addition, contrary to Defendants' counsel's recent assertions, neither Mr. Dazzo nor I "spirited away" and records, but Mr. Cardinale has locked us out of the bank accounts. Mr. Cardinale's lawyers made the absurd assertion that the computers and QuickBooks had been stolen when, in reality, neither Mr. Dazzo nor I have been to the L3 offices in more than two years due to Covid and hence could not have stolen computers or QuickBooks. The assertions are simply preposterous.

10. Plaintiffs assert five causes of action in the First Amended Complaint. They are all simple and straightforward claims that have nothing to do with the red herring purported issues that Mr. Cardinale's counsel seeks to inject here and can be quickly demonstrated by Mr. Cardinale's deposition.[4]

**<u>Defendants' Wrongful Course of Conduct</u>**

11. In the First Amended Complaint, Mr. Dazzo and I allege that the key facts begin on or about the first week of July 2019 when after numerous prior discussions, Mr. Cardinale asked Mr. Dazzo and I to be co-managers of his hedge fund he was then forming, the L3 Capital Income

---

[4] Thus, Count One is for the fair value of Plaintiffs' interests under 6 Del. C. § 18-604 in Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC and Alternative Global Six LLC. The fair value of our interests is easily obtainable from the books and records of these entities that Mr. Cardinale promised and represented he would maintain. Count Two is against Mr. Cardinale as a Manager of the Alternative Named Entities for breaching his fiduciary duties by failing to do the tasks which he represented he was doing. Count Three is against Mr. Cardinale for conversion because Mr. Dazzo and I remain as managers and members of Alternative Global Management, LLC. As managers of that entity, we have an equal ownership right and equal rights to access the bank accounts of that entity. Still, Mr. Cardinale, without authorization from us, has taken funds from this account and has also blocked us from accessing these accounts to discover the amount taken. Counts Four and Five are against Mr. Cardinale for his fraud on Mr. Dazzo and I in entering into the Alternative Named Entities with him with respect to his improper disclosure of conflicts and compensation, and his misrepresentations concerning the sham charges paid to Mr. Cardinale's entities for administration costs, back-office services, maintenance of books and records and advisory services, that were not provided and contrary to his representations that they would be provided. Yet again, none of these claims have anything to do with Mr. Cardinale's investors or my other businesses and business relationships.

Fund. Plaintiffs rejected the proposal. We told Mr. Cardinale that we had no desire to be fund managers, that our offices were not set up to service and administer a fund of retail investors, and that we had several outside businesses that would not allow us to devote the time necessary to be a fund manager and operate a fund.

12. Mr. Cardinale responded that he had operated nearly ten funds himself and already had a complete back office set up to operate a fund. Mr. Cardinale told us he employed two administrative workers and one in-house attorney, and that he would provide all record keeping, reporting, due diligence, compliance and complete back-office services so we would not have to be responsible for any administrative services. Mr. Dazzo and I still rejected the proposal.

13. In addition, Mr. Cardinale said that he had an advisory company, L3 Capital Advisors — a registered investment advisor ("RIA"). Mr. Cardinale also said that he was familiar with all legal requirements as his RIA held him to a higher standard and therefore, he was qualified to handle the services discussed. We again advised Mr. Cardinale that we still were not interested in being managers of a fund.

14. **Mr. Dazzo and I conveyed to Mr. Cardinale that we were only looking for a source of non-recourse funding to pursue various businesses we were pursuing, including merchant cash advance and real estate.**

15. We advised Mr. Cardinale that we could have our various businesses borrow money from Mr. Cardinale's fund, the L3 Capital Income Fund, and that we would pay above market interest rates if the money was loaned to us non-recourse and unsecured but we only wanted to find a lender, and we were not interested in being fund managers and had never previously acted as fund managers and did not feel comfortable with such responsibilities or the back office and record keeping requirements. As such, Mr. Dazzo and I rejected any proposal involving

responsibility for the L3 Capital Income fund.  We were simply seeking a source of funding for the businesses that we wanted to pursue and were simply looking for a lender.

16.     Mr. Cardinale said he would agree to having his fund, the L3 Capital Income Fund, be a lender to our intended business endeavors if he was made an equal equity owner in any borrowing business entity and could earn money from any monies generated from the borrowing business entities. These business entities eventually became Alternative Global One LLC (specializing in the merchant cash advance industry), Alternative Global Two LLC (seeking opportunities in infrastructure and real estate development), Alternative Global Three LLC (focusing on the debt-settlement industry), Alternative Global Four LLC (developing real estate), Alternative Global Five LLC (investing in the fast-food industry), and last, Alternative Global Six LLC (specializing in home building).

17.     The three of us agreed that another newly formed company, Alternative Global Management LLC, would receive all funds over any loan payments owed by Alternative Global One through Six (Alternative Global Management LLC and Alternative Global One through Six are collectively referred to as the "**Alternative Named Entities**").

18.     Mr. Dazzo and I agreed that we would allow Mr. Cardinale as an equal member in the Alternative Named Entities if, and only if, (a) Mr. Cardinale disclosed all conflicts of interest and compensation to his clients, and (b) if we could use L3 Capital Income Fund's back office administrative services, which included the entire staff of L3 Capital Income Fund to provide all record keeping, reporting, due diligence, compliance and complete back-office services and support for the Alternative Named Entities.  This was all to be billed as administrative expenses.

19.     Mr. Cardinale said that he would have himself and his entire back office provide such services for the Alternative Named Entities if the Alternative Named Entities paid all the

administrative expenses of both the L3 Capital Income Fund and the Alternative Named Entities since it would all be the same staff for both the fund and Alternative Named Entities and Mr. Cardinale had already gone through the time and expense and had the experience of running complete back office services. Hence, the Alternative Named Entities would pay all administrative expenses for themselves and the L3 Capital Income Fund in return for all of the back office, record keeping, due diligence, compliance (which all were collectively referred to as the administrative expenses) which were to be provided in one spot, which was at the office location of Mr. Cardinale for not only the Alternative Named Entities but also the L3 Capital Income Fund.

20.     This deal was beneficial for Mr. Dazzo and I since we would not have to worry about any of the aforementioned administrative services for the Alternative Named Entities and this deal was also beneficial for Mr. Cardinale as all administrative services were paid for by the Alternative Named Entities with regards to Mr. Cardinale's operation of the L3 Capital Income Fund, the entity which he was the sole fund manager responsible to all of his retail investors. Therefore, Mr. Dazzo and I would not have to worry about any administrative services and Mr. Cardinale would not have to worry about paying the administrative expenses for L3 Capital Income Fund.

21.     Mr. Cardinale also represented to us that he would solve all concerns about how he would make all conflict-of-interest and earnings disclosures as he was personally responsible for such disclosures anyway since he operated an RIA. *See* Ex. A of First Amended Complaint, p. 6. Thus, under law as an RIA, he was a fiduciary and would have to make all conflict-of-interest disclosures and complete and detailed compensation disclosures anyway and so the requirements of ours regarding disclosure would be met.

22.     Mr. Cardinale also required that he be paid an advisory services fee through his RIA called L3 Capital Advisors as he claimed to have the most real estate and financial experience, said he would oversee everything, and therefore he should earn even more fees for those additional services of overseeing all entities and providing what he described as his superior skills. We have since found out that Mr. Cardinale extensively lied about his business expertise and alleged successes and has been making similar lies to many persons in the investment community.

23.     Mr. Cardinale now had a multitude of roles and conflicts and sources of income as he now acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund, (2) an owner and (3) Manager of the borrowing Alternative Named Entities, (4) a paid advisor through L3 Capital Advisors, and (5) the sole manager of the entity being paid to provide back-office services named L3 Capital Management. Thus, Mr. Cardinale had multiple sources of earnings, which had to be disclosed to his investors with complete detail enumerating the exact amounts he was being paid.  In turn, Mr. Dazzo and I were simply part owners of the borrowers, the Alternative Named Entities.

**Cardinale is Paid $1.3 Million For Sham Services For About 2 Years**

24.     Over approximately the next two years, Mr. Cardinale billed the Alternative Named Entities roughly $1.3 million dollars.  Mr. Dazzo and I paid these amounts believing we were paying for all administrative expenses and Mr. Cardinale's continued promise he had maintained all the records, reporting, due diligence, and complete back-office services for the Alternative Named Entities.  Yet those promises were false.  Still, Mr. Cardinale submitted monthly invoices and never once advised either me or Mr. Dazzo that the services, which were being paid for every month, were not being done. *See* Ex. B of First Amended Complaint (voluminous bills submitted by Mr. Cardinale totaling approximately $1.3 million).

25. In some months, the bills exceeded one hundred thousand dollars and included charges from Mr. Cardinale's American Express "Black Card" where he was billing for travel and meals, all which he claimed were for the business and necessary as part of his due diligence and advisory and administrative services. Software related charges and office supply charges were also billed. Mr. Cardinale said these items were being billed because he was taking care of all the administrative services.

26. Moreover, all Mr. Cardinale's employees' salaries and benefits were paid by the Alternative Named Entities, with the understanding and belief they were supplying the complete back-office services for those entities since neither me nor Mr. Dazzo had any employees.

27. All told, Mr. Cardinale took about $1.3 million from the Alternative Named Entities under our reasonable belief that Mr. Cardinale was providing what he had promised.

28. For nearly two years, Mr. Dazzo and I operated under the false assumption that those monies paid to Mr. Cardinale was for legitimate business expenses to support the back-office operations of the Alternative Named Entities. Now upon information and belief, Mr. Cardinale fraudulently billed the Alternative Named Entities. For instance, travel and entertainment expenses were not for due diligence or advisory purposes and health insurance charges were not simply for the back-office staff. Further, the Alternative Named Entities paid for office space that had apparently been closed at some point. In all, Mr. Cardinale billed more than $1 million for expenses and now it is learned there are apparently no back office records, no due diligence files, and that the substantial monies paid were not used as represented.

29. In addition, I learned that Mr. Cardinale did not disclose millions of dollars in earnings he made from the Alternative Named Entities to his fund clients although he claimed that he would make such disclosures. As a fiduciary, Mr. Cardinale had to specifically itemize and

disclose to his investors the actual monies he made, but he never did so. There is no record of his giving his investors any itemized disclosures as he hid the amounts he made from his investors. Mr. Cardinale intentionally omitted to disclose to his fund clients what he was making even though he had to do so, not only because he was a fiduciary but also for conflict-of-interest purposes.

30.     Mr. Cardinale charged and earned what is estimated to be upwards of $10 million from his ownership in Alternative Global Management LLC, Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC, Alternative Global Six LLC, L3 Capital Advisors for advisory services billed to the Alternative Named Entities, and additional compensation he took, such as in relation to debt settlement in Alternative Global Three LLC. That undisclosed compensation related to debt settlement alone equated to at least $2 million.  In addition, further undisclosed monies were paid to L3 Capital Management.

31.     There were over ten sources of earnings which would have required detailed disclosures to his investors, which Mr. Cardinale did not make. This was intentionally not disclosed by Mr. Cardinale who represented that as a fiduciary he knew what he was supposed to disclose. Yet he intentionally failed to do so. Now he claims he has no records.  Upon further information and belief, for certain investments, Mr. Cardinale has had family members, such as his father, paid and returned capital ahead of other non-family member investors thereby showing improper preferences.

**By the End of 2021 Plaintiffs Realize That Cardinale is a Problem**

32.     During the nearly two years of our working with Mr. Cardinale, sometimes other persons in the financial community told stories of Mr. Cardinale's multiple misdeeds and acts of

dishonesty including, but not limited to, falsification of investment success, falsification of deal performance, and arguing with colleagues.

33.     Finally, by the end of 2021, Mr. Dazzo and I realized that working with Mr. Cardinale was unwise.  Even though we were simply involved as borrowers from Mr. Cardinale's web of entities, it simply did not make sense to continue with a person who appeared to lie even while being caught in many contradictions. There was simply too much drama and too many people that had reasons to not like Mr. Cardinale and too many inconsistencies in his stories.

34.     At first, I approached Mr. Cardinale to discuss my concerns. Mr. Cardinale responded by referring to everyone else being a liar, being jealous of him because he was building a nearly $7 million home, had a multi-million-dollar beach house and a multi-million-dollar farm, and many luxury cars.  Mr. Cardinale's explanations were not acceptable, and matters came to a head in January 2022, when I sent a terse communication to Mr. Cardinale ceasing all relations. *See* Ex. C of First Amended Complaint.

**Plaintiffs Resign in January 2022**

35.     Later in January 2022, on January 28, 2022, both Mr. Dazzo and I sent notice to Mr. Cardinale that we were resigning from entities involving Mr. Cardinale.  We both had a lawful right to resign and disassociate ourselves from Mr. Cardinale. *See* Ex. D of First Amended Complaint.  The resignation was lawful and done in compliance with Delaware law.

36.     Then, on February 5, 2022, Mr. Dazzo and I sued Mr. Cardinale under Delaware law in this Court to receive their fair value of the assets we left behind upon our resignation and as permitted under Delaware law.  ***After*** we sued Mr. Cardinale in this Court, Mr. Cardinale sued me and Mr. Dazzo in Delaware Court of Chancery *seeking the books and records for the Alternative Named Entities that he was paid to keep and maintain*.

37. For roughly two years, we had paid Mr. Cardinale for all administrative expenses and then learned that Mr. Cardinale claims to have no records. That statement shows that Mr. Cardinale not only took monies for administrative services he did not perform, but also shows that Mr. Cardinale may be claiming now that he does not have records to avoid answering his investors' concerns. In fact, Mr. Cardinale has refused to respond to our discovery requests in that case and has refused to sit for a deposition, and it has now become abundantly clear that Mr. Cardinale is engaging in his various litigation tactics to push off his own investors due to his own misconduct. In fact, Mr. Cardinale has been issuing letters to his investors seeking to deflect blame for his own inability to properly manage his own investment funds.

**Cardinale's Lies to His Investors Catch Up with Him**

38. Mr. Cardinale apparently represented to his investors as to their expected investment returns, telling some that they could expect to receive over 27% per year in returns (interest and profit distributions). When his income fund did not pay such returns, Mr. Cardinale, who is and has always been the sole manager, responded that he does not have the records so he cannot explain why the returns to some of his income investors have been lower than represented.

39. Now, for the first time, when Mr. Cardinale cannot meet the returns he told some of his investors, he as sole manager is claiming ignorance and lack of possession or knowledge of records. However, by taking such a baseless stance, Mr. Cardinale has at a minimum admitted that he is not a fit fund manager. A person should not be permitted to manage a fund if they have no records and no due diligence files. Yet now in an act of desperation, that is apparently the position Mr. Cardinale has continued to take to dodge his investors' questions.

40. Before Mr. Cardinale's investors questioned him, Mr. Cardinale did not make up excuses of not having records for two years and before we raised our concerns, Mr. Cardinale

continued to take all his monies and represent to the world his key leadership role in all businesses and all decisions. Mr. Cardinale had consistent monthly payments to his L3 Capital Management entity for billed administrative expenses, and his billings to the entities for "advisory services" to oversee everything were always paid, and now miraculously he is only complaining about lack of knowledge and records ***after*** his being confronted about his multiple dishonest acts and inability to answer his investors about his promised returns to his investors in his fund which he is the sole fund manager.

      41.     During the approximately two years in which Mr. Cardinale received monies from the Alternative Named Entities, he never once claimed that he did not have records or that he did not have due diligence. Rather, he not only kept receiving those monthly payments for expenses, but he also continued to bill an advisory fee claiming that he was providing advisory services overseeing the businesses under his many advisory contracts. *See* Ex. E of the First Amended Complaint (showing one of many advisory agreements that Cardinale had executed).

      42.     Once we became aware, Mr. Dazzo and I complained and questioned Mr. Cardinale about these advisory services. I have since learned that Mr. Cardinale, at other businesses and funds which he has operated, has employed a similar tactic of lack of knowledge, lack of records, and lack of understanding. For instance, Mr. Cardinale ran/runs a gold fund where he advised certain investors they had made six times their money and that the fund was guaranteed to become publicly traded. But no such public offering happened, and no such returns have been experienced. Miraculously, Mr. Cardinale has taken the same tactic here that he has no knowledge and yet again at a fund where he is the manager.

      43.     It was not until **after** Mr. Dazzo and I put Mr. Cardinale on notice of the complaints against him and **after** we resigned, that Mr. Cardinale, who is the sole Manager of the L3 Capital

Income Fund, now miraculously claims not only that he has no records but now Mr. Cardinale also claims he is unaware of business operations, that he has no due diligence, and he cannot in detail explain the business to anyone even though he was the most highly compensated person with a full office and staff and multiple entities that he received earnings and compensation for his alleged expertise.

44. Also, Mr. Cardinale participated in what is estimated to be more than one hundred conference calls on the businesses with Mr. Dazzo and I and yet now his claimed ignorance serves him well in avoiding questions by his investors. Yet again, Mr. Dazzo and I were nothing more than owners in the borrowing entities and had none of the legal obligations which Mr. Cardinale had and for which he now professes no knowledge or records to avoid the serious inquiries of his investors.

**The April 2022 Threats from Cardinale**

45. In April 2022, Mr. Cardinale dispatched his long-time friend, business associate and partner in many ventures, Robert L. Giardina ("Giardina"), to give me a "message" and threat during a call with Mr. Giardina. Mr. Giardina stated to me during that call that he and Mr. Cardinale wanted me to drop my lawsuit against Mr. Cardinale (this lawsuit) and that if the suit were not dropped they would be taking action to affect my business including harming my business by competing with me, involving anyone that I have ever done business with or do business with and that Mr. Giardina specifically acknowledged that Mr. Cardinale would make business impossible for me if I simply did not drop everything especially since I included his wife in the litigation and he conveyed that such was some kind of violation of a code of honor and he would therefore aggressively seek to ruin my business and disparage me. After that lengthy conversation, I never spoke for any real length of time to Mr. Giardina ever again.

**The May 2022 Gangster-Like Tactics Used by Cardinale Against a Business Competitor**

46.     Even more or equally disturbing, in or about, May 2022, Mr. Cardinale learned that one of his business partners in the debt settlement business (Darren Silverman, who had also been involved in Alternative Global Three), who had not signed a noncompete agreement, had left his business relationship with Mr. Cardinale to pursue a competing enterprise. Mr. Cardinale apparently called this person impliedly threatening that something might happen to that person and which would be out of the control of Mr. Cardinale. Mr. Cardinale thus implied that something would be happening, an old-style gangster move of claiming that Mr. Cardinale would not be responsible for any unexplained events happening to the competitor. Shortly thereafter (within approximately one week), a group of people showed up to the gated home of the competitor to harm and intimidate the competitor (including Giardina, a person that is a known partner of Cardinale's) admitting that they intended to physically beat up the competitor. *See* Ex. G of First Amended Complaint (putting Cardinale on notice that the threat of physical violence has required the complete separation from Cardinale and that no further communications would be permitted).

47.     This issue of violence is of such concern that a police report was made with the Boca Raton police department under case number 22-6838 by the victim who is not a party to this litigation. There is also video and photos of the would-be attackers standing outside the competitor's home, waiting for him to come home so they could assault him. Most shockingly, this is not the first time that Mr. Cardinale and Mr. Giardina have been embroiled in threats of physical violence.  In fact, the Honorable Judge Lewis J. Liman of the Southern District of New York found that Mr. Cardinale's and Mr. Giardina's business Richmond Capital had threatened violence and rape against borrowers of theirs, including a Rabbi, who received a temporary restraining order as a result and Judge Liman issued a judgment against Mr. Cardinale's and Mr.

Giardina's company. (*See* <u>Fleetwood Services, LLC v. Ram Capital Funding, LLC</u> et al.,Case 20-CV-5120, SDNY, dated June 6, 2022 - - wherein on page 12 Judge Liman stated as to Cardinale's and Giardina's company that ". . .[i]t's harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection which the Rabbi received."). Cardinale and Giardina have a history of being involved in violence and misdeeds which I do not take lightly and for which I also have grave concerns about being in a deposition room with Cardinale given his and Giardina's history of being involved in violence with those that they are in business disputes. In that regard, I would ask that any depositions of Plaintiffs be by ZOOM or at a secure location.

48.     Mr. Cardinale was put on notice via email from the victim about the attempted attack. After receiving the email, Mr. Cardinale did not respond with shock or disgust as to what happened to the victim (a normal response by someone not involved) but simply ignored the email as if to send the message he knew what happened and was condoning such conduct by his silence to the events. *See* Ex. F of First Amended Complaint (email of the victim to Cardinale). The victim directly emailed Mr. Cardinale about the outrageousness of sending attackers to a home of a competitor to which Mr. Cardinale simply remained silent but then many days later and likely after learning the police were involved, then claimed that he had no control over what his business partner had done.

49.     Because of the above, I emailed Mr. Cardinale advising him intimidation as a business tactic cannot be tolerated and used by Mr. Cardinale as a tool to achieve his desired goals and that no further contact would be continued with Mr. Cardinale. *See* Ex. G of the First Amended Complaint. I completely ceased any communication with Messrs. Cardinale and Giardina ever again and continued to pursue this lawsuit.

50.     Also significant, the victim had previously complained that he could not do business with Mr. Cardinale because of a variety of acts and conduct of Mr. Cardinale and his associates, thus significantly damaging the profitability of Alternative Global Three.

51.     In addition to the above described acts, Mr. Cardinale paid unsubstantiated compensation to his wife, Defendant Vania Cardinale, and made unsubstantiated payments to other entities Mr. Cardinale created to assist in hiding the fraudulent activity described herein. Those entities are Defendants RVCNY, LLC and RVCSI, LLC.  Upon information and belief, Defendant Vania Cardinale knew she was receiving money for services not being provided and/or was an active participant in assisting Mr. Cardinale in his fraudulent activities.  Defendants RVCNY, LLC and RVCSI, LLC are part and parcel to the activities of Mr. Cardinale and assisted Mr. Cardinale in committing the fraudulent activities described in the First Amended Complaint. Specifically, RVCNY, LLC. and RVCSI, LLC assisted Mr. Cardinale in diverting investor funds and/or payments which should have been paid to investors as part of their return on investment by accepting funds from L3 and/or Mr. Cardinale directly. As such, they are required to return the money received from fraudulent activity.

52.     Mr. Cardinale, in order to avoid dealing with his wrongdoing, had his lawyers come before this Court at a recent conference arguing some kind of urgency concerning Mr. Cardinale's L3 investors, but this is simply a further effort by Mr. Cardinale to deceive his own disgruntled investors.

**The Loans to Alternative Named Entities**

53.     As described above, the relationship between L3 Capital Income Fund and the Alternative Named Entities is one of lender and borrower. Alternative Named Entities signed promissory notes reflecting the loans and pay specified interest to L3 Capital Income Fund on a

quarterly basis and are also eligible to receive discretionary distributions from the Alternative Global Entities.  Mr. Cardinale's own literature he provides to investors prove the point.  Thus, in the "General Overview" for the L3 Capital Income Fund it provides that:

> We deploy the Fund's capital by lending it at rates of between 12% and 15% to borrowers in industries that we have identified as offering superior upside potential (the "Key Industries").
>
> We pay our investors a return of between 12% and 15% of their invested capital on an annualized basis, with payments made quarterly.
>
> We generate the returns to pay our investors from our collection of interest rates that we charge the ISE [industry specific entity] borrowers.
>
> The ISE borrower signs a note at an interest rate of between twelve and fifteen percent in favor of L3 Capital Income Fund and thereafter uses those funds to participate in the Key Industries.  We collect the interest payments from the ISE borrower and then distribute them quarterly to our investors.

*See* Exhibit "A" hereto and similarly Exhibit "B" hereto ("We provide funds at interest rates of between 12 and 15 percent to merchant cash advance investors/syndicators that in turn back portfolios of merchant advance transactions. This gives us exposure to the merchant advance industry which we believe is an industry with incredible opportunity.").

**Cardinale Locks Plaintiffs Out of Bank Accounts**

54.     Since the time that Mr. Dazzo and I resigned from Alternative Global One through Six in January 2022, we have been locked out of all of the bank accounts of the Alternative Named Entities.  At that time, there was approximately $40 million in cash and receivables from short term commercial paper.

**Cardinale Owes Millions to Plaintiffs for Fair Value**

55.     Under Delaware law, fair value is determined as of the date of resignation, which occurred here on January 28, 2022.  In open court and now for the first time ever, Mr. Cardinale's lawyers admitted that they owe fair value to the Plaintiffs, which has always been denied, but now

claim that they have no records so they cannot figure out what they owe the Plaintiffs. **Hence another reason Mr. Cardinale claims ignorance is to avoid the millions that he owes the Plaintiffs**.

**Cardinale Follows Through on His Threats - - Issues Bad Faith Subpoenas**

56.     Instead of Mr. Cardinale simply looking at the books and records of the Alternative Named Entities (that he was paid to maintain) to obtain my fair value, he has followed through on his threat to injure my business relationships (and those businesses) by issuing a multitude of subpoenas and other correspondence to persons and entities that I have a relationship with that has nothing to do with my claims against Mr. Cardinale here. In only one of those situations, between Alternative Global Six and Durham Homes, LLC, had there been a joint venture, but Mr. Cardinale defaulted there by failing to fund his commitments. Yet again, however, that has nothing to do with my fair value claim here.

57.     Indeed, all of the subpoenas have one thing in common. They include businesses/individuals that deal with me and are clearly in retaliation for my refusal against Messrs. Cardinale and Giardina's unlawful demands. In that regard, Mr. Cardinale even signed in seven different agreements and acknowledgement that I had other businesses and pursuits and he specifically contractually waived any claim to them and any claims to participation or profits. I would never have entered any past business relationship with him without those signed agreements and the specific protections they provided acknowledging that I had many other businesses apart from Cardinale and that he waived any form of claim to the profits of them.

58.     In addition, if the foregoing is not disturbing enough, Messrs. Cardinale and Giardina hold themselves out as competitors and under the guise of subpoenas seek confidential business information from the various entities and individuals. They have constantly stated their

20

expertise in real estate and business ventures, similar to mine and now they seek confidential information involving my businesses and those I do business with. This should not be permitted particularly in view of the straight-forward and limited claims of Plaintiff before this Court.[5]

### Defendants Should Be Deposed First

59.     I respectfully submit that in this case, due to these unusual circumstances, Plaintiffs should be entitled to depose Mr. Cardinale and Defendants before document exchange and any other discovery to prohibit them from tailoring their testimony after learning information from myself and Mr. Dazzo in our depositions and documents and to force them to state under oath that they have no documents and cannot change that narrative once they begin receiving discovery and documents from us.

60.     I am certain that if Mr. Cardinale is given access to the books and records that he was required to maintain he will improperly tailor his testimony here. Likewise, if he hears Plaintiffs' testimony first, he will come up with more tailored testimony. In our Delaware litigation he made the same claim that he had no books and records and when discovery was served on him, he objected and refused to answer any questions about any of the books and records. He would not respond to a single interrogatory or request to produce and merely gave blanket objections. He should not be allowed to hide behind his assertion that he has no records, he should be forced to

---

[5] Defendants' counsel's description of the New York District Court (SDNY) case during the recent conference before this Court is false (as are numerous other statements to be addressed if and when they are actually made by their clients). I am not a party in that case, and there have been no orders issued against me. I have voluntarily participated in that case because one of Mr. Giardina's lawyers has made false accusations (in the midst of Mr. Giardina's settlement with the Federal Trade Commission for a host of alleged improper practices) that I determined to dispute head on regardless of the fact that I am not a party. Notably, that very same lawyer has refused to schedule depositions for Mr. Giardina, Mr. Cardinale and Lawrence P. Giardina and refused to respond to discovery requests. In short, after many years of acting as legal counsel for Mr. Cardinale's best friend and business partner, Robert L. Giardina, once I withdrew from any relationship with Mr. Cardinale and Mr. Giardina due to their attempted assault on Mr. Silverman, now miraculously Mr. Giardina, after my lawsuit was filed here, purportedly has issues with me.

make these statements under penalty of perjury. This is a central issue in this case and resolving it now will save time and expense and, most critically, protect against the real threat of Mr. Cardinale fabricating compliance with his representations and agreements after the fact.

## <u>Conclusion</u>

61.     For the reasons stated in all of my moving papers, I respectfully request that the Court grant the motion in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27 day of September 2022 in _Miami, Florida_____.


_____
                    David Feingold

# L3 CAPITAL INCOME FUND

2020

# GENERAL OVERVIEW

The information contained herein is confidential and not meant for public dissemination. Unless you have received a written and signed authorization from L3 Capital Income Fund granting you authorization to read and review the enclosed, you should not proceed further. All information contained herein is subject to change, contains estimates, is not in any manner to be deemed an offer to make an investment and is for internal use only. There can be no guarantee as to the accuracy of the information contained herein and furthermore this information contains estimates based on presently available information, all of which is subject to change.

## WHAT WE DO

WE DEPLOY THE FUND'S CAPITAL BY LENDING IT AT RATES OF BETWEEN 12% AND 15% TO BORROWERS IN INDUSTRIES THAT WE HAVE IDENTIFIED AS OFFERING SUPERIOR UPSIDE POTENTIAL (THE "KEY INDUSTRIES")

OUR TYPICAL DEAL IS STRUCTURED SO THAT OUR BORROWER IS AN INDUSTRY SPECIFIC ENTITY ("ISE") WHICH SOLEY PARTICIPATES IN THE KEY INDUSTRIES.



## THE KEY INDUSTRIES

- **Merchant Cash Advance** – An industry that provides business funding to businesses that need immediate capital, cannot await traditional bank funding or do not qualify for traditional funding and thereby are willing to pay above market rates.   The large rates paid offset the default rates and thereby we believe that this is a key industry with great opportunity

- **Real Estate Infrastructure Development** – An industry that improves raw land into lots with zoning, streets and utilities infrastructure completed and thereafter sells the lots to homebuilders who then build  homes for sale to the consumer end user.  As mortgage rates are extremely low, we believe being involved in a specialized part of the home building sector is a key industry with great potential.

- **Debt Settlement** – An industry focused on reducing consumer credit card and unsecured debts and in return for reducing said debt, the debt settlement company is paid a fee which generally equates to a percentage of the debt reduced. Since Consumer debt is skyrocketing, we believe that this is a key industry where great opportunity exits.

- ALL OF THE ABOVE INDUSTRIES ARE THE KEY INDUSTRIES THAT WE HAVE IDENTIFIED, WE MAY ADD OR ALTER THAT LIST AS MARKET CONDITIONS CHANGE AND OPPORTUNITIES ARISE



HOW OUR INVESTORS MAKE MONEY

- WE PAY OUR INVESTORS A RETURN OF BETWEEN 12% AND 15% OF THEIR INVESTED CAPITAL ON AN ANNUALIZED BASIS, WITH PAYMENTS MADE QUARTERLY

- WE GENERATE THE RETURNS TO PAY OUR INVESTORS FROM OUR COLLECTION OF INTEREST RATES THAT WE CHARGE THE ISE BORROWERS

- THE ISE BORROWER SIGNS A NOTE AT AN INTEREST RATE OF BETWEEN TWELVE AND FIFTEEN PERCENT IN FAVOR OF L3 CAPITAL INCOME FUND AND THEREAFTER USES THOSE FUNDS TO PARTICIPATE IN THE KEY INDUSTRIES. WE COLLECT THE INTEREST PAYMENTS FROM THE ISE BORROWER AND THEN DISTRIBUTE THEM QUARTERLY TO OUR INVESTORS

# L3 CAPITAL INCOME FUND STRUCTURE



Quarterly distribution of interest we receive
From all of the ISE goes to investor

A SIMPLE DIAGRAM OF WHAT WE DO

Investor

L3 Capital Income Fund
Acting as Lender

Provides capital to L3

Borrows Money

Pays interest

Borrows Money

Pays Interest

Borrows Money

Pays Interest

ISE in the MCA Industry

ISE in Real Estate Infrastructure

ISE in Debt Settlement Industry

# DISCLAIMER

L3 Capital Income Fund shall have the sole discretion in determining its involvement in any industry. Such involvement may include but not be limited to equity investments, debt participation/funding agreements and/or transactions with affiliated entities in which funds are loaned by L3 Capital Income Fund to affiliated entities of L3 Capital Income Fund management. There are risk factors, conflicts of interest as well as other material terms that are further disclosed in additional documents not contained herein. THERE ARE NO GUARANTEES RELATED TO THIS INVESTMENT. AS WITH ANY INVESTMENT, THERE IS ALWAYS A RISK OF LOSS.

ALL PROJECTED RETURNS ARE BASED ON PAST PERFORMANCE, THERE IS NO GUARANTY THAT FUTURE PERFORMANCE WILL BE THE SAME AS PAST PERFORMANCE, HOWEVER, THE MAXIMUM RATE THAT WILL BE PAID IS 15%. THIS RATE IS ALSO SUBJECT TO CHANGE AND SUBJECT TO MULTIPLE RISK FACTORS AS FURTHER DISCLOSED IN ADDITIONAL DOCUMENTS NOT CONTAINED IN THIS POWERPOINT



# MERCHANT CASH ADVANCE STRATEGY

# L3 CAPITAL INCOME FUND

### June 2020

The information contained herein is confidential and not meant for public dissemination. Unless you have received a written and signed authorization from L3 Capital Income Fund granting you authorization to read and review the enclosed, you should not proceed further. All information contained herein is subject to change, contains estimates, is not in any manner to be deemed an offer to make an investment and is for internal use only. There can be no guarantee as to the accuracy of the information contained herein and furthermore this information contains estimates based on presently available information, all of which is subject to change.

# WHAT IS MERCHANT CASH ADVANCE?

Merchant cash advances provide small business owners with an alternative financing option separate from traditional bank loans. Since the credit crisis of 2008, businesses, also known as merchants, have been unable to receive funding from traditional sources such as banks.  Merchant Cash Advance is where all of the receivables of a merchant are pre-purchased in a factoring arrangement and the merchant repays the advance by his operating accounting being debited daily a small percentage of the business daily collections.

For businesses that need extra capital for expansion, advertising or renovations, merchant cash advances for small business offer excellent solutions with approvals much quicker than conventional bank loans. These solutions are also helpful for companies that experience seasonal business spikes, need to upgrade equipment or need to stock shelves with the latest merchandise. Some of these expenses may be planned or unplanned and depending upon the merchant company, some businesses can obtain funds ranging from $4,000 to upwards of millions within as few as two business days.

Merchant cash advances are relatively straightforward in premise:  A company provides a business with an upfront sum of cash, and then in exchange, that business provides them with a portion of their future sales. Merchant cash advances are different from loans. When you take out a business loan, you will have a set time frame to repay the loan and will be required to make monthly fixed payments. When you get a merchant cash advance, you'll make monthly, weekly, or even daily payments out of your daily revenues.

As for the fees associated with an advance, the rate charged is referred to as a factor rate – which, on average, ranges between 1.2 and 1.5, based on the business history.   As an example,  a merchant cash advance of $100,000 with a factor rate of 1.5 will require a repay of $100,000 x 1.5 = $150,000.  The two means of reimbursing a merchant cash advance are through the provide either: 1) taking a regular percentage of your credit and debit card sales, or 2) taking fixed withdrawals based upon your expected earnings.

Merchant cash advances are much faster than other business funding routes. In fact, they can many times be acquired in less than a week's time, making them beneficial for businesses that are in need of quick capital whereas bank approvals can take dramatically longer. Since merchant cash advances are legally considered a factoring arrangement and not a loan the regulatory requirements applicable to bank loans do not control and hence there is an ability for a much larger profit margin.

Source: https://www.businessloans.com/guide/merchant-cash-advance/

# MERCHANT CASH ADVANCE MARKET

- Merchant cash advance payments generally take three to 24 months to repay, which is far less time than traditional bank loans. The average repayment time frame for a merchant cash advance is 8 or 9 months.

- Typical business owners who qualify for merchant cash advance: A credit score of 525-550, $150,000-$200,000 in annual revenue, been in business 18-24 months.

- A business that uses a merchant cash advance will typically pay back 20% – 40% or more of the amount borrowed.

- Merchant cash advance can be as little as 50% of a business' monthly sales or all the way up to 250% of a business' monthly sales.

- 7% average default rate of merchant cash advance loans in 2018.

- High renewal rate – typically 50% to 60% of merchant cash advance customers renew multiple times.

- Now with the tightening of bank credit, many merchants with credit scores above 650 are seeking quick funds through merchant cash advance

- Although merchants are considered higher risk, the higher rates charged greatly offset the risk and default rates

Source: https://www.nerdwallet.com/blog/small-business-special-report-mca/

▪ Volume of merchant cash advances has steadily increased over the last couple years.

▪ Most MCA companies are expecting more than 25 percent annual growth rates.

■ There were approximately 21,000 Merchant Cash Advance transactions in 2010 for a total of over $500 Million funded compared with $19.2 billion in 2019. MCA industry grew 3,740% in 9 years.

■ Over the past five years, the MCA industry's financings have been growing by 20%.

■ The MCA industry will have more than doubled its small business funding to $19.2 billion by year-end 2019, up from $8.6 billion in 2014.

## MARKET GROWTH

Source: 2016 projections by Bryant Park Capital, a Manhattan-based, boutique investment bank

## WHAT WE DO

L3 Capital Income Fund generates some of its income which it pays to its investors by lending fund money to affiliated entities that invest in portfolios in the merchant advance industry.

Our Merchant Advance lending facility offers much higher income returns than can be traditionally received in the present interest rate environment by doing standard loans to businesses.

We provide funds at interest rates of between 12 and 15 percent to merchant cash advance investors/syndicators that in turn back portfolios of merchant advance transactions.  This gives us exposure to the merchant advance industry which we believe is an industry with incredible opportunity.

# OVERVIEW OF INDUSTRY

The merchant cash advance industry is in high demand and has more than doubled in size in the last 5 years. Merchant cash advance businesses expect enormous annual growth rates because the businesses that use a merchant cash advance will typically pay back 20% – 40% returns. More and more small businesses need short term liquidity injections in the current market environment. Traditional banks are not able lend to all the small businesses who need it causing a void in small business funding. The number of businesses who need it is growing significantly.

This leaves a lot of business owners with no choice but to get a merchant cash advance because they need the flexible payment schedule, no collateral, high borrowing limit, shorter approval, better funding timeframe, and are more likely to be approved. These features which are not offered in traditional bank loans are a big part of the reason why merchant cash advance deal volume continues to grow. The biggest factor is the rising debt of small businesses because of shifts in the economy which will significantly impact the merchant cash advance industry.

An influx of market competition has also begun to mold the merchant cash advance sector. Increased profits, growing demand, and consistent growth in the industry for the last ten years, high factor rate for borrowers are all reasons why the industry will continue to have success for a long time. The merchant cash advance market remains relatively young and legislation may force the industry to take new directions in the coming years. Merchant cash advance offers attractive returns, high commissions, unregulated industry, growing need for capital from small businesses, and a high advance renewal rate.

Source: https://debanked.com/merchantcashadvance

# OVERVIEW OF INDUSTRY/ COVID-19 IMPACT

- Over the past few weeks, coronavirus has taken the lives of thousands of Americans. But it's also had dire impacts on the U.S. economy — delivering a devastating blow for hundreds of thousands of restaurants, stores and other small businesses across the U.S., which find themselves suddenly cut off from their customers as Americans seek refuge from the lethal pandemic.

- Most small businesses lack the cash reserves to weather a month-long interruption.

- With high levels of concern about COVID-19 reported in every sector and region of the country, two in four small businesses (50%) report had to temporarily shut down.

- The demand for short term loans is skyrocketing which is very positive for the merchant cash advance industry. 1.3 million Paycheck Protection Program loans have been approved with a total value of more than $296 billion so far. The program is close to approaching its limit and small business owners are getting desperate for funding.

- More than 8 in 10 small businesses are concerned about the impact of COVID-19 on their business.

- 59% of small businesses feel comfortable with their current cash flow, compared to 80% in Q1.

- As the economy opens, these businesses will need temporary funding which makes merchant cash advance a great option for funding

Source: https://debanked.com/2020/03/how-small-business-funders-are-reacting-to-the-coronvirus/

https://www.uschamber.com/report/special-report-coronavirus-and-small-business

- The sectors with the greatest rates of loan defaults include housing and mortgages, jewelry, siding contractors, associated real estate service, computer and computer peripheral equipment, software merchant wholesalers, travel agencies, and department stores.

- The lowest default rates by industry include breweries at 3%, support activities for oil and gas operations at 4%, veterinary services are 4.3%, funeral homes and services at 6.5%, and offices of physical, occupational, and speech therapists at 7.8%.

- 45% of approved loans are in the region on $350,000 to $2,000,000, 37% towards those that are over $2,000,000, 11% towards those between $150,000 to $300,000, and just 7% towards those that are under $150,000.

- 48% of total traditional bank loan approvals go to businesses that are more than 2 years old, 12% toward those that are less than 2 years, 17% to startup companies, and 23% to businesses undergoing a change of ownership.

- Small businesses borrow over $600 Billion each year, a figure bigger than the entire GDP of Sweden.

- Large banks are responsible for 48% of total small business loans, with small banks responsible for 47% and online lenders responsible for 24%.

- The average business loan was $663,000 in 2018. The average alternative finance loan was $80,000 in 2018.

- Small firms were hit harder than large businesses during GFC, losing 40% more jobs and will be hit harder during this pandemic.

- In the US, there are 30.2 million small businesses. Each month an average of 543,000 new businesses are started.

- 82% of companies that fail say it is because of cash flow problems.

- Big banks only approved 26.9% of small business loans in 2018.

- **ALL OF THE ABOVE STATISTICS SUPPORT THE PREMISE THAT THERE IS A HUGE MARKET AND OPPORTUNITY AVAILABLE FOR MERCHANT CASH ADVANCE.  HENCE, WE BELIEVE THAT OUR LENDING MONEY TO THOSE ENTITIES THAT PARTICIPATE IN THE MERCHANT CASH ADVANCE INDUSTRY IS A SOUND BUSINESS PLAN.**

## U.S. SMALL BUSINESS DEBT

Source: https://www.finimpact.com/small-business-loan-statistics/  https://www.sba.gov/document/report--2019-weekly-lending-reports

## PERFORMANCE METRICS FOR MERCHANT CASH ADVANCE COMPANY THAT L3 INCOME FUND PROVIDES FUNDING

- Deals Funded: 2,460

- Deals Between 0-75K: 1,549

- Deals Between 75K-500K+: 911

- Average Default Rate: 13%

- # of Defaults: 373

- Total Amount Funded: $327,748,944.97

- Internally Funded: $187,771,971.13

- Average Collection Pace: 90%

- Delinquency Rate: 1%



# PERFORMANCE OF THE MERCHANT ADVANCE PORTFOLIO OF THE BORROWERS OF THE L3 CAPITAL INCOME FUND

- The margins are huge in merchant cash advance and the default rates based on our very specific criteria are in the ten to fifteen percent range which are easily absorbed based on the average factor rate
- Our borrowers primarily do deals with an average factor rate (that means discount of 1.40) and an average duration of six months and so the gross effective yield is 80% before defaults and delinquencies.
- The borrowers participate with a business that has operated for more than five years, never lost money and has more than $100 million outstanding. Huge hedge fund/Private Equity interest to participate in the business.
- The merchant advance company allows joint venture portfolio participants an opportunity to put their capital into a portfolio to make above market returns. Based on the factor rate charged and the delinquency rates, the portfolio is able to yield an above market return so that the borrowing entities from L3 Capital Income Fund are able to afford to pay a 12% to 15% interest rate to the L3 Capital Income Fund.
- All deals are secured by all the receivables of the businesses as well as filing liens on hard assets of the businesses when appropriate.
- Average deal size exposure in each portfolio is around $50k to $80k.
- Majority of merchant customers take a renewed deal on expiration of prior deal and so a captive audience of business and so a constant flow of business

# SUMMARY

- Merchant cash advances provide small business owners with an alternative financing option separate from traditional bank loans. For businesses that need extra capital for expansions, advertisements or renovations, merchant cash advances for small business offer excellent solutions.

- Merchant cash advances are relatively straightforward in premise: A company provides a business with an upfront sum of cash, and then in exchange, that business provides them with a portion of their future sales.

- A business that uses a merchant cash advance will typically pay back 20% – 40% or more of the amount borrowed. Hence L3 Capital Income Fund can lend to the portfolio managers in the merchant advance industry and expect them to pay 12 to 15 percent to L3 Capital Income for the use of the funds.

- Most MCA companies are expecting more than 25 percent annual growth rates.

- The MCA industry will have more than doubled its small business funding to $19.2 billion by year- end 2019, up from $8.6 billion in 2014.

- Merchant cash advance offers attractive returns, high commissions, unregulated industry, growing need for capital from small businesses, and a high loan renewal rate.





# DISCLAIMER

L3 Capital Income Fund shall have the sole discretion in determining its involvement in the merchant cash advance industry. Such involvement may include but not be limited to equity investments, debt participation/funding agreements and/or transactions with affiliated entities in which funds are loaned by L3 Capital Income Fund to affiliated entities to participate in the merchant cash advance industry via debt and/or equity.

ALL PROJECTED RETURNS ARE BASED ON PAST PERFORMANCE, THERE IS NO GUARANTY THAT FUTURE PERFORMANCE WILL BE THE SAME AS PAST PERFORMANCE, HOWEVER, THE MAXIMUM RATE THAT WILL BE PAID IS 15%. THIS RATE IS ALSO SUBJECT TO CHANGE AND SUBJECT TO MULTIPLE RISK FACTORS AS FURTHER DISCLOSED IN ADDITIONAL DOCUMENTS NOT CONTAINED IN THIS POWERPOINT.