UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>JONATHAN BRAUN et al.<br><br>    Defendants. | Case No. 1:20-cv-04432-JSR<br><br>**FTC'S POST-TRIAL BRIEF** |

## TABLE OF AUTHORITIES

## CASES

*FTC v. Consumer Def., LLC*,
    2022 U.S. Dist. LEXIS 234261 (D. Nev. Dec. 30, 2022)..................................................10

*FTC v. Day Pact LLC*,
    2023 U.S. Dist. LEXIS 155174 (N.D. Ill. Sep. 1, 2023) ......................................................8, 9

*FTC v. Elegant Sols., Inc.*,
    2020 U.S. Dist. LEXIS 154140 (C.D. Cal. Jul. 17, 2020).......................................................10

*FTC v. Instant Response Sys., LLC*,
    2015 U.S. Dist. LEXIS 49060 (E.D.N.Y. Apr. 14, 2015) ......................................................10

*FTC v. Lead Express, Inc.*,
    2021 U.S. Dist. LEXIS 174240 (D. Nev. Sep. 13, 2021).......................................................10

*FTC v. OMICS Grp.*,
    374 F. Supp. 3d 994 (D. Nev. 2019) .....................................................................................10

*FTC v. Pecon Software Ltd.*,
    2014 U.S. Dist. LEXIS 108950 (S.D.N.Y. Jul. 10, 2014)......................................................10

*FTC v. Roca Labs, Inc.*,
    2019 U.S. Dist. LEXIS 46420 (M.D. Fla. Jan. 4, 2019) .......................................................10

*In re Sanctuary Belize Litig.*,
    2021 U.S. Dist. LEXIS 7383 (D. Md. Jan. 12, 2021) ............................................................10

*United States v. Cornerstone Wealth Corp.*,
    549 F. Supp. 2d 811 (N.D. Tex. 2008)....................................................................................7

*United States v. Daniel Chapter One*,
    89 F. Supp. 3d 132 (D.D.C. 2015) ..........................................................................................6

*United States v. Dish Network LLC*,
    954 F. 3d 970 (7th Cir. 2020) ..............................................................................................8, 9

*United States v. Dish Network LLC*,
    256 F. Supp. 3d 810 (N.D. Ill. 2017) ......................................................................................7

## STATUTES

15 U.S.C. § 45(m)(1)(A) ........................................................................................................... 1

15 U.S.C. § 45(m)(1)(C) ........................................................................................................... 4

15 U.S.C. § 57b ......................................................................................................................... 1

15 U.S.C. § 57b(b) .................................................................................................................... 2

15 U.S.C. § 5821 ....................................................................................................................... 1

89 Fed. Reg. 1445 (Jan. 10, 2024) ............................................................................................. 4

Plaintiff Federal Trade Commission ("FTC"), by and through its undersigned counsel, hereby submits its post-trial brief regarding the amount of monetary relief under Section 19 of the FTC Act, 15 U.S.C. § 57b ("Section 19 redress judgment") and civil penalties under Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A) ("civil penalty judgment") to be imposed against Defendant Braun for his violations of Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 5821. Although the jury's findings as to the amounts of consumer harm and civil penalties were appropriate based on the evidence presented to it at trial, the FTC respectfully asks that the Court, based on additional evidence not shown to the jury and factors relevant to civil penalties the jury was not specifically instructed to consider, increase the amounts of both the Section 19 redress judgment and the civil penalty judgment decided by the advisory jury. In addition, the FTC respectfully requests that the Court enter certain injunctive provisions relating to the collectability of and use of funds received pursuant to the judgments. A proposed order has been filed herewith.

On September 19, 2023, the Court granted partial summary judgment in favor of the FTC finding that Defendant Jonathan Braun violated Section 5 of the FTC Act and Section 521 of the GLB Act as alleged in the Complaint. (ECF Nos. 178, 179.) On October 30, 2023, the Court entered a permanent injunction against Defendant Braun. (ECF No. 183.) The Court held a three-day jury trial starting on January 8, 2024 on the issue of appropriate monetary relief.

The jury made the advisory finding that Defendants caused $3,500,000 of consumer harm by their over-collection and under-funding practices in violation of Section 521 of the GLB Act during the three-year period before June 10, 2020. In addition, the jury found that Defendant Braun violated Section 521 of the GLB Act with sufficient knowledge to impose civil penalties

1

for his GLB Act violations, and made the advisory finding that a civil penalty of $7,500,000 be imposed on Defendant Braun for those violations. (ECF No. 206.)

## I. Section 19 Redress Judgment

Section 19(b) of the FTC Act authorizes the Court to grant monetary relief "necessary to redress injury to consumers" resulting from Defendant Braun and his co-Defendants' GLB Act violations. 15 U.S.C. §57b(b). This amount—which is to be returned to consumers harmed by Defendants' law violations—should thus reasonably approximate the harm actually incurred. The evidence at trial established both that a random sample is an appropriate method for estimating the harm to consumers caused by Defendants' underfunding and overcollections,[1] and that the $3.5 million figure determined by the jury (ECF No. 206) falls squarely within a reasonable estimate of that harm.

Dr. McAlvanah's analysis of the likely harm to consumers identified a range of reasonably estimated instances of GLB Act violations. (FTC Trial Ex. 4; FTC Trial Ex. 8.) Multiplying the mean amount overcollected ($9,397 per deal (Trial Tr. at 64:2-7)) by the most likely number of deals overcollected (247, or 26.9% of 918 deals (Trial Tr. at 64:19-23) yields $2,321,059 in harm caused by Defendants' overcollections. Multiplying the mean amount underfunded ($3,022 per deal (Trial Tr. at 97:18-22)) by the most likely number of deals underfunded (364, or 47.4% of 768 deals (Trial Tr. at 98:15-23)) yields $1,100,008 in harm

---

[1] As FTC investigator Elizabeth Kwok testified, identifying the contracted amounts and actual amounts funded and collected for each merchant "was a very laborious process" requiring manual searches of scanned contracts that "were not labeled or organized" and not necessarily included in Defendants' document productions, and comparing that information to data received from Defendants' payment processing company. (Trial Tr. 172:18–23; 173:8–14.) Dr. Patrick McAlvanah testified that a random sample "is an incredibly powerful tool" in such circumstances where data is not already in an electronic format and requires "manual review of files," and are frequently used in fields involving data analysis. (Trial Tr. 39:16–40:4; 41:7–8.)

caused by Defendants underfunding, and a total consumer harm of $3,421,067. But as Dr. McAlvanah explained, his analysis found that higher rates of overcollections and underfunding—up to 41.0% for overcollections and up to 71.1% for underfunding—would also be statistically reasonable. (Trial Tr. at 66:16-23, 99:16-22.) Using these figures results in total consumer harm of as much as $5,183,284.

Assessing the monetary harm to consumers as $3.5 million or as much as $5,183,284 is reasonably supported by the evidence at trial. First, as Dr. McAlvanah's testified, Defendants underfunded merchant cash advances more frequently as time passed. (Trial Tr. at 96:2-5; FTC Trial Ex. 9.)

Second, Defendant Braun engaged in additional acts of overcollection not captured by Dr. McAlvanah's comparison of the Total Purchased Amount (the contracted-for amount to be repaid to Defendants) to the actual payments collected as shown in Defendants' payment processor's data. Merchants sometimes transferred the outstanding balance on one merchant cash advance to another, and Defendant Braun admitted to inflating the amount of the balance that was transferred. (*See* ECF No. 109-10 Att. E at 31 (Admissions 34 and 37)). Indeed, Defendant Braun joked about inflating those balances. (FTC Trial Ex. 51 at 1 ("Who is allowed to decide how much a merchant owes other then me. I added 5K to there balance."); FTC Trial Ex. 56 at 1 ("ILL GET YOU PAY OFF LETTER, AND ADD SOME EXTRA TO IT CAUSE HES ANNOYING AS HELL"); FTC Trial Ex. 62 at 1 ("so I went to contract for 10k-held back . . . 2k refi which he doesn't even owe . . . FREE RIDE LOLO-try and make extra money with no risk lol").)

Defendant Braun presented no evidence or argument suggesting that these amounts (both the $3.5 million in harm found by the jury or the $5.1 million in harm that Dr. McAlvanah

3

testified is statistically reasonable) are not reasonable and should not be returned to harmed small business consumers. Accordingly, it is appropriate for the Court to enter a monetary judgment anywhere between $3.5 million (what the jury awarded) and $5,183,284 (the upper end of consumer injury that Dr. McAlvanah testified was statistically reasonable).

## II.  Taking into Account all Five Statutory Factors Warrants a Significantly Higher Civil Penalty Judgment

After finding that Defendant Braun had the requisite knowledge, the jury assessed civil penalties of $7,500,000. (ECF No. 206.) Although the jury's award is fully supported by the evidence presented to it at trial, as the Court recognized post-trial (Trial Tr. at 325:20-22), the jury was only instructed to consider two of the five statutory factors set forth in Section 5(m)(1)(C) used to determine the appropriate amount of civil penalty. (*See* ECF No. 205 at 14-15 (Jury Instr. 10).) When taking into account evidence regarding all five factors, and recent changes to the appropriate civil penalty amount, a significantly higher civil penalty is warranted.

### A.  The Civil Penalty Maximum Has Increased Since the Jury Rendered its Verdict, Warranting a Higher Civil Penalty

As anticipated, the civil penalty maximum of $50,120 referenced in the jury's instructions (ECF No. 205) increased effective January 10, 2024 to $51,744. 89 Fed. Reg. 1445, 1446 (Jan. 10, 2024). This represents a 3.241% increase in the amount of civil penalties per violation compared to the amount considered by the jury. Accordingly, at a minimum, the FTC requests that the Court increase the jury's award by 3.241% to $7,743,075.

### B.  Consideration of All Five Statutory Factors Warrants a Higher Civil Penalty

Section 5(m)(1)(C) of the FTC Act, 15 U.S.C. § 45(m)(1)(C), states that, in determining the appropriate amount of civil penalty, "the court shall take into account" five enumerated factors. In returning a civil penalty award of $7.5 million, the jury only considered two of those

4

five factors. The FTC therefore asks that the Court consider the additional three—Defendant Braun's prior conduct, his ability to pay, and the lack of effect that civil penalties would have on his ability to continue to do business in the merchant cash advance field—each of which weighs in favor of the maximum amount per violation, to increase significantly the amount of civil penalties assessed against him.

### 1. Defendant Braun Has the Ability to Pay a Significant Civil Penalty

The evidence shows that Defendant Braun is able to pay a significant civil penalty. First, as Defendant Braun previously testified, he earned money from his work at Richmond Capital: "[N]obody is working for free. This is not let's like do the world a big favor and work and for free voluntary work." (FTC Trial Ex. 75 at 12:13-15.) In addition, Mr. Reich testified that he was aware that Defendant Braun placed money with others rather than keeping it in his own name. (Trial Tr. at 223:17-19.) His testimony corroborates Mr. Giardina's invocation of the Fifth Amendment to the questions "isn't it true that Defendant Braun received tens of millions of dollars from Richmond Capital's merchant cash advance business" and "isn't it true that Defendant Braun had his money held through companies in the names of relatives or friends." (Trial Tr. at 201:3-9.) Meanwhile, the evidence also shows that Richmond Capital[2] transferred more than approximately $44 million to an entity closely associated with Defendant Braun. (*See* ECF No. 129-1 at 4 ¶¶ 7-11; Trial Tr. at 146:25-147:1, 148:2-3, 151:12-20.) Indeed, as the Court is aware (Trial Tr. at 326:1-7), Defendant Braun has a history of secreting fraudulent proceeds, having been convicted of money laundering, specifically 18 U.S.C. § 1956(a)(1)(B)(i) which

---

[2] As Mr. Giardina testified before he began asserting the Fifth Amendment, RCG Advances was also known as Richmond Capital. (Trans. at 189:20-22.)

related to concealing or disguising the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. (ECF No. 188-1 at 1.)

Defendant Braun may argue that he has no ability to pay any civil penalty, although he put on no evidence of that fact.[3] But it strains credulity to believe that the person who the undisputed evidence showed "had the authority to control almost every aspect of what the defendants did" (ECF No. 179 at 32), the person who stated "nobody is working for free" (FTC Trial Ex. 75 at 12:13-14), the person who "was there five days a week and from day one . . . probably the only one there five days a week from day one ground zero" (*id*. at 14:20-25), received nothing for his substantial efforts.

In short, the evidence clearly shows that it is more likely than not that Defendant Braun has access to significant assets. Thus, the third statutory factor, ability to pay, warrants that a significantly larger civil penalty should be assessed against him.

### 2. Defendant Braun's Lengthy History in the Merchant Cash Advance Industry Warrants a Higher Civil Penalty

The present action against Defendant Braun is not his first trip to the rodeo. He has a long history in the merchant cash advance industry, working with multiple companies alleged to have engaged in illegal conduct. As Defendant Braun previously testified, he worked for several merchant cash advance companies, including Pearl Capital, First Merchant Capital, and Yellowstone Capital, before Richmond Capital, going back to at least March 2013. (FTC Trial Ex. 75 at 4:13-25, 5:2-12, 6:13-15 7:2-19.) Indeed, Mr. Reich testified that he met Defendant Braun in 2014 at one of those companies, Yellowstone Capital. (Trial Tr. at 241:21-25.)

---

[3] Even if true, when courts consider a defendant's ability to pay, they "look beyond the funds and assets currently in the defendant's possession," and also consider dissipated assets. *United States v. Daniel Chapter One*, 89 F. Supp. 3d 132, 154 (D.D.C. 2015).

Yellowstone Capital settled charges filed by the FTC in August 2020 that it was engaging in the same over-collection and under-funding practices alleged in this action. *See Cash Advance Firm to Pay $9.8M to Settle FTC Complaint It Overcharged Small Businesses* (Apr. 22, 2021) *available at* https://www.ftc.gov/news-events/news/press-releases/2021/04/cash-advance-firm-pay-98m-settle-ftc-complaint-it-overcharged-small-businesses. Meanwhile, these companies were also accused in third-party actions (to which they settled out of court) of engaging in activities similar to what was charged by the FTC in this action. (*See* ECF No. 188-5 at 18 ¶ 86, 19 ¶ 89, 20 ¶ 91, 21 ¶ 94, 26 ¶¶ 108-09, 27-28 ¶¶ 113, 116, 35-36 ¶¶ 161-170; ECF No. 188-6 at 4-5 ¶¶ 21-30; ECF No. 188-7 at 2-3 ¶¶ 5-12; *compare* ECF No. 188-6 at 9, 13 *with* FTC Trial Ex. 44 at 1-2.)

In *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 978 (N.D. Ill. 2017), the Court considered evidence of prior state government actions alleging violations of an FTC rule when assessing civil penalties, even though those prior actions settled and did not result in adjudications of liability or wrongdoing. Similarly, in *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 822 (N.D. Tex. 2008), in finding that the defendant had "a long history of violating [the Credit Repair Organizations Act]" that warranted imposition of civil penalties, the Court considered evidence of a prior government lawsuit resulting in settlement. So too here, the Court can view prior actions against companies with which Defendant Braun worked or for which he brokered deals (even though they did not result in adjudications of liability or wrongdoing) as evidence of Defendant Braun's prior history of conduct.

Further, in July 2023, the New York Attorney General in a state court action that parallels the present one, sought a preliminary injunction against Defendant Braun because he continued to engage in illegal and fraudulent activities relating to merchant cash advances even after being

7

sued by the FTC and Attorney General. (*See* ECF No. 188-4 at 8-12 ¶¶ 31-40, 15-17 ¶¶ 52-61.) Judge Borrok of the New York Supreme Court found after a seven day hearing, that, the evidence presented "established a likelihood of success on the merits" and entered the requested injunction.[4] (ECF No. 188-3 at 2.)

In short, the evidence shows that Defendant Braun has a long and checkered past and present in the merchant cash advance industry. As he put it himself, "I was just a well-known person in the space." (FTC Trial Ex. 75 at 13:12-13.) Thus, the second statutory factor, history of prior conduct, also warrants that a significantly larger civil penalty should be assessed against him.

### 3. A Significant Civil Penalty Would Not Affect Defendant Braun's Ability to Continue in Business

The Court has already permanent banned Defendant Braun from work the merchant cash advance industry. (ECF No. 183.) Thus, any civil penalty amount will have no impact on his ability to continue to do business in this field, and the fourth factor, therefore warrants a significantly larger civil penalty.

### 4. All Five Factors Taken Together Warrant a Higher Civil Penalty

"[T]he best way" to ensure that the penalty is "within a constitutionally allowable range" is to "start from the harm rather than [the] wealth" of the Defendant, "then add an appropriate multiplier, after the fashion of the antitrust laws (treble damages) or admiralty (double damages), to reflect the fact that many violations are not caught and penalized." *United States v. Dish Network LLC*, 954 F.3d 970, 980 (7th Cir. 2020); *FTC v. Day Pact LLC,* 2023 U.S. Dist. LEXIS

---

[4] As with Richmond Capital, it is highly unlikely that Defendant Braun was "working for free" at these subsequent companies. Indeed the Attorney General cited testimony of one of the new entities' owners that Defendant Braun received consulting fees for his services. (ECF No. 188-4 at 12 ¶ 40.)

155174, at *73-74 (N.D. Ill. Sep. 1, 2023). Thus, courts often use the number of Section 5(m)(1)(C) factors present as the "appropriate multiplier." Here, that multiplier should be five.

Because the jury only relied on two of those factors, an appropriate civil penalty based on the jury's advisory finding, when all five are considered should be 2.5 times higher (dividing the jury's award by 2/5) than the jury's advisory award. Thus, taking into account all five factors and the 3.241% increase in the maximum civil penalty amount, the Court should enter a civil penalty of $19,357,687.[5] And while that penalty may seem high, "[s]omeone whose maximum penalty reaches the mesosphere only because the number of violations reaches the stratosphere can't complain about the consequences of its own extensive misconduct." *Dish Network*, 954 F.3d at 980.

### III. The FTC's Injunctive Relief Relating to the Monetary Judgments is Appropriate

As the FTC stated in the proposed Pretrial Consent Order (ECF No. 199), it also seeks additional injunctive relief relating to the monetary awards. Specifically, the FTC seeks injunctive relief relating to the collectability and use of any monies recovered by the FTC. For example, the proposed injunctive relief makes clear that the Section 19 redress judgment will be used for consumer redress and any attendant expenses. The proposed injunctive also makes clear that, if the FTC determines that consumer redress is impracticable or if money remains after redress is complete, such money will be deemed in payment of civil penalty and deposited to the

---

[5] The evidence also supports the maximum possible civil penalty. As Dr. McAlvanah testified, the likely number of deals overcollected (395, or 26.4% of 1,499 deals (Trial Tr. at 53:3-5)) plus the likely number of deals underfunded (518, or 34.6% of 1,499 deals (Trial Tr. at 71:22-24)) equals 913 total violations of the GLB Act during the five-year period before the FTC filed its complaint. Multiplying that by the civil penalty maximum of $51,744 yields a civil penalty of $47,242,272. But as Dr. McAlvanah explained, his analysis found that higher rates of overcollections and underfunding—up to 37.0% for overcollections (or 554 deals) and up to 49.1% (or 736 deals) for underfunding—would also be statistically reasonable. (Trial Tr. at 53:6-9, 72:5-7.) Using these figures results in civil penalty of as much as $66,749,760.

9

U.S. Treasury. The proposed relief also makes clear that the monetary judgments would be enforceable against any asset of Defendant Braun and would direct any financial institution or other person holding any assets of Defendant Braun to turn over such asset to the FTC or its designated agent.

These provisions are substantially similar (if not identical) to provisions contained in the stipulated final orders entered by the Court against Defendants RCG Advances, Robert Giardina, RAM Capital Funding, and Tzvi Reich. (*See* ECF No. 102 at 9 (Section VII.E); ECF No. 125 at 12 (Section VI.M).) These provisions are also substantially similar (if not identical) to provisions entered by other courts after trial, summary judgment, or default judgment. *See, e.g., FTC v. Consumer Def., LLC*, 2022 U.S. Dist. LEXIS 234261, at *13-16 (D. Nev. Dec. 30, 2022); *FTC v. Lead Express, Inc.*, 2021 U.S. Dist. LEXIS 174240, at *22-27 (D. Nev. Sep. 13, 2021); *In re Sanctuary Belize Litig.*, 2021 U.S. Dist. LEXIS 7383, at*20-23 (D. Md. Jan. 12, 2021); *FTC v. Elegant Sols., Inc.*, 2020 U.S. Dist. LEXIS 154140, at *19-23 (C.D. Cal. Jul. 17, 2020); *FTC v. OMICS Grp.*, 374 F. Supp. 3d 994, 1021-22 (D. Nev. 2019); *FTC v. Roca Labs, Inc.*, 2019 U.S. Dist. LEXIS 46420, at *26-28 (M.D. Fla. Jan. 4, 2019); *FTC v. Instant Response Sys., LLC*, 2015 U.S. Dist. LEXIS 49060, at *36-39 (E.D.N.Y. Apr. 14, 2015); *FTC v. Pecon Software Ltd.*, 2014 U.S. Dist. LEXIS 108950, at *13-16 (S.D.N.Y. Jul. 10, 2014).

**IV.   Conclusion**

In sum, the evidence presented at trial fully supports the Court using the jury's verdict of $3.5 million for the Section 19 redress judgment and $7.5 million for the civil penalty judgment. The evidence, however, also supports the Court entering a Section 19 redress judgment of $5,183,284 and a civil penalty judgment of $19,357,687, $47,242,272, or even $66,749,760. Accordingly, the FTC respectfully requests that the Court enter the attached proposed order.

Dated: January 17, 2024

Respectfully Submitted,

*/s/Gregory A. Ashe*
Gregory A. Ashe
Julia E. Heald
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, D.C. 20580
gashe@ftc.gov
jheald@ftc.gov
(202) 326-3719 (Ashe)
(202) 326-3589 (Heald)

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Gregory A. Ashe, hereby certify that on January 17, 2024, I electronically filed **FTC'S POST-TRIAL BRIEF** with the Clerk of the Court using its CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/Gregory A. Ashe*
GREGORY A. ASHE