O19MFED1-CORRECTED

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   FEDERAL TRADE COMMISSION,

 4              Plaintiff,

 5         v.                            20 CV 4432(JSR)

 6                                       Trial
     JONATHAN BRAUN, et al,
 7
                Defendants.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         January 9, 2024
10                                       10:15 a.m.

11   Before:

12                   HON. JED S. RAKOFF,

13                                       District Judge
                                         -and a Jury-
14                       APPEARANCES

15   FEDERAL TRADE COMMISSION
          Attorneys for Plaintiff
16   BY:  GREGORY ASHE
          JULIA HEALD
17
18   AIDALA BERTUNA & KAMINS PC
          Attorneys for Defendants
     BY:  MICHAEL DIBENEDETTO
19
20   LAW OFFICES OF BARATTA, BARATTA & AIDALA
          Attorneys for Defendants
     BY:  JOSEPH BARATTA
21
22   Also Present:

23   Molly Smith, FTC Paralegal
     Ken Kotarski, FTC Trial Tech
24   Emma Barbacci, Defense Paralegal

25
```

O19MFED1—CORRECTED

```
1                    (Trial resumed; jury not present)
2              THE COURT:  I'm sorry.  The other matter I had took
3     longer than I thought.
4                    (Jury present).
5              THE COURT:  Good morning, ladies and gentlemen.  Thank
6     you so much for your promptness.
7              I have left with each of you now a copy of what I read
8     to you yesterday.  These were the facts that were found at the
9     earlier phase of this case, which you may find helpful in
10    assessing the three questions you are going to answer.  These
11    are the findings that established that the defendant was liable
12    for both overcollecting and for underpayment.
13             But you may recall, that establishes liability but it
14    doesn't establish how much.  That's your job.  Just to repeat,
15    although I know you know this by now, there are basically three
16    things you need to consider.
17             First is how much is owed to the persons, the
18    borrowers who were victimized; secondly, whether or not
19    Mr. Braun acted intentionally and purposely and with a
20    knowledge that he was violating the law when he made or helped
21    others to make these misrepresentations; and, third, if, and
22    only if, you find that he did act with that intent, then what
23    kind of monetary penalty should be imposed on top of the
24    amounts that are owed to the borrowers.
25             Those are the three questions on what I have just
```

1   given to you, which you can take back with you into the jury

2   room.  I think will be helpful in getting the overall context.

3           Let's continue.

4   ELIZABETH KWOK, resumed.

5   DIRECT EXAMINATION

6   BY MS. HEALD:

7   Q.  Good morning, Ms. Kwok.

8   A.  Good morning.

9   Q.  I'd like to start by showing you what's been marked for

10  identification as FTCX-59.

11          Could you please take a look and let me know if you

12  recognize this document?

13  A.  I do.

14  Q.  What is this?

15  A.  This is an email exchange between John Braun and Marcella

16  Rabinovich.  It is an email from October 18, 2017.  We received

17  this in the course of our investigation from Richmond Capital.

18          MS. HEALD:  Your Honor, I would like to offer FTC 59

19  into evidence.

20          THE COURT:  Any objection?

21          MR. DiBENEDETTO:  No objection.

22          THE COURT:  Received.

23          (Plaintiff's Exhibit 59 received in evidence)

24  Q.  Ms. Kwok, could you please begin by reading the subject

25  line for this email.

O19MFED1                          Kwok - Direct

1   A.  Yes.  The subject line is:  Re:  Ever heard of this,

2   question mark.

3   Q.  Next could you please read the second email from the top.

4   There is a time stamp of October 18, 2017 at 4:09 p.m. from

5   John Braun.

6   A.  From 4:09 is from Marcella.

7   Q.  Excuse me.  We will do the time stamp 4:56.

8   A.  Yes.  At 4:56, John Braun wrote:  So you think we should

9   enroll and get the software and utilize it while underwriting?

10  Q.  Next, can you please read the email above that, the top

11  email in the chain.

12  A.  Yes.  4:58, Marcella Rabinovich wrote:  It could help.

13  It's like clear but may more advanced.  You should request a

14  free trial.  Well, Rob should request a free trial or to see if

15  someone would come and show us how it works.

16  Q.  Next I'd like to show you what's been marked for

17  identification FTCX-75.

18          Ms. Kwok, do you recognize this document?

19  A.  I do.

20  Q.  What is it?

21  A.  It is a transcript from a hearing with Jonathan Braun held

22  by the New York Attorney General's office.

23  Q.  Have you seen this document before?

24  A.  I have.  We received this in the course of our

25  investigation.

1          MS. HEALD:  Your Honor, I would like to offer FTC

2     Exhibit 75 into evidence.

3          MR. DiBENEDETTO:  No objection.

4          THE COURT:  Received.

5          (Plaintiff's Exhibit 75 received in evidence)

6     Q.  Ms. Kwok, if you could please look at the page marked

7     FTC-75-6.  I would ask you to read the lines 13 to 15.

8     A.  Starts with:  Q.  Did you work at any time with Yellowstone

9     Capital?  A.  As a broker, but not at the company.

10    Q.  Ms. Kwok, are you familiar with Yellowstone Capital?

11    A.  I am.

12    Q.  Can you please describe your familiarity with it.

13    A.  Yes.  I was an investigator on a matter at the FTC against

14    Yellowstone Capital where we investigated claims --

15         MR. DiBENEDETTO:  Your Honor, I am going to object to

16    this line of questioning.

17         THE COURT:  Sustained.

18    Q.  Turning to the next page -- it's not the next page.

19    Turning to the page marked FTCX-75-10, could you please read

20    lines 4 to 11.

21    A.  Q.  Were you advising Giardina and Gregg what the terms --

22    what the amounts should be?  A.  Again, Giardina does the bank.

23    I do underwriting and deal with the broker, which is who I

24    dealt with on this file, and Gregg does the input of the

25    payments.  So as far as talking about terms, it's not about the

1    terms; it's about the actual deal, you know, specifics.

2    Q.  Next could you please turn to the page 75-12.  Here could

3    you please read the lines 8 through 16.

4    A.  Q.  But the costs, including the underwriting cost to

5    Stacie Motyl, that was covered by the ACH fee?  A.  Again, each

6    deal has a million -- look.  As you can see through emails, has

7    multiple people working it, right?  So nobody is working for

8    free.  This is not let's like do the world a big favor and work

9    and for free voluntary work.  You're working for a job, so the

10   expense is offset by whatever.

11   Q.  Next on the page 75-14, could you please read starting at

12   line 11 and through the end of the page.

13   A.  Q.  Let me ask you a sort of general -- a few more specific

14   questions but one general question I do want to ask.  If

15   Giardina or Reich or Gregg or anyone at Richmond, RAM or

16   Viceroy were to say, I didn't know what was going on at the

17   company, John Braun handled everything and is responsible for

18   any problems that we had, would be your answer to that?  A.

19   That I was heavily involved in just about every deal that

20   funded, and I was there five days a week and from day one.

21   Michelle was not.  Rob was an owner.  He was not.  As I said,

22   he was there three days a week.  I was probably the only one

23   there five days a week from day one ground zero until the

24   unfortunate turn of events.

25   Q.  Ms. Kwok, I would now like to show you what's been marked

1    for identification as FTCX-44.

2              Ms. Kwok, do you recognize this document?

3    A.  I do.

4    Q.  What is this?

5    A.  These are merchant agreements that we received in the

6    course of our investigation from Richmond Capital Group, and

7    they are the contracts between Richmond Capital Group and

8    particular merchants.

9              MS. HEALD:  Your Honor, I would like to offer FTC

10   Exhibit 44 into evidence.

11             MR. DiBENEDETTO:  No objection.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 44 received in evidence)

14   Q.  Ms. Kwok, how did you use the documents that are shown in

15   FTC Exhibit 44?

16   A.  So these --

17             MR. DiBENEDETTO:  Objection.  Leading.

18             THE COURT:  No.  I think that's not leading.

19   Overruled.

20   A.  These are the contracts between Richmond Capital Group and

21   merchants that were identified in the random sampling that Dr.

22   McAlvanah conducted, and we reviewed each of these contracts

23   and pulled out particular pieces of information into

24   spreadsheets for Dr. McAlvanah.  I created two different

25   spreadsheets for his analysis.  The first pulled out three

O19MFED1                            Kwok - Direct

1    pieces of information.  The first is the total purchase price,

2    which is the amount of money that the merchant was told that

3    they were receiving from Richmond Capital Group.  The second is

4    the total purchased amount, which is the total amount that

5    Richmond Capital Group was to be paid back.  And the third is

6    the daily amount, which is the amount that Richmond Capital

7    Group would withdraw from the merchant's bank account on a

8    daily basis.

9         And then the second spreadsheet that we created pulled

10   out three additional pieces of information.  The first is the

11   total purchase price, which is the amount that the merchant was

12   to receive, the second is the origination fee, and the third is

13   the ACH fee.

14   Q.  Did the case team look at documents from any other sources

15   as part of its work on the random sample?

16   A.  We did.  We looked at bank account records for -- from

17   Empire State Bank for Richmond Capital Group in order to see

18   the amount of money that was transferred to merchants, and then

19   we also looked at the payment processing records from Actum

20   Processing group for Richmond Capital accounts to determine the

21   amount of money that was transferred to Richmond Capital Group

22   from merchants.

23   Q.  After you identified that information, what did you do with

24   it?

25   A.  We provided that information to Dr. McAlvanah.

O19MFED1                         Kwok - Direct

1          THE COURT:  So if I understand it, you were the person

2     who was responsible for getting the underlying data that he

3     then used for his report?

4          THE WITNESS:  That's correct.

5          THE COURT:  So with respect to each of the accounts --

6     withdrawn.

7          My understanding from his testimony, there was

8     something just a little less than 1500 accounts that were

9     ultimately reviewed?

10         THE WITNESS:  So we started with a list of accounts

11    from the payment processing company, and they provided us with

12    1500 -- a little bit less.  As you said, 1500.  But Dr.

13    McAlvanah then pulled a sample from that listing.

14         THE COURT:  That's what I wanted to explore.

15         With respect to the ones that he asked you to explore,

16    how long did it take to get the data he wanted for any single

17    account?

18         THE WITNESS:  It was a very laborious process.  It

19    requires us to manually -- so he provided us an initial list

20    of, I believe, a hundred merchants to search through the

21    records of contracts.  And these are all -- as you can see,

22    they are scans of contracts, and so you have to manually search

23    through your whole data set.  It was quite a long time ago that

24    I did this work, so I can't tell you with specificity how long

25    overall, but it probably took me a couple of weeks to find the

1    initial set or to search those first set.

2            THE COURT:  If most of the time, or at least a

3    meaningful part of the time, was simply having to search

4    through the whole set to find the ones that you wanted, why

5    didn't you simply provide him the information for the entire

6    1499, or whatever the exact figure was, as opposed to a

7    hundred?

8            THE WITNESS:  So the documents, the contract

9    documents, were not labeled or organized in any particular

10   fashion, and we actually don't necessarily have a contract for

11   every single account identified by the payment processing

12   company because these are coming from different sources.  We

13   got the contracts through Richmond Capital Group, but we have

14   the data from the payment processing company.

15           And so we started with the sample because Dr.

16   McAlvanah had his own work, and I was pulling these documents

17   for him.  But it was a manual process.  So there was not a

18   one-to-one match between what was identified as a merchant and

19   what contract documents we had in our possession.

20           THE COURT:  So if I understand what you are saying,

21   you are saying that if it had been done for the entire 1499 or

22   whatever, as opposed to the sample, not only would it have

23   been -- require a great deal of time, but in some cases it

24   would have been very difficult because you would have had to

25   reach out for additional data that you didn't have yet.

O19MFED1                          Kwok - Cross

| | |
|---|---|
| 1 | THE WITNESS:  That is correct. |
| 2 | THE COURT:  Go ahead, counsel. |
| 3 | MS. HEALD:  Thank you, your Honor.  I have no further |
| 4 | questions for Ms. Kwok. |
| 5 | THE COURT:  Cross-examination. |
| 6 | CROSS-EXAMINATION |
| 7 | BY MR. DiBENEDETTO: |
| 8 | Q.  Good morning, Ms. Kwok. |
| 9 | A.  Good morning. |
| 10 | Q.  Can you remind me how long you've been an investigator with |
| 11 | the Federal Trade Commission? |
| 12 | A.  I was an investigator at the Federal Trade Commission |
| 13 | beginning in June 2013, and I permanently switched to my |
| 14 | current role as an assistant director in March of 2022. |
| 15 | Q.  And do you recall the year that you were assigned to this |
| 16 | case? |
| 17 | A.  Not with specificity. |
| 18 | Q.  Isn't it correct that you were assigned to investigate RCG |
| 19 | Advances, Mr. Giardina, Mr. Braun, RAM Capital Funding, and |
| 20 | Mr. Reich? |
| 21 | A.  Can you repeat the first part of your question. |
| 22 | Q.  Was it your job to investigate the defendants in this case? |
| 23 | A.  Yes. |
| 24 | Q.  What does an investigation encompass with the Federal Trade |
| 25 | Commission? |

1    A.  So, generally speaking, there are claims or allegations,

2    complaints of unfair or deceptive acts and practices, and I use

3    a variety of Internet search engines, databases, other

4    investigative tools to look through and analyze records, such

5    as bank data, website registration data, all those sorts of

6    things, records that we received directly from defendants or

7    third parties, and I look for indicators of fraudulent

8    activity.

9    Q.  Who speaks to the consumers?

10   A.  Typically, me.  Sometimes we have paralegals who work on

11   the matter.

12   Q.  Who obtains copies of the consumer complaints initially?

13   A.  Sorry.  Can you repeat that.

14   Q.  Sure.  Who initially obtains complaints of the consumer

15   complaints?

16   A.  We get consumer complaints from a variety of sources.  Is

17   there a specific place that you are referring to?

18   Q.  News in general.  If a consumer complains to the Federal

19   Trade Commission, where does that complaint go?

20   A.  So we have a hotline which you can either call or submit

21   online.  It's called Consumer Sentinel.  So consumers can

22   submit complaints there.  But we also get complaints through

23   other sources fed into that same database, such as places like

24   Better Business Bureau, if you were to complain to your local

25   state attorney.

O19MFED1                          Kwok - Cross

1   Q.  Did you ever speak to the consumers who filed complaints?

2   A.  I did.

3   Q.  Do you remember how many?

4   A.  I apologize.  I don't.

5   Q.  Did you ever look at the tax records for RCG Advances?

6   A.  I believe, yes.

7   Q.  Do you recall ever seeing Mr. Braun's name on the tax

8   returns for RCG?

9   A.  I can't say with certainty right now.

10  Q.  You were the investigator in this case, correct?

11  A.  Yes.

12  Q.  As it stands today, you don't recall whether or not

13  Mr. Braun's name was on the tax returns for RCG, correct?

14  A.  I don't, not right in this moment.

15  Q.  Did you review the tax return for RAM Capital Funding?

16  A.  I believe, yes.

17  Q.  Do you recall Mr. Braun's name on those tax returns?

18  A.  Not in this moment, no.

19  Q.  You previously testified that Mr. McAlvanah gave you the

20  records of the consumer cases, right, to pull the cases?

21  A.  He selected names.  He did not provide me with records.

22  Q.  Do you know if Mr. McAlvanah ever reviewed MCA agreements?

23  A.  I can't speak to Mr. McAlvanah's work.

24  Q.  Did you ever give him copies of the MCA agreements to

25  review?

O19MFED1                         Kwok - Cross

```
1    A.  He had access to them, yes.

2    Q.  He did have access to them?

3    A.  Yes.  We work in the same agency, so on the same matter, so

4    he would have access.

5    Q.  Would it be surprising to you --

6            THE COURT:  No, no, no.  No question beginning with

7    the words "would it be surprising to you" is ever allowed

8    because it's really a form of counsel testifying.

9            MR. DiBENEDETTO:  Can we pull up what was marked as

10   Plaintiff's Exhibit 38.  I'm sorry.  Can we go to 38-5.  Thank

11   you.

12   Q.  Ms. Kwok, do you remember reviewing these documents with

13   the FTC's attorney?

14   A.  Do you mean in court?

15   Q.  Yes, in court.

16   A.  Yes.

17   Q.  What is this document again?

18   A.  So this is part of the merchant agreement between -- I'm

19   sorry.  This is a payment processing agreement with Actum

20   Processing.

21   Q.  Do you know what Actum Processing is?

22   A.  It's a payment processing company.

23           MR. DiBENEDETTO:  If we go to 38-6, please.

24   Q.  In 38-6, do you see on the fourth box, it says contact

25   information?
```

1    A.  I see the one underneath principal/officers.

2    Q.  Yes.  Whose name is listed?

3    A.  In which field?

4    Q.  Under the contact information, the fourth box.

5    A.  I don't see a field -- I'm sorry.  The one above

6    principals, the primary contact is Robert Giardina.

7    Q.  The box underneath that, where it says principal officers

8    of the company, whose name is listed on this form?

9    A.  In which field?

10   Q.  The field below where it says principals/officers of the

11   company.

12   A.  It says principal name.  1.  Iron Horse Asset

13   Management/Robert Giardina.  2.  Principal name, RVCNY/Richard

14   Giardina.

15   Q.  I don't believe it says Richard Giardina.

16   A.  I apologize.  Cardinale.  It's not large on here.  I

17   apologize.

18   Q.  Who is the authorized signature at the bottom of this page?

19   A.  It says Rich Cardinale and Robert Giardina.

20   Q.  Whose initials do you believe is at the bottom of this

21   page?

22   A.  It would read to me as RG.

23   Q.  Would that indicate Robert Giardina?

24   A.  I believe so.

25          MR. DiBENEDETTO:  If we can go to 38-7.

O19MFED1                        Kwok – Cross

1    Q.  If you look at the third box down where it says personal

2    guaranty, could you read the last sentence, please, in that

3    box.

4    A.  The one that begins with I/we?

5    Q.  Correct.

6    A.  I/we have read, understand, and agree to be bound by the

7    client services terms and conditions and conditions contained

8    in the client services application and agreement.

9    Q.  Who signed this document?

10   A.  It would appear to be Robert Giardina.

11   Q.  And the bottom box, where it says client authorization and

12   agreement to terms and conditions, who is the signer on this

13   page?

14   A.  It says:  Client, Richmond Capital Group and name of

15   authorized signer, Robert Giardina.

16   Q.  Whose initials are at the bottom of this page?

17   A.  Sorry.  The box -- you're saying at the -- it would look to

18   be RG.

19          MR. DiBENEDETTO:  If we could go to 38-8, please.

20   Q.  Whose initials are at the bottom of this page?

21   A.  It would appear to be RG.

22          MR. DiBENEDETTO:  If we could go to 38-9.

23   Q.  Whose initials are at the bottom of this page?

24   A.  It would appear to be RG.

25          MR. DiBENEDETTO:  If we go to 38-10.

O19MFED1                        Kwok - Cross

1    Q.  Do you recall reading into the record section 5.3

2    yesterday?

3    A.  Yes.

4    Q.  Whose initials are at the bottom of this page?

5    A.  It would appear to be RG.

6    Q.  If we go to 38-11, whose initials are at the bottom of this

7    page?

8    A.  It would appear to be RG.

9    Q.  If we go to 38-12, whose initials are at the bottom?

10   A.  It would appear to be RG.

11   Q.  If we go to 38-13, whose initials are at the bottom?

12   A.  It would appear to be RG.

13   Q.  Would it be fair to say that Mr. Braun's name is not on any

14   of the Actum applications?

15   A.  None that we have reviewed.

16          MR. DiBENEDETTO:  If we could please go to Plaintiff's

17   39-6.

18   Q.  Do you recall what this document is, Ms. Kwok?

19   A.  Sorry.  Did you say 39-6?

20   Q.  Yes.

21   A.  Sorry.  I had a different one on my screen.

22          It's on my screen now.

23   Q.  Do you recall what this document is?

24   A.  Yes.  It is an application page with Thompson Reuters.

25   Q.  Who is the email address for the subscriber information?

1    A.  Robert@RichmondCapitalGroup.com.

2    Q.  Is it fair to say that it is Mr. Giardina?

3    A.  Yes.

4            MR. DiBENEDETTO:  If we go to 39-7.

5    Q.  Can you please read who the company/principal is.

6    A.  Name:  Robert Giardina.

7    Q.  And the title says managing member, correct?

8    A.  Correct.

9            MR. DiBENEDETTO:  If we go to 39-9, please.

10   Q.  See on the bottom where it says authorized representative

11   for certification?

12   A.  I do.

13   Q.  Can you please read the name and who signed it.

14   A.  Robert Giardina.

15           MR. DiBENEDETTO:  If we go to 39-10.

16   Q.  Whose email address is listed at the top of this page?

17   A.  Robert@RichardCapitalGroup.com.

18           MR. DiBENEDETTO:  If we go to 39-11.

19   Q.  Who does it say that the company principal is?

20   A.  Robert Giardina.

21           MR. DiBENEDETTO:  If we go to 39-12.

22   Q.  Isn't it correct that Mr. Giardina is the authorized

23   representative?

24   A.  His name is in the printed name field, correct.

25   Q.  So is it fair to say that in Plaintiff's 39 nowhere is

1   Mr. Braun's name mentioned and/or did he sign anything?

2   A.  Not on any of the pages we reviewed.

3   Q.  Thank you.

4           Where did you maintain the records that you had made

5   or received during your investigation?

6   A.  So anything that was in paper format was in a locked

7   cabinet in my office, and anything that was electronic is in a

8   shared network folder on our servers that has limited

9   permissions to members of the team and other select people at

10  the agency.

11  Q.  Who else had access to these records at the agency?

12  A.  It would be anybody that was working directly on the case,

13  certain members of our office management, and folks like Dr.

14  McAlvanah.

15  Q.  Did you ever discuss your investigation with the New York

16  Attorney General's office?

17  A.  I personally did not.

18  Q.  Do you know if anybody in your office did?

19  A.  I couldn't say for certain.

20  Q.  As you investigated, you reviewed the bank records in this

21  case, correct?

22  A.  Correct.

23  Q.  Do you recall who was the owner of the bank account in this

24  case?

25  A.  There were many.  I can't say right in this moment who

O19MFED1                        Kwok - Cross

1    every particular owner was, no.

2    Q.  Do you recall seeing Mr. Braun's name on the bank

3    statements?

4    A.  Not right in this moment.

5    Q.  You investigated this case, correct?

6    A.  Correct.

7    Q.  As it stands today, do you recall seeing Mr. Braun's name

8    on any of the bank statements for RCG, RAM Capital, or Viceroy?

9    A.  I worked on this case many years ago at the level where I

10   was looking at bank records every day.  So just in this moment

11   I could not attest whose name is on what records without

12   looking at it.

13   Q.  You're testifying today, correct?

14   A.  Correct.

15   Q.  Did you review any documents in preparation for your

16   testimony?

17   A.  A limited number of them.

18   Q.  What did you review?

19   A.  The things that we have testified to.

20   Q.  You testified to bank records.  Did you review those?

21   A.  I reviewed limited forms of them.

22   Q.  So in the limited records that you reviewed, was

23   Mr. Braun's name on any of those statements?

24   A.  Not any of the ones that we have testified to.

25   Q.  You also reviewed the merchant cash advance agreements in

O19MFED1                          Kwok - Cross

1    this case, correct?

2    A.  Correct.

3    Q.  Do you recall who of the defendants signed those

4    agreements?

5    A.  Not in this moment right now.

6    Q.  To the best of your recollection, do you ever recall

7    Mr. Braun signing any of these agreements?

8    A.  Not right in this moment, no.

9    Q.  Are you aware that Mr. Reich and Mr. Giardina settled this

10   matter?

11   A.  I believe I am, yes.

12   Q.  There is the allegation of overcollecting and underfunding,

13   correct?

14   A.  Correct.

15   Q.  To the best of your knowledge, do you know what specific

16   individual was in charge of debiting the bank accounts of the

17   consumers?

18   A.  No.

19   Q.  Do you know who would know that information?

20   A.  So can you clarify what you mean by the actual person who

21   does the debiting?

22   Q.  Sure.  Whether it's RAM Capital, Viceroy, or RCG, there is

23   employees of the company, there is Mr. Giardina, there is

24   Mr. Reich, and there is Mr. Braun, correct?

25   A.  Correct.

O19MFED1                          Kwok - Cross

1   Q.  During your investigation, did it become apparent what

2   specific individual at the company would specifically debit the

3   account of the consumers?

4   A.  Well, the debiting is set up at an automatic level.

5   Q.  Do you know who would set up that automatic debiting?

6   A.  Not in every single case, no.

7   Q.  In the cases that you are aware of, do you know who it was?

8   A.  Again, I didn't review that portion of my records, so I

9   can't say.

10  Q.  But you're the investigator in this case, right?

11  A.  Correct.

12  Q.  And there were complaints of overcollecting and

13  underfunding, correct?

14  A.  Correct.

15  Q.  Wouldn't it be your job as the investigator to find out the

16  source of how that's happening?

17  A.  I found evidence that it was happening.

18  Q.  How did you find that, though?

19  A.  We reviewed complaints from consumers, we reviewed bank

20  data, we reviewed payment processing records.

21  Q.  So you reviewed the complaints of the consumers and then

22  what?

23  A.  Can you clarify?

24  Q.  Sure.  Did you specifically interview or meet with these

25  consumers?

O19MFED1                           Kwok - Cross

1    A.  Some of them.

2    Q.  Did you ever ask them who at any of these corporate

3    defendants they spoke with about giving their debit information

4    to?

5    A.  Most of them sign a form and turn it over, and they have no

6    idea who is doing what with their information.

7    Q.  But, as you sit here today, you are not aware of Mr. Braun

8    directly inputting any consumer bank account information,

9    correct?

10   A.  Not in this moment, no.

11   Q.  As you sit here today, Ms. Kwok, are you aware of anything

12   that Mr. Braun did in this case specific as to him?

13   A.  I am not sure I understand that question.

14   Q.  We are here today for alleged damages that Mr. Braun did to

15   consumers, correct?

16   A.  As I understand it, they are here to answer specific

17   questions about the amount of damages.

18   Q.  What specifically as an investigator do you believe

19   Mr. Braun did in this case?

20   A.  I think that would be a rather long answer.  Can you

21   clarify?

22   Q.  That's fine.  Please answer the question.

23          THE COURT:  Although there has been no objection by

24   plaintiff's counsel, who apparently believes in the

25   potted-plant approach to being a lawyer, the jury has already

O19MFED1                        Kwok - Cross

1   been furnished with the Court's undisputed facts to which

2   Mr. Braun did not object, saying what makes him liable for the

3   misrepresentations.

4          Now, if what you are asking is what relates to his

5   intent or lack of intent, that would be a permissible question,

6   but I think you would need to more narrow it.

7   Q.  Are you aware of any intentional acts of Mr. Braun that

8   harmed consumers?

9   A.  Yes.

10  Q.  What are those?

11  A.  Well, yesterday we reviewed several of the emails which

12  related to his purposeful actions for, as you termed it,

13  overcollecting and underfunding.

14  Q.  Those were just emails, correct?

15  A.  They were emails from Mr. Braun.

16  Q.  Correct.  But did -- strike that.

17         Those alleged agreements were never shown to you

18  yesterday, correct?

19  A.  Which agreements?

20  Q.  Relating to those emails with Stone Capital Funding, those

21  alleged agreements were never shown to you, correct?

22  A.  Not in court.

23  Q.  Is it fair to say at this time there is no evidence that

24  those overcollecting practices actually took place?

25  A.  His emails were quite plain that that is the action he

O19MFED1                          Kwok - Cross

1  took.  They were usually phrased as this is what I did or this

2  is what we do on a regular basis.

3  Q.  If those are the actions that Mr. Braun did, wouldn't that

4  have been alleged -- strike that.

5           As it stands today, there is nothing -- strike that.

6           The attorneys for the FTC didn't show you any

7  agreements relating to those emails, correct?

8  A.  Not in court today or yesterday.

9  Q.  So as it stands today, those were just emails with words on

10  them, correct?

11  A.  They were emails from Mr. Braun explaining what he did or

12  intended to do.

13  Q.  But there is no agreement substantiating those emails,

14  correct?

15           MS. HEALD:  Objection.  As your Honor just

16  explained --

17           THE COURT:  I think what counsel is attempting to ask

18  is, at some point did you match those emails to specific

19  agreements?

20           THE WITNESS:  In some of the instances the emails had

21  attachments, and we would have attempted to review them.

22  Again, this was many years ago, so I can't attest with

23  certainty which ones we were able to locate, but, yes, we would

24  always make an effort to get all the underlying documents as

25  part of an email conversation, yes.

O19MFED1                        Giardina - Direct

1   Q.  As it stands today in court, you were never shown any of

2   those alleged attachments in this case, correct?

3   A.  Not in court.

4               MR. DiBENEDETTO:  I have no further questions.

5               THE COURT:  Any redirect?

6               MS. HEALD:  No, your Honor.

7               THE COURT:  Thank you so much.  You may step down.

8               (Witness excused)

9               THE COURT:  Call your next witness, please.

10              MR. ASHE:  Your Honor, at this point we are calling

11  Mr. Robert Giardina to the stand.

12  ROBERT GIARDINA,

13       called as a witness by the Plaintiff,

14       having been duly sworn, testified as follows:

15  DIRECT EXAMINATION

16  BY MR. ASHE:

17  Q.  Good morning, Mr. Giardina.  You are a defendant in this

18  case?

19  A.  Yes.

20  Q.  The company RCG Advances is also known as Richmond Capital,

21  who is a defendant in this case?

22  A.  Yes.

23  Q.  And that you and the company have settled with the FTC in

24  this case?

25  A.  Yes.

1  Q.  Under the terms of that settlement, you were required to

2  cooperate with the FTC by providing truthful testimony?

3  A.  Yes.

4  Q.  And you are here because of that agreement?

5  A.  Yes.

6  Q.  Mr. Giardina, when did defendant Braun start working for

7  Richmond Capital?

8  A.  On the advice of counsel I am going to take the Fifth

9  Amendment.

10  Q.  As I understand it, you are now asserting in response to my

11  question your privilege under the Fifth Amendment of the United

12  States Constitution?

13  A.  Yes.

14  Q.  Have you had the opportunity to discuss the subject of the

15  Fifth Amendment with your counsel prior to your appearance

16  today?

17  A.  Yes.

18  Q.  And are you invoking your Fifth Amendment privilege on the

19  advice of counsel?

20  A.  Yes.

21  Q.  To invoke the Fifth Amendment you understand you need to

22  have a reasonable fear of criminal prosecution.

23         Do you understand that?

24  A.  Yes.

25  Q.  Do you have a reasonable fear?

1    A.  Yes.

2    Q.  Do you understand that by invoking the Fifth Amendment

3    privilege against self-incrimination, the Court and the jury

4    may draw, but are not required to draw, an adverse inference

5    against Mr. Braun or yourself, that had you answered the

6    questions fully and truthfully, rather than assert the

7    privilege, your answers may have intended to incriminate either

8    yourself or Mr. Braun?

9    A.  Yes.

10   Q.  In light of that understanding, do you still wish to invoke

11   the Fifth Amendment?

12   A.  Yes.

13           THE COURT:  Let me elaborate a little bit on that,

14   ladies and gentlemen.

15           When someone invokes the Fifth Amendment privilege

16   against self-incrimination, which they have a constitutional

17   right to do, while that cannot be held against them in any

18   criminal case, in a civil case the finders of fact, namely,

19   you, can, if you wish, draw an adverse inference, that the

20   reason the person is invoking the Fifth Amendment is because

21   the answers would tend to expose them to criminal liability.

22           However, while you are not required to draw that

23   adverse inference, what is being asked here, as I understand

24   the FTC's position, is that you should draw an inference not

25   just regarding this gentleman but against Mr. Braun, and you

O19MFED1                          Giardina - Direct

1    would have a basis for doing so only based on what connections

2    you found have been established or will be established in the

3    evidence of this case regarding the inner relationship of

4    Mr. Braun and this person.

5         In other words, just so we are clear, it's one thing

6    to draw an inference against the gentleman who is invoking the

7    Fifth.  You don't have to do that, but you can do that.  But in

8    order to go a further step and say the reason he is taking the

9    Fifth is not only adverse to him but is also a basis to draw an

10   adverse inference against Mr. Braun, you would have to have a

11   sufficient basis for assessing their interactions to feel that

12   that was a reasonable inference.

13        That's entirely up to you, but I just wanted to make

14   sure that you understood that it's neither here nor there in

15   terms of this case whether you would draw an adverse inference

16   against him, because he has already settled with the FTC.  He

17   is not involved in a civil matter.  But whether you go a

18   further step and draw an adverse inference against Mr. Braun is

19   up to you.

20        Go ahead.

21        MR. ASHE:  Thank you.

22   BY MR. ASHE:

23   Q.  Just to save time, and with the Court's permission, when I

24   ask you a question and you want to assert the Fifth, you need

25   only say Fifth Amendment, if that's acceptable to the Court.

1        Isn't it true that defendant Braun started working at

2   Richmond Capital at least by March 2014?

3   A.  Take the Fifth.

4   Q.  Isn't it true that you were the managing member of Richmond

5   Capital?

6   A.  Take the Fifth.

7   Q.  If you could speak up just a little bit.

8   A.  Sorry.

9   Q.  Thank you.

10       Isn't it true that even though you were the managing

11  member, you considered defendant Braun to be in charge of

12  Richmond Capital?

13  A.  Taking the Fifth.

14  Q.  And isn't it true that you took instruction in your

15  activities from defendant Braun?

16  A.  Taking the Fifth.

17  Q.  And isn't it true that it is your understanding that

18  Richmond Capital's other employees also considered defendant

19  Braun to be the top person in charge of Richmond Capital?

20  A.  Taking the Fifth.

21  Q.  Isn't it true during his entire time working at Richmond

22  Capital, defendant Braun was responsible for Richmond Capital's

23  day-to-day decisions?

24  A.  Taking the Fifth.

25  Q.  Isn't it true that defendant Braun during his entire time

1   working at Richmond Capital was responsible and oversaw the

2   underwriting of merchant cash advances?

3   A.  Taking the Fifth.

4   Q.  Isn't it true that during his entire working time at

5   Richmond Capital, defendant Braun was in charge of the funding

6   of merchant cash advances?

7   A.  Taking the Fifth.

8   Q.  Isn't it true that during his entire time working at

9   Richmond Capital, defendant Braun oversaw the collecting on

10  merchant cash advances?

11  A.  Taking the Fifth.

12  Q.  I'd like to show you what has already been introduced into

13  evidence as FTC's Exhibit 38, which are certified documents

14  from Actum Processing.

15          Isn't it true that Actum Processing was Richmond

16  Capital's payment processor?

17  A.  Taking the Fifth.

18  Q.  If you could look at 38-6 and 38-7.

19          Isn't it true that that's your signature at the bottom

20  of the client services application agreement?

21  A.  Taking the Fifth.

22          (Continued on next page)

23

24

25

1   BY MR. ASHE:

2   Q.  Isn't it true that defendant Braun provided you this

3   agreement?

4   A.  Taking the Fifth.

5   Q.  Isn't it true that defendant Braun instructed you to sign

6   this agreement?

7   A.  Taking the Fifth.

8   Q.  Isn't it true that defendant Braun instructed you how to

9   complete this agreement?

10  A.  Taking the Fifth.

11  Q.  Isn't it true that these are your initials on the bottom of

12  page 6 and 7?

13  A.  Taking the Fifth.

14  Q.  If you could please look at pages 8, 9 and 10; isn't it

15  true that these are your initials at the bottom of the pages?

16  A.  Taking the Fifth.

17  Q.  If you could look at the bottom page 38-13, isn't it true

18  that these are your initials on the bottom of the page?

19  A.  Taking the Fifth.

20  Q.  Isn't it true that maintaining Richmond Capital's merchant

21  account was critical for its continued operation?

22  A.  Taking the Fifth.

23  Q.  I'm going to show you now what has already been introduced

24  into evidence as FTC's Exhibit 39 which are certified documents

25  from Thompson Reuters.  If you could look specifically at pages

| | |
|---|---|
| 1 | 39-6 and 39-9?  Isn't it true that Richmond Capital regularly |
| 2 | used Clear reports as an integral part of the underwriting |
| 3 | process for merchant cash advances? |
| 4 | A.  Taking the Fifth. |
| 5 | Q.  If you could look at the bottom of these pages, isn't it |
| 6 | true that that's your signature at the bottom? |
| 7 | MR. DiBENEDETTO:  Objection.  Leading. |
| 8 | A.  Taking the Fifth. |
| 9 | THE COURT:  Hold on.  When there is an objection I |
| 10 | have to rule. |
| 11 | Overruled. |
| 12 | BY MR. ASHE: |
| 13 | Q.  Isn't it true that defendant Braun provided you this |
| 14 | agreement? |
| 15 | A.  Taking the Fifth. |
| 16 | Q.  Isn't it true that defendant Braun instructed you how to |
| 17 | complete this agreement? |
| 18 | A.  Taking the Fifth. |
| 19 | Q.  Isn't it true that defendant Braun directed you to sign |
| 20 | this agreement? |
| 21 | A.  Taking the Fifth. |
| 22 | Q.  If you would look at pages 39-7 and 39-8, isn't it true |
| 23 | that if you look at page 39-8 and the section Permissible Use |
| 24 | Under Gramm-Leach-Bliley Act -- I apologize, I think it should |
| 25 | have been 39-6, I may have been wrong, I'm not sure whether it |

O195fed2                    Giardina - Direct

1   is -- let's just say isn't it true that defendant Braun

2   directed you how to complete this document?

3   A.  Taking the Fifth.

4   Q.  If you look at page 39-9, isn't it true that pursuant to

5   this agreement, Richmond Capital and all persons authorized

6   under its account, agreed that they would comply with the

7   Gramm-Leach-Bliley Act?

8   A.  Taking the Fifth.

9   Q.  Isn't it true that defendant Braun was one such authorized

10  person under Richmond Capital's account?

11          MR. DiBENEDETTO:  Objection.  Leading.

12          THE COURT:  I think under these circumstances leading

13  is appropriate, however the frame of the question raises the

14  inference that the jury may or may not have seen it.

15  Overruled.

16          You took the Fifth on that?

17  A.  Yes, taking the Fifth.

18  Q.  If you could look now at page 39-10 and 39-12; is that your

19  signature at the bottom of 39-12?

20  A.  Taking the Fifth.

21  Q.  Isn't it true that defendant Braun provided you this second

22  agreement and directed you to sign?

23  A.  Taking the Fifth.

24  Q.  Isn't it true that defendant Braun instructed you how to

25  complete this agreement?

1    A.  Taking the Fifth.

2    Q.  If you look at page 39-12, isn't it is true that pursuant

3    to this agreement, Richmond Capital agreed to use information

4    provided in the Clear reports pursuant to the

5    Gramm-Leach-Bliley Act?

6    A.  Taking the Fifth.

7    Q.  Isn't it true that defendant Braun instructed you how to

8    complete the permissible use section of this agreement?

9    A.  Taking the Fifth.

10   Q.  I would like to show you what's been marked into evidence

11   as FTC's Exhibit 40.  Isn't it true that this document is an

12   e-mail that defendant Braun sent to you?

13   A.  Taking the Fifth.

14   Q.  Isn't it true that in this e-mail defendant Braun is

15   forwarding to you an e-mail he received from a company called

16   QuarterSpot?

17   A.  Taking the Fifth.

18   Q.  Isn't it true that the forwarded e-mail involves an

19   amendment to a partner agreement between Richmond Capital and

20   QuarterSpot that clarifies and updates the applicable laws and

21   regulations?

22   A.  Taking the Fifth.

23   Q.  Isn't it true in this e-mail defendant Braun is directing

24   you to sign the amendment?

25   A.  Taking the Fifth.

1    Q.  If you look at page 40-4 of this exhibit, isn't it true --

2    and then looking at the Roman numeral II, isn't it true that

3    this amendment to the partner agreement that defendant Braun

4    forwarded to you states that Richmond Capital represents and

5    warrants that it is not subject to any legal proceeding

6    involving violations of the Gramm-Leach-Bliley Act?

7    A.  Taking the Fifth.

8    Q.  Isn't it true that you are -- I am done with this

9    exhibit -- isn't it true that you are the authorized signatory

10   for Richmond Capital's bank account at Empire State Bank?

11   A.  Taking the Fifth.

12   Q.  Isn't it true that although you were the authorized

13   signatory, defendant Braun directed you when to deposit funds

14   into consumers' bank accounts?

15   A.  Taking the Fifth.

16   Q.  And isn't it true that although you were the authorized

17   signatory on Richmond Capital's bank accounts, defendant Braun

18   directed you how much to deposit into consumers' bank accounts?

19   A.  Taking the Fifth.

20   Q.  Isn't it true that defendant Braun asked you to sign these

21   documents Actum Processing, Thompson Reuters, QuarterSpot and

22   Empire State Bank because defendant Braun was not able to do so

23   himself?

24   A.  Taking the Fifth.

25   Q.  Isn't it true that defendant Braun's name does not appear

1    on these documents because, had it been so, it would have

2    triggered red flags with those entities?

3    A.  Taking the Fifth.

4    Q.  I would like to show you what's been marked into evidence

5    already as FTC's Exhibit 68.  Isn't it true that this document

6    is an e-mail from defendant Braun to yourself?

7    A.  Taking the Fifth.

8    Q.  Isn't it true that in this e-mail defendant Braun is

9    directing you to fund a deal for a company called Aerodynamics?

10   A.  Taking the Fifth.

11   Q.  I am showing you what's been already introduced into

12   evidence as FTC Exhibit 57 and I direct you to the e-mail that

13   is dated July 21, 2017 at 5:00 p.m. from Stone Funding to Jon

14   Braun at the top of the page and it says:  I want to start

15   putting money in deals.  Should I talk to Rob?

16            Isn't it true that the "Rob" being referenced in this

17   e-mail is you?

18   A.  Taking the Fifth.

19   Q.  I'm showing what's already been introduced into evidence as

20   FTC Exhibit 59, and I direct your attention to the message from

21   Marcella Rabinovich to Jon Braun that is dated October 18, 2017

22   at 4:58 where she says:  It could help.  It's like Clear, but

23   way more advanced.  You should request a free trial -- well,

24   Rob should request a free trial.

25            Isn't it true that you are the "Rob" being referenced

O195fed2                         Giardina - Direct

1    in this e-mail?

2    A.   Taking the Fifth.

3    Q.   Isn't it true that defendant Braun received tens of

4    millions of dollars from Richmond Capital's merchant cash

5    advance business?

6    A.   Taking the Fifth.

7    Q.   Isn't it true that defendant Braun had his money held

8    through companies in the names of relatives or friends?

9    A.   Taking the Fifth.

10   Q.   Isn't it true that Richmond Capital transferred tens of

11   millions of dollars to a company called Kessef Capital?

12   A.   Taking the Fifth.

13   Q.   Support it true that Kessef Capital was officially

14   controlled by a Jacob Braun and Elizer Schwartz?

15             MR. DiBENEDETTO:  Objection to the relevance of this.

16             MR. ASHE:  Your Honor, it is relevant to one of the

17   issues that we need to prove -- Mr. Braun's ability to pay --

18   and it goes to show that he does have access to substantial

19   funds which --

20             THE COURT:  I think in the context of an adverse

21   inference I think it is too tangential.  Sustained.  If you can

22   produce more evidence relating to that we can deal with that

23   when it happens.

24   BY MR. ASHE:

25   Q.   This question, which maybe I should have asked first:

1   Isn't it true that defendant Braun indicated to you that Kessef

2   Capital was one way in which he got money from Richmond

3   Capital?

4           MR. DiBENEDETTO:  Objection to the relevance of Kessef

5   Capital.

6           MR. ASHE:  Your Honor, I believe the answer to that

7   does show relevance because if he does take the Fifth it shows

8   the inference that this was a vehicle by which Mr. Braun was

9   receiving money which establishes the relevance that you were

10  asking about.

11          MR. DiBENEDETTO:  Your Honor, FTC has not established

12  proof that Mr. Braun is connected to Kessef Capital.

13          MR. ASHE:  Your Honor, we would say there are -- we

14  believe the evidence that we have put on, including with this

15  witness would be strong circumstantial evidence that Mr. Braun,

16  although not nominally on the account, still has control over

17  this money and therefore could be considered an --

18          THE COURT:  You don't seem to have gotten the point

19  that I made a minute ago which is whether or not I will allow

20  direct evidence of that is something we will take up

21  separately, but in terms of whether it is sufficiently germane

22  on the evidence presently before the jury that they can draw an

23  adverse inference relating to that from this gentleman's

24  across-the-board taking of the Fifth is, I think, involves too

25  much speculation.  Sustained.

O195fed2                    Giardina – Cross

1              MR. DiBENEDETTO:  Thank you.

2      BY MR. ASHE:

3      Q.  Isn't it true that when you were in Richmond Capital's

4      offices you worked in close proximity to defendant Braun?

5      A.  Taking the Fifth.

6      Q.  Isn't it true that when you were in Richmond Capital's

7      offices you could hear defendant Braun speaking on the phone to

8      consumers?

9      A.  Taking the Fifth.

10     Q.  Isn't it true that you heard defendant Braun threaten one

11     or more consumers with physical violence if they stopped making

12     their daily payments?

13     A.  Taking the Fifth.

14             MR. ASHE:  I don't have any more questions at this

15     time, your Honor.

16             THE COURT:  Cross-examination.

17     CROSS-EXAMINATION

18     BY MR. DiBENEDETTO:

19     Q.  Good morning, Mr. Giardina.

20     A.  Good morning.

21     Q.  Isn't it true that you settled with the FTC in this matter?

22     A.  Taking the Fifth.

23     Q.  Isn't it true that you failed to fully make the full

24     payment for settlement in this matter?

25     A.  Taking the Fifth.

O195fed2                       Giardina - Cross

1    Q.  Isn't it correct that you are under criminal investigation

2    for your involvement with RCG Advances?

3    A.  Taking the Fifth.

4    Q.  Isn't it true that Mr. Braun never intentionally

5    overcollected from merchants?

6    A.  Taking the Fifth.

7    Q.  Isn't it true that Mr. Braun never underfunded merchants?

8    A.  Taking the Fifth.

9    Q.  Isn't it true that Mr. Braun never threatened physical

10   violence for failing to make a payment?

11   A.  Taking the Fifth.

12   Q.  I want to show you what is marked as Plaintiff's Exhibit 38

13   and go to 38-6.  Mr. Giardina, isn't it true that you are the

14   signor on the bottom of this page?

15          MR. ASHE:  Your Honor, objection.  Asked and answered.

16   He has already testified that that is his signature.

17          THE COURT:  Overruled.

18   A.  Taking the Fifth.

19   Q.  Isn't it true that Mr. Braun did not force you to sign this

20   page?

21   A.  Taking the Fifth.

22   Q.  Can I show you page 38-7?  Isn't it true that you signed

23   the bottom of this page?

24   A.  Taking the Fifth.

25   Q.  Isn't it true that Mr. Braun did not force you to sign this

O195fed2                    Giardina - Cross

1   page?

2   A.  Taking the Fifth.

3   Q.  Can we go to 38-8?

4           Isn't it true that you initialed the bottom of this

5   page?

6   A.  Taking the Fifth.

7   Q.  Isn't it true that Mr. Braun did not force you to initial

8   this page?

9           MR. ASHE:  Your Honor, I would like to object to this

10  line of questioning on the grounds that when a witness takes

11  the Fifth, it is to draw an adverse inference.  Counsel here is

12  trying to draw a positive inference and the law does not allow

13  the drawing of a positive inference from the invocation of the

14  Fifth Amendment so it is not a proper line of questioning.

15          THE COURT:  No.  I think what he is trying to show,

16  which is fair game for cross-examination, is that the fact that

17  this defendant is going to be taking the Fifth across the board

18  on each and every question, may not really be an adequate basis

19  to draw any adverse inference with respect to Mr. Braun.

20  Overruled.

21  BY MR. DiBENEDETTO:

22  Q.  Mr. Giardina, isn't that your initials on the bottom of

23  this page?

24  A.  Taking the Fifth.

25  Q.  Isn't it true that Mr. Braun did not force you to initial

O195fed2                          Giardina - Cross

1   this page?

2   A.  Taking the Fifth.

3   Q.  Can we please go to 38-9?

4           Isn't it correct that that is your initials at the

5   bottom of this page?

6   A.  Taking the Fifth.

7   Q.  Isn't it correct that Mr. Braun did not force you to

8   initial this page?

9   A.  Taking the Fifth.

10  Q.  Can we go to 38-10, please?

11          Isn't it correct that that is your initials at the

12  bottom of this page?

13  A.  Taking the Fifth.

14  Q.  Isn't it correct that Mr. Braun did not force you to

15  initial this page?

16  A.  Taking the Fifth.

17  Q.  Can we go to 38-11?

18          Isn't it correct, Mr. Giardina, that is your initials

19  at the bottom of this page?

20  A.  Taking the Fifth.

21  Q.  Isn't it correct that Mr. Braun did not force you to

22  initial this page?

23  A.  Taking the Fifth.

24  Q.  38-12?

25          Mr. Giardina, isn't it correct that that is your

O195fed2                          Giardina – Cross

```
 1    initials at bottom of this page?
 2    A.  Taking the Fifth.
 3    Q.  Isn't it correct that Mr. Braun did not force you to
 4    initial this page?
 5    A.  Taking the Fifth.
 6    Q.  Next page?
 7         Isn't it correct that that is your initials at the
 8    bottom of this page?
 9    A.  Taking the Fifth.
10    Q.  Isn't it correct that Mr. Braun did not force you to
11    initial this page?
12    A.  Taking the Fifth.
13    Q.  I now want to show you what is marked as FTC 39.  If you go
14    to 39-9?  Isn't it correct, Mr. Giardina, that that is your
15    signature on the page?
16    A.  Taking the Fifth.
17    Q.  Isn't it correct that Mr. Braun did not force you to sign
18    this page?
19    A.  Taking the Fifth.
20    Q.  If we could go to 39-12?
21         Isn't it correct that that is your signature at the
22    bottom of the page?
23    A.  Taking the Fifth.
24    Q.  Isn't it correct that Mr. Braun did not force you to sign
25    this page?
```

O195fed2                          Giardina - Cross

1   A.  Taking the Fifth.

2   Q.  Isn't it correct that you were in charge of putting

3   consumers' debit information into the Actum processing system?

4   A.  Taking the Fifth.

5   Q.  Isn't it true that Mr. Braun was not responsible for

6   putting the debit consumers' information into the Actum

7   processing system?

8   A.  Taking the Fifth.

9   Q.  Isn't it correct that Mr. Braun never threatened a

10  consumer?

11  A.  Taking the Fifth.

12  Q.  Isn't it correct that Mr. Braun never signed a merchant

13  cash advance agreement?

14  A.  Taking the Fifth.

15  Q.  At any time it true that Mr. Braun's name is not on RCG's

16  tax return?

17  A.  Taking the Fifth.

18  Q.  Isn't correct that Mr. Braun's name is not on the tax

19  returns for RCG -- I'm sorry -- RAM Capital?

20  A.  Taking the Fifth.

21  Q.  Isn't it correct that Mr. Braun's name is not on any of the

22  bank accounts associated with RCG?

23  A.  Taking the Fifth.

24  Q.  Isn't it correct that Mr. Braun's name is not listed on any

25  bank accounts for RAM Capital Funding?

O195fed2                        Giardina - Redirect

1    A.  Taking the Fifth.

2    Q.  Isn't it correct that Mr. Braun did not intentionally

3    overcollect from consumers?

4    A.  Taking the Fifth.

5    Q.  Isn't it correct that you fired Mr. Braun in 2018?

6    A.  Taking the Fifth.

7            MR. DiBENEDETTO:  I have no further questions.

8            THE COURT:  Any redirect?

9            MR. ASHE:  One question, your Honor.

10   REDIRECT EXAMINATION

11   BY MR. ASHE:

12   Q.  Mr. Giardina, isn't it true that although you were not

13   forced to sign any of these documents, you did so on defendant

14   Braun's express instruction?

15   A.  Taking the Fifth.

16           MR. ASHE:  Thank you.

17           THE COURT:  Anything else?

18           MR. DiBENEDETTO:  No, your Honor.

19           THE COURT:  Stay here just a minute.

20           Ladies and gentlemen, I think we will give you your

21   mid-morning break at this time so we will take a 15-minute

22   break.

23           (Continued on next page)

24

25

1              (Jury not present)

2              THE COURT:  Please be seated.

3              So, I am unclear about one thing.  First of all, is

4    Mr. Giardina represented by counsel?

5              MR. ASHE:  He is, your Honor.

6              THE COURT:  Is the counsel here?

7              MR. IANDOLO:  Yes, your Honor.

8              THE COURT:  Do you want to identify yourself for the

9    record, please?

10             MR. IANDOLO:  Good morning.  Jeremy Iandolo, on behalf

11   of Rob Giardina.

12             THE COURT:  So, I thought that the FTC had indicated

13   in your initial questions of this witness that he had some form

14   of cooperation agreement with the FTC.

15             MR. IANDOLO:  Your Honor, may I?

16             THE COURT:  Yes.

17             MR. IANDOLO:  There was a settlement agreement that

18   was entered into in June of '21, I believe, whereby he had to

19   pay a sum certain and complete certain satisfactions of

20   judgments, which were completed.  And then he had to cooperate

21   with the FTC.  And under our conversations with counsel for the

22   FTC, we capitulated to that settlement agreement.

23             THE COURT:  Well --

24             MR. IANDOLO:  So cooperation --

25             THE COURT:  I think by the word "capitulate" you mean

```
 1    entered into it.

 2              MR. IANDOLO:  Yes.

 3              THE COURT:  Now, so does someone have -- was this a

 4    written agreement?

 5              MR. IANDOLO:  Yes, sir.

 6              THE COURT:  Does someone have a copy of it?

 7              MR. ASHE:  Your Honor, it was filed and entered on the

 8    record.

 9              THE COURT:  That may be but I want to see a copy.

10              MR. ASHE:  We are getting a copy of it, your Honor.

11              THE COURT:  Thank you.  Just hand it to my law clerk.

12              Let me ask the FTC, where in this agreement, if at

13    all, is an agreement to cooperate?

14              MR. ASHE:  The cooperation clause should be maybe

15    Section 6 or 7.  It would be right after the money judgment

16    section.

17              THE COURT:  OK.  Hold on.

18              MR. ASHE:  I don't recall chapter and verse.  I will

19    say that we did know that Mr. Giardina had ongoing criminal

20    investigation so our cooperation clause, although requiring

21    truthful and complete testimony, expressly did not waive any

22    right he may have under the Fifth Amendment.

23              THE COURT:  I am trying to find the wording but you

24    put your finger on what I am concerned about, which was whether

25    he had waived his Fifth.
```

O195fed2                    Giardina - Redirect

1            MR. ASHE:  He did not, your Honor.

2            THE COURT:  All right.

3            MR. ASHE:  That was expressly negotiated between

4       counsel.

5            THE COURT:  Well, that answers my question and I will

6       give this back to my law clerk to give back to plaintiff's

7       counsel.

8            You are excused.  Thank you very much.

9            MR. IANDOLO:  Thank you, your Honor.

10           THE COURT:  Thank you.

11           (Witness excused)

12           MR. ASHE:  It was Section 8.

13           THE COURT:  I will take a quick look at it.

14           MR. ASHE:  The last sentence.

15           THE COURT:  So, for the record, the cooperation

16      agreement, which is Section VIII of this agreement says -- I

17      will read the entire paragraph -- "It is further ordered that

18      settling defendants must fully cooperate with representatives

19      of the FTC in this case and in any investigation related to or

20      associated with the transactions or recurrences that are the

21      subject of the complaint.  Settling defendants must provide

22      truthful and complete information, evidence, and testimony.

23      Individual settling defendant must appear, and corporate

24      settling defendant must cause its officers, employees,

25      representatives, or agents to appear for interviews, discovery

O195fed2                         Giardina - Redirect

hearings, trials, and any other proceedings that a FTC

representative may reasonably request upon five days' written

notice or other reasonable notice, at such places and times as

a FTC representative may designate, without the service of the

subpoena."

         And if it ended there I would have said he waived his

Fifth, but the following sentence that appears as the final

sentence in this section:  "nothing herein shall be deemed a

waiver by individual settling defendant of any rights he may

have pursuant to the Fifth Amendment to the Constitution of the

United States."

         Now, far be it for me to inquire whether the FTC would

enter into such a worthless agreement but that agreement speaks

for itself and so he was able to take the Fifth Amendment.

         Now there is the matter that unfortunately I couldn't

deal with first thing this morning so let's deal with it now.

         MR. ASHE:  Yes, your Honor.

         As you recall, yesterday morning and yesterday

afternoon we were talking about one of our motions *in limine*

was to --

         THE COURT:  I see someone else in the courtroom.  Is

that a witness by any chance?

         UNIDENTIFIED SPEAKER:  No.

         MR. DiBENEDETTO:  He is an attorney, I think, for

Mr. Reich; and he is from our office.

1              THE COURT:  That's fine.  Go ahead.

2              MR. ASHE:  One of our motions *in limine* was to enter

3     into the record and be read to the jury certain admissions of

4     defendant Braun, requests for admissions that he failed to

5     respond to, and under the Federal Rule 36(a)(3) they are deemed

6     admitted.

7              THE COURT:  Yes.  Judge Kaplan originally so held, and

8     then he cleverly reassigned this case to me -- and eventually I

9     will forgive him -- and then I so held as well in my summary

10    judgment.

11             MR. ASHE:  As I recall you declined to reconsider that

12    decision.  So, yesterday you had mentioned that you denied that

13    motion because in reading that portion of your opinion into the

14    record, you had indicated that the majority of the admissions

15    that we had wanted to go in were incorporated in that and so

16    what I said is we reviewed that and we did identify four --

17             THE COURT:  Yes.

18             MR. ASHE:  So I have, it is specifically from our

19    second request, request to admit 43, 49, 50 and 51, and these

20    are directly relevant.

21             THE COURT:  Do you have a copy?

22             MR. ASHE:  I have a copy.  I basically cut and paste

23    and these are directly relevant admissions from Mr. Braun on

24    the issue of knowledge.  As I recall, in the summary judgment

25    you said these facts -- a jury could look at these admissions

1    and go either way.  And so we think it important that at some

2    point they be read either now or as part of your final

3    instructions.

4            THE COURT:  So, first before we get to the specifics

5    here, one of the problems I had more generally with a lot of

6    your proposed admissions was you didn't tell the jury the

7    relationship between various entities.  So, for example, the

8    first of the admissions you want me to put before the jury

9    reads:  Defendant Braun had knowledge of a client services

10   application and agreement between Richmond Capital Group, LLC

11   and Actum Processing.  Now, the jury has already heard lots of

12   references to Richmond Capital Group.  I'm not sure they've yet

13   heard anything of the relationship between Richmond Capital

14   Group and defendant Braun, so I would think that would be

15   something you would want to put in.  And then I think they have

16   no idea who Actum Processing is.  They don't know whether that

17   is a borrower or the man in the moon.

18           MR. ASHE:  There has already been testimony, your

19   Honor, from Ms. Kwok, that Actum Processing was the payment

20   processor.  There has been considerable testimony on that.  And

21   Mr. Giardina has also --

22           THE COURT:  I'm sorry.  I forgot her testimony --

23           MR. ASHE:  And Mr. Giardina also, through the adverse

24   inference, has established that he was directed by Mr. Braun to

25   sign this document.

O195fed2                    Giardina - Redirect

1           THE COURT:  No, no, no, no, no.  That's not my

2      question.  My question is what evidence -- this could go back

3      to things I may have found on summary judgment, I haven't

4      looked for that but you are invited to look for it, but what

5      affirmative evidence or findings of the Court previously

6      established the relationship of Richmond Capital Group either

7      to RCG, or assuming that is what Richmond Capital Group is,

8      which it may be, that, and Mr. Braun.  So, the undisputed

9      findings of fact that were already given to the jury taken

10     straight from my findings refers to RCG Advances, LLC, RAM

11     Capital, Robert Giardina and so forth.  I don't think -- but

12     maybe I'm wrong -- there is in evidence what the relationship

13     is between Richmond Capital Group and RCG Advances, although

14     there is an obvious inference to be drawn from the letters.

15          MR. ASHE:  I think Richmond Capital was the d/b/a of

16     RCG.

17          THE COURT:  Yes, so that's the first -- that's my

18     point.  The jury needs to know that.

19          MR. ASHE:  Well, Mr. Giardina, through the --

20          THE COURT:  No.  They need to know it -- they don't

21     have to draw any inference.  And, in fact, though I felt I had

22     to allow you to call Mr. Giardina, I have deep doubts as to the

23     probative value of the adverse inference.

24          MR. ASHE:  Your Honor, Mr. Reich, who is our next

25     witness --

1            THE COURT:  Is going to tell all of this?

2            MR. ASHE:  -- will be able to tell us that RCG

3    Advances was also known as Richmond Capital Group.

4            THE COURT:  My point is -- I guess my real point is,

5    forgive me, I think in every aspect of your presentation you

6    are going backwards.  You start -- I don't know why you didn't

7    start with Mr. Reich but you start with an expert who knows

8    absolutely nothing about the underlying facts, just the

9    calculations, then yes, we get someone who did know something

10   about it, who it would have been much better to have her first

11   and him second but, OK, that's your choice.  Then we have

12   Mr. Giardina taking the Fifth when you have sitting there

13   someone who is not going to be taking the Fifth who is going to

14   spell out what the jury needs to know and then of course will

15   be cross-examined on it.

16           So, my point is I think these findings of fact, which

17   I may well admit, should be admitted after Mr. Reich testifies.

18           MR. ASHE:  We do not disagree with that, your Honor.

19   It does not need to be read now, it can be done, as I said,

20   even as part of your final instruction when you talk about

21   admissions.

22           THE COURT:  Well, I'm not going to do that but I will

23   consider and hear from defense counsel, of course, on whether

24   to admit these four after Mr. Reich testifies.

25           MR. ASHE:  The other thing we would point out that you

O195fed2                    Giardina - Redirect

1    have already entered into the record how Mr. Braun exercised

2    considerable control over all of the defendants and so this was

3    part of that.

4            THE COURT:  I wonder -- you didn't raise any objection

5    to any of the questions put by defense counsel other than you

6    felt that the adverse inference didn't apply to what he was

7    raising, which I explained why I thought it was proper

8    cross-examination.  You never objected to questions that might

9    have been said to be improper because they contradicted the

10   undisputed findings of fact to which Mr. Braun had previously

11   acquiesced.  You didn't object to questions like:

12   *Mr. Giardina, did Mr. Braun ever intentionally do X, Y, or Z?*

13   That was a totally improper question because it calls for the

14   operation of someone else's state of mind, which this witness'

15   adverse inference or not, he couldn't testify if he wasn't

16   taking the Fifth about someone else's state of mind.  But you

17   didn't raise any of those objections so we are where we are, we

18   will take five more minutes.  And your next witness is

19   Mr. Reich?

20           MR. ASHE:  Yes.

21           THE COURT:  Very good.

22           (Recess)

23           (Continued on next page)

24

25

O195fed2                      Reich - Direct

1              (Jury present)

2              THE COURT:  Swear in the witness.

3              THE DEPUTY CLERK:  Please rise and raise your right

4    hand.

5    TZVI REICH,

6         called as a witness by the Plaintiff,

7         having been duly sworn, testified as follows:

8              THE DEPUTY CLERK:  Please be seated.  State your name

9    and spell it for the record.

10             THE WITNESS:  Tzvi Reich.  T-Z-V-I  R-E-I-C-H.

11             THE COURT:  Counsel.

12   DIRECT EXAMINATION

13   BY MS. HEALD:

14   Q.  Good morning, Mr. Reich.

15   A.  Good morning.

16   Q.  First, do you ever go by another name?

17   A.  Steve Reich.

18   Q.  Were you a defendant in this case?

19   A.  Yes.

20   Q.  Has the FTC's case against you been resolved?

21   A.  Yes.

22   Q.  Are you allowed to work in the merchant cash advance

23   industry currently?

24   A.  No.

25   Q.  Were you required to pay any money as part of the

O195fed2                          Reich - Direct

1    resolution of your case with the FTC?

2    A.   Yes.

3    Q.   How much money?

4    A.   $675,000.

5    Q.   Did your settlement with the FTC require anything of you

6    with regard to continued litigation?

7    A.   It required me to be a witness here today.

8    Q.   Are you testifying today voluntarily?

9    A.   No.

10   Q.   Are you testifying because the FTC invoked the cooperation

11   provision of the settlement agreement with you?

12   A.   Yes.

13   Q.   Mr. Reich, what was your relationship, if any, to RAM

14   Capital Funding, LLC?

15   A.   I was the owner.

16   Q.   What was RAM's connection to Richmond Capital Group?

17   A.   We would broker deals to them.

18   Q.   Was Richmond Capital Group ever called by any other names?

19   A.   Viceroy Capital and RAM Capital d/b/a.

20             THE COURT:  What was RCG Advances?

21             THE WITNESS:  I don't believe that it was affiliated,

22   as far as I know.

23             THE COURT:  I see.  Do you have any knowledge of it?

24             THE WITNESS:  I think I have seen them in bank

25   statements but I believe it was an unaffiliated company.  And

1  Richmond Capital Group was sometimes referred to as RCG but in

2  any wire or any time it did a debit it would say Richmond

3  Capital Group, clearly.

4          THE COURT:  Go ahead.

5  BY MS. HEALD:

6  Q.  What was the nature of any work that you did personally

7  with Richmond Capital?

8  A.  I would broker deals to them so I would send them different

9  deals, get offers, and then negotiate with the clients to get

10  the deals closed, get contracts signed.  Stuff like that.

11  Q.  What role did the underwriters play with respect to the

12  merchant cash advance business?

13  A.  Can you repeat?

14  Q.  What role did the underwriters play with respect to the

15  merchant cash advance business?

16  A.  They look at different things within the deal to see if it

17  fits the parameters of their underwriting guidelines, whether

18  it is having enough revenue to support payments or who they

19  defaulted on in the past and stuff like that.

20  Q.  Have you ever worked as an underwriter?

21  A.  I have worked with my company, yes.

22  Q.  And what was the time period when you operated RAM?

23  A.  From 2016 to 2019, I believe.

24  Q.  Where was the RAM office located?

25  A.  The corporate office was in Lakewood, New Jersey.

O195fed2                          Reich - Direct

1    Q.  Where was the office that you went to work in?

2    A.  Manhattan.

3    Q.  Do you remember its address?

4    A.  There were several.  I worked at 125 Maiden and 111 John

5    Street.

6    Q.  Where was Richmond Capital's office?

7    A.  The same addresses.

8    Q.  Was anyone else in the same room as RAM's office space?

9    A.  We shared space with Richmond Capital Group.

10   Q.  How many days per week were you in that office?

11   A.  Five.

12   Q.  Did Jonathan Braun work in that office space?

13   A.  Yes.

14   Q.  How many days a week was Mr. Braun typically in the office?

15   A.  Five.

16   Q.  Would you recognize Mr. Braun if you saw him?

17   A.  Yes.

18   Q.  Would you recognize his voice if you heard it?

19   A.  Yes.

20   Q.  How would you describe Mr. Braun's role at Richmond

21   Capital?

22   A.  Managerial position.

23   Q.  Who did you understand to be in charge of Richmond Capital?

24   A.  I couldn't hear you.

25   Q.  Who did you understand to be in charge of Richmond Capital?

O195fed2                        Reich - Direct

1    A.  It was Jon Braun and Robert Giardina.

2    Q.  From your perspective, who made decisions for Richmond

3    Capital?

4    A.  Jon Braun.

5    Q.  Was it your understanding that Richmond Capital employees

6    viewed Mr. Braun as the boss?

7    A.  Yes.

8    Q.  Did he instruct Richmond Capital employees about how to do

9    their jobs?

10   A.  Yes.

11   Q.  Did he make business decisions for Richmond Capital?

12   A.  Yes.

13   Q.  Do you consider Mr. Braun to be a smart business person?

14   A.  Yes.

15   Q.  In his work, did he pay attention to details?

16   A.  Yes.

17   Q.  Are you aware of Mr. Braun ever placing money with others

18   rather than keeping it in his name?

19   A.  Yes.

20   Q.  Mr. Braun, I would like to show you what's been marked for

21   identification as FTCX 73.

22   A.  Have I ever seen this?  Yes.

23   Q.  That was my next question, is have you ever seen this

24   document before?

25   A.  Yes.

1    Q.  And what is it?

2    A.  This is the lawsuit against Richmond Capital Group

3    Advances.

4    Q.  And turning to the right-hand side, does that help you

5    understand what this document is specifically?

6    A.  Yes.

7    Q.  Could you explain what it is?

8    A.  The defendant -- myself's -- objections and responses to

9    plaintiff's first set of requests for admissions.

10              MS. HEALD:  Your Honor, I would like to offer FTC

11   Exhibit 73 into evidence.

12              MR. DiBENEDETTO:  No objection.

13              THE COURT:  Received.

14              (Plaintiff's Exhibit 73 received in evidence)

15   BY MS. HEALD:

16   Q.  Thank you.

17              I would like to move on to what's been marked for

18   identification as FTCX 66.  Mr. Reich, I should say there are

19   hard copies of these documents in the binder in front of you,

20   if you prefer to look there.

21              Mr. Reich, do you recognize this document?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's an e-mail from myself to Jon Braun.

25              MS. HEALD:  Your Honor, I would like to offer FTC

O195fed2                          Reich - Direct

1    Exhibit 66 into evidence.

2                 MR. DiBENEDETTO:  No objection.

3                 THE COURT:  Received.

4                 (Plaintiff's Exhibit 66 received in evidence)

5    BY MS. HEALD:

6    Q.  Mr. Reich, do you see the subject line of this e-mail?

7    A.  Yes.

8    Q.  Could you please read it?

9    A.  Forward an e-mail of Aerodynamics.

10   Q.  What does Aerodynamics refer to in this message?

11   A.  That's the name of a business.

12   Q.  Mr. Reich, do you see the top line in your message where

13   you write:  I don't have app.  Have Jasmine find the TLO's.

14   A.  Yes.

15   Q.  When you mentioned "TLO's" in this e-mail what were you

16   referring to?

17   A.  That's the program where people's information, we can look

18   up any information about them.

19   Q.  What sort of information?

20   A.  Anything from phone numbers, home addresses, default

21   judgments, current debt that they have.  Stuff like that.

22   Q.  Could you describe what the attachments are to this e-mail?

23   A.  There are several attachments that are bank statements and

24   business and corporation docs, probably along with maybe a

25   driver's license or some other documents that would be a

1    regular submission for a deal.

2    Q.  Is a TLO report included here?

3    A.  It might be where it says the one with the word "people" in

4    it, but I'm not sure.  I would have to open it to check.

5    Q.  Why did you send this e-mail to Mr. Braun?

6    A.  I was looking for an offer as a broker.

7    Q.  And by offer, can you be more specific what sort of offer

8    you were looking for?

9    A.  I was looking for terms on a merchant cash advance deal

10   that I could relate to the client and try to make some money as

11   a broker.

12   Q.  Can you explain why you decided to send him these

13   particular documents in your efforts to get an offer on that

14   deal?

15   A.  Well, first of all, I could see it says no RCG, which means

16   Richmond Capital Group hasn't funded it before.  They obviously

17   wouldn't fund a deal for me that they funded before for someone

18   else.  I submitted deals to multiple different funders always

19   looking for offers.

20   Q.  Why did you select these documents listed in your e-mail to

21   send to Mr. Braun?

22   A.  This is what they needed for underwriting.

23   Q.  In your experience, were TLO reports useful to merchant

24   cash advance underwriters?

25   A.  Yes.

O195fed2                        Reich - Direct

1    Q.  What about TLO reports makes them useful to an underwriter?

2    A.  TLO or Clear is where they can see if they've defaulted on

3    recently and if they're paying their bills to other people,

4    which would help them understand if they're going to pay them.

5    Q.  You mentioned Clear.  Can you explain what that means?

6    A.  It is a similar program to TLO.

7    Q.  Next I would like to show you what's been marked for

8    identification as FTC Exhibit 43.  Mr. Reich, do you recognize

9    this document?

10   A.  I believe it is a TLO report.

11   Q.  Looking at the second page, are you able to determine the

12   subject of this report?

13   A.  This would be Aerodynamics Incorporated.

14   Q.  Did you obtain this document as part of your work as a

15   broker-dealer at RAM?

16   A.  It seems like I did.  I don't recall exactly.

17            MS. HEALD:  Your Honor, I would like to offer Exhibit

18   43.

19            MR. DiBENEDETTO:  I object to the relevance of this

20   document to Mr. Braun.

21            MS. HEALD:  Your Honor, this document is relevant to

22   Mr. Braun's knowledge, one of the elements we will prove,

23   related to civil penalties.  Mr. Reich has established that it

24   was a document seen by underwriters and useful to them.

25            MR. DiBENEDETTO:  Your Honor, there is no proof that

O195fed2                        Reich - Direct

1    Mr. Braun has ever seen this document.

2              MS. HEALD:  Mr. Reich just testified that he sent

3    documents relating specifically to this deal to Mr. Braun.

4              THE COURT:  I think it is marginally relevant.

5    Overruled.

6              (Plaintiff's Exhibit 43 received in evidence)

7    BY MS. HEALD:

8    Q.  I would now like to move to what's been marked for

9    identification as FTCX 67.  Mr. Reich, do you recognize this

10   document?

11   A.  Yes.

12   Q.  And what is it?

13   A.  This is a funding e-mail -- sorry.  This is an e-mail from

14   Jon Braun to myself, Robert Giardina, and Michelle Gregg.

15   Q.  Do you recall receiving this e-mail?

16   A.  Yes.

17             MS. HEALD:  I would like to offer FTC Exhibit 67 into

18   evidence.

19             MR. DiBENEDETTO:  No objection.

20             THE COURT:  Received.

21             (Plaintiff's Exhibit 67 received in evidence)

22   BY MS. HEALD:

23   Q.  Mr. Reich, does this e-mail relate to any particular

24   merchant?

25   A.  Yes.

O195fed2                          Reich - Direct

1    Q.  Who is the merchant?

2    A.  Joseph DuMouchelle.

3    Q.  Can you please read the subject line for the top e-mail in

4    the chain?

5    A.  Please fund wire signed 600K RCG Joseph DuMouchelle fine

6    and estate jewelry.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  What did you understand that subject line to mean?

2   A.  He was sending out instructions for Robert Giardina to send

3   out a wire to the merchant with all the details for accounting

4   to handle it from there.

5   Q.  Next I'd like to show what has been marked for

6   identification as FTCX-41.

7           Mr. Reich, do you recognize this document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's a TLO report.

11  Q.  Does it relate to any particular individual?

12  A.  Yes.

13  Q.  Who is that individual?

14  A.  Joseph DuMouchelle.

15          MS. HEALD:  Your Honor, I'd like to offer FTC Exhibit

16  41?

17          MR. DiBENEDETTO:  Your Honor, I am going to object to

18  the admission of this document.  It says it's page 1 of 56.  It

19  doesn't appear that the full comprehensive report is included

20  as an exhibit.

21          MS. HEALD:  Your Honor, we have limited this.  Given

22  the content of personally identifiable information, we have

23  limited this to the relevant pages.

24          THE COURT:  Does someone have the full report?

25          MS. HEALD:  We do have a copy of it, yes.

1           THE COURT:  Let me see.

2           What portion are you offering?

3           MS. HEALD:  We are going to look at just the first two

4   pages.  Would you like me to point me to --

5           THE COURT:  No.  I have the first two pages.

6           Sustained.

7   Q.  Next I'd like to show you, Mr. Reich, what has been marked

8   for identification as FTC Exhibit 46.

9           Mr. Reich, do you recognize this document?

10  A.  Yes.

11  Q.  Could you please describe what it is.

12  A.  It's an email from John Braun to myself.

13  Q.  Do you recall receiving this email?

14  A.  Yes.

15          MS. HEALD:  Your Honor, I would like to offer FTC

16  Exhibit 46 into evidence.

17          MR. DiBENEDETTO:  Your Honor, I am going to object to

18  the entrance of this exhibit, as it's outside of the three-year

19  statute of limitations.

20          THE COURT:  I still think it's relevant.  Overruled.

21  Received.

22          (Plaintiff's Exhibit 46 received in evidence)

23  Q.  Mr. Reich, do you see the message sent from

24  status@quarterspot.com and John@RichmondCapitalgroup.com on

25  October 16, 2016?

 1   A.   Yes.

 2   Q.   What is QuarterSpot?

 3   A.   QuarterSpot is a merchant advance company.

 4   Q.   Next I would like to turn to what's been marked for

 5   identification as FTCX-48.

 6            Mr. Reich, do you recognize this document?

 7   A.   Yes.

 8   Q.   What is it?

 9   A.   An email from John Braun to myself.

10   Q.   Do you recall receiving this email?

11   A.   Yes.

12            MS. HEALD:  Your Honor, I would like to offer FTC

13   Exhibit 48.

14            MR. DiBENEDETTO:  Same objection, your Honor.

15            THE COURT:  Same ruling.  Received.

16            (Plaintiff's Exhibit 48 received in evidence)

17   Q.   Mr. Reich, if you could please take a look at the page

18   marked FTCX-48-3.  If you can please read the email at the

19   bottom of the page sent by you on February 24, 2017, at 3:26

20   p.m.

21   A.   Merchant knows to the dollar we are 10K over.  Please stop

22   payment.  We will deal with refund Monday, or whatever, after I

23   talk to John.

24   Q.   Who are you referring to when you mentioned John?

25   A.   John Braun.

1    Q.  Next can you please read the email directly above that one

2    sent by John Braun at 3:28 p.m.

3    A.  We can shut off.  But this guy can talk to me directly.

4    John at RAM can be reached, 646-762-1842.

5    Q.  Now I'd like to show you what's been marked for

6    identification as FTCX-50.

7           Mr. Reich, do you recognize this document?

8    A.  Yes.

9    Q.  What is it?

10   A.  An email from myself to John Braun.

11   Q.  Do you recall sending this?

12   A.  Yes.

13          MS. HEALD:  Your Honor, I would like to offer FTC

14   Exhibit 50 into evidence.

15          MR. DiBENEDETTO:  Same objection.

16          THE COURT:  Same ruling.  Received.

17          (Plaintiff's Exhibit 50 received in evidence)

18   Q.  Please turn to the page marked FTCX-50-9, or it will appear

19   on your screen.

20          Can you please read the message you sent on April 26,

21   2017 with the time stamp of 14:49:17 towards the middle of the

22   page.

23   A.  BT TWISS 200K, question mark.

24   Q.  What is BT TWISS?

25   A.  It's the name of a merchant.

O19MFED3                        Reich - Direct

1    Q.  What did you mean by 200K?

2    A.  I was looking for an offer of 200K for funding.

3    Q.  Can you next please read the two messages directly below

4    that one from John Braun, starting with one with the time stamp

5    of 14:49:32.

6    A.  No.  Go to hell.  Let's just leave on forever and

7    overcollect.  LOL.

8    Q.  Next I'd like to show you what's been marked for

9    identification as FTCX-51.

10             Mr. Reich, do you recognize this document?

11   A.  Yes.

12   Q.  What is this?

13   A.  An email from myself to John Braun.

14   Q.  Do you recall sending this email?

15   A.  Yes.

16             MS. HEALD:  Your Honor, I would like to offer FTC

17   Exhibit 51 into evidence.

18             MR. DiBENEDETTO:  Same objection.

19             THE COURT:  Same ruling.  Received.

20             (Plaintiff's Exhibit 51 received in evidence)

21   Q.  Mr. Reich, could you please read the email in about the

22   middle of the page with the time stamp of May 2, 2017, at 7:56

23   a.m., sent by John Braun.

24   A.  Who is allowed to decide how much a merchant owes other

25   than me.  I added 5K to their balance and, if we wanted to be

O19MFED3                              Reich - Direct

1    generous, give them 2500 discount.  We are now out 5,000.

2    Q.  Next I'd like to show you what's been marked for

3    identification as FTCX-53.

4              Mr. Reich, do you recognize this document?

5    A.  Yes.

6    Q.  What is it?

7    A.  An email from John Braun to myself and Stone Funding.

8    Q.  Do you recall receiving this email?

9    A.  Yes.

10             MS. HEALD:  Your Honor, I would like to offer FTC

11   Exhibit 53 into evidence.

12             MR. DiBENEDETTO:  Same objection.

13             THE COURT:  Same ruling.  Received.

14             (Plaintiff's Exhibit 53 received in evidence)

15   Q.  Mr. Reich, can you please read the top email in the chain.

16   A.  We also overcollected 3200 on the previous 5K deal.  LOL.

17   Q.  Now I'd like to show you what has been marked for

18   identification as FTCX-54.

19             Mr. Reich, do you recognize this document?

20   A.  Yes.

21   Q.  What is it?

22   A.  An email from myself to John Braun.

23   Q.  Do you recall sending this email?

24   A.  Yes.

25             MS. HEALD:  Your Honor, I would like to offer FTC

1   Exhibit 54.

2                MR. DiBENEDETTO:  No objection.

3                THE COURT:  Received.

4                (Plaintiff's Exhibit 54 received in evidence)

5   Q.  Mr. Reich, taking a look at the page marked FTCX-54-7,

6   could you please read two messages from John Braun at the

7   bottom of the page beginning with the one with the time stamp

8   2017 0620 9:55:02.

9   A.  31K paying back 60, and I overcollected 16K.  LOL.

10  Q.  Next I am going to show you what's been marked as FTCX-55.

11               Mr. Reich, do you recognize this?

12  A.  Yes.

13  Q.  What is it?

14  A.  An email from John Braun to Marcella Rabinovich, myself and

15  Robert Giardina.

16  Q.  Do you recall receiving this email from Mr. Braun?

17  A.  Yes.

18               MS. HEALD:  Your Honor, I would like to offer Exhibit

19  55 into evidence.

20               MR. DiBENEDETTO:  Your Honor, I am going to object to

21  this email.  I believe that Ms. Rabinovich was their attorney

22  and that this is attorney-client privilege.

23               MS. HEALD:  Your Honor, we provided copies of all of

24  these documents to defense counsel weeks ago, and we heard no

25  privilege objections.  It's also not apparent that there is any

1    legal advice contained in this document.

2                THE COURT:  Let me see the document.

3                Yes.  There is no privilege involved.  In addition,

4    even if there were privilege involved, which there is not, it

5    was waived by copying other people on the email.

6                Overruled.  The document is received.

7                (Plaintiff's Exhibit 55 received in evidence)

8    Q.  Mr. Reich, could you please read aloud the forwarded email

9    in the middle of the page sent -- it says from Sabryna to

10   Marcella Rabinovich, on July 20, 2017, at 6:08:38 p.m.

11   A.  So I'm very confused.  The loan was for 25,000 and payback

12   was 37,475.  I paid 25,974 in payments, and the judgment amount

13   you took from my account was 23,414.30.  The total is

14   49,388.30.  So the difference is 11,913.30.  So I'm owed

15   11,913.30 from RAM.

16   Q.  Next please read the top message in the chain sent by John

17   Braun at 6:21:26 p.m.

18   A.  Ignore her.

19   Q.  Now I'd like to show you what's been marked for

20   identification as FTCX-56.

21               Mr. Reich, do you recognize this document?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's an email from Mindy Stone to John Braun and myself.

25   Q.  Do you recall receiving this email?

O19MFED3                          Reich - Direct

1    A.  Yes.

2              MS. HEALD:  Your Honor, I would like to offer FTC

3    Exhibit 56.

4              MR. DiBENEDETTO:  No objection.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 56 received in evidence)

7    Q.  Mr. Reich, please read the email on the first page of this

8    document sent July 21, 2017 at 3:03 p.m. from John Braun.

9    A.  You are not requesting it, right.  You forward us their

10   emails like we give a shit.  I'll get you a payoff letter and

11   add some extra too.  It causes -- he's annoying as hell.

12   Q.  Could you explain, what is a payoff letter?

13   A.  When a merchant has a balance that hasn't been paid off in

14   full through his regular payment schedule and he wants to pay

15   it off early or another company is going to pay it off, you get

16   a balance letter that states the amount that he owes as well as

17   the wire info to complete the deal.

18   Q.  What did you understand Mr. Braun to mean when he said he

19   would add some extra to it?

20   A.  That he would inflate the balance.

21             MS. HEALD:  Mr. Kotarski, could you display just the

22   opening image from FTCX-74.

23   Q.  Mr. Reich, have you viewed the video accompanying this

24   image recently?

25   A.  Yes.

1  Q.  Do you recognize what's shown in it?

2  A.  Yes.

3  Q.  What does it depict?

4  A.  Mr. Braun screaming at a merchant.

5  Q.  Is the merchant present in the video?

6  A.  No.

7  Q.  Were you present for the events depicted in the video?

8  A.  Yes.

9  Q.  Do you recognize where Mr. Braun is located in this video?

10  A.  Yes.

11  Q.  Where is it?

12  A.  111 John Street.

13         MS. HEALD:  Your Honor, I would like to offer FTCX-74

14  into evidence.

15         MR. DiBENEDETTO:  Your Honor, I object to this video

16  being entered into evidence.  This is a damages trial.  This

17  video is Mr. Braun having a conversation with a merchant.

18  There are no threats made in the video.  This is nothing more

19  than to inflame the jury and prejudice Mr. Braun.

20         MS. HEALD:  I disagree about the content of the video.

21         THE COURT:  It seems to me, from what I just heard

22  about this from the witness, that the video bears on intent.

23         Overruled.  The video is received.

24         (Plaintiff's Exhibit 74 received in evidence)

25         MS. HEALD:  Mr. Kotarski, could you please play the

 1  video.

 2              (Video played)

 3              MS. HEALD:  I have no further questions at this time.

 4              THE COURT:  Cross-examination.

 5  CROSS-EXAMINATION

 6  BY MR. DiBENEDETTO:

 7  Q.  Good afternoon, Mr. Reich.

 8  A.  Good afternoon.

 9  Q.  Why did you record that video of Mr. Braun?

10  A.  Because it was unusual for someone to be doing that

11  consistently, and I don't know.

12  Q.  Did Mr. Braun in that video threaten anybody?

13  A.  Not directly, no.

14  Q.  Who owns RAM Capital Funding?

15  A.  The DBA or the LLC?

16  Q.  The DBA.

17  A.  Richmond Capital Group.

18  Q.  Who owns the LLC?

19  A.  Me.

20              THE COURT:  When you say that he didn't threaten

21  someone.

22              THE WITNESS:  I didn't hear any physical violence.

23              THE COURT:  You heard him say he would come spit on

24  him.  Did you hear him say that?

25              THE WITNESS:  Yes.

O19MFED3                    Reich - Cross

```
 1              THE COURT:  Isn't that a threat?

 2              THE WITNESS:  Yes.

 3              THE COURT:  OK.

 4              Go ahead, counsel.

 5   BY MR. DiBENEDETTO:

 6   Q.  Do you recall who the merchant was on the other line of

 7   that call?

 8   A.  No.

 9   Q.  Are you aware of any charges pressed against Mr. Braun for

10   that call?

11   A.  No.

12   Q.  Are you aware of any charge pressed against Mr. Braun from

13   any merchants which alleged threats by Mr. Braun?

14   A.  I am not sure if there were charges pressed.  I know he had

15   one issue with a fellow in Brooklyn regarding a call.  I can't

16   recall exactly what happened with it, so I can't answer.

17   Q.  You're the owner of RAM Capital Funding, correct?

18   A.  LLC, yes.

19   Q.  About when was that formed?

20   A.  2016.

21   Q.  When did you first meet Mr. Braun?

22   A.  2014, I believe.

23   Q.  Where did you meet him?

24   A.  Either in the offices of Yellowstone Capital or somewhere

25   on Wall Street.
```

O19MFED3                          Reich - Cross

```
1    Q.  When was the first time that you and Mr. Braun started
2    working together?
3    A.  Either late 2014 or early 2015.
4    Q.  Did you see Mr. Braun every day?
5    A.  At the end of 2016 to 2019, yes.
6    Q.  What happened after 2016 that you started seeing Mr. Braun
7    every day?
8    A.  I would work in the same offices as him.
9    Q.  Can you explain to me the relationship between RCG and RAM
10   Capital Funding.
11   A.  Richmond Capital Group and RAM.  So RAM was a broker.  They
12   set up a similar name, which -- the DBA.  So we were able to
13   broker deals.  It's called white labeling, where we were able
14   to present ourself as a funder when essentially Richmond
15   Capital was funding the deals, not us.
16   Q.  At the beginning of your testimony you testified about RCG
17   not being connected to RAM Capital, is that correct?
18   A.  They asked me about a different RCG.  I am not sure if
19   that's what you are referring to.
20   Q.  RCG Advances.
21   A.  I don't know.  I'm not aware of who those are.
22   Q.  You never heard of RCG Advances?
23   A.  I believe there was another company that I believe I have
24   seen in bank statements, but I'm aware of Richmond Capital
25   Group.
```

1   Q.  To what extent are you aware of Richmond Capital Group?

2   A.  I used to do business with them.  I used to share an office

3   with them.  I knew all the principals.

4   Q.  Who were the principals?

5   A.  As far as I knew, it was Robert Giardina and John Braun.

6   Q.  Isn't it correct that RCG Advances and RAM Capital would

7   collect consumer's debit information and input it into a

8   processing system?

9   A.  Richmond Capital Group would do that.  RAM Capital Funding

10  LLC never had any ACH processing.

11  Q.  Do you recall who was in charge of putting the information

12  into the ACH processing system?

13  A.  Michelle Gregg.

14  Q.  Was there anyone else that had access to that?

15  A.  I'm unaware.  I did not have access to it.

16  Q.  Who is Michelle Gregg?

17  A.  She worked for Richmond Capital Group.

18  Q.  What was her role there?

19  A.  She would handle the ACH payments and do some collections.

20  Q.  Did you ever see bank statements for RAM Capital or

21  Richmond Capital Group?

22  A.  No.

23  Q.  Did you ever see bank statements for RAM Capital Funding?

24  A.  The DBA, no.

25  Q.  The LLC.

O19MFED3

| | |
|---|---|
| 1 | A.  Yes.  It's my company. |
| 2 | Q.  Whose name is on it? |
| 3 | A.  Mine. |
| 4 | Q.  Solely yours? |
| 5 | A.  Yes. |
| 6 | Q.  Who filed tax returns for RAM Capital LLC? |
| 7 | A.  Myself. |
| 8 | Q.  Was Mr. Braun's name on any of the tax returns? |
| 9 | A.  No. |
| 10 | MR. DiBENEDETTO:  I have no further questions. |
| 11 | THE COURT:  Any redirect? |
| 12 | MS. HEALD:  No, your Honor. |
| 13 | THE COURT:  Thank you very much.  You may step down. |
| 14 | (Witness excused) |
| 15 | THE COURT:  Anything else from the FTC? |
| 16 | MR. ASHE:  No further witnesses, your Honor. |
| 17 | THE COURT:  Anything from the defense? |
| 18 | MR. DiBENEDETTO:  Your Honor, the defense rests, but |
| 19 | we do have an application we want to make.  I don't know if |
| 20 | your Honor wants it now in front of the jury. |
| 21 | THE COURT:  No.  That probably has to be not in front |
| 22 | of the jury. |
| 23 | I think, ladies and gentlemen, as you see, we are |
| 24 | moving with lightning speed.  We are going to give you a reward |
| 25 | of an early lunch.  Why don't you take your lunch now and come |

O19MFED3

1    back at 1:30, an hour and five minutes, but who is counting.

2         (Jury not present)

3         THE COURT:  Before we get to any applications from the

4    defense, do I understand that the plaintiff is either resting

5    now or is resting but for the question of those four admissions

6    that you raised earlier?

7         MR. ASHE:  But for those admissions.

8         THE COURT:  Let's deal with that.

9         First one is defendant Braun had knowledge of the

10   signed services application agreement between Richmond Capital

11   Group LLC and Actum Processing.

12        Second is that section 4.2 of the client services

13   application agreement between Richmond Capital Group LLC and

14   Actum Processing states that, quote, client agrees to follow

15   all regulations regarding the use of the company sales of

16   services and any other applicable regulatory body.

17        I take it the client, though you don't specify it, is

18   Actum Processing, yes?

19        MR. ASHE:  The client in this case would be Richmond

20   Capital.

21        THE COURT:  Don't you think you ought to make that

22   clear?

23        MR. ASHE:  We wanted to quote from the client services

24   agreement, but we can make that clear.

25        THE COURT:  How is the jury going to understand --

O19MFED3

1    MR. ASHE:  We can say the client -- since there is

2    quotes with client, and then like bracket, Richmond Capital.

3    THE COURT:  Third one is Section 52 of the client

4    services application agreement between Richmond Capital Group

5    LLC and Actum Processing which States that, quote, client does

6    and at all times during the term of this agreement will operate

7    its business in strict compliance with all laws and regulations

8    applicable to the client's business to the highest legal and

9    ethical standards, including, among others, the Federal Trade

10   Commission Act of 1914 and the rules and regulations

11   promulgated thereunder.

12       And the fourth one is a similar thing relating to the

13   Gramm-Leach-Bliley Act.

14       I take it that the purpose of these four is to

15   circumstantially attempt to show that Mr. Braun had knowledge

16   of or had represented indirectly that he had knowledge of those

17   two acts.  Is that the point?

18   MR. ASHE:  That's correct, your Honor.

19   THE COURT:  Yes.

20   MR. DiBENEDETTO:  Your Honor, the attorneys for the

21   FTC have not established that Mr. Braun had any knowledge of

22   the applications for Actum.  There wasn't any testimony, at

23   least to my understanding, from Mr. Giardina, nor from

24   Mr. Reich, that Braun had actual knowledge about this document,

25   that he had any conversations with Mr. Giardina about signing

O19MFED3

1    and initialing these documents.

2            THE COURT:  Well, that's a good argument for the jury,

3    but I don't see -- these are admissions that he made by not

4    otherwise responding to them or challenging them at the time

5    when they were called.

6            But I think, just as I was confused, I think you need

7    to -- do we have a copy of this agreement in evidence?

8            MR. ASHE:  Yes, your Honor.  The exhibit itself, this

9    comes from Exhibit 38, and there was already extensive

10   testimony about that.

11           THE COURT:  You can quote from the provisions of the

12   document if it's already in evidence.

13           MR. ASHE:  Now that you mentioned it, your Honor, only

14   the first one is really the one that is -- you're right.  The

15   last three, you're right, are quoting what's already in

16   evidence.  If your Honor just wants to limit to the first

17   one --

18           THE COURT:  Any objection to that?

19           MR. DiBENEDETTO:  Yes, your Honor.  Again, this

20   document has no bearing on Mr. Braun.  Mr. Braun's name is not

21   on one page, whether it's typed into the document, whether it's

22   a signature or initials.  This is a trial against Mr. Braun.

23           THE COURT:  But the admission that he made early on in

24   this case was that he, quote, had knowledge of this agreement.

25   So I think the first -- tell me what the exhibit number is.

1              MR. ASHE:  It was Exhibit 38, your Honor.

2              THE COURT:  Part of the exhibit or all of it?

3              MR. ASHE:  Part.

4              THE COURT:  What part?

5              MR. ASHE:  One moment.

6              MS. HEALD:  Starting on page 38-6.

7              THE COURT:  I think what we should -- I think I should

8    simply tell the jury that defendant Braun previously admitted

9    that he had knowledge of the client services application and

10   agreement between Richmond Capital Group and Actum Processing

11   that is part of Exhibit 38.  The defense has an objection.

12             But any objection by the government, by the FTC?

13             MR. ASHE:  The specific pages were 38-6 through 38-13

14   inclusive.

15             THE COURT:  OK.  I will mention that when I tell the

16   jury.  The defense objection is overruled.

17             Now, assuming then the FTC rests after I said what I

18   just said to the jury, I take it then you're prepared to rest?

19             MR. ASHE:  Yes, your Honor.

20             THE COURT:  Now let me hear the application from

21   defense counsel.

22             MR. DiBENEDETTO:  Thank you, your Honor.

23             Yesterday, after the jury left, we had a conversation

24   regarding the exhibits that were admitted into evidence, but

25   with an objection, that was going to be regarding the Kessef

O19MFED3

1    Capital documents.  Mr. Reich did not testify that Mr. Braun

2    had any involvement with Kessef Capital.  So all of the

3    documents --

4              THE COURT:  I see your point.  Let me ask the FTC,

5    what about that?

6              MS. HEALD:  Mr. Reich did testify that Mr. Braun had a

7    practice of storing money with others, not in his name.

8              THE COURT:  I was amazed, by the way, and I know I've

9    been sort of picky about compliance with the rules of evidence,

10   but about the first 25 questions from FTC counsel to the

11   witness were blatantly leading questions, but there was no

12   objection raised, so the defense is stuck with them.  But the

13   one you're referring to didn't specifically refer to any

14   particular company.

15             MS. HEALD:  That's correct, your Honor.  We still

16   think there is strong circumstantial evidence related to

17   Mr. Braun's ability to pay.

18             THE COURT:  I agree with the defense.  Those

19   exhibits -- you'll have to go over and put on the record this

20   afternoon exactly what exhibits and testimony we are talking

21   about, but I agree the connection has not been made.

22             MR. DiBENEDETTO:  Thank you, your Honor.

23             THE COURT:  Now, the defense is not presenting any

24   evidence, correct?

25             MR. DiBENEDETTO:  That's correct, your Honor.

O19MFED3

1          THE COURT:  Just for the record, I assume the defense

2     moves at this time for the dismissal of the remaining claims.

3     You so move?

4          MR. DiBENEDETTO:  We do, your Honor.

5          THE COURT:  And I would be quite negligent if I didn't

6     overrule that objection.  We are all set.

7          Here is what remains to be done.  When they come back

8     at 1:30, I'll give them one little piece of evidence that we

9     just referenced about Exhibit 38 and so forth.  I'll tell the

10     jury that.  I will ask the FTC to formally get up and rest.

11     I'll ask defense counsel to formally get up and rest.  I will

12     then excuse the jury until 9:30 tomorrow morning.

13          I will get to you by no later than 2:30 this afternoon

14     my proposed instructions of law.  I will give you the choice.

15     Either you could stick around, and we will then have a charging

16     conference here in open court, or, if you prefer, we can have

17     the charging conference by telephone with a reporter on the

18     telephone, so it can all be recorded.  You don't have to stick

19     around here if you don't to.  But then I will send you later in

20     the afternoon the final instructions of law.

21          Tomorrow morning, starting at 9:30, we will have

22     closing arguments and the Court's instructions of law to the

23     jury, and they will start their deliberations.

24          How long does plaintiff want for its summation?

25          MR. ASHE:  Your Honor, certainly pending review of

O19MFED3

1    what those final instructions look like, we estimate about 45

2    minutes for closing argument, but it could be a little bit

3    more, a little bit less, depending on would those

4    instructions --

5              THE COURT:  Why don't we say no more than an hour.

6              MR. ASHE:  Yes, your Honor.

7              THE COURT:  Defense counsel.

8              MR. DiBENEDETTO:  Thirty or 45 minutes.

9              THE COURT:  Again, I'll give you up to an hour, if you

10   need it, but I am sure the jury will appreciate if each side is

11   even less.

12             We will have those two summations, we will take a

13   short break, we will give my instructions of law, which will

14   take less than 30 minutes, and then we will start the

15   deliberations.

16             Counsel overnight needs to prepare a copy of each of

17   the exhibits, except for the video, to go to the jury.  You

18   need to jointly prepare an index.  Consult with each other on

19   both sides and just prepare a single document that is an index

20   of all of the exhibits, and then put it in a Redweld, or

21   something like that, a copy of each of the exhibits.

22             I'll tell the jury that if they want to see the video

23   again, they can come out, they can let me know through a note,

24   and we will play it for them here in open court.

25             I'll also, when I send you my chart, I'll also send

O19MFED3

1    you the proposed verdict form, and at the charging conference

2    you can give me any issues you have with that.

3            I think that's everything.

4            First, let me ask you, do you want to go back to your

5    office and do the charging conference by telephone, or you want

6    to remain here and do it in person?

7            MR. DiBENEDETTO:  We are here.

8            MR. ASHE:  We are here.

9            THE COURT:  We will resume with the jury at 1:30.

10   I'll give them the instruction.  You will rest.  If I have the

11   draft charge by then, I'll give it to you right then and there.

12   If not, you will just stay here in the courtroom, we will get

13   you the draft charge.  We will give you a time to look it over,

14   and we will call back the reporter and have the charging

15   conference.

16           MS. HEALD:  Your Honor, just to clarify, for copies of

17   the exhibits for the jury, should it be a single copy for all

18   of the jury?

19           THE COURT:  Yes, a single copy.  If they want multiple

20   copies, they will let me know, but usually they can just pass

21   it around.

22           Anything else we need to discuss?

23           MR. ASHE:  No, your Honor.

24           THE COURT:  We will see you at 1:30.

25           (Luncheon recess)

O195fed4

```
1                   A F T E R N O O N   S E S S I O N

2                          1:40 p.m.

3           (Jury present)

4           THE COURT:  So, ladies and gentlemen, in Plaintiff's

5   Exhibit 38, which you had which was received earlier, there is

6   an agreement at pages 6 to 13 of that exhibit which is a client

7   services agreement between Richmond Capital and something

8   called Actum Processing, which is a processor, and I want to

9   instruct you that at an earlier stage in this case the

10  defendant, Mr. Braun, admitted that he had knowledge of that

11  agreement.  The relevance of that will I think be argued by

12  counsel in their closing arguments, but I just want you to know

13  that he has admitted that he had knowledge of that particular

14  agreement.

15          So, does the FTC rest?

16          MR. ASHE:  Yes, your Honor; the FTC rests.

17          THE COURT:  Does defendant rest?

18          MR. DiBENEDETTO:  The defendant rests, your Honor.

19          THE COURT:  So that concludes the taking of evidence

20  in this case.  We have moved with lightning speed thanks to the

21  good work of counsel, so here is the story:

22          Both because there are legal issues I have to take up

23  with counsel and also because the weather later this afternoon

24  is supposed to be really nasty, I'm going to let you go now,

25  but you need to return promptly at 9:30 tomorrow.  At 9:30
```

O195fed4

1  tomorrow we will first have the closing arguments of counsel,

2  each side is being given one hour, they may not need a full

3  hour but they have each up to one hour, so that will take us to

4  about 11:30, and then we will take a 15-minute break, and then

5  there will be my instructions of law which will take about a

6  half hour, and I will both read them but I will also give you

7  copies so you can take them into the jury room.  So, that will

8  take us to about 12:15.  And then the case will be yours to

9  deliberate.  To make it easier for you we will have lunch

10  brought in around 1:00, and we will give you a menu earlier so

11  you can pick your lunch.  And, you can take as little or as

12  long as you need for your deliberations.  If you haven't

13  completed your deliberations by 4:30 tomorrow, then you will go

14  home and come back at 9:30 the next day.

15         So, anyway, I thank you again for your promptness and

16  have a very good evening.  I hope the weather won't be as bad

17  as they're predicting but at least it will be rain, not snow.

18  We will see you at 9:30 tomorrow morning.

19         (Continued on next page)

20

21

22

23

24

25

O195fed4

```
 1                 (Jury not present)

 2                 THE COURT:  So let's put some time on.  I will have my

 3     draft charge and draft verdict form for you by 2:00, so just

 4     stay here in the courtroom until 2:00.  And then how much time

 5     do you want to look it over?  Half hour?  45 minutes?  Does

 6     that work for counsel.

 7                 MR. DiBENEDETTO:  Yes, Judge.

 8                 THE COURT:  So we will reconvene at 2:30 and have the

 9     charging conference at that time.  So, I think that's

10     everything.

11                 MR. DiBENEDETTO:  Your Honor, you asked me during the

12     lunch break to list out the exhibits to be excluded from

13     evidence relating to Kessef Capital.

14                 THE COURT:  I'm sorry?

15                 MR. DiBENEDETTO:  You asked me during the break to

16     pinpoint the exhibits to be removed.

17                 THE COURT:  Thank you very much.

18                 MR. DiBENEDETTO:  I have them.

19                 THE COURT:  Why don't you read them for the record.

20                 MR. DiBENEDETTO:  Plaintiff's Exhibit 45, Plaintiff's

21     Exhibit 69, Plaintiff's Exhibit 70, Plaintiff's Exhibit 71, and

22     Plaintiff's Exhibit 72.

23                 THE COURT:  I'm sorry I let the jury go, I should have

24     told them about that, but I will tell them about that first

25     thing tomorrow morning.  Just remind me before they come in.
```

O195fed4

1              MR. DiBENEDETTO:  I will, your Honor.  Thank you.

2              MS. HEALD:  Your Honor, Plaintiff's Exhibit 45 were

3     bank records for Richmond Capital.

4              THE COURT:  Oh, so that's different.  Why don't,

5     between now and 2:00 when I come back with the charge, we won't

6     need the reporter until 2:30.  Try to work it out and make sure

7     we have a definitive list of what is being excluded and what is

8     not and we will put it on the record at 2:30.

9              MS. HEALD:  Thank you.

10             (Recess)

11             THE COURT:  What I want with respect to the draft

12    instructions of law that you previously received is if you have

13    an objection or an addition, tell me specifically the words

14    that you would like in place of any of your objections.  So, we

15    will start with the general instructions 1 through 7, these are

16    basically my standard instructions but any objections to

17    anything in 1 through 7 from the FTC?

18             MR. ASHE:  No, your Honor.

19             THE COURT:  From the defense?

20             MR. DiBENEDETTO:  No, your Honor.

21             THE COURT:  Very good.

22             MR. ASHE:  Oh, I apologize, your Honor.  What you had

23    written, there is one addition.  So there is no objection but

24    there is an addition.

25             THE COURT:  What is the addition?

O195fed4

1            MR. ASHE:  Because Mr. Giardina took the Fifth

2     Amendment we would request an instruction related to

3     inferences.

4            THE COURT:  Yes.  I thought about that but I think I

5     gave the jury more than enough and it is not like they have to

6     remember back days and days, they heard it today.

7            MR. ASHE:  OK.

8            THE COURT:  So I think they have the instruction.  If

9     they send out a note about that for any reason I will

10    reinstruct them, but I don't --

11           MR. ASHE:  In closing may I tell them they can take

12    the adverse inference?

13           THE COURT:  Yes.

14           MR. ASHE:  OK.  Then we are fine.  We have no further

15    objections or additions to the general instructions.

16           THE COURT:  So, with respect to the first of the three

17    substantive instructions, instruction no. 8, which is just

18    basically an overview, any objections or additions to that

19    instruction before we get to the more specific ones?  Anything

20    further, anything from the FTC?

21           MR. ASHE:  Not on instruction 8.

22           THE COURT:  Anything from the defense?

23           MR. DiBENEDETTO:  No, your Honor.

24           THE COURT:  Now we get to the most interesting parts,

25    9 and 10.  So, on 9, anything from the FTC?

O195fed4

1          MR. ASHE:  Yes, your Honor.

2          First, I think it was just housekeeping on the first

3    paragraph of instruction 9, it is underfunded meaning the

4    borrower received less and then overcollected meaning the

5    borrower paid more.

6          THE COURT:  Oh yes, yes.  I got those reversed.  Yes.

7    Thank you very much.

8          Oh no, no, no.  That's not right.  Overcollected,

9    meaning the borrower received less money than what the borrower

10   was supposed to receive, or underfunded meaning that Mr. Braun

11   and his co-defendants took more money from borrowers than what

12   the borrower owed.

13         What is the problem with that?

14         MR. ASHE:  Underfunded is that the borrower received

15   less money up front and we have it overcollected.  So the

16   underfunded is, those are the situations where the borrower

17   received less.

18         THE COURT:  You are right.  You are exactly right.  I

19   got them mixed up.  So, in particular, the FTC seeking monetary

20   damages for any MCA agreements as to which Mr. Braun and his

21   co-defendants either underfunded, meaning that the borrower

22   received less money than what the borrower was supposed to

23   receive, or overcollected, meaning that Mr. Braun's

24   co-defendants took more money from the borrowers than what the

25   borrowers owed.

O195fed4

1              MR. ASHE:  Yes.

2              THE COURT:  Thank you very much for catching that.  My

3     mistake.

4              MR. ASHE:  The other comment we would make is in the

5     second paragraph there is two issues in the sentence that

6     begins:  However, the FTC may prove such injury by showing that

7     Mr. Braun and his co-defendants made material

8     misrepresentations.

9              As the Court has previously read to the jury that has

10    already been established and the same of a kind that a

11    reasonable person would rely upon.  But, more fundamentally, we

12    understand that this whole language of showing material

13    representations widely disseminated of a kind that would be

14    relied upon, that is in a situation where the FTC is trying to

15    establish a presumption that every consumer relied on the

16    defendant's misrepresentations and those are situations where

17    the damages the FTC is seeking is every dollar that the

18    defendants take, and the courts say you don't have to show

19    actual reliance from every single consumer you do this

20    presumption.  Here, the evidence that we have presented and the

21    damage that we are seeking is only the violations of the law

22    relating to the undercollection and underfunding which is

23    specific numbers.  So, we are not seeking to recover every

24    dollar that the defendants took from every deal because, as the

25    experts showed, there were plenty of deals where there was no

O195fed4

1    overcollection and there was no underfunding and so therefore

2    that language is not --

3                THE COURT:  OK.  I think you are making a good point

4    but what is the language you request?

5                MR. ASHE:  We would have it say the FTC bears the

6    burden of proving these damages by a preponderance of the

7    evidence.  To meet this burden, the FTC must show the amount of

8    damages -- I guess if I could borrow the language from our

9    proposed instruction, it would be the second paragraph of our

10   proposed instruction 19 where we say --

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O19MFED5

1          THE COURT:  Read it to me.

2          MR. ASHE:  The FTC has the burden of proving by a

3    preponderance of the evidence the amount of consumer harm that

4    resulted from these violations of the GLB Act; specifically,

5    the amount of consumer harm caused by defendants collecting

6    more from consumers than what was set forth in the merchant

7    cash agreements and the amount of consumer harm caused by

8    defendants collecting more from consumers than what was set

9    forth in the merchant cash advance agreements, and the amount

10   of consumer harm caused by defendants funding less to consumers

11   than what was set forth in the MCA agreements, and then the FTC

12   can meet this burden by making a reasonable estimate and going

13   into that language.  Then the rest of it.  Once the FTC makes

14   that reasonable estimate, the burden shifts.

15         This is the accurate reflection of the law.  We are

16   not seeking every dollar that the defendants --

17         THE COURT:  Your instruction.

18         MR. ASHE:  It would be the second paragraph.

19         THE COURT:  Of instruction 19.

20         MR. ASHE:  Posttrial instruction 19.  Basically the

21   second paragraph.

22         The other thing that we would like is just a reminder,

23   because civil penalties involves knowledge, a reminder that

24   there is no knowledge.  I know you had said that before, but we

25   think it's important that the jury be reminded that the

O19MFED5

1    knowledge element doesn't apply to the consumer harm judgment.

2              That's our second paragraph.

3              THE COURT:  Hold on.

4              Here is how I would revise it.  This is all subject to

5    hearing in a minute from defense counsel.  I am going to read

6    you the entire instruction slowly as I have now revised it.

7              The FTC is seeking what are called damages for the

8    monetary harm that the misrepresentations caused to borrowers.

9    In particular, the FTC is seeking monetary damages for those

10   MCA agreements as to which Mr. Braun and his codefendants

11   either underfunded, meaning that the borrower received less

12   money than what the borrower was supposed to receive, or

13   overcollected, meaning that Mr. Braun and his codefendants took

14   more money from borrowers than what the borrowers owed.  Then a

15   new sentence:  As you know, it has already been established at

16   an earlier phase of this case that such misrepresentations were

17   made and that Mr. Braun is legally liable for his role relating

18   thereto.

19             We go back to the next sentence:  However, because of

20   what is called a statute of limitations, the damages are

21   limited to the amount of such monetary harm that occurred

22   during the three-year period between June 10, 2017 and June 10,

23   2020.

24             Then strike the first six lines of the next paragraph

25   and substitute the following:  As to the amount of damages

O19MFED5

resulting from these misrepresentations -- and pick up the word

misrepresentations from the seventh line -- as to the amount of

damages resulting from these misrepresentations, the FTC can

meet its burden of proof to show the amount of monetary damages

by putting forward a reasonable estimate of the harm to

borrowers.  Once the FTC puts forward evidence of a reasonable

estimate, the burden shifts to Mr. Braun to show why the FTC's

reasonable estimate is inaccurate or unreasonable.

          Let me read that in its entirety one more time to make

sure you all have it, and then I'll hear any further objections

or additions.

          The FTC is seeking what are called damages for the

monetary harm misrepresentations caused to borrowers.  In

particular, the FTC is seeking monetary damages for those MCA

agreements as to which Mr. Braun and his codefendants either

underfunded -- strike the words as to -- those MCA agreements

which Mr. Braun and his codefendants underfunded, meaning that

the borrower received less money than what the borrower was

supposed to receive or overcollected, meaning that Mr. Braun

and his codefendants took more money from borrowers than what

the borrowers owed.

          As you know, it has already been established at an

earlier phase of this case that such misrepresentations were

made and that Mr. Braun is legally liable for his role relating

thereto.  However, because of what is called a statute of

O19MFED5

limitations, the damages are limited to the amount of such

monetary harm that occurred during the three-year period

between June 10, 2017 and June 10, 2020.

          And as to the amount of damages resulting from these

misrepresentations, the FTC can meet its burden of proof to

show the amount of monetary damages by putting forward a

reasonable estimate of the harm to borrowers.  Once the FTC

puts forward evidence of a reasonable estimate, the burden

shifts to Mr. Braun to show why the FTC's reasonable estimate

is inaccurate or unreasonable.

          Any problems with that by the FTC?

          MR. ASHE:  That instruction as edited is acceptable,

your Honor.

          THE COURT:  By the defense.

          MR. DiBENEDETTO:  We do have an objection.

Specifically in the first paragraph, where it mentions

Mr. Braun and his codefendants overcollected or underfunded, we

believe that it should just be Mr. Braun.  The corporate

defendants settled this matter.  The other individual

defendants settled this matter.  And the damages at this trial

is solely related to Mr. Braun, not to any wrongdoing by the

other codefendants in this case.  For the jury to have an

instruction that says codefendants may influence the jury in a

different direction from the real crux issue of this case,

which is solely Mr. Braun.

O19MFED5

1    THE COURT:  I think the sentence that I added about

2    he's legally liable for his role is what was decided on summary

3    judgment and is the case here.  He is not responsible for any

4    underfunding or overcollecting that he had no role in.  But if

5    his role was that he controlled everything that was going on,

6    that he approved everything that was going on, etc., etc., all

7    of which was the subject of part of my ruling on summary

8    judgment, then he's liable.

9    MR. DiBENEDETTO:  I understand that, your Honor, but

10   part of the issue is that the statute of limitations is for the

11   three-year period from June 2017 to June 2020, and the

12   testimony showed that Mr. Braun was fired in December 2018.  So

13   arguably half of the time frame that FTC is looking for damages

14   includes a time frame in which Mr. Braun was not employed by

15   any of the corporate defendants.

16   THE COURT:  By the way, the only question I heard

17   about that -- I think that's a point I'm glad you raised

18   because I wanted to inquire about this.  Maybe I missed it.

19   The only question I heard was simply as part of the questions

20   as to which Mr. Giardina took the Fifth.  I don't know that

21   there is any affirmative evidence of his being fired on that

22   date or being fired, period.

23   What is the evidence of that?

24   MR. DiBENEDETTO:  Other than the testimony we have of

25   Mr. Giardina asserting the Fifth Amendment to that question,

O19MFED5

1   there isn't any other direct evidence linking Mr. Braun's

2   firing to 2018.

3           THE COURT:  I don't think we have even heard that he

4   was fired by any direct evidence.

5           Let me ask the government, assuming for the sake of

6   argument that there was evidence that he was fired on that day,

7   what do you say?  How does that affect his responsibility for

8   damages thereafter?

9           MR. ASHE:  The damages that we are seeking, it doesn't

10  affect.  There were documents never entered into evidence that

11  suggest that he may have been fired in December of 2018.

12  Assuming that's accurate, as Ms. Kwok testified, the last deal

13  from the review of the Actum transaction database was November

14  2018, which was a month before.  So all of the damages are

15  within the period of time when he was still employed, and we

16  are not -- even though the period goes all the way to 2020, we

17  are really for damages going to 2017, June 10, 2017, until that

18  last deal which came in in November 2018.

19          THE COURT:  Which came in when?

20          MR. ASHE:  November of 2018.  That was Ms. Kwok's

21  testimony, that based on the Actum database, the last

22  transaction came in sometime in November 2018.  It doesn't

23  affect --

24          THE COURT:  Should we add then to the sentence about

25  the statute of limitations.  However, because of what is called

O19MFED5

1    a statute of limitations, the damages are limited to the amount

2    of such monetary harm that occurred during the three-year

3    period between June 10, 2017 and June 10, 2020.  Indeed, the

4    FTC is only seeking damages for such harms as occurred between

5    June 10, 2017 and, what is it, November 2018?

6            MR. ASHE:  I don't remember the exact date, your

7    Honor.  We have actually -- just for the sake of argument, we

8    have not conceded he was even fired.

9            THE COURT:  I understand.  And I am not sure that's in

10   evidence.

11           MR. ASHE:  We would think that the instruction as

12   written -- and they can make their argument, if they want to

13   make it.

14           THE COURT:  No, no, no.  I think if you are only

15   claiming between -- in fairness to the defense, if you're only

16   claiming through such and such a time, and it will bear on

17   whatever arguments are going to be made in this regard, he may

18   still argue -- let's say it's November.  He may still say:

19   Hey, you can infer from the adverse inference that it was July

20   that he was fired, so he's not responsible for August,

21   September, October, or November.  I may have some issues to

22   raise about that argument, but can't you tell me what the final

23   date is?

24           MR. ASHE:  We have to go into the database.  I think

25   the witness said November.  She was basing that on memory.

O19MFED5

| | |
|---|---|
| 1 | THE COURT:  OK.  Why don't you do this.  Why don't you |
| 2 | check that tonight, but at least for now I'll put down |
| 3 | November. |
| 4 | Having made that change, let me go back to defense |
| 5 | counsel.  There was no affirmative evidence of his being fired, |
| 6 | period, let alone on a particular date.  I think you can make |
| 7 | the argument:  Ladies and gentlemen, you heard Mr. Giardina |
| 8 | take the Fifth on the question of whether he was -- Mr. Braun |
| 9 | was fired in July of 2018.  You didn't hear anything from the |
| 10 | FTC about this other than their limiting their damages through |
| 11 | November.  You may find that there is insufficient evidence to |
| 12 | believe that Mr. Braun was still involved at that late date, |
| 13 | something along those lines.  I think that would be the most |
| 14 | you could do. |
| 15 | MR. DiBENEDETTO:  I understand. |
| 16 | THE COURT:  Let's move on then to instruction number |
| 17 | 19. |
| 18 | Any objections or additions from the FTC? |
| 19 | MR. ASHE:  One is just a statutory comment.  They are |
| 20 | both actually statutory comments. |
| 21 | Right now the penalty -- the amount for violation is |
| 22 | 50,120.  The White House has instructed agencies to revise |
| 23 | those for 2024.  The FTC has not yet published that number. |
| 24 | But if it should publish it between now and when this goes to |
| 25 | the jury -- |

O19MFED5

1            THE COURT:  Tomorrow morning.

2            MR. ASHE:  Tomorrow morning.

3            Usually, they publish it the first Monday of January,

4    and we are surprised it hasn't gone out.

5            THE COURT:  If that happens, you will let me know.

6            MR. ASHE:  We will let you know.

7            The second one is just at the very bottom of page 13,

8    the factor of culpability and then such other factors.  We do

9    note that the statute -- I guess my question is, can we talk

10   about -- if we have evidence, can we talk about the other

11   factors?

12           THE COURT:  Yes.

13           MR. ASHE:  Or are we limited?

14           THE COURT:  No.  You can talk about the other factors.

15   As I say, such other factors.

16           MR. ASHE:  That is, in fact, the five factors.

17           THE COURT:  I want to repeat why I have limited it in

18   this regard because this is something I did, did with malice

19   and forethought.

20           If the jury were making the final determination on the

21   amount of civil penalties, then I think I would have to list

22   all five factors, which includes, however, the catch-all other

23   such factors but includes things like ability to pay and things

24   like that.  And probably in that case I would have considered

25   possibly admitting his prior conviction as well.

O19MFED5

1          But since it is just an advisory opinion, what I need

2     from this jury most essentially is one thing that is not an

3     advisory opinion, which is, did he act knowingly or not.

4     That's why it's a separate question in the verdict form.

5          If they can conclude that, it would be useful to me to

6     know what they thought was appropriate penalties based just on

7     the misconduct that has been brought to their attention and not

8     ability to pay, not prior convictions, not any of this other

9     stuff.  And, in fact, if it wasn't cabined in that way, it

10    seems to me their advice would be of less value to the Court in

11    making my final decision.  That's why I cut out all those other

12    factors.

13         You are free, both sides are free to make mention of

14    those, not by saying the statute says, but just saying:

15    Another factor you may want to consider is such and such, but

16    only as to stuff that's in evidence.  But that's the reason I

17    shaped it in the way I did.

18         MR. ASHE:  With that clarification, the FTC doesn't

19    have any objection to the instruction as written.

20         THE COURT:  Any objections from defendants?

21         MR. DiBENEDETTO:  Yes, your Honor.

22         I feel like I have said this a lot this trial, but I

23    have the same objection as relating to instruction number 9.

24         But instruction number 10 in the third paragraph on

25    the second line where it says, Between June 10, 2015 and now

O19MFED5

1    after the conversation --

2              THE COURT:  It's now -- because this is the five year.

3              MR. DiBENEDETTO:  We believe it should be June 10,

4    2015 and November 2018.

5              THE COURT:  Let me reword it.  Hold on a minute.

6              I would reword the first sentence of the third

7    paragraph to read as follows:  Here, because of a different

8    statute of limitations, the FTC is entitled to seek up to

9    $50,120 for each violation of the GLB Act that occurred between

10   June 10, 2015 and June 10, 2020, but in fact the FTC is only

11   seeking such penalties through November 2018.  OK.

12             MR. DiBENEDETTO:  Thank you, your Honor.

13             THE COURT:  Of course you have your argument about

14   July versus November.

15             Anything else from defense?

16             MR. DiBENEDETTO:  No, your Honor.

17             THE COURT:  Anything regarding the final concluding

18   instructions, which, again, are my standard instructions?

19             MR. ASHE:  Not from the FTC.

20             MR. DiBENEDETTO:  Not from defense.

21             THE COURT:  I will get you the revised charge sometime

22   late this afternoon and email it to both sides.

23             So the last thing is the verdict form, if I can find

24   where I put my copy.  There.  I put my copy in the hands of my

25   law clerk.

O19MFED5

1          Any problem with the verdict form from the FTC?

2          MR. ASHE:  No, your Honor.

3          THE COURT:  From the defense.

4          MR. DiBENEDETTO:  No, your Honor.

5          THE COURT:  Very good.

6          I will send you the final of that tonight as well or

7    later this afternoon.

8          Very good.

9          MR. ASHE:  Your Honor, one housekeeping matter.

10         At the very end, counsel and I, on that Exhibit 45, we

11   have agreed how to remove just -- the exhibit will go in, but

12   we are going to remove those pages that made reference to

13   Kessef.

14         THE COURT:  Be sure to remind me to tell the jury

15   first thing tomorrow before we start summations that certain

16   exhibits relating to Kessef Capital have now been removed and

17   should not be part of your consideration in any respect.

18         Very good.

19         (Adjourned to January 10, 2024, at 9:30 a.m.)

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                         Page
 3   ELIZABETH KWOK
 4   Direct By Ms. Heald  . . . . . . . . . . . . 166
 5   Cross By Mr. DiBenedetto . . . . . . . . . . 174
 6   ROBERT GIARDINA
 7   Direct By Mr. Ashe . . . . . . . . . . . . . 189
 8   Cross By Mr. DiBenedetto . . . . . . . . . . 203
 9   Redirect By Mr. Ashe . . . . . . . . . . . . 209
10   TZVI REICH
11   Direct By Ms. Heald  . . . . . . . . . . . . 219
12   Cross By Mr. DiBenedetto . . . . . . . . . . 240
13                    PLAINTIFF EXHIBITS
14   Exhibit No.                           Received
15     59    . . . . . . . . . . . . . . . . . . 166
16     75    . . . . . . . . . . . . . . . . . . 168
17     44    . . . . . . . . . . . . . . . . . . 170
18     73    . . . . . . . . . . . . . . . . . . 224
19     66    . . . . . . . . . . . . . . . . . . 225
20     43    . . . . . . . . . . . . . . . . . . 228
21     67    . . . . . . . . . . . . . . . . . . 228
22     46    . . . . . . . . . . . . . . . . . . 231
23     48    . . . . . . . . . . . . . . . . . . 232
24     50    . . . . . . . . . . . . . . . . . . 233
25     51    . . . . . . . . . . . . . . . . . . 234
```

53  . . . . . . . . . . . . . . . . . . . 235

54  . . . . . . . . . . . . . . . . . . . 236

55  . . . . . . . . . . . . . . . . . . . 237

56  . . . . . . . . . . . . . . . . . . . 238

74  . . . . . . . . . . . . . . . . . . . 239