O1A6FED1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    FEDERAL TRADE COMMISSION,

4                    Plaintiff,

5              v.                          20 CV 4432(JSR)
                                           Trial
6    JONATHAN BRAUN, et al,

7                    Defendants.

8    ------------------------------x
                                           New York, N.Y.
9                                          January 10, 2024
                                           9:30 a.m.
10
     Before:
11
                        HON. JED S. RAKOFF,
12
                                           District Judge
13                                         —and a Jury—
                              APPEARANCES
14
     FEDERAL TRADE COMMISSION
15        Attorneys for Plaintiff
     BY:  GREGORY ASHE
16        JULIA HEALD

17   AIDALA BERTUNA & KAMINS PC
          Attorneys for Defendants
18   BY:  MICHAEL DIBENEDETTO

19   LAW OFFICES OF BARATTA, BARATTA & AIDALA
          Attorneys for Defendants
20   BY:  JOSEPH BARATTA

21   Also Present:

22   Molly Smith, FTC Paralegal
     Ken Kotarski, FTC Trial Tech
23   Emma Barbacci, Defense Paralegal

24

25

O1A6FED1

```
 1              (Trial resumed; jury not present; case called)
 2              MR. DIBENEDETTO:  Your Honor, before you bring in the
 3    jury, I wanted to remind you or inform the jury that all of the
 4    Kessef Capital documents are going to be removed.
 5              THE COURT:  Yes.
 6              MR. ASHE:  Do you want us to provide the clerk with
 7    the copies of the exhibits now or after?
 8              THE COURT:  After.
 9              MR. ASHE:  After closing.
10              THE COURT:  Yes.
11              MR. ASHE:  Okay.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

O1A6FED1

1              (Jury present)

2              THE COURT:  Good morning, ladies and gentlemen.  Once

3     again, thank you for your promptness.

4              In a minute, we're going to hear closing arguments.

5     There was one other evidentiary point I wanted to bring to your

6     attention.

7              You may possibly recall that there were certain

8     documents and portions of documents relating to an entity

9     called Kessef.  They were received subject to connection.  The

10    connection was never made, and so those have now been excluded.

11    So we won't send in those exhibits to you, and anything you

12    remember about those particular exhibits you should now put out

13    of your mind.  They are no longer part of the case.

14             So we're now going to hear closing arguments of

15    counsel.  Each side has been allotted up to an hour.  They may

16    not take that much.  And you will recall that the burden of

17    proof is on the plaintiff, the FTC, so they will go first.

18             I should also mention before I forget it:  Just as I

19    told you in opening statements, nothing that counsel says is

20    evidence.  This is their opportunity to tell you what they

21    think the evidence amounts to.  The evidence is only the

22    testimony of the witnesses, the exhibits that were received,

23    and the stipulated or the found facts, the undisputed facts I

24    gave you yesterday in writing and read to you earlier.

25             Go ahead.

O1A6FED1                      Summation - Mr. Ashe

1              MR. ASHE:  May I begin, your Honor?

2              THE COURT:  Please.

3              MR. ASHE:  Members of the jury, thank you for your

4     time and your attention these past several days.  I ask for

5     your attention for just a little bit more.

6              My name is Gregory Ashe, and together with my

7     colleague, Julia Heald, we represent the plaintiff, the

8     Federal Trade Commission, or the FTC, for the consumer.

9              The mission of the FTC is to protect consumers by

10    enforcing the nation's consumer protection laws to ensure a

11    free and fair marketplace, and that's what we're doing here.

12             We brought this case to protect a group of consumers,

13    small businesses, small businesses trying to make a go at it,

14    small businesses that needed money to operate, small businesses

15    that, for whatever reason, were not able to obtain traditional

16    financing.  So they reached out to defendant Braun's company,

17    Richmond Capital, to get what are called merchant cash

18    advances.

19             Now, you heard evidence of how these merchant cash

20    advances work.  Richmond Capital and these small businesses

21    entered into contracts called merchant agreements.  Now,

22    according to the merchant agreements, Richmond Capital would

23    give these businesses an agreed amount of money called the

24    total purchase price, and then make daily withdrawals from the

25    businesses' bank accounts until Richmond Capital collected an

O1A6FED1                        Summation - Mr. Ashe

1    agreed amount called the agreed total purchased amount.  But

2    that's not what happened.

3            Instead, in many instances, as the Court already

4    found, Richmond Capital would deduct significant fees,

5    sometimes without the consumers having any knowledge of those

6    fees.  Other times, consumers agreed to some fees.  But

7    Richmond Capital deducted even more than those agreed-upon

8    fees, the result being that small businesses often receive

9    significantly less funding than what was promised.

10           And, again, as the Court already found, in many

11   instances, Richmond Capital kept making daily withdrawals from

12   the businesses' bank account, even after the total purchased

13   amount was paid.  The result being that small businesses paid

14   substantially more than what Richmond Capital promised to

15   collect from them.  Now, to stop these egregious practices, in

16   June 2020, the FTC sued defendant Braun and Richmond Capital

17   and several other defendants, two of whom you heard yesterday.

18           The FTC charged that the ways in which the defendants

19   marketed, collected, and serviced their merchant agreements

20   violated the FTC Act, which prohibits unfair deceptive acts or

21   practices, and Section 521 of the Gramm-Leach-Bliley, or the

22   GLB Act, which prohibits making false, fictitious, or

23   fraudulent statements in order to get someone's bank informers.

24           Now, I want to say again that the Court has already

25   determined that defendant Braun violated the law.  That is not

1    in dispute, and that is not something that you need to decide.

2    You are here to decide the amount of money that defendant Braun

3    should pay for his violations.

4           There are two types of monetary relief that the FTC is

5    seeking in this case:  First, a consumer redress judgment, an

6    amount to be returned to the small businesses based on the harm

7    they suffered; and second, a type of fine called a civil

8    penalty.

9           I'd like to start with the first type of money

10   judgment that we are asking you to enter.

11          Because defendant Braun violated Section 21 of the

12   GLB Act, Section 19 of the FTC Act allows for the entry of a

13   monetary judgment to redress or remedy the harm to consumers

14   caused by those violations.  Now, the question for you is not

15   whether consumer redress judgment should be entered, but how

16   much that judgment should be.

17          As the Court will instruct you, the law requires that

18   we demonstrate a reasonable estimate of that amount, the amount

19   of the harm caused by the defendant's violations of the

20   GLB Act.  Then the burden is going to shift to defendant Braun

21   to prove to you by a preponderance of the evidence that our

22   estimate was not reasonable or inaccurate.

23          Now, the Court also is going to instruct you that the

24   law requires that we prove our case by what's called a

25   preponderance of the evidence; in other words, that it is more

O1A6FED1                    Summation – Mr. Ashe

1    likely than not true, our claims.

2          So I want you to imagine scales, and as long as the

3    scales tip slightly in our favor, then the FTC has met its

4    burden.

5          Now, Section 19 of the FTC Act, which governs the

6    consumer redress, has what is called a three-year statute of

7    limitations.  That means we need to demonstrate to you the

8    amount of consumer harm caused in the three years before we

9    filed our complaint in June of 2020.

10          Now, remember when Dr. McAlvanah testified on Monday?

11    He testified about the amount of consumer harm caused by

12    defendant's over-collection and underfunding practices.  Let's

13    start with the over-collection violations.

14          He testified that there was a total population of 918

15    deals where the defendants made withdrawals within the

16    three-year period.  Now, why did Dr. McAlvanah use those deals?

17    Because as long as defendants were still making withdrawals,

18    they are still telling small businesses they owe money even

19    when this wasn't true, unless they're still violating the law.

20          Then Dr. McAlvanah described how based on his analysis

21    of a statistically valid random sample of those 918 deals, the

22    defendants over-collect 26.9 percent of the time, or 246 of

23    those 918 deals.  He also testified that it was statistically

24    reasonable that the violation rate could be as high as

25    41 percent, or 376 out of those 918 deals.  Dr. McAlvanah

1  further testified that the average amount that was

2  over-collected was $9,397 per deal.

3          Now, if you multiply those numbers, the 376 deals with

4  over-collections by the 9,397 per deal, the consumer injury

5  caused by the over-collection practices was $3,533,272.

6          Now, with respect to defendant's underfunding

7  violations, remember, that's where they held back more in

8  undisclosed, sometimes bogus, fees than what was promised.

9  Dr. McAlvanah testified there was a total population of 768

10  deals where the first withdraw was within the three-year

11  period.

12          Why the different number?  Because for underfunding,

13  we're looking at the start of the merchant cash advance deal.

14  That's the time that the defendant lied to small businesses

15  about how much money they are going to receive.

16          Now, Dr. McAlvanah testified to you based on his

17  analysis of a statistically valid random sample of those 768

18  deals that the defendants underfunded 47.4 percent of the time,

19  or on 364 of those deals.

20          He also testified that it was statistically reasonable

21  that the violation rate could be as high as 71.1 percent, or

22  546 deals.  But Dr. McAlvanah further testified that the

23  average amount underfunded was $3,022 per deal.  And if we

24  multiply those numbers, the 546 deals with underfunding and the

25  $3,022 of underfunding per deal, that yields a consumer injury

O1A6FED1                    Summation - Mr. Ashe

caused by the underfunding of $1,650,012.

        Now, as Dr. McAlvanah testified, these numbers are
statistically reasonable.  They are based on a random sample, a
method that is scientifically valid and widely used in the
field of economics.

        You may wonder why the FTC used a random sample
instead of looking at every deal.  Well, as FTC investigator
Ms. Kwok testified, finding the relevant data was a very
laborious process requiring manual review of hundreds of
documents from Richmond Capital that were not labeled or even
organized.  As you recall from Dr. McAlvanah, this was one of
the very reasons that random samples are so widely used.  Thus
I submit to you that the FTC has demonstrated that it is more
likely than not that the defendants caused a total of
$5,183,284 in consumer harm.

        Now, under the law, the burden now shifts to defendant
Braun to try to prove to you by a preponderance of the evidence
that our numbers are not reasonable.  And he has not shown you
any evidence to suggest that the FTC's calculations are not
reasonable.  The defendants may try to argue that the FTC is
trying to sneak in damages after December 2018 when Mr. Braun
was supposedly fired from Richmond Capital, but there's been no
evidence that he was ever fired or ever stopped controlling
Richmond Capital.

        In fact, the evidence shows, looking at

1    Richmond Capital's bank statements in Exhibit 45, that

2    defendant Braun remained on Richmond Capital's bank statements

3    dated December 31, 2018.  And Ms. Kwok testified that the last

4    deal in that database was in November 2018, a month before

5    Mr. Braun was supposedly fired.

6              Now, defendant Braun may also try to argue that

7    because Dr. McAlvanah did not personally review the underlying

8    merchant cash advance agreements, that somehow his calculations

9    are suspect.

10             As the Court reminded you, it's not uncommon for an

11   expert to rely on information that has been provided by other

12   people.  Moreover, as you heard from Ms. Kwok, the spreadsheets

13   that were provided to Dr. McAlvanah accurately reflected the

14   data that was provided to Dr. McAlvanah, accurately reflected

15   the data that were in the merchant agreements and the bank

16   processing documents, and defendant Braun put on no evidence to

17   suggest otherwise.

18             In fact, defendant Braun put on no evidence that the

19   methodology by which Dr. McAlvanah drew the random sample was

20   incorrect, or that the methodology by which he made his

21   calculations was in error.  Thus I submit to you, defendant

22   Braun has failed to carry his burden, and that the FTC's

23   calculations of $5,183,284 in consumer harm is reasonable.

24             Now, when you begin your deliberations, the Court is

25   going to give you a verdict form.  This is what it's going to

1    look like.  The first question reads:  We the jury award the

2    FTC the following monetary damages from defendant Braun.  Now,

3    based on the evidence, I respectfully ask that you enter

4    $5,183,284 in monetary damages on the verdict form.

5            I now want to turn to the second type of monetary

6    judgment that the FTC is seeking, and that's civil penalties.

7            Now, because defendant Braun violated Section 521 of

8    the GLB Act, Section 5 of the FTC Act, a different provision,

9    allows for the entry of civil penalties if he acted knowingly.

10           As the Court will shortly instruct you, the FTC must

11   first show that defendant Braun knew that material

12   misrepresentations were being made with his consent about the

13   amounts the defendants would provide to and collect from

14   consumers; and second, that the FTC must show that the

15   defendant, Braun, knew or should have known he was violating

16   the GLB Act.

17           And as the Court will instruct, we do not need to

18   prove actual knowledge.  Instead, it is enough if a reasonable

19   person in the same situation as defendant Braun would have

20   known of the GLB Act.  And the evidence is clear that it is

21   more likely than not that defendant Braun, or a reasonable

22   person in his shoes, knew or should have known that his conduct

23   was prohibited by the GLB Act.

24           Now, you heard Ms. Kwok testify that Richmond Capital

25   used a company called Actum Processing as its payment

O1A6FED1                        Summation – Mr. Ashe

processor.  She explained that a payment processer is a company

that facilitates electronic payments between businesses and

their customers.  So Actum Processing is what enabled

Richmond Capital to make those daily withdrawals from their

customers.

          As Ms. Kwok, who, as you heard, is a certified fraud

examiner, explained merchant accounts are everything to a

business, and without one, a business can't accept money from

their customers.

          Now, remember Exhibit 38, the client services

application agreement that Richmond Capital signed?

Richmond Capital agreed as a condition of having that critical

merchant account to follow the GLB Act.  And as the Court told

you, defendant Braun admitted that he knew of this agreement.

Another service, very important to Richmond Capital, was

getting information about potential customers.

          As you heard Mr. Reich testify, and he was a

codefendant of Mr. Braun's, obtaining such information was

important to merchant cash underwriters.  Now, a company called

Thomson Reuters provides this type of service in what are

called CLEAR reports.

          In 2014 and again in 2017, Richmond Capital signed an

account validation and certification form, which was in

Exhibit 39, to get access to these CLEAR reports to do its

underwriting.  Now, as part of that certification,

O1A6FED1                    Summation - Mr. Ashe

Richmond Capital had to certify compliance with the GLB Act.
And Richmond Capital agreed as a condition to access these
reports that it, and all authorized persons, would comply with
the GLB Act.

        Now Mr. Reich testified that underwriting used CLEAR
reports.  And defendant Braun previously testified that among
his other duties, he was heavily involved in Richmond Capital's
underwriting.  Now, defendant Braun may argue he never signed
these agreements, not even an officer of Richmond Capital.  You
know, he's right.  He didn't sign the Actum Processing
agreement or the Thomson Reuters agreements.  But that fact is
not relevant.  It doesn't mean anything.

        He may also argue that his name was nowhere to be
found on Richmond Capital documents, like tax returns.  While
that may be true about the tax returns — though, we have not
seen any evidence of it — what is true is that defendant
Braun's name does appear over Richmond Capital's bank
statements.  You saw a few of them a few minutes ago.  And his
name appears from at least May 2016 all the way through
December 2018.

        Now, these bank documents, along with Mr. Giardina,
one of his codefendants, testimony -- and this is before he
began invoking the Fifth Amendment, and Mr. Reich's testimony,
they also show that the names, RCG Advances, Richmond Capital,
RCG Advisory, these are interchangeable.

1            Now, the evidence shows even though defendant Braun

2    was never named officer of Richmond Capital, that was

3    Mr. Giardina, he was the person in charge -- the person who

4    made all the decisions, called the shots.

5            Remember, the Court has already determined that it is

6    undisputed that Mr. Braun exercised considerable control over

7    all the defendants in this case.  As defendant Braun put it in

8    his previous testimony, he was there five days a week from

9    day one.  Mr. Giardina was not.  And you may draw an adverse

10   inference from Mr. Giardina's taking the Fifth.

11           Now, as the Court explained, when a person takes the

12   Fifth Amendment, you may, based on the relationship between

13   that witness and defendant Braun, you may draw an inference

14   that had he testified truthfully and not asserted the Fifth,

15   that his answer would have incriminated Mr. Braun.

16           And so when Mr. Giardina was asked but refused to

17   answer that he considered defendant Braun to be in charge of

18   Richmond Capital, you may draw the adverse inference that he

19   was.  Same with when he was asked whether Braun was responsible

20   for the day-to-day decisions concerning underwriting, funding,

21   collections.

22           Mr. Reich testified to the same thing.  And defendant

23   Braun certainly made sure that his employees knew it.

24           If you look at an e-mail that was shown to you as

25   Exhibit 51, he tells employees, who is allowed to decide how

much a merchant owes other than me?  Or Exhibit 57, when an
employee asks if they should consult with Mr. Giardina,
defendant Braun response, lol, you still don't realize who is
in charge.

        And regarding the act of Thomson Reuters' agreements,
you may draw an adverse inference from Mr. Giardina that
Mr. Giardina signed them at the direction of defendant Braun.
And not only signed them, but that defendant Braun instructed
him how to complete the agreements.  Not just those agreements,
you may draw the adverse inference that even though
Mr. Giardina was the authorized signatory on Richmond Capital's
bank statements, as you can see in Exhibit 68, it was defendant
Braun who directed him as to when and how much to deposit into
consumers' bank accounts.

        It was so understood by employees that Mr. Giardina
did sign things for Mr. Braun that Mr. Braun didn't want done
or signed in his own name, that when defendant Braun was
considering a replacement -- those CLEAR reports I mentioned
earlier, one of his employees stated:  Defendant Braun should
request a free trial of the software, then she corrects
herself, noting, well, Rob -- that is Mr. Giardina -- should
request a free trial.

        Now, QuarterSpot is another merchant cash advance
company that Richmond Capital had an agreement with.  The
exhibit shows in Exhibit 40, that QuarterSpot sent directly to

O1A6FED1                          Summation - Mr. Ashe

defendant Braun an amendment to that partner agreement.  The

cover e-mail to defendant Braun explained that the amendment

reflected changes made to clarify and update the applicable

laws and regulations governing that agreement.  Now, the

amendment itself requires that Richmond Capital represent that

it had not been or was currently the subject of any

investigation or legal proceeding relating to violations of the

GLB Act.

        Remember, this was sent directly to defendant Braun.

And what did he do with it?  He forwarded that e-mail to

Mr. Giardina, telling him sign the contract amendment.

        Mr. Reich testified that in addition to CLEAR reports,

merchant cash advance companies also use another report called

a TLO report to underwrite deals.  He explained how useful TLO

reports are to underwriting merchant cash advance deals.  The

TLO reports in Exhibit 43 in this example -- and this TLO

reports warn that the reports may only be used in accordance

with the GLB Act.

        And remember from Mr. Braun's earlier testimony that

he was heavily involved in underwriting at Richmond Capital?

Now, notice how often the GLB Act appears in all of these

important documents, in the agreements for Richmond Capital's

merchant accounts, in the agreements to get CLEAR reports for

underwriting, in the QuarterSpot partner agreement, in the TLO

requests.

1          Now, the defendant may try to argue that defendant

2     Braun has never heard of the GLB Act.  But they never presented

3     any evidence of that.  Use your common sense.  A reasonable

4     person who consistently sees references to a statute, who time

5     and again instructs others to agree and affirm that

6     Richmond Capital would comply with that statute, that

7     reasonable person would find out what that statute requires

8     them to do or prohibits them from doing.

9          And what does Section 521 of the GLB Act say?  It says

10    you can't make false, fictitious, or fraudulent statements; in

11    other words, you can't lie to get bank information.  And the

12    evidence clearly shows that defendant Braun knew he was not

13    telling small businesses the truth about how much they would

14    get in funding or how much Richmond Capital would collect

15    from them.

16         The Court has already found that it is undisputed that

17    the defendants misrepresented the amounts they would fund to

18    consumers and collect from consumers.  And defendant Braun

19    often joked to his colleagues and employees in e-mails about

20    what he was doing.  For example, in Exhibit 62 where he says in

21    one deal, we actually are overpaid $6,000, so I went to

22    contract for 10k, held back 2k in fees and 2k in refi, which he

23    doesn't even owe.  And then commenting, free ride lol, try and

24    make extra money with no risk.

25         Or in Exhibit 65, this is another deal, where he ups

O1A6FED1                    Summation - Mr. Ashe

1    the fees after the contract signing, stating, honestly, I do

2    that when I can.  It was signed at 4,999, then I changed it to

3    19,999, and 19,999, lol, because I smelled the opportunity.

4    It's extra 30k.  I got to do what I got to do.

5            Or this exchange in Exhibit 63 in which defendant

6    Braun pretty much explained his MO when he says, I see your

7    offers, then look at it clear and figure out what type of shady

8    shit can I pull off.

9            Mr. Reich testified defendant Braun was a smart

10   businessman, paid attention to detail.  A smart businessperson

11   is not going to jeopardize their payment processing account —

12   the lifeblood of their company — or jeopardize their access to

13   reports essential to deciding whether to make new deals.

14           Ask yourselves, would a reasonable person, a smart

15   businessperson who works with contracts daily, who pays

16   attention to details, would that reasonable person fail to read

17   contracts essential to keeping their business operating?  A

18   reasonable person in defendant Braun's position would have

19   known, or should have known, that the GLB Act prohibited his

20   lies to small businesses.  In other words, the evidence clearly

21   shows that it is more likely than not that the defendant Braun

22   knew his conduct was prohibited by the GLB Act and that if he

23   didn't know, he should have.

24           And on the verdict form that the Court is going to

25   give you, on the second question, the FTC's claims for civil

1   penalties, do you, the jury, find the defendant acted

2   knowingly, I respectfully ask that you check the box yes.

3          Finally, having found defendant Braun liable for civil

4   penalties, you must determine what amount that penalty should

5   be.  As the Court will instruct you, first, you will need to

6   determine how many times defendant Braun violated the law.

7   Then you will need to determine the appropriate amount of civil

8   penalties for those violations.  Under the FTC Act, penalties

9   can be up to $50,120 per violation.

10          Now, federal law says there is a five-year statute of

11   limitations for civil penalties.  Now, this is longer than the

12   period for consumer redress that I discussed earlier.  That

13   means we need to determine to you, or demonstrate to you, the

14   number of deals that defendants over-collected and underfunded

15   in the five-year period before the FTC filed this case for

16   purposes of civil penalties.

17          Remember, again, Dr. McAlvanah, he testified there was

18   a total population of 1,499 deals within this five-year period.

19   And with respect to defendants' over-collection violations,

20   where they collected more from consumers than what was set

21   forth in the merchant agreements, Dr. McAlvanah testified how

22   based on his analysis of a statistically valid random sample of

23   those 1,499 deals, that defendants over-collected 26.4 percent

24   of the time, or 365 of those deals.  He also testified that it

25   was statistically reasonable that the violation rate could be

O1A6FED1                    Summation – Mr. Ashe

1    as high as 37 percent, 554 of those 1,499 deals.

2            And with respect to defendants' underfunding

3    violations, Dr. McAlvanah testified that based on his analysis

4    of the statistically valid random sample of those 1,499 deals,

5    that the defendants underfunded 34.6 percent of the time, or

6    around 519 of those deals.  He also testified that it was

7    statistically reasonable that the violation rate could be as

8    high as 49.1 percent, or such 736 deals.

9            Adding the number of over-collection violations to the

10   number of underfunded violations, the evidence shows it's more

11   likely than not the defendants engaged in a total of 1,290

12   violations during the five-year period.  So the last thing we

13   are asking you to determine is the appropriate amount of civil

14   penalties.  And that's the number that's going to be multiplied

15   by 1,290 to get the total civil penalty.

16           As you said, the FTC Act says that you can assess an

17   amount up to $50,120 per violation; in other words, any number

18   between a penny and $50,120.  Now, keep in mind, the purpose of

19   civil penalties is to both punish defendant Braun's unlawful

20   conduct and to deter future violations by would-be fraudsters.

21           As the Court will instruct you, to help you determine

22   the appropriate amount of civil penalties, you should consider

23   several factors, including the degree of defendant Braun's

24   culpability or responsibility for the violations, and any other

25   merits you believe justice may require.

1         When you review all the evidence you have seen, we ask

2    that you conclude a civil penalty of $50,120 per violation is

3    the appropriate amount.

4         Now, the evidence is overwhelming that defendant Braun

5    personally participated in the law violations, that his degree

6    of culpability or responsibility is high.  The evidence shows

7    that even if he was never named officer, defendant Braun was

8    the person in charge, the person who made all the decisions.

9         The Court has already found it is undisputed that he

10   exercised considerable control over Richmond Capital.

11   Mr. Reich testified to it.  You may take the adverse inference

12   from Mr. Giardina's taking the Fifth to it.  And you have seen

13   in Exhibits 51 and Exhibits 57, defendant Braun certainly made

14   sure his employees knew it.  And the evidence is overwhelming

15   that defendant Braun personally directed and participated in

16   defendants' unlawful over-collection and underfunding

17   practices.

18        Now, the Court has already determined that it is

19   undisputed that he personally participated in the

20   over-collection and the scheme to not pay the promised funding.

21   You heard in his own instructions to his own employees in

22   e-mail.  In Exhibit 51, telling them in one deal, I added 5k to

23   the balance.  Or in Exhibit 56 that he would add some extra.

24   Or in Exhibit 62, that he added 2k refi, which the business

25   didn't even owe.  Or in Exhibit 65, that after contract

O1A6FED1                      Summation - Mr. Ashe

1    signing, he changed the fees from the agreed, just under 5,000,

2    to almost 40,000 because he smelled the opportunity.  Or

3    Exhibit 53, where he says we over-collected $3,200 on the

4    previous deal, lol.  Or Exhibit 54, how he collected over

5    16,000 from a business.  Or Exhibit 64, saying we're 13k

6    overpaid in our last deal.

7            Finally, I ask you to consider -- and the evidence

8    clearly demonstrates -- a few matters as justice may require.

9    First, when defendant Braun collected on outstanding merchant

10   cash advances, he used egregious practices.  I'm not going to

11   replay it, but you remember the video from yesterday.  You

12   heard it with your own ears, you saw it with your own eyes, how

13   defendant Braun treats his customers.

14           And Exhibit 73, Mr. Reich admitted earlier in this

15   case that the defendant Braun threatened his customers.  When

16   he was asked to admit whether defendant threatened customers

17   with physical violence, Mr. Reich admitted at least on one

18   occasion he did.  Or if the defendant threatened to ruin the

19   reputation of customers, he admitted he was aware of threats.

20   Or if the defendant threatened or ruined personal property, he

21   admitted that defendant Braun threatened harm in various ways

22   to consumers.

23           And, finally, I want you to remember that defendant

24   Braun didn't just violate the law, he didn't just over-collect,

25   didn't just underfund.  He enjoyed doing it.  He relished in

O1A6FED1                    Summation - Mr. Ashe

1    the cruelty.  The evidence shows time and again how defendant

2    Braun made light of his illegal practices.

3            We're all familiar with the texting lingo L-O-L,

4    laughing out loud.  You can hear defendant Braun in his own

5    words and e-mails to employees.  In Exhibit 57, when asked, did

6    you ever send him his 25k you reserved, he said nope, lolllll.

7    Or in Exhibit 50, where he says, let's just leave on forever

8    and over-collect, lol.  Or Exhibit 53, where he says, we also

9    over-collected 3,200 on the previous 5k deal, lol.  Or

10   Exhibit 54, I over-collected 16k, lol.  Or Exhibit 60, lol, we

11   are over 10k, and I'm running RCG, Viceroy, and RAM deals with

12   this moron, lol.  Or Exhibit 62, free ride, lol.  Try and make

13   extra money with no risk, lol.  Or Exhibit 65, when asked, you

14   changed the fees on this to 40k?  He replies, yeah, lol.

15           As you can see, defendant Braun was laughing out loud

16   a lot, as he either instructed his employees to over-collect or

17   underfund, or he boasted about doing it.  And he relished in

18   the cruelty.  The video just speaks for itself.  Meanwhile, you

19   can almost hear the glee in his voice, in e-mails, for example,

20   in Exhibit 47, where he states, I ripped ass whole apart with

21   11k fee.  Or Exhibit 56, where he says he's going to inflate a

22   consumer's outstanding balance because consumer is annoying as

23   hell.  Or in Exhibit 61, where he boasts I'm going to beat this

24   bitch at his own game, and they never thought they'd land on a

25   slick motherfucker like me, and concluding, I'm going to get

O1A6FED1                         Summation - Mr. Ashe

1     paid and make yet again another grown man cry.

2              But one of his colleagues described defendant Braun's

3     cruelty best in Exhibit 49, when she told him it's disgusting,

4     you're ruining this guy's business, and you think it's funny.

5              So when you begin your deliberations, I ask that you

6     remember these other matters, how serious they are, how

7     important they are to affect justice.  When you consider the

8     overwhelming evidence that we have presented, including the

9     extent to which defendant Braun is personally responsible and

10    those important matters that justice requires, I ask that you

11    impose the largest civil penalty allowed.  Remember, the

12    purpose of civil penalties is not just to punish defendant

13    Braun, but to deter future violations by others, send the

14    message that lies and deception will not be tolerated in the

15    marketplace.

16             And on Question 3 of the verdict form that the Court

17    will give you, multiplying 120,090, the number of times the

18    defendants violated the GLB Act, by what we're asking you to

19    enter, $50,120, civil penalty per violation, I respectfully

20    request that you require defendant Braun to pay a civil penalty

21    of $64,654,800.

22             You're next going to hear from the defendant's lawyer.

23    I ask that you give him the same time, attention, and

24    consideration that you gave me.  Then the Court will give you

25    some final instructions, and when you go into the jury room to

1  begin your deliberations, I ask that you remember what I said.

2  I ask that you remember the evidence that has been presented, I

3  ask that you remember the testimony that you have heard, I ask

4  that you remember the e-mails, the documents, the charts that

5  you have seen, and I ask that you use your common sense, and I

6  ask that you return a verdict for the FTC, a verdict for the

7  consumer.

8       Thank you for your time, your attention, and your

9  consideration.

10       THE COURT:  Thank you very much.  And now we'll hear

11  from defense counsel.

12       MR. DIBENEDETTO:  Good morning, ladies and gentlemen

13  of the jury.  I want to first thank you for your time in this

14  matter.  My name is Michael DiBenedetto with Joseph Baratta.

15  We represent the defendant, Jonathan Braun.

16       I want to say, it is important to remember that it is

17  the burden of the FTC to prove their case, to prove these

18  damages of nearly $70 million against defendant Braun.

19       The plaintiff's counsel wants to set a precedent,

20  deter others from committing these alleged heinous acts.  You

21  heard testimony from Mr. Reich yesterday, who is the owner of

22  one of the corporate defendants who settled this matter for

23  $675,000.  If you want to send a message to, quote/unquote,

24  deter, deter other merchant cash advance companies from

25  committing these alleged acts, and you settle for $675,000 with

1    one codefendant and asking for 70 million against another, it

2    seems a bit egregious to me.

3          The FTC has not provided any proof of consumer harm.

4    The FTC focused on the Actum application, whether or not

5    Mr. Braun had knowledge of the GLB Act.  Where are the Actum

6    records?  Where are the records that show these alleged

7    overpayments and underfunding?  All of these debits that came

8    out, where are those records?  Where are those consumers in

9    this courtroom today?  No one came and testified.  No one came

10   and testified about these alleged threats that Mr. Braun

11   supposedly made.

12         It is the FTC's burden to prove damages.

13   Mr. McAlvanah, who testified -- it's also important to remember

14   Mr. McAlvanah is employed by the Federal Trade Commission.  He

15   testified that he was instructed by the staff attorneys on what

16   to do.  He testified that he never saw any of the agreements.

17   He was given an Excel spreadsheet and said, have at it.

18         He also testified that he took a small random sample

19   of the 1,499 deals and acknowledged that there's a wider margin

20   of error.  That is very important to understand.  The one

21   witness that they had to discuss damages acknowledged that

22   there's a wide margin of error in his analysis.

23         For the FTC to ask for $70 million, wouldn't it be

24   important to conduct an analysis of the 1,499 deals, or

25   something close to it, to shrink that margin of error, instead

of saying it's too laborious or burdensome to conduct that kind

of analysis?  You're asking for $70 million, $70 million.

There is not a bank record in evidence that shows the

over-collecting.  There isn't a bank record that shows the

underfunding.  There isn't a consumer in here that said

anything of that sort.  It's mere -- here's a merchant cash

advance agreement, and they want you to determine that that's

worth $70 million.  It's not there.

Ms. Kwok testified, who was an investigator for the

Federal Trade Commission.  When cross-examined, she didn't seem

to remember much.  She didn't remember much.  She was the

investigator on this case.  I asked her about the bank

statements; she couldn't recall.  I asked her about the tax

returns; she couldn't recall.  Her testimony contradicted

Mr. McAlvanah.  Mr. McAlvanah testified that he didn't review

any of the documents or any of the records, but Ms. Kwok

testified that Mr. McAlvanah gave her the records.  So what is

it?

Ms. Kwok didn't testify to any damages.  She testified

she interviewed some consumers, looked at some bank statements.

What damages did she show?  None.

Mr. McAlvanah was unable to show a finite number of

damages.  Ms. Kwok did not show any damages.  Where are the

records?  Where are the records showing all of these alleged

over-debitings?

1              Plaintiff's counsel shows you a bunch of e-mails from

2    Mr. Braun about all the over-collecting and the lols.  We're

3    not going to sit here and downplay that.  Where are those

4    agreements?  They didn't link any of those alleged deals to

5    anything in evidence.  They didn't link that to any Actum

6    records showing that Mr. Braun over-collected the 16k.

7              Let's discuss the video.

8              Again, we will not downplay Mr. Braun's words in the

9    video.  I also want the jury to remember that sometimes when

10   you're angry at work, you say things, and sometimes you say

11   things that you shouldn't say.  But what's important to

12   remember about that video is that the consumer on the other

13   side acknowledged he owed Mr. Braun the money.  He didn't say,

14   you overcharged me.  He didn't say, I was underfunded.  He just

15   said, I can't pay you.  Where is the consumer harm?  How was he

16   harmed?

17             Yes, Mr. Braun said, I'll come spit in your face.  I

18   would have completely acknowledged that that's poor language.

19   But where in that video does the consumer seem harmed?  And the

20   individual that took that video, Mr. Reich, settled this case

21   for $675,000.  Mr. Braun should not be responsible for

22   $70 million when Mr. Reich was in the same room.  He didn't

23   stop Mr. Braun from speaking to the consumer that way.  They

24   probably both laughed at it together.  But Mr. Reich got out

25   easy.  And the FTC is asking for Mr. Braun to bear the brunt to

1    be their headline.

2            Mr. Giardina testified, who was another owner of the

3    corporate defendants.  He testified.  Again, it's important to

4    understand that it's the FTC's burden.  Their own witness took

5    the Fifth Amendment.  They asked for an adverse inference

6    against Mr. Braun for the testimony of Mr. Giardina.  We asked

7    for the complete opposite.  Everything that plaintiff's counsel

8    asked Mr. Giardina, we asked the negative, and he continued to

9    take the Fifth Amendment.  Mr. Braun did not force Mr. Giardina

10   to sign any of these Actum documents, so we ask that any

11   negative inference against Mr. Braun should not be taken.

12           There is no proof, other than some nasty e-mails that

13   Mr. Braun sent to some of his coworkers that had some foul

14   language.  Where are those agreements?  That 16k alleged

15   overfunding.  Plaintiff's counsel didn't even specify or get

16   any sort of testimony about what agreement or what merchant

17   that even was.  The only numbers they have is from someone that

18   worked for them.

19           I'm not going to sit here and say that Mr. Braun is a

20   nice guy.  I'm not going to sit here and say that Mr. Braun

21   didn't say some stupid things.  Mr. Braun is not liable for

22   $70 million.  None of the other codefendants settled for

23   anything over a million dollars.  They are looking for a

24   headline.

25           It is important to remember that there were all these

1    claims of alleged threatening physical violence.  All of these

2    threats -- one video saying I'm going to spit in your face does

3    not equate to $70 million.  It just doesn't.

4            So, again, I'm not going to sit here and say that

5    Mr. Braun has not said some foul things, whether it was to a

6    consumer in a video, whether it was to his coworkers in an

7    e-mail, but when you deliberate and you look at those e-mails

8    saying I overfunded 16k, lol, just remember, where is that

9    agreement?  Where is that agreement?  Where are the records

10   from Actum showing the 16 K overfunding?  An e-mail is not

11   proof that these things actually happened.  The records, the

12   bank records, the Actum records, would actually be the proof

13   that the FTC should have brought, but they didn't.

14           They could have brought consumers in here to testify

15   as to the actual harm that they suffered, the actual alleged

16   overfunding and under-collecting, but they didn't.  They

17   brought in the two of their employees and the other

18   codefendants that they settled with that had to cooperate.

19   That's all they brought in.

20           Another important factor that I want the jury to

21   deliberate about is Mr. Braun's ability to pay.  They

22   haven't -- there's no testimony about Mr. Braun's ability to

23   pay.  There is no evidence as to his bank records.  There's no

24   testimony as to his financial stature.  There's nothing.

25   That's their burden; they didn't meet it.

1              So when the jury deliberates today, I ask that you

2     return a verdict for Mr. Braun in the amount of $0.  Again, it

3     is FTC's burden to prove consumer harm, and all of these

4     monetary relief penalties — civil penalties, the violation of

5     the GLB Act — where is the proof?  Other than some e-mails,

6     it's not there.

7              Thank you.

8              THE COURT:  Thank you very much.

9              All right.  Ladies and gentlemen, since we're moving

10    with good speed, I think we'll just give you a 10-minute break

11    at this time, and then I will give you my instructions of law.

12    So we'll take a 10-minute break.

13

14

15

16

17

18

19

20

21

22

23

24

25

O1A6FED1

1              (Jury not present)

2              THE COURT:  Okay.  Let me say that while occasionally

3    I have been critical of counsel at one moment or another, I

4    thought the summations by both sides were excellent.  I thought

5    that they fairly presented to the jury the two very different

6    points of view that are involved in this case.  So I commend

7    counsel for a job well done.

8              All right.  We'll take a 10-minute break.

9              (Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1A5fed2                         Charge

1         (Jury present)

2         THE COURT:  Ladies and gentlemen, each of you now have

3    a copy of my instructions.  We are going to read them together

4    but then you can take them with you into the jury room for your

5    deliberations.  And if you look at the table of contents, you

6    will see that the instructions are divided into three parts.

7    The first are general instructions, these apply really to all

8    civil cases, then there are the instructions about the specific

9    issues that you need to address in this case, and then there

10   are some concluding instructions about how you fill out the

11   verdict form and things like that.  So, let's turn to

12   instruction no. 1.

13        We are now approaching the most important part of this

14   case, your deliberations.  You have heard all of the evidence

15   in the case as well as the final arguments of the lawyers for

16   the parties.  Before you retire to deliberate, it is my duty to

17   instruct you as to the law that will govern your deliberations.

18   These are the final and binding instructions which entirely

19   replace the preliminary instruction I gave you earlier.

20        Regardless of any opinion you may have as to what the

21   law may be or ought to be, it is your sworn duty to follow the

22   law as I give it to you.  Also, if any attorney or other person

23   has stated a legal principle different from any that I state to

24   you in my instructions, it is my instructions that you must

25   follow.

O1A5fed2                         Charge

1          Because my instructions cover many points, I have

2     provided each of you with a copy of them not only so that you

3     can follow them as I read them to you now, but also so that you

4     can have them with you for reference throughout your

5     deliberations.  In listening to them now and reviewing them

6     later, you should not single out any particular instruction as

7     alone stating the law but instead consider the instructions as

8     a whole.

9          Your duty is to decide the fact issues in the case and

10    arrive, if you can, at a verdict.  You, the members of the

11    jury, are the sole and exclusive judges of the facts; you pass

12    upon the weight of the evidence; you determine the credibility

13    of the witnesses; you resolve such conflicts as there may be in

14    the testimony; and you draw whatever reasonable inferences you

15    decide to draw from the facts as you determine them.

16         In determining the facts, you must rely upon your own

17    recollection of the evidence.  To aid your recollection, we

18    will send you all the documentary exhibits at the start of your

19    deliberations.  If you want to see the video, please let us

20    know and we will bring you back to court to play it for you.

21    Also, if you need to review any particular items of testimony,

22    we can arrange to provide them to you in transcript or

23    read-back form.

24         Please remember that none of what the lawyers have

25    said in their opening statements, in their closing arguments,

in their objections or in their questions is evidence.  Nor is
anything I may have said evidence.  The evidence before you
consists of just three things:  The testimony given by
witnesses that was received in evidence, the exhibits that were
received in evidence, and the undisputed facts found by the
Court, which you will recall you got in written form as well.

Testimony consists of the answers that were given by
the witnesses to the questions that were permitted either here
in court or in the depositions that were read into evidence.
Please, remember the questions, although they may provide the
context for answers are not themselves evidence.  Only answers
are evidence and you should therefore disregard any question to
which I sustained an objection.  Also, you may not consider any
answer that I directed to you disregard or that I directed be
stricken from the record.  Likewise, you may not consider
anything you heard about the contents of any exhibit that was
not received in evidence.

More generally, you should be careful not to speculate
about matters not in evidence.  Your focus should be solely on
the evidence that was presented here in court.

It is duty of the attorney for each side of the case
to object when the other side offers testimony or other
evidence that the attorney believes is not properly admissible.
Counsel also have the right and duty to ask the Court to make
rulings of law and to request conferences at the side bar out

O1A5fed2                    Charge

of the hearing of the jury -- although I don't think we had any

side bars in this case.  All such questions of law must be

decided by me.  You should not show any prejudice against any

attorney or party because the attorney objected to the

admissibility evidence, asked for a conference out of the

hearing of the jury, or asked me for a ruling on the law.

I also ask you to draw no inference from my rulings or

the fact that on occasion I asked questions of certain

witnesses.  My rulings were no more than applications of the

law and my questions were only intended for clarification or to

expedite matters.  You should understand that I have no opinion

as to the verdict you should render in this case.

You are to perform your duty of finding the facts

without bias or prejudice or sympathy or hostility as to any

party, for all parties are equal under the law.  You are to

perform your final duty in an attitude of complete fairness and

impartiality.  You are not to be swayed by rhetoric or

emotional appeals.  It must be clear to you that if you were to

let extraneous considerations interfere with your thinking,

there would be a risk that you would not arrive at a true and

just verdict.  So, do not be guided by anything except clear

thinking and calm analysis of the evidence.

As you know, this is a civil case.  To prevail in a

civil case, a party who is making a claim against another party

has what we call the burden of proof which is the burden of

O1A5fed2                    Charge

establishing each of the essential elements of the claim by a

preponderance of the credible evidence.

"Credible evidence" means such evidence that you find

worthy of belief.  To establish an element of a claim by

preponderance of the credible evidence means to prove that the

element is more likely true than not true.  When assessing

whether a party has met its burden of proof or failed to do so,

the question is not which party called the greater number of

witnesses or how much time one party or another spent during

the trial.  The focus must always be on the quality of the

evidence, its persuasiveness in convincing you of its truth.

In deciding whether a party meets its burden of proof

you may consider both direct evidence and circumstantial

evidence.

Direct evidence is evidence that proves a fact

directly.  For example, where a witness testifies to what he or

she saw, heard, or observed, that is called direct evidence.

Circumstantial evidence is evidence that tends to

prove a fact by proof of other facts.  To give a simple

example, suppose when you came into the court house today the

sun was shining and it was a nice day, but the court house

blinds were drawn and you could not look outside.  Later, as

you were sitting here, someone walked in with a dripping wet

umbrella, and soon after somebody else walked in with a

dripping wet raincoat.  Now, on our assumed facts, you cannot

1    look outside the courtroom and you cannot see whether it is

2    raining so you have no direct evidence of that fact.  But on

3    the combination of the facts about the umbrella and raincoat,

4    it would be reasonable for you to infer that it had begun

5    raining.

6           That is all there is to circumstantial evidence.

7    Using your reason and experience, you infer from established

8    facts the existence or the non-existence of some other fact.

9    Please note, however, it is not a matter of speculation or

10   guess, it is a matter of logical inference.

11          The law makes no distinction between direct and

12   circumstantial evidence.  Circumstantial evidence is of no less

13   value than direct evidence, and you may consider either or both

14   and give them such weight as you conclude is warranted.

15          It must be clear to you by now that counsel for the

16   opposing parties are asking you to draw very different

17   conclusions about various factual issues in the case.  An

18   important part of that decision will involve making judgments

19   about the testimony of the witnesses you have listened to and

20   observed.  In making these judgments, you should carefully

21   scrutinize all of the testimony of each witness, the

22   circumstances under which each witness testified, and any other

23   matter in evidence that may help you to decide the truth and

24   the importance of each witness' testimony.

25          Your decision to believe or to not believe a witness

may depend on how that witness impressed you.  How did the

witness appear to you?  Was the witness, candid, frank, and,

forthright or did the witness appear to you to be basic or

suspect in some way?  How did the way the witness testified on

direct examination compare with how the witness testified on

cross-examination?  Was the witness consistent or

contradictory?  Did the witness appear to know what he or she

was talking about?  Did the witness strike you as someone who

was trying to report his or her knowledge accurately?  These

are examples of the kinds of common sense questions that you

should ask yourselves in deciding whether a witness is or is

not truthful.

          How much you choose to believe a witness may also be

influenced by a witness' bias.  Does the witness have a

relationship with any of the parties that may affect how he or

she testified?  Does the witness have some interest, incentive,

loyalty or motive that might cause him or her to shade the

truth?  Does the witness have some bias, prejudice, or

hostility that may cause the witness to give you something

other than a completely accurate account of facts he or she

testified to?

          You should also consider whether the witness had an

opportunity to observe the facts he or she testified about, and

whether the witness' recollection of the facts stands up in

light of the other evidence in the case.

1          In other words, what you must try to do in deciding

2     credibility is to size up a person just as you would in any

3     important matter where you are trying to decide if a person is

4     truthful, straightforward, and accurate in his or her

5     recollections.

6          The law permits parties to offer opinion evidence for

7     witnesses who were not involved in the underlying events in the

8     case but who, by education or experience, profess to expertise

9     in a specialized area of knowledge.  In this case,

10    Dr. Dr. Patrick McAlvanah was such a witness.  Specialized

11    testimony is presented to you on the theory that someone who is

12    learned in the field may be able to assist you in understanding

13    the specialized aspects of the evidence.

14          But your role in judging credibility and assessing

15    weight applies just as much to these witnesses as to other

16    witnesses.  When you consider the specialized opinions that

17    were received in evidence in this case, you may give them as

18    much or as little weight as you think they deserve.  For

19    example, a specialized witness necessarily bases his or her

20    opinions, in part or in whole, on what the witness learned from

21    others, and you may conclude that the weight given the witness'

22    opinions may be affected by how accurate or inaccurate or

23    reliable that underlying information is.  More generally, if

24    you find that the opinions of a specialized witness were not

25    based on sufficient data, education, or experience, or if you

1    should conclude that the trustworthiness or the credibility of

2    such a witness is questionable, or if the opinion of the

3    witness is outweighed, in your judgment, by other evidence in

4    the case, then you may, if you wish, disregard the opinions of

5    that witness, either entirely or in part.  On the other hand,

6    if you find that a specialized witness is credibility and that

7    the witness' opinions are based on sufficient data, education,

8    and experience, and that the other evidence does not give you

9    reason to doubt the witness' conclusions, you may, if you wish,

10   rely on that witness' opinions and give them whatever weight

11   you deem appropriate.

12           Applying the general principles that I have just

13   discussed, you must now determine, in accordance with my

14   instructions, whether the FTC has established its entitlement

15   to damages and civil penalties.  As I already informed you, the

16   Court previously found Mr. Braun liable for violating federal

17   law, specifically the Gramm-Leach-Bliley Act (the "GLB Act"),

18   by making material misrepresentations about the amount of money

19   that borrowers would receive and the amount of money that the

20   borrowers would have to repay under their merchant cash advance

21   ("MCA") agreements.  In addition, the Court has already found

22   that Mr. Braun is liable not only for his own material

23   misrepresentations but also for the material misrepresentations

24   that were made by RCG Advances, LLC; RAM Capital Funding, LLC;

25   Robert Giardina and Tzvi Reich, who I will collectively refer

O1A5fed2                    Charge

1   to as the co-defendants.  You must accept these conclusions on

2   liability as settled and binding.

3           As a result, there are only three remaining issues for

4   you to determine.

5           First, what is the monetary amount of damages, if any,

6   caused to the borrowers by misrepresentations made to them by

7   Mr. Braun and his co-defendants.

8           Second, did Mr. Braun know that making these

9   misrepresentations was deceptive or misleading and a violation

10  of the law?

11          Third, if you find that Mr. Braun so knowingly made

12  these representations, what is the amount of civil penalties

13  that should be imposed on Mr. Braun?

14          I will now discuss each of these issues in more

15  detail.

16          The FTC is seeking what are called "damages" for the

17  monetary harm that the misrepresentations caused to the

18  borrower.  In particular, the FTC is seeking monetary damages

19  for those MCA agreements to which Mr. Braun and his

20  co-defendants either underfunded, meaning that the borrower

21  received less money than what the borrower was supposed to

22  receive, or over-collected, meaning that Mr. Braun and his

23  co-defendants took more money from borrowers than what the

24  borrowers owed.  As you know, it has already been established

25  in an earlier phase of the case that such representations were

1    made and that Mr. Braun is legally liable for his role relating

2    thereto.  However, because of what is called the statute of

3    limitations, the damages are limited to the amount of such

4    monetary harm that occurred during the three-year period

5    between June 10, 2017, and June 10, 2020.  Indeed, the FTC is

6    only seeking damages for such harms as occurred between June

7    10, 2017 and November 2018.

8            As to the amount of damages resulting from these

9    misrepresentations, the FTC can meet its burden of proof to

10   show monetary damages by putting forward a reasonable estimate

11   of the harm to borrowers.  Once the FTC puts forward evidence

12   of a reasonable estimate, the burden shifts to Mr. Braun to

13   show why the FTC's reasonable estimate is inaccurate or

14   unreasonable.

15           The FTC is also seeking civil penalties.  To recover

16   civil penalties, the FTC must first prove that Mr. Braun acted

17   knowingly.  "Knowingly" here has two aspects.  First, the FTC

18   must show that Mr. Braun knew that material misrepresentations

19   were being made to borrowers with his consent about the amount

20   of money that borrowers were to receive and/or must repay.

21   Second, the FTC must show that Mr. Braun knew or should have

22   known he was violating the GLB Act.  The FTC can show the

23   second aspect by proving that Mr. Braun had actual knowledge he

24   was violating the GLB Act or that a reasonable person under the

25   circumstances would have known there was a federal law

O1A5fed2                    Charge

1    prohibiting deceptive practices in the making of agreements

2    like the MCA agreements.

3           If you find that the FTC has failed to prove these

4    requirements by a preponderance of the evidence, then you must

5    not award any civil penalties.  If, however, you find that the

6    FTC has proven these requirements by a preponderance of the

7    evidence, then you must calculate the appropriate amount of

8    civil penalties.

9           Here, because of a different statute of limitations,

10   the FTC is entitled to seek up to $50,120 for each violation of

11   the GLB Act that occurred between June 10, 2015 and June 10,

12   2020; but, in fact, the FTC is only seeking such penalties

13   through November 2018.  This requires you to determine both how

14   many times Mr. Braun violated the law during this period, and

15   how much to award the FTC per violation.  In determining the

16   number of violations, you should consider not just the

17   violations Mr. Braun personally committed but also any

18   violations that were committed by his co-defendants with his

19   consent.  In determining how much to award the FTC per

20   violation, which can range anywhere from one cent to $50,120

21   per violation, you should consider not only Mr. Braun's

22   culpability but also any other matters that you believe justice

23   may require.  You should multiply the number of times Mr. Braun

24   violated the GLB Act by what you determine is the appropriate

25   amount per violation to arrive at total civil penalties.  You

O1A5fed2                    Charge

1    should record the final, total amount on the verdict form.

2            You will shortly retire to the jury room to begin your

3    deliberations.  As soon as you get to the jury room, please

4    select one of your number as the foreperson to preside over

5    your deliberations and to serve as your spokesperson if you

6    need to communicate with the Court.

7            You will be bringing with you into the jury room a

8    copy of my instructions of law and a verdict form on which to

9    record your verdict.  Let me pause there.

10           Ladies and gentlemen, you already saw put up on the

11   screen the verdict form but here it is again.  It is a simple,

12   one-page document, that asks you three questions:  First, how

13   much do you award in damages; second, whether or not Mr. Braun

14   acted knowingly as I have defined that term; and third, if he

15   did act knowingly, how much you award in penalties.

16           After you have reached your verdict, your foreperson

17   will sign it, date it, fold it up, and seal it in this envelope

18   very cleverly marked "verdict" and that envelope will be

19   brought to me but I won't open it and read it until you are all

20   back here in the courtroom.  And then, after we have read it, I

21   will ask each of you individually whether that is your verdict.

22   And the reason we go through that is to be absolutely sure we

23   have your verdict as you have decided it.

24           So, back to the instructions.

25           In addition, we will send to the jury room all the

1    documentary exhibits that were admitted into evidence.  If you

2    want to see the video, let us know and we will bring you back

3    to the courtroom to see it.  If you want any of the testimony,

4    that can also be provided in either transcript or read-back

5    form, but please remember that it is not always easy to locate

6    what you might want so be as specific as you possibly can be in

7    requesting portions of testimony.

8            Any of your requests, in fact any communication with

9    the Court, should be made to me in writing, signed by your

10    foreperson, and given to the marshal who will be available

11    outside the jury room throughout your deliberations.  After

12    consulting with counsel, I will respond to any question or

13    requests you have as promptly as possible, either in writing or

14    by having you return to the courtroom so that I can speak with

15    you in person.

16            You should not, however, tell me or anyone else how

17    the jury stands on any issue until you have reached your

18    verdict and recorded it on your verdict form.

19            Each of you must decide the case for yourself, after

20    consideration, with your fellow jurors, of the evidence in the

21    case, and your verdict must be unanimous.  In deliberating,

22    bear in mind that while each juror is entitled to his or her

23    opinion, you should exchange views with your fellow jurors.

24    That is the very purpose of jury deliberation -- to discuss and

25    consider the evidence, to listen to the arguments of fellow

1    jurors, to present your individual views, to consult with one

2    another, and to reach a verdict based solely and wholly on the

3    evidence.

4            If, after carefully considering all of the evidence

5    and the arguments of your fellow jurors, you entertain a

6    conscientious view  that differs from the others', you are not

7    to yield your view simply because you are outnumbered.  On the

8    other hand, you should not hesitate to change or modify an

9    earlier opinion that, after discussion with your fellow jurors,

10    now appears to you erroneous.

11            In short, your individual must reflect your individual

12    views and it must also be unanimous.

13            This completes my instructions of the law.

14            So, any suggestions or objections previously made to

15    the charge are deemed remade at this time and the Court stands

16    by its previous rulings.

17            So, ladies and gentlemen, let me remind you that you

18    can take as little or as long as you want for deliberations.

19    At about 1:00 we will send in lunch so you can have lunch.  The

20    lawyers will be here at all times except between 1:00 and 2:00

21    when they will have lunch as well.  If you haven't reached a

22    verdict by 4:30, you should go home and then come back in the

23    morning at 9:30, and if that happens your foreperson is in

24    charge of making sure that all nine of you are back before you

25    resume your deliberations.

O1A5fed2                              Deliberations

1              So, we will swear in the marshal.

2              THE DEPUTY CLERK:  Marshal, please come forward.

3              THE MARSHAL:  Yes.

4              (Marshal sworn)

5              THE DEPUTY CLERK:  Jurors, please follow the marshal.

6              (At 11:06 a.m., the jury retired to deliberate)

7              THE COURT:  Please, be seated.

8              I will give a copy of my charge to my law clerk marked

9    as Court Exhibit 1 to docket.  Now, while the jury is

10   deliberating, we need to have at least one lawyer from each

11   side who can answer any questions either right in the courtroom

12   or just outside, not on some other floor, not outside the court

13   house.  The only exception is between 1:00 and 2:00 when you

14   are all excused to have lunch.

15             Any questions anyone has?  Very good.  We will see you

16   when we get a note.  Thank you very much.  My law clerk will

17   take the exhibits and the index to the marshal to give to the

18   jury.

19             (Recess pending verdict)

20

21

22

23

24

25

O1A6FED3

1          (At 2:24 p.m., a note was received from the jury)

2          (Jury present)

3          THE COURT:  Please be seated.

4          So I understand we have a verdict.  In a moment, I'll

5    open the verdict form, but I never comment on the verdict.

6    That's your job to decide, not mine.  But I do want to comment

7    on what a terrific jury this has been.  I observed you out of

8    the corner of my eye, and you were all very attentive, very

9    prompt, followed all the evidence.  I do have a trial starting

10   in two weeks.  It will only last about a month.  You don't mind

11   staying for that, do you?  Actually, you'll be glad to know

12   you're excused from federal jury service for four years, and

13   that's a reflection of your excellent service.  So I thank you

14   again for your service.

15         Okay.  Let's see the verdict slip.

16         Okay.  The verdict is in proper form.  I will give it

17   to my courtroom deputy to take the reading of the verdict.

18         DEPUTY CLERK:  Will the foreperson please rise?

19         As to *United States v. Jonathan Braun*, you, the jury,

20   award the FTC the following monetary damages from defendant

21   Jonathan Braun.  You say?

22         THE JUROR:  $3,500,000.

23         DEPUTY CLERK:  On the FTC's claim for civil penalties,

24   do you, the jury, find that the defendant acted knowingly as

25   defined in the Court's instructions, yes or no?  You say?

O1A6FED3

```
1              THE JUROR:  Yes.

2              DEPUTY CLERK:  Having found that the defendant acted

3    knowingly, you, the jury, award the FTC the following civil

4    penalties.  You say?

5              THE JUROR:  $7,500,000.

6              DEPUTY CLERK:  Shall I poll the jury?

7              THE COURT:  Yes.

8              DEPUTY CLERK:  Juror Number 1, is that your verdict?

9              THE JUROR:  Yes, it is.

10             DEPUTY CLERK:  Juror Number 2, is that your verdict?

11             THE JUROR:  Yes, it is.

12             DEPUTY CLERK:  Juror Number 3, is that your verdict?

13             THE JUROR:  Yes, it is.

14             DEPUTY CLERK:  Juror Number 4, is that your verdict?

15             THE JUROR:  Yes.

16             DEPUTY CLERK:  Juror Number 5, is that your verdict?

17             THE JUROR:  Yes.

18             DEPUTY CLERK:  Juror Number 6, is that your verdict?

19             THE JUROR:  Yes.

20             DEPUTY CLERK:  Juror Number 7, is that your verdict?

21             THE JUROR:  Yes.

22             DEPUTY CLERK:  Juror Number 8, is that your verdict?

23             THE JUROR:  Yes.

24             DEPUTY CLERK:  Juror Number 9, is that your verdict?

25             THE JUROR:  Yes.
```

O1A6FED3

1           DEPUTY CLERK:  Jury polled; verdict unanimous.

2           THE COURT:  Thank you very much, and we'll take the

3     verdict form back from you.

4           So, again, you are now excused for real, with a great

5     thanks of the Court.  And I thank you again for your service

6     and also hope you will have a lovely rest of the day, so you

7     can leave now.

8           (Jury not present)

9           THE COURT:  You may be seated.

10          All right.  So the one part of that verdict that is

11    binding on me, of course, is the answer to the second question

12    that the defendant acted knowingly in the way that it was

13    defined.  With respect to the other two parts of the verdict,

14    those are advisory, but, of course, I will give them

15    substantial weight, but I'm going to give each side the

16    opportunity to make brief additional submissions on the first

17    item.  All I want is any further argument that anyone wants to

18    make.  I don't want any additional evidence.  The evidence was

19    all submitted.

20          On the third, the penalties, since there were certain

21    factors that were kept out of this trial for reasons I

22    previously indicated, if someone wants to put in something in

23    the way of evidence with respect to some of the other factors,

24    I will consider it -- although, I think you should keep that to

25    a minimum.

O1A6FED3

1          For example, I'm already aware of the prior

2     conviction, so you don't need to put in anything on that, you

3     can argue -- I think it's an interesting argument -- of whether

4     I should give any weight to that prior conviction or give

5     meaningful weight to it.  As I understand it, but you can

6     clarify this in your submissions, it was a money laundering

7     conviction for which the defendant was ultimately pardoned; is

8     that right?

9          MR. ASHE:  His sentence was commuted.

10          THE COURT:  Or commuted.  And it was for money

11     laundering in connection with drugs?

12          MR. ASHE:  Yes, your Honor.

13          THE COURT:  So, obviously, that was a serious matter,

14     but I'm not sure that it particularly relates to the misconduct

15     that he's now been found liable for here.

16          So, anyway, I'll be happy to hear whatever anyone

17     wants to say, but you don't need to put in anything of an

18     evidentiary nature.

19          The one thing that possibly you might want to put in,

20     something of an evidentiary nature, is his capacity to pay.  I

21     would like to avoid, if we can, any further hearing on that

22     evidentiary hearing.  But maybe a declaration and a response to

23     the declaration.

24          So initial papers for all that I've just described

25     should be submitted on January 17, limited for the argument to

O1A6FED3

```
 1   ten double space pages, and if there are any declarations
 2   attached, whatever they are, will be.  The response from each
 3   side is on January 24, again, limited to ten double space
 4   pages.
 5            And I will endeavor to get you a final decision by the
 6   end of the month, but I can't guarantee that.  I have, as you
 7   just heard, another trial going on that's going to take some
 8   time.  But, certainly, worst case, it will be sometime in
 9   February.  And then final judgment can, of course, be appealed.
10            Anything else we need to take up today?
11            MR. ASHE:  Not for the FTC, your Honor.
12            MR. DIBENEDETTO:  No, your Honor.
13            THE COURT:  Very good.  So I thank counsel again, all
14   counsel, for your help -- even the gentleman who sat a distance
15   on the -- in my view, he's of the far left, but he may prefer
16   to think he's on the far right.  But in any way, my thanks to
17   everyone, and I look forward to seeing your papers.
18            That concludes this proceeding.
19            (Adjourned)
20
21
22
23
24
25
```