UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

        Plaintiff,

   -v-

JONATHAN BRAUN,

        Defendant.

20-cv-4432 (JSR)

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND FINAL JUDGMENT

JED S. RAKOFF, U.S.D.J.

    The Federal Trade Commission ("FTC") sued defendant, Jonathan Braun, for violating Section 5(a) of the Federal Trade Commission Act ("FTC Act") and Section 521 of the Gramm-Leach-Bliley Act ("GLB Act"). See First Am. Compl. ("FAC"), ¶¶ 33-55, ECF No. 84. On summary judgment, the undisputed facts established that Mr. Braun violated Section 5(a) of the FTC Act and Section 521 of the GLB Act, by cheating borrowers both by underpaying how much they were entitled to receive from his lending company and by overcharging how much they were supposed to repay. 9/27/23 Op. at 13-32, ECF No. 179. The Court accordingly entered a permanent injunction that in relevant part banned Mr. Braun from "making merchant cash advances or participating in debt collection activities." Id. at 42-45; Order for Permanent Inj. as to Def. Jonathan Braun, ECF No. 183. However, there were genuine disputes of material fact that

precluded summary judgment on the FTC's request for damages and civil penalties. 9/27/23 Op. at 32-42.

After summary judgment, three issues remained for trial: (1) the amount of money that should be awarded to the FTC under Section 19 of the FTC Act in order to redress the injury to consumers resulting from Mr. Braun's violation of the GLB Act; (2) whether Mr. Braun knowingly violated the GLB Act such that it would be proper to impose civil penalties under Section 5 of the FTC Act; and (3) if Mr. Braun acted knowingly, the amount of civil penalties that should be awarded to the FTC. Although the first and third issues were ultimately for the Court to decide, the parties agreed that a jury would initially hear all the remaining issues and render a verdict that would be merely advisory on the amount of civil penalties and damages but that would be binding on the issue of whether Mr. Braun acted knowingly.

Accordingly, starting on January 8, 2024, a three-day jury trial was held. On January 10, 2024, the jury returned a verdict, finding that Mr. Braun knowingly violated the GLB Act and owed $3,500,000 in damages and $7,500,000 in civil penalties. See Jury Verdict, ECF No. 206. The Court is bound by the jury's determination that Mr. Braun acted knowingly. However, while the Court will give some weight to the jury's recommendation to award the FTC $3,500,000 in damages and $7,500,000 in civil penalties, the Court must still determine for itself, based not only on the

evidence presented at trial but also in the post-trial briefing, the appropriate amount of consumer redress and civil penalties to award to the FTC. This is further influenced by the fact that the Court, in order not to prejudice the jury in its determination of knowledge and intent, kept hidden from the jury such facts as Mr. Braun's prior criminal conviction, which arguably might be relevant to the determination of penalties.

I.   Findings of Fact

Based on the exhibits, the undisputed facts found by the Court on summary judgment, the parties' post-trial briefs, the trial testimony, and the Court's assessment of the trial witnesses' demeanor and credibility, the Court makes the following factual findings:

1. Mr. Braun exercised considerable control over his co-defendants, RCG Advances, LLC ("RCG"); Ram Capital Funding, LLC ("Ram"), Robert Giardina, and Tzvi Reich (collectively, the co-defendants). Tr. 91:1-2.[1] In Mr. Braun's own words, he "was heavily involved in just about every deal that [was] funded" and "was probably the only one there five days a week from day one ground zero." FTC Ex. 75 at 14:19-25.

2. Mr. Braun was an owner, manager, and officer of RCG and had decision-making authority for all the co-defendants. Tr.

---

[1] Hereinafter, "Tr." refers to the trial transcript.

91:2-4. For example, in an email exchange with Mr. Reich and Michelle Gregg, Mr. Braun stated, "Who is allowed to decide how much a merchant owes other than me." FTC Ex. 51-1.

3. Mr. Braun and his co-defendants (collectively, the defendants) misrepresented the amount of money they would withdraw from their customers' bank accounts. Tr. 87:21-23. Specifically, Mr. Braun and his co-defendants withdrew more money, from their customers' bank accounts, than they were owed under the merchant cash advance ("MCA") agreements. Tr. 87:9-21.

4. Mr. Braun personally participated in, had knowledge of, and had authority to control these over-withdrawals. Tr. 91:9-11, 92:7-10.

5. The Court credits the statistical analysis performed by Dr. Patrick McAlvanah, an economist at the Bureau of Economics of the FTC, in order to determine the number of times that Mr. Braun and his co-defendants over-collected from their customers. Tr. 32:23-24, 38:23-25. Dr. McAlvanah performed this analysis for both a five-year window and a three-year window to account for the different statutes of limitations for civil penalties and damages respectively. See FTC Ex. 3; FTC Ex. 4.

6. Starting with the five-year window, the defendants funded 1,499 deals between June 10, 2015, and June 10, 2020. See Tr. 43:23-24, 47:14-17.

7. From those 1,499 deals, Dr. McAlvanah drew a random sample of 87 deals. Tr. 44:2-3. Given the enormous amount of manual review that would have been required to analyze each of the 1,499 deals individually, see Tr. 102:10-24, the Court finds that it was appropriate to use a random sample. In addition, based on Dr. McAlvanah's testimony, the Court finds that a random sample of 87 deals was an adequate sample from which to draw statistically valid data that can be extrapolated to the entire population. Id. 44:14-17.[2]

---

[2] For the first time in his post-trial briefing, Mr. Braun argues that Dr. McAlvanah did not use an appropriately sized random sample to draw a conclusion with a 95% or a 99% confidence interval. Mr. Braun cites to mathematical formulas (with no explanation) in the footnotes of his post-trial brief and argues that the appropriate sample size was at least 385 deals (if a 95% confidence interval were used) and at least 664 deals (if a 99% confidence interval were used). See Def. Opening Post-Trial Br. ("Def. Opening Br.") at 4 & nn. 7-8, ECF No. 208. The Court declines to consider Mr. Braun's newly offered evidence regarding the sample size. Mr. Braun did not offer any evidence at trial suggesting the random sample was inadequate based upon the need to conduct a certain type of statistical test with a 95% or 99% confidence interval. And the Court was clear that it did not "want any additional evidence" on the issue of damages in the parties' post-trial briefing because "[t]he evidence was all submitted." Tr. 325:18-19. The Court only invited "any further argument that anyone wants to make." Tr. 325:17-18. Furthermore, even if the Court were to consider this evidence, it is not at all clear Mr. Braun's criticisms are valid for the type of statistical test that Dr. McAlvanah performed. Accordingly, the Court takes note that Mr. Braun failed to raise

8. Of those 87 deals, Dr. McAlvanah identified 23 deal in which the defendants over-collected from their customers. Tr. 47:4-6. Dr. McAlvanah thus concluded that the "the mostly likely over-collection rate in the population of 1,499" deals is 26.4%. Tr. 51:12-21, 53:3-5. See FTC Ex. 3. Dr. McAlvanah also concluded that "the upper limit of statistically reasonable values" is an over-collection rate of 37%. Tr. 53:8-9. See FTC Ex. 3. The Court credits these conclusions.[3]

9. The Court accordingly finds that the over-collection rate for the 1,499 deals funded between June 10, 2015 and June 10, 2020 is 26.4%, because that is the statistically most likely

---

any factual disputes regarding the random sample that Dr. McAlvanah employed.

[3] During cross examination, defense counsel implied that the Court should doubt all of Dr. McAlvanah's calculations because he did not personally derive the underlying data about which MCA agreements were underfunded or over-collected, and by how much, but instead relied upon information that was provided to him by the FTC. See Tr. 107:15-110:6. Defense counsel also implied that deals were included in the dataset from after Mr. Braun's alleged firing in December 2018 (of which Mr. Braun offered no affirmative evidence). See Tr. 110:7-112:7. However, Mr. Braun never provided any affirmative evidence that the FTC made any miscalculations. Furthermore, Ms. Elizabeth Kwok, an FTC investigator, provided credible testimony as to how the FTC derived the underlying data that was provided to Dr. McAlvanah and testified that the last deal included in the dataset was from November 2018 (well in advance of Mr. Braun's alleged firing). See Tr. 124:18-19, 170:20-174:1. In fact, the FTC conceded it was not seeking any damages for violations that occurred after November 2018. See Tr. 266:9-23. Accordingly, the Court finds that all of Dr. McAlvanah's calculations are accurate, and notes again that Mr. Braun has not provided any evidence to question the accuracy of Dr. McAlvanah's various calculations.

over-collection rate. Using the 37% over-collection rate, as the FTC has suggested, would be inappropriate because it is the most statistically unlikely percentage within the 95% confidence interval and there was no persuasive testimony indicating that it would be more reasonable to use the 37% over-collection rate instead of the more likely 26.4% over-collection rate. See FTC Ex. 3.

10.    Based on an over-collection rate of 26.4%, the Court finds that Mr. Braun and his co-defendants over-collected on 396 deals between June 10, 2015 and June 10, 2020.

11.    Turning to the three-year window on over-collection, Dr. McAlvanah found that 918 deals had at least one transaction between June 10, 2017 and June 10, 2020. See Tr. 54:10-56:9. The Court again credits this conclusion, and notes once more than Mr. Braun offered no contrary evidence.

12.    Dr. McAlvanah then winnowed down his original random sample of 87 deals to 52 deals that fell within the three-year window. Tr. 56:23-57:4. Based on the testimony of Dr. McAlvanah, the Court finds that this was an adequate and valid random sample. See Tr. 57:6-8.

13.    Of those 52 deals, Dr. McAlvanah identified 14 deal in which the defendants over-collected from their customers. Tr. 58:6-10. Dr. McAlvanah thus concluded that "the mostly likely guess f[or] what the over-collection rate is within th[e]

three-year population" of 918 deals is 26.9%. Tr. 58:10-15. See FTC Ex. 4. Dr. McAlvanah also concluded that 41% was the highest over-collection rate that was statistically reasonable based on the results of the random sample. See Tr. 64:24-65:2. Mr. Braun offered no evidence to suggest that the over-collection rate that Dr. McAlvanah calculated was inaccurate.

14.    The Court finds that the over-collection rate for the 918 deals funded between June 10, 2017 and June 10, 2020 is 26.9%, because that is the most statistically likely over-collection rate. See FTC Ex. 4. It would be inappropriate to use the 41% rate of over-collection, as the FTC suggests, for the same reasons that it would be inappropriate to use the 37% rate of over-collection for the deals funded within the five-year period.

15.    Using an over-collection rate of 26.9%, the Court finds that Mr. Braun and his co-defendants over-collected on 247 deals between June 10, 2017 and June 10, 2020.

16.    Dr. McAlvanah concluded that the mean over-collection amount was $9,397 for the deals funded between June 10, 2017 and June 10, 2020. Tr. 62:15-64:7. See FTC Ex. 6. Mr. Braun provided no evidence to suggest that the calculation of the mean over-collection rate was inaccurate. Accordingly, the Court finds that the mean over-collection amount was $9,397.

17.    Based on the Court's findings that Mr. Braun and his co-defendants over-collected an average of $9,397 on each of 247 deals, the Court finds that Mr. Braun and his co-defendants over-collected $2,321,059 from their customers between June 10, 2017 and June 10, 2020.

18.    Mr. Braun and his co-defendants also underfunded the MCA agreements and misrepresented the amount of money that customers would receive pursuant to the MCA agreements. Tr. 89:1-13. Mr. Braun knew of and participated in the scheme to deduct upfront fees and not pay the specified upfront lump sum amount. Tr. 91:19-21. Mr. Braun also had authority to control the underfunding of the MCA agreements. Tr. 92:7-10.

19.    Dr. McAlvanah also performed a statistical analysis to determine the number of times that Mr. Braun and his co-defendants underfunded their deals with consumers. Tr. 38:23-25, 67:1-5. Dr. McAlvanah similarly performed this analysis for a five-year period and a third-year period to account for the different statutes of limitations for civil penalties and damages. See FTC Ex. 7; FTC Ex. 8. The Court credits this analysis.

20.    For the five-year period in which the defendants funded 1,499 deals, Dr. McAlvanah used the same random sample of 87 deals that he used to determine the over-collection rate. See Tr. 43:23-24, 44:2-3, 47:14-17, 67:6-16. Of those 87 deals,

funding information was only available for 52 deals. Tr.
68:16-20. Dr. McAlvanah testified that 52 deals are still a
sufficient number of observations from which to draw a
statistically valid conclusion. Tr. 68:21-69:6. The Court
finds that testimony credible and accordingly finds that 52
deals were an adequate random sample.

21.     Of those 52 deals for which funding information was
available, Dr. McAlvanah identified 18 deals in which the
defendants underfunded the MCA Agreements. Tr. 70:11-17. Dr.
McAlvanah thus concluded that the "most likely" underfunding
rate for the 1,499 deals funded in the five-year period is
34.6%. Tr. 70:17-21, 71:22-24. See FTC Ex. 7. Dr. McAlvanah
also concluded that "the range of statistically likely values
for the underfunding rate" was 22.0% to 49.1%. Tr. 70:23-
71:3, 72:5-7. See FTC Ex. 7. The Court accepts these
conclusions, and notes that Mr. Braun provided no evidence to
suggest that the underfunding rate that Dr. McAlvanah
calculated was inaccurate.

22.     The Court thus finds that the underfunding rate for the
1,499 deals funded between June 10, 2015 and June 10, 2020 is
36.4%, because that is the most statistically likely
underfunding rate. There was no persuasive testimony
indicating it would be more appropriate to use either the
lower or higher end of statistically likely values for the

underfunding rate, as those rates are far less probable than the 36.4% underfunding rate. See FTC Ex. 7.

23. Based on an underfunding rate of 36.4%, the Court finds that Mr. Braun and his co-defendants underfunded approximately 546 deals between June 10, 2015 and June 10, 2020.

24. Now turning to the three-year window for underfunding, Dr. McAlvanah found that "[t]here were 768 deals . . . in which the first transaction occurred" between June 10, 2017, and June 10, 2020. See Tr. 72:8-73:15. The Court credits this conclusion.

25. Dr. McAlvanah then winnowed down his original random sample of 87 deals to 19 deals that fell within the three-year window for which funding information was available. Tr. 73:19-74:8. Dr. McAlvanah testified that 19 deals are a sufficient random sample from which to draw a statistically valid conclusion. Tr. 74:9-18. The Court finds this testimony credible and accordingly finds that 19 deals were an adequate random sample.

26. Of those 19 deals, Dr. McAlvanah identified 9 deals in which the defendants underfunded the MCA agreements. Tr. 75:4-6, 93:20-21. Dr. McAlvanah thus concluded that the "best estimate" of the rate of underfunding is 47.4%. Tr. 74:4-11, 93:21-25. See FTC Ex. 8. Dr. McAlvanah also concluded that

11

the range of statistically likely values for the underfunding rate is between 24.4% and 71.1%. <u>See</u> Tr. 93:25-94:4; FTC Ex. 8. Mr. Braun provided no evidence to suggest that Dr. McAlvanah inaccurately calculated the underfunding rate.

27.    The Court thus finds that the underfunding rate between June 10, 2017 and June 10, 2020, is 47.4%, because that is the most statistically likely underfunding rate. <u>See</u> FTC Ex. 8. There was no persuasive testimony indicating it would be more reasonable to use 71.1% as the underfunding rate, as the FTC suggests, when the 47.4% rate of underfunding is the most statistically likely underfunding rate.

28.    Using an underfunding rate of 47.4%, the Court finds that Mr. Braun and his co-defendants underfunded 364 deals between June 10, 2017 and June 10, 2020.

29.    Dr. McAlvanah concluded that the mean underfunding amount was $3,022 for the deals funded between June 10, 2017 and June 10, 2020. Tr. 96:6-97:22. <u>See</u> FTC Ex. 10. The Court credits this conclusion. Accordingly, the Court finds that the mean underfunding amount was $3,022.

30.    Based on the Court's findings that Mr. Braun and his co-defendants underfunded 364 deals by an average amount of $3,022, the Court finds that Mr. Braun and his co-defendants underfunded the MCA Agreements by $1,100,008 between June 10, 2017 and June 10, 2020.

31.    The evidence also shows that Mr. Braun not only personally participated in this illegal conduct, but did so gleefully, with little remorse. This is evidenced, for example, by numerous emails that Mr. Braun sent to Stone Funding.

32.    On March 30, 2017, Mr. Braun sent an email to Stone Funding, stating "it was 1.99 and i am in profit, i did 999 a day on 10k and cleared 13k already LOL." To which Stone Funding replied, "it's disgusting….you're ruining this guys business and you think it's funny." FTC Ex. 49-1.

33.    On May 24, 2017, Mr. Braun sent email to Stone Funding and Mr. Reich, stating "we also over collected 3,200 on the previous 5k deal – LOL." FTC Ex. 53-1.

34.    On November 16, 2017, Mr. Braun sent an email to Stone Funding, stating "LOL WE ARE OVER 10K ON RAM I SHUT IT OFF, AND INSTEAD OF REFUNDING HIM 10K, ILL GO TO CONTRACT FOR 10K – NET HIM 8K BUT HE OWES A NEW 15K IN 30 PAYMENTS – IM RUNNING RCG, VICEROY, AND RAM DEALS WITH THIS MORON LOL[.]" FTC Ex. 60-1.

35.    On February 12, 2018, Mr. Braun emailed Stone Funding that, "we actually are over paid by 6k – so i went to contract, for 10k – held back 2k in fees – and 2k 'refi' which he doesnt even owe – and sent his 6k – and lowered daily to 599 instead of 699 – lol[.]" Stone Funding then replied, "lol omg," to

13

which Mr. Braun boasted, "FREE RIDE LOL – try and make extra money with no risk lol." FTC Ex. 62-1.

36.   On March 27, 2018, Mr. Braun emailed Stone Funding, "lol dont worry we are 13k over paid on our last deal, its free spin." FTC Ex. 64-1.

37.   Mr. Braun's lack of remorse for his blatantly illegal conduct is also illustrated by his exchanges with Mr. Reich. In a conversation with Mr. Reich on April 26, 2017, Mr. Braun stated, "lets just leave on forever and over collect lol." FTC Ex. 50-9. Then, in a later conversation with Mr. Reich, on June 20, 2017, Mr. Braun professed "and i over collected 16k lol." FTC Ex. 54-7.

38.   On multiple occasions, Mr. Braun also evidenced complete disregard for how his actions would affect his customers (most of whom were small businesses).

39.   First, on July 20, 2017, when Mr. Braun received a forwarded email from a consumer explaining she was owed $11,913.30, Mr. Braun instructed that the consumer should be "ignore[d]." FTC Ex. 55-1.

40.   Second, in an email exchange with Stone Funding on November 22, 2017, Mr. Braun boasted, "Its ok, im gonna beat this bitch at his own game, they may be sneaky and shady, but they never thought theyd ever land on a slick mother fucker like me, ill rock his world." Mr. Braun then continued, "im

gonna get paid and make yet again another grown man cry." FTC Ex. 61-1.

41.     Third, in yet another email exchange with Stone Funding, on February 22, 2018, Mr. Braun explained, "i see your offers and then look at it clearer and figure out what type of shady shit i can pull off lo." FTC Ex. 63-1.

42.     Fourth, on March 30, 2018, Mr. Braun told Stone Funding that a deal "was signed at 4,999 then I changed it to 19,999 & 19,999 lol cause I smelled the opportunity it's extra 30k I gotta do what I gotta do." FTC Ex. 65-1.

43.     Fifth, in response to a forwarded request from a consumer for payoff letter on July 21, 2017, Mr. Braun told Mindy Stone and Mr. Reich, "UR NOT REQUESTING IT RIGHT, YOU FWD US THERE EMAILS LIKE WE GIVE A SHIT, ILL GET YOU PAY OFF LETTER, AND ADD SOME EXTRA TO IT CAUSE HES ANNOYING AS HELL." FTC Ex. 56-1.

44.     Sixth and finally, Mr. Reich recorded a video of Mr. Braun making grossly threatening comments to a borrower over the phone in order to intimidate the borrower from gaining information. Among other things, Mr. Braun threatened to send the consumer to jail and said he would spit on the consumer's "fucking face on visiting day" in prison. Mr. Braun told the consumer to drive his Honda "off a cliff" and that he hoped the consumer's wife would leave him. Throughout the call, Mr.

Braun also called the consumer a "fucking lowlife," a "loser," a "degenerate," and "a piece of shit." FTC Ex. 74.

45.     In its prior submissions and post-trial briefing, the FTC also attempted to show that the misconduct at issue in this case is only one part of Mr. Braun's longer history of similar misconduct. However, most of the evidence that the FTC put forward on this score is only of little or no relevance to the assessment of civil penalties.

46.     First, as the Court already indicated at the close of the trial, the Court will take judicial notice of the fact that Mr. Braun was convicted of conspiracy to commit money laundering in connection with a drug offense. See ECF No. 188-1; Tr. 326:1-18. However, because this conviction is for conduct that is different in kind from the conduct at issue in this case, the Court finds that it is of little relevance to the legal questions at issue in this case.

47.     Second, the FTC urges the Court to consider that Yellowstone Capital, to which Mr. Braun brokered business between 2013 and 2018, settled with the FTC for $9.8 million, after the FTC alleged it had engaged in similar underfunding and over-collecting on MCA agreements. See Compl., 20-cv-6023, ECF No. 1; Stipulated Order for Permanent Inj. and Monetary J., 20-cv-6023, ECF No. 44; FTC. Ex. 75 at 6:18-7:8. However, this lawsuit was not filed against Mr. Braun, there

is no evidence that Mr. Braun participated in the alleged wrongdoing, and the Stipulated Order that settled the lawsuit did not include an admission from Yellowstone Capital that it committed the alleged over-collecting and underfunding. See Stipulated Order for Permanent Inj. and Monetary J., 20-cv-6023, ¶ 3. Accordingly, the Court declines the FTC's invitation to find this settlement relevant to the present issues, as it does not establish that the alleged over-collecting and underfunding in that case was actually committed or that Mr. Braun was involved.[4]

48.      Third, the FTC urges the Court to consider complaints of similar misconduct filed by consumers against numerous corporate defendants (none of which are Mr. Braun or the corporate defendants in the present lawsuit). See ECF Nos. 188-5, 188-6, 188-7; FTC Ex. 75 at 4:13-7:6. However, these

---

[4] The FTC cites to two out of circuit district court cases for the proposition that it is appropriate to consider evidence of prior governmental actions that settled without an adjudication of wrongdoing in determining the appropriate amount of civil penalties. Setting aside the fact that neither of those cases are binding on this Court, those cases are also factually dissimilar because the prior settlements at issue there were with the same defendant that the FTC was then suing for civil penalties. See United States v. Cornerstone Wealth Corp., 549 F. Supp. 2d 811, 813-14, 822 (N.D. Tex. 2008); United States v. Dish Network LLC, 256 F. Supp. 3d 810, 978 (C.D. Ill. 2017), aff'd in part, vacated in part, remanded sub nom. United States v. Dish Network L.L.C., 954 F.3d 970 (7th Cir. 2020). By contrast, here the settlement was not with Mr. Braun and there is no evidence Mr. Braun was involved in Yellowstone Capital's illegal conduct. The cases are thus completely inapposite.

complaints provide no evidence that Mr. Braun actually engaged in any of the alleged misconduct.

49.     Fourth, the FTC urges the Court to consider that a New York State judge entered a preliminary injunction against Mr. Braun in a parallel state action for continuing to engage in misconduct after New York State filed suit. See ECF Nos. 188-3, 188-4. Although the Court will take judicial notice of this preliminary injunction, the Court does not see how the entrance of a preliminary injunction against Mr. Braun based on actions after 2020 is relevant to showing that Mr. Braun has a prior history of similar misconduct.

50.     On the issue of Mr. Braun's ability to pay a fine, Mr. Braun submitted with his post-trial briefing an affidavit claiming that his annual salary is $30,000, 15% of which he pays on a monthly basis to the Government, that he has "almost no financial assets," and that he has "no ability to pay the monetary damages and/or civil penalties" at issue in this case in part because this Court banned Mr. Braun from participating in debt collection activities for the rest of his life. Braun Decl., ¶¶ 4-5, 7, 9, ECF No. 208-1.

51.     Although the Court invited the parties to submit post-trial declarations or other evidence on the issue of Mr. Braun's ability to pay a fine, see Tr. 326:19-23, the Court does not find Mr. Braun's affidavit to be credible. Mr. Braun

18

had every opportunity to testify on his own behalf at trial.
Instead, Mr. Braun chose to waive even his appearance at his
own civil trial and then wait until after trial to submit a
self-serving declaration, with no corroborative evidence, to
plead his case. The Court cannot help but infer that Mr. Braun
chose this route to avoid being cross-examined by the FTC on
the veracity of the assertions he now makes in his
declaration. Furthermore, Mr. Reich's testimony that he was
"aware of Mr. Braun . . . placing money with others rather
than keeping it in his [own] name" makes the Court doubt the
relevance of the assertion that Mr. Braun personally has no
financial assets. See Tr. 223:17-19.[5] Accordingly, the Court
gives little to no weight to Mr. Braun's self-serving
assertion that he has no ability to pay a fine.

---

[5] In its post-trial briefing, the FTC urges the Court to find that
Richmond Capital (another name for defendant RCG, see Tr. 189:20-
22) wired $44 million to Kessef Capital, an entity affiliated with
Mr. Braun's family, and that $3 million of that money was then
wired to Mr. Braun's wife. The FTC seemingly ignores that the Court
excluded all of the exhibits relating to Kessef Capital because
the FTC never established a sufficient connection between that
evidence and Mr. Braun. See Tr. 248:23-249:21, 277:7-13. The FTC
cannot now attempt to backdoor that evidence into the record by
citing testimony about those excluded exhibits or by arguing the
exhibits are somehow magically admissible to impeach Mr. Braun's
newly submitted declaration when the FTC still has not shown a
sufficient connection between the transfers to Kessef Capital and
Mr. Braun. Accordingly, the Court will not consider any of that
evidence in making its determinations.

52.     The most that the Court can find on this score is that
there is ample evidence that Mr. Braun earned money from his
work at RCG and Ram. See, e.g., FTC Ex. 75 at 12:13-15 ("So
nobody is working for free. This is not let's like do the
world a big favor and work and for free voluntary work.").

## II. Conclusions of Law

For the reasons discussed below, the Court concludes that the
FTC is entitled to $3,421,067 for consumer redress and $16,956,000
in civil penalties for Mr. Braun's repeated violations of the GLB
Act.

### a. Consumer Redress

Under Section 19 of the FTC Act, the Court may award relief,
such as "the refund of money" or "the payment of damages," that it
"finds necessary to redress injury to consumers." 15 U.S.C.
§ 57b(b). For the reasons already explained in the Court's decision
on summary judgment, the FTC is entitled to seek monetary damages
under Section 19 of the FTC Act for Mr. Braun's violations of the
GLB Act that occurred between June 10, 2017 and June 10, 2020. See
9/27/23 Op. at 33-36; 15 U.S.C. § 57b(d).

The Court already laid out the relevant legal framework for
calculating consumer redress in its instructions of law to the
jury but repeats it here for the sake of clarity. The FTC can meet
its burden of proof to show the amount of monetary damages by

putting forward a reasonable estimate of the harm to borrowers. Once the FTC puts forward evidence of a reasonable estimate, the burden shifts to Mr. Braun to show why the FTC's reasonable estimate is inaccurate or unreasonable. As noted, much of what the FTC presented at trial on this issue was uncontested there by Mr. Braun.

Now, for the first time in his post-trial briefing, Mr. Braun argues that the FTC may not rely upon a reasonable estimate to show damages but must instead show the "precise amount of monetary harm" that Mr. Braun caused to specific consumers. Def. Opening Br. at 3-6; Def. Post-Trial Reply Br. ("Def. Reply Br.") at 1, 4, ECF No. 210.[6] For starters, this argument is waived because Mr.

---

[6] Mr. Braun also appears to repeatedly protest that the defendants' "total gross receipts" are the proper baseline for consumer redress under Section 19. See Def. Opening Br. at 3; Def. Reply Br. at 2. This argument is similarly waived because it was not presented as an objection at the charging conference. See Tr. 264:14-268:15. In addition, the Court is puzzled as to why Mr. Braun would advocate for this position, as it would result in a vastly higher consumer redress amount than what the FTC is currently seeking. Setting Mr. Braun's unclear motivations aside, he is also wrong on the law. The recovery of gross receipts serves as a baseline when the FTC seeks to rely upon a presumption of consumer reliance. See F.T.C. v. BlueHippo Funding, LLC, 762 F.3d 238, 244-45 (2d Cir. 2014). Here, the FTC expressly disclaimed its intent to rely on the presumption of consumer reliance because they were only seeking the amount that Mr. Braun and his co-defendants underfunded and over-collected, not the return of all the money that Mr. Braun and his co-defendants received from consumers pursuant to the MCA agreements. See Tr. 259:4-261:14; FTC Post-Trial Reply Br. at 3 n.2, ECF No. 209. Accordingly, there is no reason total gross receipts should serve as a baseline in this case, where the amount of underfunding and over-collecting is the best match for the consumer harm that needs to be redressed.

Braun did not raise it as an objection to the Court's instructions of law at the charging conference. See Tr. 264:14-268:15. It is accordingly not properly before the Court.

Worse yet for Mr. Braun, his argument is wrong on the merits. The Second Circuit's precedent is clear that there is "a two-step burden-shifting framework for calculating equitable monetary relief." FTC v. Moses, 913 F.3d 297, 310 (2d Cir. 2019).[7] And the first step of that burden-shifting framework is that "the FTC [must] show that its calculations *reasonably approximated* . . . the defendants' unjust gains." Id. (emphasis added). Mr. Braun has not provided a single, cogent reason as to why the Second Circuit's established framework for awarding equitable monetary relief in FTC actions should not apply here.

The closest Mr. Braun comes to providing a rationale for his position is that the failure to present evidence as to which specific consumers were harmed could result in some consumers receiving a windfall when the FTC distributes the monetary award under Section 19 to the effected consumers. That very well may pose an administrative hurdle when the FTC begins the process of distributing the monetary award to consumers; however, it is not an argument that undermines settled Second Circuit precedent that the FTC may rely on a reasonable approximation to determine the

---

[7] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

aggregate consumer harm that Mr. Braun's fraudulent conduct caused. To hold otherwise would make it incredibly difficult, if not effectively impossible, for the FTC to ever recover a monetary consumer redress award when there are hundreds of affected consumers. Cf. BlueHippo Funding, LLC, 762 F.3d at 244 ("To require proof of each individual consumer's reliance on a defendant's misrepresentations would be an onerous task with the potential to frustrate the purpose of the FTC's statutory mandate."); F.T.C. v. Sec. Rare Coin & Bullion Corp., 931 F.2d 1312, 1316 (8th Cir. 1991) ("This is not a private fraud action, but a government action brought to deter unfair and deceptive trade practices and obtain restitution on behalf of a large class of defrauded investors. It would be inconsistent with the statutory purpose for the court to require proof of subjective reliance by each individual consumer."). Accordingly, the Court declines Mr. Braun's invitation to deviate, without rhyme or reason, from settled Second Circuit precedent.

The Court now turns to the application of the burden-shifting framework to the facts of this case. The Court has already held that the defendants' misrepresentations regarding the amount that the defendants would collect and the amount consumers would receive violated the GLB Act. See 9/27/23 Op. at 27-30. Additionally, the Court already held that Mr. Braun can be held responsible for violations of the GLB Act that he personally committed and for

those violations of the GLB Act that his co-defendants committed. See id. at 30-32. The FTC's random sample evidence provides a reasonable approximation of the consumer harm caused by the misrepresentations that Mr. Braun is responsible for, as the amount that the defendants over-collected or underfunded the deals is a direct proxy for the injury caused by the misrepresentations that the defendants made regarding the amount of funding consumers would receive and the amount of money that the defendants would collect. Applying the three-year statute of limitations that is applicable to this part of the case, the FTC's evidence showed that Mr. Braun is responsible for underfunding 364 deals by an average of $3,022, which totals $1,100,008, and the FTC's evidence also showed that Mr. Braun is responsible for over-collecting on 247 deals by an average of $9,397, which totals $2,321,059.

Mr. Braun, for his part, put forward no evidence showing that the FTC's reasonable estimate was inaccurate or unreasonable. Setting aside Mr. Braun's ill-conceived attacks on Dr. McAlvanah's calculations (none of which the Court finds persuasive for the reasons explained in its factual findings), Mr. Braun's only other argument now appears to be that because the FTC did not identify individual consumers that were harmed and no individual consumers testified as to the harm they suffered, the FTC has not shown there was any consumer injury. See Def. Opening Br. at 3, 5. Mr. Braun completely misses the point. The FTC did provide evidence that

individual consumers were harmed; Dr. McAlvanah's calculations relied on a random sample of actual consumers some of whom were actually harmed by Mr. Braun's fraudulent and deceptive conduct.

Accordingly, the Court awards $3,421,067 to the FTC to redress the harm that Mr. Braun's misconduct caused to consumers. This, it may be noted, is just under the $3,500,000 figure that the jury recommended on this score.

### b. Civil Penalties

Under Section 5(m)(1)(A) of the FTC Act, the FTC may seek civil penalties "against any person . . . [who] violates any rule under this subchapter respecting unfair or deceptive acts or practices . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). A five-year statute of limitations applies to the FTC's recovery of civil penalties. 28 U.S.C. § 2462. The Court already held that the FTC may seek civil penalties for Mr. Braun's violations of the GLB Act. See 9/27/23 Op. at 40-41. In addition, the jury found that Mr. Braun acted with the requisite knowledge for the imposition of civil penalties. See Jury Verdict.

Since the FTC is entitled to civil penalties, the Court must now turn to calculating the appropriate amount to award as a civil penalty per violation. The statute instructs the Court to "take

into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require" when "determining the amount of such a civil penalty." 15 U.S.C. § 45(m)(1)(C).[8]

The Court first turns to the degree of Mr. Braun's culpability. The evidence established that Mr. Braun is highly culpable. Mr. Braun was in charge and used that authority to defraud consumers deliberately and knowingly by underfunding and over-collecting on MCA agreements. And this illegal conduct was not an isolated incident. The evidence showed that Mr. Braun and his co-defendants, over whom he exercised considerable control and authority, violated the GLB Act 942 times. This extensive misconduct is made all the more egregious by the fact that Mr. Braun boasted about his illegal conduct and treated it as a laughing matter, evidencing little remorse for his illegal conduct.

Mr. Braun attempts to downplay his culpability by arguing that he was merely an underwriter, his name was not on the relevant

---

[8] For the reasons explained on the record, the Court did not instruct the jury as to three of the statutory factors (prior misconduct, ability to pay, and effect on the ability to continue to do business). See Tr. 269:17-270:17. However, because the Court must make the final decision on the appropriate amount of civil penalties, the Court will consider all five statutory factors in making its decision.

documents, and there was no evidence that he defrauded specific consumers. Mr. Braun posits at the very least that he is no more culpable than his co-defendants, who settled this matter with the FTC for less than the amount the FTC is currently seeking against Mr. Braun. Def. Opening Br. at 6-7; Def. Reply Br. at 7-8. Mr. Braun's arguments fly in the face of the undisputed facts that the Court found on summary judgment, which were binding at trial and on Mr. Braun. Regardless of whether Mr. Braun's name was on the relevant documents, the undisputed evidence establishes beyond question that Mr. Braun exercised considerable control over all the co-defendants, exercised authority over the over-collecting and underfunding of MCA agreements, and was an owner, manager, and officer of RCG. The fact that the FTC did not name specific consumers that Mr. Braun defrauded is beside the point, as the evidence at trial established that Mr. Braun and his co-defendants violated the GLB Act a whopping 942 times. The Court thus concludes that Mr. Braun is highly culpable and that this factor favors the imposition of a very substantial civil penalty amount.

Second, the Court will consider Mr. Braun's history of prior misconduct. The statute instructs that the Court must consider "any history of prior *such* conduct." 15 U.S.C. § 45(m)(1)(C) (emphasis added). The Court understands this statutory phrase to only require the Court to consider Mr. Braun's history of committing similar violations to those at issue in this case,

27

rather than sweeping in any prior, unrelated illegal conduct by Mr. Braun. Accordingly, Mr. Braun's conviction for money laundering is of little to no relevance in assessing the appropriate civil penalty amount. Furthermore, the evidence that the FTC attempted to put forward of Mr. Braun's prior history of over-collecting and underfunding MCA agreements was of no probative value. The settlement and complaints that the FTC pointed to resulted in no admission of wrongdoing and were against defendants other than Mr. Braun, with no indication that Mr. Braun was involved in the wrongdoing alleged against those defendants. And the preliminary injunction in New York State case was based on conduct that occurred after 2020 and the same conduct that is at issue in this case, which does not establish a prior history of similar misconduct. Accordingly, the second factor does not militate in favor of imposing an even higher civil penalty beyond that warranted by Mr. Braun's egregious misconduct in this case.

Third, the Court will consider Mr. Braun's ability to pay. Despite Mr. Braun's extensive involvement in underfunding and over-collecting on MCA agreements in this case, it is not clear how much money Mr. Braun personally derived from his illegal conduct or if he has the financial wherewithal to withstand a large monetary judgment in this case. Mr. Braun's affidavit, proclaiming his inability to pay a fine, is not credible, but the FTC has put forward very little evidence that Mr. Braun secreted his assets to

other individuals to judgment-proof himself, other than vague testimony from Mr. Reich. However, the evidence does support finding that Mr. Braun was not working for free and must have at least earned substantial money from his work on the MCA agreements at issue in this case. Accordingly, the Court finds that the third factor is neutral in its analysis of the appropriate civil penalty amount to award.

Fourth, the Court will consider the impact of any civil penalty on Mr. Braun's ability to continue to do business. Because the Court's previously entered permanent injunction banned Mr. Braun from participating in the merchant cash advance industry or debt collection activities for the rest of his life, see Order for Permanent Inj. as to Def. Jonathan Braun at 5-6, a civil penalty will have no impact on Mr. Braun's ability to continue his business in the merchant cash advance industry. The Court thus finds the fourth factor is neutral in its analysis of the appropriate civil penalty amount to award.

Fifth, the Court will consider any "other matters" it finds that "justice may require." 15 U.S.C. § 45(m)(1)(C). The Court finds that it must consider the utter disregard and contempt that Mr. Braun showed for consumers. The evidence showed that Mr. Braun blatantly ignored or disregarded consumer complaints and spewed vile threats and profanities when a consumer was purportedly unable to pay his debts. Mr. Braun's conduct toward consumers was

completely out of bounds and inappropriate. Mr. Braun's treatment of consumers thus favors imposing a higher civil penalty amount per violation.

Based upon the Court's analysis of the foregoing factors, the Court concludes that a civil penalty of $18,000 per violation is warranted.[9] This civil penalty amount best reflects the seriousness of Mr. Braun's extensive misconduct. As the Court already held at summary judgment, Mr. Braun is responsible for violations of the GLB Act that he personally committed and for those violations of the GLB Act that his co-defendants committed. See 9/27/23 Op. at 30-32. The evidence thus shows that Mr. Braun violated the GLB Act 942 times (by over-collecting on 396 deals and underfunding 546 deals) within the statute of limitations period (June 10, 2015 to June 20, 2020). Accordingly, the FTC is entitled to a civil penalty award of $16,956,000.[10]

---

[9] At the time that the advisory jury rendered its verdict, the maximum civil penalty per violation was $50,120. That same day, however, the FTC promulgated a final rule that increased the maximum civil penalty amount to $51,744. See 89 Fed. Reg. 1445, 1446 (Jan. 10, 2024). Now, the FTC urges this Court to consider $51,744 as the maximum civil penalty amount per violation, while Mr. Braun argues that the Court should use $50,120 as the maximum civil penalty amount per violation "in the interest of justice." Def. Reply Br. at 5. The Court need not decide the maximum civil penalty amount that applies here, as the Court would find that $18,000 per violation is the appropriate civil penalty amount regardless of whether the maximum civil penalty per violation is $50,120 or $51,744.

[10] The Court, of course, is in no way bound by the jury's advisory recommendation that the FTC was entitled to $7,500,000 in civil

III. <u>Conclusion</u>

For the foregoing reasons, the Court hereby enters Final Judgment as follows:

1. Judgment in the amount of THREE MILLION, FOUR HUNDRED AND TWENTY-ONE THOUSAND, AND SIXTY-SEVEN Dollars ($3,421,067) is entered in favor of the FTC against defendant Jonathan Braun, with post-judgment interest at the legal rate, as monetary relief pursuant to Section 19 of the FTC Act, 15 U.S.C. § 57b, for defendant Jonathan Braun's violation of Section 521 of the GLB Act. This judgment is joint and several with (1) the judgment entered in this case against defendants RAM Capital Funding LLC and Tzvi Reich on January 8, 2022 (ECF No. 102) and (2) the judgment entered in this case against defendants RCG Advances, LLC and Robert Giardina on June 2, 2022 (ECF No. 127).

2. The judgment entered in Section 1 of this Judgment is enforceable against any asset, real or personal, whether located within the United States or outside the United

---

penalties. The Court finds that the jury's civil penalties award did not adequately reflect the egregiousness and deliberateness of Mr. Braun's extensive misconduct. To be frank, the Court believes the jury's relatively low civil penalty award resulted from the FTC's frequent inability to present the evidence to the jury in a non-confusing manner, for which the Court critiqued the FTC at trial outside the presence of the jury. <u>See</u> Tr. 217:4-15.

States, owned jointly or singly by, on behalf of, for the benefit of, in trust by or for, or as a deposit for future goods or services to be provided to, defendant Jonathan Braun, whether held as tenants in common, joint tenants with or without the right of survivorship, tenants by the entirety, and/or community property.

3. In partial satisfaction of the judgment against defendant Jonathan Braun entered in Section 1, any financial or brokerage institution, escrow agent, title company, commodity trading company, business entity, or person, whether located within the United States or outside the United States, that holds, controls, or maintains accounts or assets of, on behalf of, or for the benefit of, defendant Jonathan Braun, whether real or personal, whether located within the United States or outside the United States, shall, within ten (10) business days from receipt of a copy of this Judgment, turn over such account or assets to the FTC or its designated agent.

4. Judgment in the amount of SIXTEEN MILLION, NINE HUNDRED AND FIFTY-SIX THOUSAND dollars ($16,956,000) is entered in favor of the FTC against defendant Jonathan Braun, with post-judgment interest at the legal rate, as a civil penalty pursuant to Section 5(m)(1)(A) of the FTC Act,

15 U.S.C. § 45(m)(1)(A), for defendant Jonathan Braun's violations of Section 521 of the GLB Act.

5. The judgment entered in Section 4 of this Judgment is enforceable against any asset, real or personal, whether located within the United States or outside the United States, owned jointly or singly by, on behalf of, for the benefit of, in trust by or for, or as a deposit for future goods or services to be provided to, defendant Jonathan Braun, whether held as tenants in common, joint tenants with or without the right of survivorship, tenants by the entirety, and/or community property.

6. In partial satisfaction of the judgment against defendant Jonathan Braun entered in Section 4, any financial or brokerage institution, escrow agent, title company, commodity trading company, business entity, or person, whether located within the United States or outside the United States, that holds, controls, or maintains accounts or assets of, on behalf of, or for the benefit of, defendant Jonathan Braun, whether real or personal, whether located within the United States or outside the United States, shall, within ten (10) business days from receipt of a copy of this Judgment, turn over such account or asset to the FTC or its designated agent.

7. Defendant Jonathan Braun relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

8. All money received by the FTC pursuant to Sections 2 and 3 of this Judgment may be deposited into a fund administrated by the FTC or its designee to be used for consumer relief, such as redress and any attendant expenses for the administration of any redress fund. If a representative of the FTC decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, such money shall be deemed in payment of the civil penalty judgment entered in Section 4 of this Judgment and deposited to the U.S. Treasury.[11] Further, any money received by the FTC pursuant to Sections 5 or 6 of this Judgment shall be deposited to the U.S. Treasury. Defendant Jonathan Braun has no right to challenge any actions the FTC or its representatives may take pursuant to this provision.

---

[11] While a standard provision of this nature has been the subject of some controversy, see FTC v. Consumer Def., LLC, No. 2:18-CV-30, 2022 WL 18106047, at *3-*4 (D. Nev. Dec. 30, 2022); F.T.C. v. Figgie Int'l, Inc., 994 F.2d 595, 607-08 (9th Cir. 1993), in this case, no objection to this provision has been raised by defense counsel.

9. This Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of these provisions.

The Court directs the Clerk of the Court to enter this Judgment and to close the case.

SO ORDERED.

Dated:     New York, NY

           February 6, 2024         _____
                                    JED S. RAKOFF, U.S.D.J.